# In The Matter Of:

*TERESA HOOKS, ET AL. vs.*
*CHRISTOPHER BREWER, ET AL.*

---

*TIM BURRIS*
*October 5, 2016*

---

*HAWTHORNE & WEBB COURT REPORTING*
*149 RIVER HILLS LANE*
*MACON, GEORGIA  31211*

Original File TIM BURRIS.prn
**Word Index included with this Min-U-Script®**

Case 3:16-cv-00023-DHB-BKE   Document 83-1   Filed 05/25/17   Page 2 of 28

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

---

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERESA POPE HOOKS,          :
Individually and ESTATE
OF DAVID HOOKS, by          :
Teresa Pope Hooks,
Administratrix,             :

    PLAINTIFFS,            :     CASE NO.
                         3:16CV00023-DHB-BKE
    VS.                    :

CHRISTOPHER BREWER, ET AL.,  :

    DEFENDANTS.            :

OCTOBER 5, 2016      DUBLIN, GEORGIA      11:55 A.M.

    Deposition of TIM BURRIS, called before Laura M.
Jackson, Certified Court Reporter, State of Georgia,
Certificate No. B-959, testimony taken at the Laurens County
Courthouse, Dublin, Georgia, beginning at approximately 11:55
a.m., on October 5, 2016.

---

NOW OFFERING VIDEO CONFERENCING

HAWTHORNE & WEBB COURT REPORTING
149 RIVER HILLS LANE
MACON, GEORGIA 31211
PHONE:  478.746.2295
LAURA@HAWTHORNE-WEBB.COM

---

Page 2

APPEARANCES:

FOR THE PLAINTIFFS:      MR. G. BRIAN SPEARS
                        G. Brian Spears, PC
                        1126 Ponce de Leon Avenue N.E.
                        Atlanta, Georgia  30306
                        bspears@mindspring.com

                        MR. MITCHELL M. SHOOK
                        Salter, Shook & Tippett
                        Post Office Drawer 300
                        Vidalia, Georgia  30475
                        mitchshook@vidalialaw.com

FOR THE DEFENDANT:       MR. TIMOTHY J. BUCKLEY, III
                        Buckley Christopher
                        Suite 1010
                        2970 Clairmont Road N.E.
                        Atlanta, Georgia  30329
                        tbuckley@bchlawpc.com

ALSO PRESENT:            MS. TERESA HOOKS

REPORTER'S NOTE:         Witness RESERVES reading and
                        signing of the document.

INDEX

CROSS EXAMINATION                    5
BY MR. SPEARS

DIRECT EXAMINATION                  71
BY MR. BUCKLEY

RECROSS EXAMINATION                 72
BY MR. SPEARS

---

Page 3

EXHIBITS

| EXHIBIT NO. & DESCRIPTION | PAGE |
| --- | --- |
| PLAINTIFF'S EXHIBIT NO. 31<br>PHOTO OF AVIATOR REAR | 26 |
| PLAINTIFF'S EXHIBIT NO. 32<br>PHOTO OF AVIATOR INTERIOR | 26 |
| PLAINTIFF'S EXHIBIT NO. 33<br>PHOTO OF LOCK BOX | 26 |
| PLAINTIFF'S EXHIBIT NO. 34<br>CD | 44 |
| PLAINTIFF'S EXHIBIT NO. 35<br>OPERATIONS PLAN, 10/22/2009 | 48 |
| PLAINTIFF'S EXHIBIT NO. 36<br>INVESTIGATOR'S NARRATIVE | 50 |
| PLAINTIFF'S EXHIBIT NO. 37<br>FRAZIER'S CRIMINAL HISTORY | 58 |
| PLAINTIFF'S EXHIBIT NO. 38<br>GCIC ARREST RECORD, FRAZIER | 58 |
| PLAINTIFF'S EXHIBIT NO. 39<br>FRAZIER'S PHOTO | 58 |
| PLAINTIFF'S EXHIBIT NO. 40<br>SUMMARY OF CONTROLLED PURCHASES | 57 |
| PLAINTIFF'S EXHIBIT NO. 41<br>INVESTIGATOR'S NARRATIVE BY BREWER | 67 |
| PLAINTIFF'S EXHIBIT NO. 42<br>NOTICE OF SEIZURE - FRAZIER HOME | 57 |
| PLAINTIFF'S EXHIBIT NO. 43<br>SEARCH WARRANT AND AFFIDAVIT | 55 |

---

Page 4

**STIPULATIONS:**

[1]

[2]     **MR. SPEARS:** This will be the deposition of MR. TIM

[3] BURRIS and it's taken pursuant to notice and agreement

[4] of counsel.  The witness has reserved signature.

[5]     We'll conduct this deposition with the same

[6] stipulations as the ones previously having to do with

[7] the form of the question and the responsiveness of the

[8] answer.  Any other preliminaries, Tim?

[9]     **MR. BUCKLEY:** No.  Thanks.

[10]     **MR. SPEARS:** Mr. Burris, I'm Brian Spears.  I'll be

[11] asking you a number of questions today.  I don't know

[12] whether you've had other experience with depositions as

[13] a format of being asked questions and giving answers.

[14] But, long story short, in a sense it's like in court

[15] because everything I ask you and then all of your

[16] responses are taken down.

[17]     One difference is that you're -- as a witness in a

[18] deposition you're given the opportunity to take a look

[19] at the deposition once it's transcribed.  So you'll have

[20] an opportunity to do that in the wake of the deposition.

[21]     We obviously are less formal than when we're in

[22] court.  As a witness and technically, well, you're not

[23] the person being quote/unquote "tried" and so it's not

[24] like you have a specific attorney representing you.

[25] Obviously, Mr. Buckley will say something if he thinks a

---

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 5

[1] question has a form or responsiveness type of objection
[2] that he needs to make, and that's fine.  But in general,
[3] we'll be just kind of plowing ahead.
[4]        If you could, let me know if there comes a point
[5] where I've asked you something and you either didn't
[6] hear it or you really don't understand what I've asked,
[7] could you please let me know?  Because that's how we can
[8] be certain that once you respond that can be your, you
[9] know, your answer and not some kind of a
[10] miscommunication between us.
[11] _____
[12]        TIM BURRIS
[13]        Witness having been first
[14]        duly sworn, testified on
[15]        **CROSS EXAMINATION**
[16]        **BY MR. SPEARS:**
[17] Q   Please state your full name.
[18] A   **Timothy Burris.**
[19] Q   And how are you employed at present?
[20] A   **I currently am a private investigator for my own**
[21] **company.**
[22] Q   And how long have you been self-employed?
[23] A   **Since January of 2014.**
[24] Q   And --
[25] A   **January of 2015.  I'm sorry.**

Page 6

[1] Q   Okay.  That's fine.  And if anything else, either
[2] big or small comes up, and you want to correct a response,
[3] please let us know.  Because obviously what brings us here is
[4] an incident and series of events that occurred culminating in
[5] September of 2014.
[6] A   **Uh-huh, (affirmative).**
[7] Q   So, let's see, do you have any employees?
[8] A   **No, just me.**
[9] Q   Okay and where do you work out of?
[10] A   **My office.**
[11] Q   And what town is that in?
[12] A   **Dudley, Georgia.**
[13] Q   Okay.  Had you been in investigative work before
[14] then in the kind of private sector?
[15] A   **Not in the private sector, no.**
[16] Q   You have a PI's license and all that?
[17] A   **I do.**
[18] Q   When did you get your PI license?
[19] A   **The beginning of 2015.  I think it was official in**
[20] **March.  From like January to March, I was working some cases**
[21] **for a private investigator out of Milledgeville under his**
[22] **license as an employee of his and --**
[23] Q   Sure.
[24] A   **-- my license was official in March and that's when**
[25] **my company officially began.**

Page 7

[1] Q   Do you have a name for your company?
[2] A   **Middle Georgia Investigations.**
[3] Q   And the name of the other company or other person
[4] you worked for --
[5] A   **Mike Wagner Investigations.**
[6] Q   Previously, you worked for the Laurens County
[7] Sheriff's Department?
[8] A   **Yes, sir.**
[9] Q   Can you give us an approximate start and end time
[10] for them?
[11] A   **May of 2000 was my start month and my end month was**
[12] **December, 2014.**
[13] Q   During that period of time, did you ever serve on
[14] the SRT?
[15] A   **SRT?  No, I did not.**
[16] Q   Okay.  Through that period of time, that number of
[17] years, you worked with Investigations?
[18] A   **I was never on General Investigations.  I was with**
[19] **the Drug Unit, which is an investigative unit.**
[20] Q   Okay.  How many years did you work with the Drug
[21] Investigative Unit?
[22] A   **Approximately nine.  I believe I went over there in**
[23] **2005 -- to the Drug Unit.  I transferred in 2005 to 2014.**
[24] Q   I just want to have the nomenclature down right.
[25] Is it called the Drug Unit?

Page 8

[1] A   **Yes.**
[2] Q   Okay.
[3] A   **Well, I call it the Drug Unit.  I don't know what**
[4] **is on paper, now.**
[5] Q   Okay.
[6] A   **Some people will call it the Task Force or the, you**
[7] **know, whatever.  The GBI, technically, I think they use the**
[8] **word Task Force.  I've always called it the Drug Unit and I**
[9] **believe that's what the majority of us call it.  Now, what it**
[10] **is on paper, I'm not sure.**
[11] Q   Okay.  Since you used the phrase Task Force, I want
[12] to be certain I understand how this unit that you worked with
[13] operated.  I know that in some counties there'll be a
[14] multi --
[15] A   **Right.**
[16] Q   -- jurisdictional type of unit that comes together
[17] --
[18] A   **Right.**
[19] Q   -- municipality along with county, that sort of
[20] thing?
[21] A   **Right.**
[22] Q   The drug unit that you worked with, was it
[23] exclusive to Laurens County?
[24] A   **Exclusive to Laurens County, under the Laurens**
[25] **County Sheriff's Department.**

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 9

[1] Q   Over the course of your work with the Drug Unit,
[2] you worked a case involving a Jeff Frazier.  Correct?
[3] A   I did.
[4] Q   Okay.  That culminated in his arrest, if I'm not
[5] Mistaken, in October of 2009?
[6] A   That sounds right.
[7] Q   Okay.  And that was a case where -- and please,
[8] know we've been getting some number of documents and I'll
[9] show you some of those as we go along --
[10] A   Right.
[11] Q   -- but over the course of time you worked, you
[12] prepared an operational plan and an investigator summary,
[13] that type thing, in connection with Frazier case.  Correct?
[14] A   Yes.
[15] Q   In a manner of speaking, were you the main member
[16] of the Drug Unit who worked that case?
[17] A   Yes.  I was the case agent on the Frazier case.
[18] Q   All right.  And Chris Brewer was your supervisor?
[19] A   Yes.
[20] Q   In connection with the Garrett case, the Rodney
[21] Garrett case --
[22] A   Uh-huh, (affirmative)
[23] Q   -- prior to the afternoon of -- I'll give you a
[24] specific date and let's see if it squares with what you
[25] remember.  Prior to the afternoon of September 24th of 2014,

Page 10

[1] had you ever worked any case that involved Rodney Garrett?
[2] A   Not to my knowledge.
[3] Q   Okay.  And for purposes of my question now, I'll
[4] just explain it this way.  When I refer to September 24th, I
[5] refer to that as the date on which Garrett gets arrested for
[6] the theft associated with the Hooks' home --
[7] A   Right.
[8] Q   -- and then things get set in motion.  Is that --
[9] even if you don't remember the exact date, does that square,
[10] generally?
[11] A   Yes.  Yes, I think so.
[12] Q   In getting oriented towards this deposition, have
[13] you been able to get a sense of what we've covered with
[14] Chris Brewer already?
[15] A   I don't understand what you're asking.
[16] Q   Well, we've taken his deposition --
[17] A   Right.
[18] Q   -- and taken the deposition of other deputies and
[19] like.
[20] A   Right.
[21] Q   I just want to get a sense of what -- what's your
[22] sense of what we've covered already and --
[23] A   I don't know.  I haven't, I mean, I haven't spoken
[24] to any of them.  I'm not working there.  I don't know.
[25] You're asking me what y'all have covered as far as

Page 11

[1] depositions with the other people y'all have deposed
[2] already?
[3] Q   In a manner of speaking.
[4] A   Oh, I don't have a clue.
[5] Q   Okay.  Have you been able to look over any of the
[6] materials that you prepared in connection with Jeff Frazier
[7] and the investigation that pertained to him in advance of
[8] today's deposition?
[9] A   Very briefly and that was probably a month ago, or
[10] so, and it was just a matter of moments.  Just a few minutes.
[11] I was -- right before the -- this thing was scheduled about a
[12] month or so ago, sometime.
[13] Q   Yes, sir.
[14] A   I got the paperwork, some of the reports at that
[15] time, and looked through them briefly and was going to, that
[16] morning, get a little more intimate with it and then I got
[17] the call saying it wasn't going to happen.  And since then
[18] I've been wide open.  I haven't had a chance to stop and read
[19] through stuff.  I was -- I worked -- matter of fact, I was
[20] out a lot last night.
[21] Q   Okay.
[22] A   So, was trying to get to sleep this morning but my
[23] phone kept ringing.
[24] Q   We'll try to keep moving along.
[25] A   Yeah, that's fine with me.

Page 12

[1] Q   Did you take a look at the summary that was
[2] prepared by Special Agent Giddens or any of the other GBI
[3] persons who interviewed you?
[4] A   I did.  I did.  I did briefly read through those.
[5] It was Giddens and --
[6] Q   Jones.  I think was the other name.
[7] A   Jerry.
[8] Q   Right.
[9] A   Jerry.
[10] Q   I think -- I thought Jones is his last name.
[11] A   That don't sound right.
[12] Q   Okay.  Well, what's important is what you're
[13] telling us today on this incident.
[14] A   Right.  I briefly read through those, yes.
[15] Q   Okay.  And did you have a chance to look at any of
[16] the photographs taken during --
[17] A   No.
[18] Q   -- this search of Garrett?  Well, the -- I keep
[19] wanting to say Aviator -- the Navigator?
[20]     MR. SHOOK: Aviator.
[21] Q   MR. SPEARS: Aviator?  Okay.  The Lincoln that
[22] Garrett stole.
[23] A   The photographs?  I haven't looked -- I haven't
[24] seen any photographs.
[25] Q   Okay.  Listen to any of the recordings of

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 13

[1] interviews? That type thing?
[2] **A No.**
[3] Q I'll have some of those that I may need to refer to
[4] them and possibly play some of it for you, just to get a feel
[5] for it.
[6] **A Okay.**
[7] Q Chris Brewer is, unless I'm mistaken, he was
[8] already with the Drug Unit when you joined --
[9] **A Uh-huh, (affirmative).**
[10] Q -- when, I think you said 2004-2005?
[11] **A In '05, I think. Yeah, he had been in the Drug**
[12] **Unit -- he had been on the Drug Unit for a long time. I**
[13] **think he had been on it since, like, '99 or something.**
[14] Q Okay.
[15] **A When I started at the sheriff's office, he was on**
[16] **the Drug Unit. He was -- by the time I come over, he was**
[17] **already the supervisor and remained the supervisor until, I**
[18] **assume, now.**
[19] Q Have you ever had -- before September 24th of 2014,
[20] had you, personally, ever had any contact with David Hooks?
[21] **A No.**
[22] Q Had you ever been to his house?
[23] **A I remember going out to his house one time for**
[24] **something but I do not remember what it was for. I'm**
[25] **thinking, I think we were looking for something else at the**

Page 14

[1] **time and somebody else. I do not remember. I don't -- it**
[2] **wasn't to deal specifically with him, I don't believe**
[3] **because I would have -- you know, when all this started**
[4] **coming up on the night in question, I would have remembered**
[5] **his name. I think we were looking for -- I want to say it**
[6] maybe had to do with somebody that owns that property across
[7] **the pond, or something. I don't even know who owns it at**
[8] **this time. And that may not be correct but, so, no.**
[9] Q Okay. So prior to September 24th, 2014, had you
[10] ever, to the best of your knowledge, have any information
[11] come to you specific as to David Hooks and any relationship
[12] between him and Rodney Garrett?
[13] **A Prior to the Frazier case is what you're asking?**
[14] Q Well, actually, my question was referencing
[15] September, 2014. And so you're welcome to answer by saying
[16] --
[17] **A I got information on Mr. Hooks --**
[18] Q Okay.
[19] **A -- during the Frazier case.**
[20] Q All right.
[21] **A And to my knowledge, that was the first time I**
[22] **received information on Mr. Hooks.**
[23] Q Other than from Frazier, did you, yourself, ever
[24] speak to anyone who claimed, based on their own experience,
[25] that they knew of David Hooks being involved in either

Page 15

[1] purchasing or selling drugs?
[2] **A Not that I remember.**
[3] Q Okay. And Frazier, in a sort of capsulize it, as I
[4] understand it, Frazier's claim was that he was bringing meth
[5] back from Atlanta and giving, I think his phrase was, "some
[6] ounces" to David Hooks?
[7] **A Yeah. Yes.**
[8] Q Jeff Frazier never, as you can recall, never
[9] informed you that David Hooks, himself, had ever given any
[10] meth to any third party. Had he?
[11] **A Not that I remember.**
[12] Q And Frazier never informed you that David Hooks had
[13] ever sold any drug to anybody?
[14] **A I don't remember the specifics of the date but I**
[15] **don't specifically remember that part.**
[16] Q Okay. And again, the sense I have is that once
[17] Frazier's in custody, once he's been arrested in October of
[18] 2009, he starts talking about "There's this guy, there's that
[19] guy." He's giving you names. Some people who he's claiming,
[20] "I give -- I distribute meth to these folks."
[21] **A Yep.**
[22] Q Right. And one of the names he mentions is David
[23] Hooks?
[24] **A Right.**
[25] Q But other than saying that he gives dope to David

Page 16

[1] Hooks, he doesn't give you any dates of actual delivery, does
[2] he?
[3] **A Not that I remember. No.**
[4] Q And he doesn't give you any dates of alleged sales
[5] by David Hooks to other people, does he?
[6] **A I don't think so.**
[7] Q He doesn't give you any location at which he,
[8] meaning Jeff Frazier, has been the location where he provided
[9] to David Hooks any meth. Right?
[10] **A Not that I remember.**
[11] Q It's just the generalized statement. "I bring
[12] ounces back to David Hooks." Something along those lines?
[13] **A Right.**
[14] MR. BUCKLEY: Object to the form of the question.
[15] MR. SPEARS: So in terms of David Hooks being a
[16] distributor of meth and you investigating Frazier, Frazier's
[17] information is to the effect that he has delivered meth to
[18] Hooks, but unless there's more I need to hear from you,
[19] Frazier's never reporting to you that Hooks has been involved
[20] in distribution. Is he?
[21] MR. BUCKLEY: Same objection. You may answer.
[22] **A THE WITNESS: I don't remember no specifics of that**
[23] **being said. No.**
[24] Q Frazier had been the subject of controlled buys
[25] from Frazier to a certain subject or a person. I don't know

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 17

[1] the person's name in the reports.  It just says "Subject #1."
[2] **A  Right.**
[3] Q  Do you recall that those controlled buys occurred
[4] over the course of nearly two months?  Beginning in August
[5] until sometime in October?
[6] **A  I know there was a duration there.  Yes.**
[7] Q  In upwards of eight or nine purchases?
[8] **A  Right.  There were several.**
[9] Q  Yeah.  I mean, he was a pretty busy boy.
[10] **A  Yeah.  A little more than normal.**
[11] Q  Right.
[12] **A  Right.**
[13] Q  And before those controlled buys, there's Subject
[14] #1 who's -- he had some controlled money, if that's the right
[15] term.  He's making purchases and then he's returning to you
[16] and the other investigators with the dope that he's bought?
[17] **A  Yes.**
[18] Q  During that period of time, of course the Subject
[19] #1 is closely monitored because Subject #1 is the person
[20] you're using to meet this guy, do the controlled buy, return
[21] to you, and that's a very carefully controlled process.
[22] Correct?
[23] **A  Correct.**
[24] Q  During the course of any activity that you -- and
[25] back up for just a moment.  In terms of contact with this

Page 18

[1] Subject #1, you and Chris Brewer, fair to say you're the main
[2] persons with the Drug Unit dealing with Subject #1?
[3] **A  I know I was.  I don't know if Brewer or another**
[4] **agent was with me during the majority of the buys.  I don't**
[5] **remember.**
[6] Q  Okay.  Well, we can -- I'll try to touch on that in
[7] a bit.  But you're the main person in contact with Subject
[8] #1?
[9] **A  Yes.**
[10] Q  During the course of the investigation that
[11] pertained to Jeff Frazier and your contact with Subject #1,
[12] did Subject #1 ever report to you that David Hooks had had
[13] any contact whatsoever with Jeff Frazier?
[14] **A  Not that I remember.**
[15] Q  Okay.  During the course of the investigation of
[16] Frazier, the controlled buys were monitored and recorded,
[17] were they not?
[18] **A  Yes.**
[19] Q  And my next question to you related is, during the
[20] course of any of the recordings made that had to do with the
[21] controlled buys by Subject #1 from Frazier, over that span of
[22] time, was there ever any mention of David Hooks by Jeff
[23] Frazier?
[24] **A  Not once.**
[25] Q  Insofar as the Jeff Frazier investigation goes

Page 19

[1] then, it is the case, is it not, that there was nothing
[2] uncovered during the course of the investigation of Jeff
[3] Frazier prior to his arrest that signaled or indicated or in
[4] any way suggested that David Hooks had anything to do with
[5] Jeff Frazier?
[6] **A  No.**
[7] Q  Once the name David Hooks was mentioned by Jeff
[8] Frazier, once Frazier's now arrested in October of 2009, can
[9] you tell me what steps were undertaken to investigate David
[10] Hooks by yourself or any other member of the Drug Unit?
[11] **A  I cannot.  I doubt we did absolutely nothing.  I**
[12] **mean, but I do not remember what was done at that time or by**
[13] **whom.  I do not recall.**
[14] Q  Was there a -- are you aware of there having been
[15] -- let me back up a second and ask it this way.  I don't know
[16] whether to use the example of Frazier or not, but let me just
[17] go at it this way.  When you as an investigator with the Drug
[18] Unit would get a report to the effect that there was someone
[19] who was involved in drug activity, is there a way in which
[20] you initiate an investigation?  Do you open up a file of some
[21] kind or open up kind of a leads inquiry list or anything that
[22] would reflect that this new name is now a person of interest
[23] and you're going to start to gather information about them?
[24] Is there any process that we could look to that might
[25] have been initiated about David Hooks as of October of 2009

Page 20

[1] that even if -- and I know you wouldn't have the records, but
[2] that might be around?
[3] **A  Not that I can tell you right off.  At that time,**
[4] **we initiated cases differently.  I mean, it may be just to go**
[5] **and speak.  It may be to talk to other people or whatever.**
[6] **Now, they're using a little bit more of a system now that we**
[7] **wasn't it using back then.  So I don't -- as far as a file**
[8] **being opened or anything, I don't know that there was or**
[9] **wasn't.**
[10] Q  And insofar as there being any steps that you're
[11] aware of to initiate any controlled sales possibly to David
[12] Hooks, you're not aware of that ever having taken place --
[13] **A  No.**
[14] Q  -- once Frazier was arrested?
[15] **A  Uh-uh, (negative).**
[16] Q  Or any -- there wasn't any stakeout of Hooks'
[17] property?
[18] **A  Not that I remember.**
[19] Q  Let me just try to define it just so you know when
[20] I use it, you know, an expression like stakeout, it means
[21] something.  I know with respect to the Frazier investigation,
[22] there were times when the controlled buys were going to take
[23] place and there had been a phone call between subject one and
[24] Frazier.  And, correct me if I'm wrong, but a stakeout would
[25] be set up that consisted of an investigator being positioned

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

---

Page 21

[1] at a point where they could be relatively close to Frazier's
[2] home --
[3] **A   Yes.**
[4] Q   -- such that they would know that he was about to
[5] depart in response to the phone call that he had just had
[6] with Subject #1?  They could see when he left?
[7] **A   Right.**
[8] Q   Someone would now where he was headed 'cause they
[9] were with Subject #1 and then they'd know when he would come
[10] back?
[11] **A   Right.**
[12] Q   And among other things, the advantage of that kind
[13] of observation is you could see where, at least in theory,
[14] where on the property Frazier would go just before going to
[15] sell the dope?
[16] **A   Right.  Right.**
[17] Q   So you could see, one would hope, you could then
[18] get a sense of where on the property he had any of the dope?
[19] **A   Right.**
[20] Q   Was any of that kind of observation, best of your
[21] knowledge, ever done with respect to David Hooks?
[22] **A   No.**
[23] Q   Okay.  Before the date of David Hooks' death, are
[24] you aware of anyone ever reporting to either you or to other
[25] members of the Drug Unit that any source, Frazier or

---

Page 22

[1] otherwise, claimed that they had been to David Hooks' home
[2] and a drug transaction take place?
[3] **A   I don't recall.  No.**
[4] Q   Prior to David Hooks' death, are you aware of
[5] anyone having, and this would include Garrett, having
[6] reported that they spoke, themselves, with David Hooks about
[7] engaging in a drug transaction?
[8] **A   Not other than Frazier.**
[9] Q   Did Frazier, himself, ever, and I understand that
[10] Frazier reported that he was --
[11] **A   Right.**
[12] Q   -- distributing to Hooks.  I'm not trying to take
[13] that away but in terms of --
[14] **A   I guess the answer to your question is Frazier is**
[15] **the only person that has given me information on David Hooks.**
[16] Q   Right.  Right.  And again, I don't want to
[17] mischaracterize it, but his information to you about David
[18] Hooks didn't include a date of distribution to Hooks?
[19] **A   No.**
[20] Q   Didn't include an allegation that Hooks was selling
[21] drugs?
[22] **A   Not that I remember.  No.**
[23] Q   Didn't include an allegation of where he had given
[24] David Hooks drugs?
[25] **A   Not that I know of.**

---

Page 23

[1]      **MR. BUCKLEY:** Object to the form of the question.
[2] Q   MR. SPEARS:  So that -- part of what I'm trying to
[3] get a sense of is had there ever in the world been any
[4] information to the Drug Unit to the effect that there were
[5] any drugs at David Hooks' home or on his property other than
[6] what Garrett had to say?
[7]      **MR. BUCKLEY:** Object to the form of the question.
[8] **A   THE WITNESS:  Not that I remember.**
[9] Q   We will get into, you know, what Garrett had to say
[10] as we go along.  So my questions right now are kind of
[11] bracketed prior to the Drug Unit's contact with David Hooks
[12] -- with Rodney Garrett -- on September 24th.
[13] Best of your knowledge, had a member of the Drug Unit
[14] had any information to the effect that located at David
[15] Hooks' home was equipment used in the manufacturing of
[16] methamphetamines?
[17]      **MR. BUCKLEY:** Object to the form of the question.
[18] You may answer.
[19] **A   THE WITNESS:  Not that I remember.**
[20] Q   Okay.  Prior to the unit's contact with Garrett
[21] sometime in the late afternoon or so of September 24th, 2014,
[22] did the Drug Unit have any information to the effect that
[23] located at David Hooks' home was equipment needed for
[24] packaging meth?
[25]      **MR. BUCKLEY:** Same objection.

---

Page 24

[1] **A   THE WITNESS:  Not that I remember.**
[2] Q   Or equipment used to cut meth?
[3] **A   Not that I remember.**
[4] Q   Or equipment used to distribute meth?
[5]      **MR. BUCKLEY:** Same objection.
[6] **A   THE WITNESS:  Not that I remember.**
[7] Q   Or currency connected to financing drug activity?
[8]      **MR. BUCKLEY:** Same objection.
[9] **A   THE WITNESS:  Not that I remember.**
[10] Q   The questions I've asked you up to this point, of
[11] course, have focused on David Hooks.  Again just out of an
[12] abundance of caution I want to ask, in the course of any
[13] investigative activity in which you were involved, has there
[14] ever been any allegation that Teresa Hooks ever had had any
[15] dealings with drugs or persons doing drugs whatsoever?
[16] **A   No.**
[17]      **MR. BUCKLEY:** Let me interpose an objection to that
[18] question, to the form.  And to the extent necessary, I
[19] move to strike the testimony since I couldn't object to
[20] it before he answered.
[21] Q   MR. SPEARS:  With respect to the information that
[22] you were aware of that was received from Rodney Garrett; were
[23] you aware of Garrett ever claiming that he had sold drugs to
[24] Hooks?
[25] **A   I specifically have no idea, at this point, what**

---

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 25

[1] Garrett said because he talked to Sergeant Brooks, Ryan
[2] Brooks, first and then Ryan called Chris Brewer, and then I
[3] was basically the second agent with Chris Brewer because I
[4] was, I was the one at the office at the time he got the call
[5] and we rode down there. So as far as what all Garrett said,
[6] I couldn't tell you right now one thing he said or didn't
[7] say.
[8]   Q   In response to the call that Brewer received, you
[9] and Brewer went out to the Garrett property. Correct?
[10]   A   I guess. We went out to some property. I don't
[11] know whose it was. We went down to someplace where there was
[12] a Aviator in the woods --
[13]   Q   Right.
[14]   A   -- that he said he had stole. I don't know whose
[15] property it was.
[16]   Q   Okay. For our purposes, that isn't the most
[17] important thing right now.
[18]   A   Right.
[19]   Q   I'm just trying to get what you can remember --
[20]   A   Yes, I understand.
[21]   Q   -- about what happened. Now, you were aware that
[22] once you were out of -- going to the property -- are you
[23] aware that Rodney Garrett was either already arrested or had
[24] been arrested?
[25]   A   Yeah. Him and Sergeant Brooks were there.

Page 26

[1]   Q   Oh, Brooks, right.
[2]   A   Right.
[3]   Q   Okay. And there was already a warrant out for
[4] Garrett's arrest anyhow?
[5]       MR. BUCKLEY: Object to the form.
[6]   Q   MR. SPEARS: Were you aware of that?
[7]   A   I don't know.
[8]   Q   But once you were out at the property where -- I
[9] take it for the first time you're meeting Garrett -- there's
[10] this Lincoln and there's stuff inside it that gets --
[11]   A   Yes.
[12]   Q   -- seized? Right?
[13]   A   Yes.
[14]   Q   Okay. Let me ask you about that. See if I can get
[15] this figured out here. Number 32?
[16]       COURT REPORTER: Thirty-one.
[17]       MR. SPEARS: Could I go ahead and get 32 and 33 if
[18] I can?
[19]       COURT REPORTER: Yes, sir.
[20]       THE WITNESS: While we're doing this, can I ask, do
[21] we know about how long this is going to take?
[22]       MR. SPEARS: Can we go off the record for a minute?
[23] (OFF THE RECORD)
[24] (DOCUMENTS MARKED PLAINTIFF'S EXHIBITS 31, 32 AND 33.)
[25]   Q   MR. SPEARS: I'm handing the witness three pages:

Page 27

[1] Exhibit Numbers 31, 32, and 33. If you could, just take a
[2] few moments, get a look at those, and I'll be asking you some
[3] questions about them.
[4]   A   Okay.
[5]   Q   Okay?
[6]   A   Yes, sir.
[7]   Q   Exhibit 31, could you tell us please, whether you
[8] recognize that as a photocopy of a photograph taken of the
[9] rear of the Lincoln Aviator that -- when you went out to the
[10] property and had contact with Garrett -- this was that
[11] vehicle?
[12]   A   Appears to be, yeah.
[13]   Q   If you could, take a look at Exhibit 32.
[14]   A   Uh-huh, (affirmative).
[15]   Q   Do you recognize that as a photograph of the
[16] contents of the interior of that Lincoln Aviator once the
[17] passenger side front door was opened?
[18]   A   I guess so. I mean, I don't remember exactly what
[19] the inside of it looked like but, I mean --
[20]   Q   Well, let me ask you this. We know that based on
[21] the -- I think this might have an exhibit sticker somewhere
[22] else -- but we know based on the receipt of property that
[23] Chris Brewer drew up that included in the materials taken
[24] from Rodney Garrett that were in the Lincoln Aviator were a
[25] lockbox that contained certain items --

Page 28

[1]   A   Okay.
[2]   Q   -- and then, even though I don't have a photograph
[3] of it, the report also speaks in terms of seizing a couple of
[4] firearms. With that said, does that help refresh your
[5] recollection as to these photographs? And if so, does it
[6] look like we're looking at photographs taken of the -- I'll
[7] just say the interior of the Aviator once you're there at the
[8] scene and able to get to the contents of that vehicle?
[9]   A   I do remember the lockbox. It seems like we had a
[10] hard time finding the key for it or something.
[11]   Q   You're right there.
[12]   A   I think we had a hard time finding the key. I do
[13] remember the lockbox.
[14]   Q   Okay.
[15]   A   So, yes.
[16]   Q   So the -- just to specify it, then, in Exhibit 33,
[17] there's a photograph of the lockbox that then is taken out of
[18] the Lincoln and moved from there down to, I guess, well, to
[19] headquarters?
[20]   A   I guess so.
[21]   Q   Well, did you ever see the contents of that
[22] lockbox?
[23]       MR. BUCKLEY: Ryan, he's saying he doesn't
[24] remember. He's not avoiding you.
[25]       MR. SPEARS: No, no, no, I'm not --

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 29

[1] MR. BUCKLEY: He's says, "I don't know." Then you
[2] ask him again and he still doesn't know.
[3] A  THE WITNESS: I mean, I don't know what was in the
[4] box or where it was taken to.  I just remember we had a hard
[5] time finding a key to it.
[6] Q  Let me ask, out of an abundance of caution, given I
[7] know where I got these.
[8] MR. SPEARS: Can we stipulate these are photographs
[9] taken of the contents of the Lincoln Aviator once it was
[10] out -- while it was still out at the Garrett property?
[11] MR. BUCKLEY: My hesitancy is on contents because
[12] it's only showing what's in the front passenger side.  I
[13] don't know if there was anything in the back or --
[14] MR. SPEARS: I'm not saying -- these are
[15] photographs taken once the door's opened and this is
[16] what's seen inside.  I'm not saying this is everything
[17] that was in the vehicle.
[18] MR. BUCKLEY: Yes, we can stipulate to that --
[19] MR. SPEARS: Okay.
[20] MR. BUCKLEY: --  on behalf of the defendants.
[21] MR. SPEARS: Sure, sure.
[22] MR. BUCKLEY: This gentlemen, if he doesn't recall,
[23] he doesn't recall.
[24] Q  MR. SPEARS: Did -- if we go back to the
[25] lockbox, the one that I would say, is it Number 33?

Page 30

[1] A  Uh-huh, (affirmative).
[2] Q  Did you ever see it opened at any time?
[3] A  Probably.  I mean, I was there through the whole
[4] thing.  And when I say "there" a lot of times we just go at
[5] least two together.  So, I mean, I was there.  I'm sure I did
[6] see it opened.  I don't recall specifically but --
[7] Q  At any time while you were -- and I know that you
[8] had conversations off and on with Chris Brewer that evening
[9] both before the search warrant was sought and then after it
[10] was obtained.  Can you recall Chris Brewer ever reporting to
[11] you that Garrett had claimed that he had bought drugs from
[12] David Hooks?
[13] A  Not that I remember.
[14] Q  Or that he had seen David Hooks -- "he" being
[15] Garrett -- had seen David Hooks ever dealing, or selling, or
[16] manufacturing drugs?
[17] A  Not that I remember.
[18] Q  Was it your understanding that Garrett's, the gist
[19] of Garrett's claim was that he went out to the Hooks'
[20] property and in the course of robbing items from the
[21] property, that he came across a bag with what he then learned
[22] later was meth?
[23] A  Yes.
[24] Q  Best of your knowledge, Garrett never reported ever
[25] having any contact whatsoever with David Hooks did he?

Page 31

[1] A  Not that I know of.
[2] Q  Other than Garrett's version of how he came in
[3] contact with the meth that was taken from Garrett's
[4] possession when he was arrested, was there any other evidence
[5] or information that you were aware of on that night that the
[6] meth that was found in Garrett's possession came from the
[7] Hooks' property?
[8] A  No.
[9] Q  So it was just Garrett?
[10] MR. BUCKLEY: Object to the form of the question.
[11] MR. SPEARS: Garrett's the only source of that
[12] information?
[13] A  To my knowledge.
[14] Q  Although I realize you weren't out at the site of
[15] Garrett's arrest for very long, can you remember whether
[16] there was any other bystanders?  Whether they be family
[17] members or even if you knew who they were, who ever claimed
[18] anything to the effect that Garrett had ever had contact with
[19] David Brooks -- excuse me, David Hooks?
[20] A  No.
[21] Q  Did you travel from the site of Garrett's arrest
[22] back to the Law Enforcement Center with Chris Brewer?
[23] A  I believe so.
[24] Q  I realize -- I think you've already kind of
[25] indicated you went out there together?

Page 32

[1] A  Right.  Right.
[2] Q  Okay.  And Garrett wasn't in your vehicle was he,
[3] as you came back to the Law Enforcement Center?
[4] A  I don't think so.
[5] Q  Do you recall anything that Chris Brewer said about
[6] what you, as investigators with the Drug Unit, had or what
[7] should be done?
[8] A  I do not.
[9] Q  On your return to the Law Enforcement Center, what
[10] do you recall being the first thing that you did?
[11] A  I have no clue.  I don't remember.  I really didn't
[12] do much of anything.  With Brewer being the case agent, he
[13] initiated everything; set the plans in motion as far as
[14] writing a search warrant and contacting, I guess, SRT and the
[15] magistrate and stuff.  I mean, I didn't, I don't know -- I
[16] don't remember doing much of anything.  I mean, if he, you
[17] know, if he needed me to make a phone call or do something, I
[18] may have done that.  But as far as what I done specifically,
[19] I don't remember.
[20] Q  There was -- maybe I can bracket it this way just
[21] to kind of confine, you know, a span of time.  There's a
[22] point at which Chris Brewer spoke with the magistrate judge
[23] about the warrant.
[24] A  Right.
[25] Q  Were you present for that discussion with the

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

---

Page 33

[1] magistrate?

[2] **A   When we met the judge and got the warrant signed?**

[3] Q   That's the kind of thing I'm asking about. I don't

[4] know one way or another whether you were present with him as

[5] he met with the magistrate. Do you recall whether you were

[6] one way or the other?

[7] **A   There's been literally hundreds of search warrants**

[8] **signed. I've been there on some and some I haven't been**

[9] **there.**

[10] **Can I look at his report or something? I mean, I don't**

[11] **know whether for sure I was with him or not. Do you know**

[12] **where we got it signed?**

[13] Q   Please understand, this isn't a test with a right

[14] or wrong answer,

[15] **A   No, I understand that. I just don't remember.**

[16] Q   I'm not saying that there is a definitive right or

[17] wrong --

[18] **A   Yeah. No. I understand that.**

[19] Q   -- because I don't know either.

[20] **A   I just don't remember.**

[21] Q   Okay.

[22]      MR. BUCKLEY: You can say, "I don't know," and then

[23] if he wants to --

[24]      THE WITNESS: Yeah, that's fine --

[25]      MR. BUCKLEY: -- show you a document to refresh you

---

Page 35

[1] **remember from what phone.**

[2] Q   Best of your recollection was -- of the officers

[3] present -- of the three officers that were present in the

[4] room once you arrived, was Chris Brewer the only officer

[5] speaking to Faircloth?

[6] **A   Best I remember.**

[7] Q   Do you recall that Faircloth told Brewer at some

[8] point in the conversation that he did not think that he had

[9] enough to show that there would be drugs inside the

[10] residence?

[11]      MR. BUCKLEY: Object to the form of the question.

[12] You may answer.

[13] **A   THE WITNESS: I think -- yeah. I believe that's --**

[14] **I think that's about when I walked in. That was one of the**

[15] **first things and then -- yes.**

[16] Q   And then do you recall that Chris Brewer then told

[17] Faircloth about the grams of meth and scales that according

[18] to Garrett had been found in a truck at the residence?

[19] **A   Uh-huh, (affirmative).**

[20]      MR. BUCKLEY: You have to say "yes" or "no". The

[21] court reporter --

[22] **A   THE WITNESS: Oh, yes, sorry.**

[23] Q   Was there ever any point in time in which you heard

[24] Brewer represent or state to Faircloth information along the

[25] lines that there was specific information to the effect that

---

Page 34

[1] he can. "I don't know" is a fine answer.

[2] **A   THE WITNESS: I just flat don't remember.**

[3] Q   There was a point in time before the signing of the

[4] warrant by the magistrate that a conversation was had over a

[5] speaker phone with Brandon Faircloth.

[6] **A   Uh-huh, (affirmative).**

[7] Q   Do you recall that?

[8] **A   Uh-huh, (affirmative).**

[9] Q   And am I correct in understanding that while you

[10] may not have been in Deputy Padgett's office when that call

[11] started that you nonetheless, came into that office as the

[12] call was taking place?

[13] **A   That's right.**

[14] Q   Okay. And the persons present that you can recall,

[15] did they include Brewer, Padgett, and then yourself as the

[16] third officer in the room?

[17] **A   Uh-huh, (affirmative). I think that's all.**

[18] Q   Best to your knowledge, was the only person on the

[19] other end of the conversation, if you will, Brandon

[20] Faircloth?

[21] **A   Yes.**

[22] Q   Okay. As I understand it, the call was placed

[23] using Chris Brewer's cell phone. Is that how you recall it

[24] or do you know one way or another?

[25] **A   I remember it was on speaker phone but I don't**

---

Page 36

[1] drugs were known to be in the house?

[2] **A   Not that I remember.**

[3] Q   The presence of the scales and meth -- assuming

[4] that Garrett's -- at that time you're assuming that Garrett's

[5] claim about where he found or came into possession of the

[6] meth and scales that is accurate --

[7]      MR. BUCKLEY: Objection to the form of the

[8] question.

[9] Q   MR. SPEARS:  -- that is to say he's telling the

[10] truth. Well, did you assume that Garrett was telling the

[11] truth?

[12]      MR. BUCKLEY: Same objection.

[13] **A   THE WITNESS: Yeah, I mean, at that point, I**

[14] **assumed so.**

[15] Q   Okay. And insofar as assuming that he's telling

[16] you the truth, was that based on any other information you

[17] had about Garrett other than that he's now in custody and

[18] he's talking?

[19] **A   No.**

[20] Q   Okay. So realizing that we -- I'll phrase the

[21] question this way. Assuming that Garrett is telling the

[22] truth that he found scales and meth in a truck adjacent to

[23] the property of David Hooks, in your mind, what about that

[24] reflected that inside of David Hooks' home there would be any

[25] drugs?

---

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 37

[1]      MR. BUCKLEY: Same objection.

[2]   A   THE WITNESS: When you say the truck adjacent to

[3]   the home, I don't remember where the -- at that particular

[4]   time where the vehicle was. From the way I remember it, the

[5]   actual drugs that Garrett said he took was not in this

[6]   vehicle. Right? Or rather it was in some other vehicle he

[7]   went through and then left in this vehicle.

[8]   Q   Yeah.

[9]      MR. BUCKLEY: For the record, he's pointing to 31.

[10]  Q   MR. SPEARS: I think that that's --

[11]  A   Not the Aviator.

[12]  Q   -- the understanding.

[13]  A   At this particular point, I don't remember whether

[14]  he said that the vehicle that he originally took the drugs

[15]  out of was positioned. I couldn't tell you at this point

[16]  what Garrett said or didn't say. So I don't remember. I

[17]  guess what I'm saying is I have no way of knowing what I was

[18]  thinking at that particular time because I don't remember

[19]  what he said at this point. I don't --

[20]  Q   Okay. Assuming for the sake of my question that

[21]  Garrett has reported to Chris Brewer, and you're then told

[22]  whether by Brewer or Garrett, that Garrett took scales and

[23]  meth from the vehicle adjacent to Hooks' residence.

[24]  What, in that information, would indicate to you that

[25]  there were any drugs inside of David Hooks' home?

Page 38

[1]      MR. BUCKLEY: Object to the form of the question.

[2]   A   THE WITNESS: To me, if I'd gotten that

[3]   information, I would of course relate it to the information

[4]   I'd received previously during the Frazier case. So, to me,

[5]   that would kind of corroborate that. And then if there's

[6]   drugs on the property then, you know, I think it's safe to

[7]   consider if there's drugs outside there may be drugs inside

[8]   or proceeds thereof or, you know, items for distribution, or

[9]   packaging or, you know. If those items are outside the

[10]  residence, I'd feel it's safe to consider they're also inside

[11]  the residence.

[12]  Q   Without knowing anything more about David Hooks

[13]  then you did then, how can you be safe in concluding that

[14]  there would be drugs found in the home on the strength of

[15]  there having been one uncorroborated report from Jeffrey

[16]  Frazier in 2009 that he had distributed to Hooks and now a

[17]  report that drugs were found in the vehicle?

[18]     MR. BUCKLEY: Object to the form. Argumentative.

[19]  You may respond.

[20]  Q   MR. SPEARS: So how does that mean there's going to

[21]  be anything in the house?

[22]     MR. BUCKLEY: Same objection.

[23]  A   THE WITNESS: I mean, it don't necessarily mean

[24]  for certain there is going to be anything in the house. But

[25]  like I said, in my mind I feel like it's safe to consider

Page 39

[1]   that if there's drugs found right outside the house, you

[2]   have, you know, a previous story that corroborates this, then

[3]   there's reason to believe there may be some in the house

[4]   also.

[5]   Q   The corroboration was only the implication of the

[6]   name David Hooks. Right?

[7]   A   Sir?

[8]      MR. BUCKLEY: Object to the question.

[9]   Q   MR. SPEARS: The corroboration was just the

[10]  indication of the name David Hooks. Frazier mentions David

[11]  Hooks. Right?

[12]  A   Right.

[13]  Q   And between October of 2009 and September 24, 2014,

[14]  there's no other information that you have so far of any

[15]  relationship between David Hooks and drugs. Correct?

[16]     MR. BUCKLEY: Object to the form of the question.

[17]  Q   MR. SPEARS: Correct?

[18]  A   Me, personally, to my knowledge, no.

[19]  Q   Okay. And you're unaware of the Drug Unit having

[20]  other information of it either. Correct?

[21]     MR. BUCKLEY: Same objection.

[22]  A   THE WITNESS: Like I said me, personally, no, and I

[23]  don't know that they knew or heard between now and then --

[24]  Q   Okay. Fair enough.

[25]  A   -- then and now.

Page 40

[1]   Q   And the Frazier information didn't link anything

[2]   about David Hooks and drugs and there being drugs in his

[3]   home. Did they? That information didn't say anything --

[4]   A   Well, it linked David Hooks and drugs, but not

[5]   drugs in the home.

[6]   Q   Right. Right. So by itself it doesn't mean that

[7]   in 2009 David Hooks had any illegal drugs in his home. Did

[8]   it?

[9]      MR. BUCKLEY: Object to the form.

[10]  A   THE WITNESS: No.

[11]  Q   Okay. So as of that -- I mean we're just building

[12]  blocks here. As of October, 2009, there's no information to

[13]  the effect that David Hooks has any drugs in his home.

[14]  Correct?

[15]  A   In his home? No.

[16]  Q   And as of the Garrett report, there's no

[17]  information to the effect that David Hooks has any drugs in

[18]  his home. Correct?

[19]     MR. BUCKLEY: Object to the form. Asked and

[20]  answered.

[21]  A   THE WITNESS: Inside? No.

[22]  Q   As of the report that was received from Garrett

[23]  about his theft of the Hooks' home, to the best of your

[24]  knowledge, did you or any of the other -- or Chris Brewer

[25]  have any information to the effect of who had been driving

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 41

[1] the truck within the last day or so?  Before the 24th?

[2] **A  Not that I know of.**

[3] Q  Or who had placed the scales in the truck, assuming

[4] that they were even found there?

[5] **A  I don't know.**

[6] Q  Or who had placed the meth into the truck, even

[7] assuming that that's where Garrett got it?

[8] **A  I don't know.**

[9] Q  Or whether David Hooks, himself, had even been in

[10] the truck in the 24 hours before say 9:00 o'clock at night on

[11] the 24th?

[12] **A  I don't know.**

[13] Q  During the conference call conversation between

[14] Chris Brewer and Faircloth, am I correct in understanding

[15] that Brewer made specific reference to the Frazier case --

[16] the Jeff Frazier case?

[17] **A  Specifically?  I don't remember but I would think**

[18] **so.**

[19] Q  And then the Frazier case that you're familiar with

[20] is the one in 2009.  Correct?

[21] **A  Yes.**

[22] Q  And do you recall the fact that the Frazier case

[23] was one that was undertaken in 2009 was discussed with

[24] Faircloth?  Was it not?

[25]     MR. BUCKLEY: Object to the form of the question.

Page 42

[1] **A  THE WITNESS:  It would have been the only case I**

[2] **know of we worked on Frazier.  So it would have had to have**

[3] **been that case.**

[4] Q  What I'm trying to understand is whether or not,

[5] per your observations, the fact that the Frazier

[6] investigation had taken place in that specific year of 2009

[7] was a fact that was communicated to Brandon Faircloth?

[8]     MR. BUCKLEY: Object to form.

[9] **A  THE WITNESS:  I do not remember.**

[10]     MR. SPEARS: Let's go off the record for a minute.

[11] (OFF THE RECORD)

[12]     MR. SPEARS: Mr. Burris, what I'm about to do is to

[13] play portions of what have been told us to be audio

[14] recordings of your interviews with the GBI folks.  We were

[15] given two.  One was done on October 2nd, 2014.  Another was

[16] done in the early morning hours of September 25th, 2014,

[17] which, actually, I think was the longer one.  The one with

[18] Giddens is the one October 2nd.

[19] Anyhow, I wanted to be able to let you hear the voices

[20] and let us know if you recognize them as that interview.

[21] Then if I have any other questions, I'll ask.  But that'll

[22] give us a way to get it identified.

[23] **A  Okay.**

[24] Q  I'll start with one and I think we'll be able to

[25] tell which of the two it is.  I don't have them dated --

Page 43

[1] **A  All right.**

[2] Q  -- in the recordings.

[3] (PORTION OF AUDIO RECORDING BEING PLAYED.)

[4]     MR. SPEARS:  Okay, Mr. Burris, what I wanted to

[5] know -- it's towards the end and see if it sounds like it's

[6] the end of it.  I'm not going to specifically quiz about it

[7] because I'm really just trying to have this be a part of our

[8] record.

[9] **A  Okay.**

[10] Q  Did you recognize your voice as the person who

[11] self-identified as Tim Burris?

[12] **A  Yes.**

[13] Q  And just so you know, the title of this is simply

[14] "Tim Burris Interview."  And then there will be one, I think,

[15] just called "Tim Burris" as a second file on this disc.

[16] Okay?

[17] **A  (Nodding head affirmatively.)**

[18] Q  I'll go to the end now so you can hear that and

[19] I'll go to time.  It's just -- on the time imprint it's 10:30

[20] -- 10 minutes and 36, 35 seconds.

[21] (PORTION OF AUDIO RECORDING BEING PLAYED.)

[22] Q  MR. SPEARS:  Were you able to hear your voice at

[23] the very end there?

[24] **A  Yes.**

[25] Q  Are you able to tell us, then that you recognize

Page 44

[1] this as a copy of the audio recording of your interview with

[2] Agent Jerry Jones, September the 25th, 2014?

[3] **A  Yes.**

[4] Q  The next audio file that I have is entitled simply

[5] "Tim Burris."  It doesn't have the word interview.  I'll

[6] start it and let us know if you recognize it.

[7] (PORTION OF AUDIO RECORDING BEING PLAYED.)

[8] Q  MR. SPEARS:  Mr. Burris, do you recognize that as

[9] the audio recording of your interview with Agent Giddens of

[10] the GBI?

[11] **A  I do.**

[12]     MR. SPEARS:  I'm going to mark this with sticker

[13] 34.  I'll just leave it with the court reporter.

[14] (CD MARKED PLAINTIFF'S EXHIBIT NO. 34.)

[15] Q  MR. SPEARS:  Were you aware of there having been

[16] any steps taken by Chris Brewer, or yourself, or any other

[17] members of the Drug Unit to investigate whether Garrett's

[18] possession of the meth or the scales was a result of him

[19] having gotten them from any location other than Hooks?

[20] **A  Not that I know of.**

[21] Q  As of that conversation with Faircloth, were you

[22] aware that Garrett had been in the last month and a half or

[23] so -- and I'm approximating because I don't know the exact

[24] dates -- but in the month a half or so before September 24th,

[25] 2014, he'd been arrested a number of times?  He'd been

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 45

[1] reported as having been possibly involved in attempted theft
[2] from another vehicle and his family was begging him to turn
[3] himself in?  Were you aware of any of that?
[4] **A  This is Garrett?**
[5] Q   This is Garrett.
[6] **A  I may have been aware of it at the time but I don't**
[7] **remember now.**
[8] Q   Okay.  Did you, yourself, look at the warrant
[9] application that was actually signed by Chris Brewer and
[10] provided to the magistrate judge?
[11] **A  Probably.  I can't say for certain.**
[12] Q   When you say, "probably", in all fairness is that a
[13] guesstimate or do you specifically recall seeing it?
[14] **A  I can tell you a lot of times we do.  We'll read**
[15] **them behind each other, for one, just to check for any errors**
[16] **and make sure everything sounds all right or whatever.  We'll**
[17] **just check behind each other.  That's why I say probably.  I**
[18] **do not specifically recall looking through his application.**
[19] Q   Okay.  Do you have any understanding as to why
[20] Chris Brewer in the warrant application did not recite in
[21] that application that the Frazier investigation had been
[22] undertaken in calendar year 2009?
[23]     MR. BUCKLEY: Object to the form of the question.
[24] You may respond.
[25] **A  THE WITNESS: No, sir.**

Page 46

[1] Q   Sitting here today, are you aware that the warrant
[2] application did not reflect the date of the Frazier
[3] investigation?
[4] **A  No, sir.**
[5] Q   You would agree with me, would you not, that the
[6] relative recency of information of drug activity is a
[7] valuable piece of information when it comes to determining
[8] whether or not there's current drug activity taking place?
[9]     MR. BUCKLEY: Object to the form.
[10] **A  THE WITNESS: Yes.**
[11] Q   It's valuable.  It's not determinative, maybe, but
[12] it's something that is useful for an agent, certainly, to
[13] take into account.  Correct?
[14] **A  Yes.**
[15] Q   As well as it would be for a judicial officer
[16] deciding whether or not there's probable cause.  Right?
[17]     MR. BUCKLEY: Object to the form.
[18] **A  THE WITNESS: Yes.**
[19] Q   In your interview with Giddens, I believe that you
[20] referred to the volume or weight of the meth that Garrett had
[21] as being somewhere around 20 grams.  Correct?
[22] **A  Yeah.  I heard that.**
[23] Q   And that's an amount that's less than an ounce.
[24] Correct?
[25] **A  Yes.**

Page 47

[1] Q   Am I correct in -- with respect to your
[2] investigation of Frazier, Jeff Frazier, as I recall it from
[3] the investigative materials, Frazier was claiming he was
[4] picking up a quarter of a pound of meth and then distributing
[5] it.  Do you recall that?
[6] **A  I mean, that sounds right.  I don't know the**
[7] **specifics, but, yeah.**
[8] Q   In relative terms, a quarter of pound of meth is a
[9] heck of a lot more than 20 grams.  Isn't it?
[10] **A  Yes, over four times as much.**
[11] Q   Before officers from SRT went to the Hooks' home,
[12] there was a briefing, was there not?
[13] **A  Yes, there always is.  I don't specifically recall**
[14] **it but there's always a briefing before a search warrant is**
[15] **executed.**
[16] Q   Okay.  Before the execution of the search warrant
[17] at Frazier's home, you had prepared an operations plan, had
[18] you not?
[19] **A  Well, I'm sure one was done.  I don't -- I think**
[20] **back then I may have prepared that one.  Things changed as to**
[21] **how OPs plans were prepared.  So if I prepared that one then,**
[22] **yes.**
[23] Q   Like I said, this isn't a true or false --
[24] **A  Right.**
[25] Q   -- type thing.  Let me see if I can find it.

Page 48

[1] (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 35.)
[2] Q   MR. SPEARS:  I'm showing you a document that we've
[3] been provided with.  It's got an exhibit sticker on it,
[4] Exhibit 35.  And I'll ask you to take a look at it and answer
[5] -- excuse me.  Once you've had a chance to look through it,
[6] let us know whether these pages appear to be a true and
[7] accurate copy of the operations plan that was prepared in
[8] October of 2009, listing you as the case agent, supervisor
[9] Chris Brewer.  This being an operations plan pertaining to
[10] the execution of search warrant at the home of Jeff Frazier?
[11] **A  It is.**
[12] Q   Are you aware of there having come a point in time
[13] between October of 2009 and September of 2014 where the
[14] practice on the part of the Drug Unit to prepare an
[15] operations plan was ended?
[16] **A  Uh-huh, (affirmative).**
[17] Q   Please tell me what that was.
[18] **A  As SRT became established and started executing the**
[19] **search warrants, I felt like since the information in here --**
[20] **as far as, like you'll see on the back page, who is doing**
[21] **what, as far as tactical operations and stuff like that, that**
[22] **was strictly under the SRT's guides.  They handled all of**
[23] **that.  That was aside from the Drug Unit.  They did all the**
[24] **tactical part.  So I decided that I felt like since they were**
[25] **handling all that, then if they wanted to prepare an OPs plan**

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 49

[1] that was, you know, up to them.
[2] In other words, it wasn't for me to sit there and write
[3] this OPs plan to say what SRT was going to do when I had no
[4] dealings with what SRT was going to do.  That was, you know,
[5] left up to the SRT commander.
[6] So I think around, about that time, it was decided that
[7] from then on if an OPs plan was warranted or needed then SRT
[8] would do their own.  That was sometime after this though
[9] because this looks like one of the ones that I prepared.
[10]   A   Okay.
[11]   A   I'm not even sure what theirs looked like.
[12]   Q   Let's go back to the point in time of the briefing,
[13]  at least that time frame.
[14]   A   Uh-huh, (affirmative).
[15]   Q   Can you give us any information about any
[16]  understanding you had at that time for immediacy in getting
[17]  to the Hooks' home?  And by that, I mean, of course, the
[18]  search.
[19]   A   Right.  Yeah.  I don't recall any specific thing
[20]  being said, or I don't know.  I don't recall anything about
[21]  that.
[22]   Q   With respect to -- let's go to some information
[23]  other information we have about Frazier.  Give me just a
[24]  couple minutes to look.
[25]      MR. SPEARS:  We can go off the record.

Page 50

[1]    (OFF THE RECORD)
[2]    (DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 36.)
[3]   Q   MR. SPEARS:  Could you please take a look at
[4]  Exhibit 36 and after you've had a chance to do so, let me
[5]  know whether or not you recognize that as a photocopy of the
[6]  investigator's narrative that you prepared summarizing
[7]  investigative steps taken in connection with the
[8]  investigation into Jeffrey Frazier and his selling of
[9]  methamphetamines?
[10]   A   Yes.
[11]   Q   The second paragraph refers to Sergeant Chris
[12]  Brewer with you and he meeting Source #1.  Source #1, that
[13]  again is the undercover agent, or person, whoever that was?
[14]   A   Right.
[15]   Q   Yeah.  I'm not asking for the name --
[16]   A   Right.
[17]   Q   -- I just want to be sure --
[18]   A   Yes.  Yes.
[19]   Q   -- that we're talking about the same one that we
[20]  talked about before.  Same suspect or source one?
[21]   A   Yes.  Yes.
[22]   Q   And, let's see, as I understand it, Brewer was
[23]  involved in the investigation -- well, let's see.  You listed
[24]  this as a meeting on August 11th.  He's involved in the
[25]  investigation the very next day after your initial

Page 51

[1]  information from a reliable informant on August the 10th.
[2]  Correct?
[3]   A   Yes.
[4]   Q   And then on that same day, that is to say August
[5]  11th, that's the day on which a controlled purchase is set
[6]  up?
[7]   A   Yes.
[8]   Q   And Sergeant Brewer and yourself, you were both
[9]  involved in the logistics of that controlled buy.  Correct?
[10]   A   Yes.
[11]   Q   On page, on the following page -- and sometimes I
[12]  might refer to these numbers that we put on there --
[13]   A   Okay.
[14]   Q   -- so you have sense of that.  The next one is
[15]  #206.  We have a buy number two on August 14th.  You see
[16]  that?
[17]   A   Yes.
[18]   Q   And that again is one in which you and Sergeant
[19]  Brewer were meeting with this source, --
[20]   A   Yes.
[21]   Q   -- number one, and arrangements were being made for
[22]  a controlled buy?
[23]   A   Right.
[24]   Q   And then on, let's see, the buy number three, if we
[25]  go over to page 207, the third full paragraph on that page,

Page 52

[1]  it appears that Sergeant Brewer was involved on August the
[2]  20th, 2009, with a meeting with Source #1.  Phone call was
[3]  being made to Frazier at the time to arrange another
[4]  purchase.
[5]   A   Yes.  I'm trying to see.  Yes.
[6]   Q   Thank you.  There's a buy number four that's
[7]  described on page 208.  If you look at the paragraph that
[8]  begins with the phrase, "On Monday, August 24th, 2009, at
[9]  approximately 11:36, Sergeant Brewer and I met with Source
[10]  #1."  That again were arrangements pertaining to another
[11]  controlled purchase.  Correct?
[12]   A   Yes.
[13]   Q   Had Sergeant Brewer been involved meeting not only
[14]  with Source #1 but also with other deputies?
[15]   A   Yeah.  The other two members of the Drug Unit.
[16]   Q   Were those Payne and Jackson?
[17]   A   Yes.
[18]   Q   And on page, what we've marked 209, there's a
[19]  description of drug buy number five with the second paragraph
[20]  there referring to, "On August 28th, 2009, purchase of an
[21]  ounce from Jeff Frazier."
[22]  I think I have that right.  We have Sergeant Brewer,
[23]  Brian Scarborough, Corporal Vertin, others --
[24]   A   Right.
[25]   Q   -- were there to prepare for the controlled

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 53

[1] purchase?

[2] **A** Yes.

[3] **Q** "Giving the source," I'm now looking at the next

[4] full paragraph,

[5] **A** Okay.

[6] **Q** "Giving Source #1 an audio recording device and

[7] $1,600 in Drug Unit funds," apparently for the purchase from

[8] Frazier?

[9] **A** Yes.

[10] **Q** Page 210, up at the very top, am I correct in

[11] understanding that in that paragraph we have a report from

[12] you to the effect that Sergeant Brewer was able to take

[13] several pictures of Frazier at his residence after leaving as

[14] well as returning to his residence?  That's the -- that's the

[15] kind of surveillance we were talking about earlier --

[16] **A** Yes.  Yes.

[17] **Q** -- where, you know, if you have someone who you

[18] suspect to be distributing drugs, you can set up a situation

[19] where there'd be a controlled purchase?  You can monitor them

[20] leaving their house, returning to their house, that sort of

[21] thing?

[22] **A** Yes.

[23] **Q** Buy number six is described on that same page, 210.

[24] That again, if I read the first paragraph correct, "September

[25] 8th, approximately 11:40," we have Chris Brewer being

Page 54

[1] directly involved once again with that arrangement?

[2] **A** Yes.

[3] **Q** We'll go to the next page.  Buy number seven is

[4] described on page 211.

[5] **A** Uh-huh, (affirmative).

[6] **Q** On September 23rd, 2009, that again involved a

[7] controlled purchase and Sergeant Brewer was involved?

[8] **A** Yes.

[9] **Q** And the next buy is on October the 21st, buy number

[10] eight?

[11] **A** Yes.

[12] **Q** And that, again, is one that involved Sergeant

[13] Brewer being involved not only generally in the case but also

[14] being positioned in the woods across from Frazier's

[15] residence?

[16] **A** Correct.

[17] **Q** So of those eight controlled buys, Chris Brewer was

[18] involved as a participating officer in each of the purchases?

[19] **A** Yes.

[20] **Q** Now once Frazier was arrested, and I'm now looking

[21] at page 212, --

[22] **A** Okay.

[23] **Q** -- in the second full paragraph that begins with

[24] the phrase, "On October 22nd, 2009" --

[25] **A** Uh-huh, (affirmative).

Page 55

[1] **Q** -- we have the SRT, the Response Team, and units

[2] from other parts of the sheriff's department being involved

[3] in seeing Frazier leaving the residence.  "Harrison executed

[4] a traffic stop."  Do you see that part there?

[5] **A** I do.

[6] **Q** And as of that point, which according to your

[7] report it's about 3:00 in the afternoon.  You see that?  3:00

[8] p.m.?

[9] **A** Uh-huh, (affirmative).

[10] **Q** At that point, you already have the search warrant

[11] for his home.  Right?

[12] **A** I believe so, yeah.

[13] **(DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 43.)**

[14] **Q** MR. SPEARS:  According to what I've marked as

[15] Exhibit 43, and if you could just take a look at it for a

[16] moment.  And I'm hoping, if my record keeping is correct that

[17] it's a true and correct copy of the search warrant

[18] application that was presented to Judge Snell, Magistrate

[19] Court, Laurens County, seeking court authorization for the

[20] search of Jeff Frazier's residence?

[21] **A** It is.  This is the affidavit and the warrant.

[22] **Q** So once Frazier's -- once a traffic stop is made on

[23] Frazier as he leaves the home that afternoon, one of the

[24] things that Frazier told you right away was -- and again, I'm

[25] just paraphrasing from your report.

Page 56

[1] **A** Uh-huh, (affirmative).

[2] **Q** That he didn't have any dope and he didn't have any

[3] guns at his home.  Correct?

[4] **A** Right.

[5] **Q** Frazier's already a convicted felon.  He can't have

[6] guns in his custody, can he?

[7] **A** I believe that's right.

[8] **Q** So it's illegal for him to have them at the home

[9] but in fact, once the search is done on his home, guns are

[10] found.  Correct?

[11] **A** I think so.  Yeah.

[12] **Q** So you knew as of the point that the guns were

[13] found that Frazier's already lying to you.

[14] **A** Right.

[15] **Q** Was there any discussion that you can remember --

[16] and this is one of those things where, of course, there's no

[17] recording of it -- but any discussion with Faircloth to the

[18] effect that the information that Frazier had been giving you

[19] in 2009 included outright lies?

[20] **MR. BUCKLEY:** Object to the form.

[21] **A THE WITNESS:** No.

[22] **Q** In -- again looking at your report, in the

[23] description of what you're learning or being told by Frazier,

[24] Frazier claims that there's a Frank Demonte who kept his meth

[25] for him.  Something like that?

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 57

[1]   **A   Yeah, he said that at some point.**
[2]   Q   Demonte, he eventually gets arrested.  Right?
[3]   **A   Yes.**
[4]   Q   Was there anyone as directly and intimately
[5]   involved in the investigation into Frazier -- was there
[6]   anyone as involved as you, other than Brewer?  And of course,
[7]   Subject #1?
[8]   **A   No.**
[9]   **(DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 42.)**
[10]  Q   MR. SPEARS:  One of the documents I gave you was
[11]  Exhibit 42.  Can you take a look at that?
[12]  **A   Yeah, the seizure document.**
[13]  Q   After looking at it for a moment, can you tell me
[14]  whether you recognize it as a copy of a Notice of Seizure
[15]  that you signed as the requesting officer that reflected that
[16]  at the Frazier home among the things that were seized were
[17]  weapons and vehicles?
[18]  **A   Yes.**
[19]  **(DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 40.)**
[20]  Q   MR. SPEARS:  If you could, please, take a look at
[21]  Exhibit 40.  It's the single sheet there.
[22]  **A   Yes.**
[23]  Q   This is a part of the file materials that we were
[24]  provided.  Am I correct in understanding that Exhibit 40 is a
[25]  summarization of the controlled purchases that were

Page 58

[1]   undertaken with respect to Frazier?
[2]   **A   Appears to be, yes.**
[3]   Q   Along with what the CI got paid, costs for
[4]   restitution for batteries, and equipment, and the like?
[5]   **A   Right.**
[6]   **(DOCUMENT MARKED PLAINTIFF'S EXHIBIT NO. 39.)**
[7]   Q   MR. SPARS:  Please take a look at Exhibit 39.  You,
[8]   I think, have the only color copy of that.  Do you recognize
[9]   that as the photograph of Jeff Frazier?
[10]  **A   Yep.**
[11]  Q   At or about the time he was arrested in October of
[12]  2009?
[13]  **A   Yes.**
[14]  **(DOCUMENTS MARKED PLAINTIFF'S EXHIBITS 37 AND 38.)**
[15]  Q   MR. SPEARS:  As a part of the workup of the file
[16]  materials that went to the district attorney's office, and
[17]  possibly, actually before Frazier's arrest, did you -- I'm
[18]  looking at 37 and 38 now.
[19]  **A   Uh-huh, (affirmative).**
[20]  Q   Thirty-seven is identified as Florida Criminal
[21]  History.  Thirty-eight, I think is from GCIC.  Do you
[22]  recognize those as photocopies of the arrest and conviction
[23]  record that was pulled on Jeff Frazier at or about the time
[24]  of his arrest and prosecution?
[25]  **A   Yes.**

Page 59

[1]   Q   Can you recall there ever being a point in time at
[2]   which Mr. Faircloth was informed of the arrest and conviction
[3]   history of Frazier?
[4]   **A   I don't remember.**
[5]   Q   Or of Garrett?
[6]   **A   Not that I remember.**
[7]   Q   Following Jeff Frazier's arrest, do you recall that
[8]   there were occasions when -- I don't know how many, actually
[9]   -- but there were times when he was interviewed at the jail?
[10]  Frazier was?
[11]  **A   I'm sure he was.  I don't recall specifically.**
[12]  Q   Do you -- now I could -- do you recall that during
[13]  the course of your contact with Jeff Frazier following his
[14]  arrest that he claimed, among other things, that there were
[15]  other persons to whom he was supplying drugs?
[16]  **A   Yes.**
[17]  Q   Do you remember the name of Mark Rogers?
[18]  **A   Not specifically.**
[19]  Q   How about a Greg Warren?
[20]  **A   Not specifically.**
[21]  Q   Do you recall that Frazier claimed that David Hooks
[22]  had friends in the sheriff's department who could find out
[23]  things before they happened?
[24]  **A   I don't specifically recall that particular**
[25]  **statement.**

Page 60

[1]   Q   Do you recall that among other things Frazier
[2]   claimed that Hooks was distributing drugs to attorneys in
[3]   Dublin?
[4]   **A   Not specifically.**
[5]   Q   Can you recall whether there was any follow-up
[6]   investigative step taken vis-à-vis Frazier's claim that Hooks
[7]   was distributing drugs after Frazier's arrest in October of
[8]   2009?
[9]   **A   Not specifically.  No.**
[10]  Q   Between the time that you were out at the location
[11]  of Garrett's arrest in September of 2014 and the execution of
[12]  the search warrant on Hooks' home, can you think of any
[13]  investigative options discussed between yourself and Chris
[14]  Brewer other than the investigative option of getting a
[15]  search warrant?
[16]  **A   I don't remember being involved in any of that**
[17]  **discussion.**
[18]  Q   Based on what you've told us up to this point, am I
[19]  correct in understanding that Mr. Brewer was the -- of the
[20]  officers involved in the Drug Unit, Mr. Brewer was the
[21]  officer who applied for the search warrant?
[22]  **A   Right.**
[23]  Q   And he, personally, completed the contents of the
[24]  search warrant affidavit application?
[25]  **A   Yes.**

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 61

[1]  Q   And made the decision to seek the search warrant?
[2]  A   Yes.
[3]  Q   To the best of your knowledge, he initiated the
[4]  contact with Brandon Faircloth?
[5]  A   When I walked into the office, that conversation
[6]  was ongoing so --
[7]  Q   Yes.
[8]  A   -- I don't know who initially called him.
[9]  Q   Can you think of anyone other than Chris Brewer who
[10]  initiated contact with, I forget his first name, Stokes?
[11]  A   Brian Stokes, SRT Commander.
[12]  Q   Head of the SRT.  As far as you know, was Mr.
[13]  Brewer the officer directly responsible for that?
[14]  A   As far as I know.  That's not to say, I definitely
[15]  didn't.  I mean, if he was in his office, I was in mine.
[16]  He'd say, "Hey, call Stokes and get them on the way."  You
[17]  know, I might have made the phone call.  I don't know.
[18]  Q   But as between yourself and Brewer, Brewer being
[19]  your supervisor, it would have been his call to --
[20]  A   Yes.  Yes.
[21]  Q   -- make.  And by "call" I mean decision to make.
[22]  A   Right.  Yes.
[23]  (OFF THE RECORD)
[24]  Q   MR. SPEARS:  Based on materials that we've been
[25]  provided in the last few weeks, it appears that in the wake

Page 62

[1]  of David Hooks' death, Chris Brewer prepared a list of
[2]  persons dealing drugs, who had claimed to have had some
[3]  connection to David Hooks, and gave that list to a GBI agent.
[4]  Are you familiar with that list?
[5]       MR. BUCKLEY:  I'll object to the form of the
[6]  question.  You may answer.
[7]  A   THE WITNESS: No, sir.
[8]  Q   Are you familiar with any such list being prepared
[9]  at all?
[10]  A   No, sir.  I don't think there's been a couple of --
[11]  my employment with the sheriff's office ran through December
[12]  of that year; however, I had, like, three months of time
[13]  built up.  So not long after this occurred, I actually left
[14]  the sheriff's office and ran out my time.  So a lot of what
[15]  happened after that night and since then, I don't know about.
[16]  Q   At the Hooks' home when you traveled there as the
[17]  SRT was going out to the home, am I correct in understanding
[18]  that you were positioned somewhere relatively close to the
[19]  residence?
[20]  A   Yes.
[21]  Q   Can you describe for me the observations you made
[22]  of the bullets coming through the house?
[23]  A   Yeah.  That part stands out.  I pulled up with
[24]  Sergeant Brewer.  I rode with -- me and him -- so, actually,
[25]  Sergeant Brewer pulled up behind SRT's vehicle.  We were --

Page 63

[1]  as you come up the driveway, I believe you go just around the
[2]  left side of the house, around to the back, and that's where
[3]  the carport was.  SRT pulled straight up kind of to the left
[4]  of the house and left of the carport.  So when our vehicle
[5]  stopped, we were directly to the left side of the house.  If
[6]  I stepped out of the vehicle and looked straight to the
[7]  right, I seen the complete side of the house.
[8]  Q   That would be the side that would be parallel to
[9]  319?
[10]  A   That's correct.  Yes.  Parallel to 319, if I got
[11]  my bearings are right.
[12]  Q   Yeah.  I don't know myself.
[13]  A   The front facing the pond.  The left facing the
[14]  driveway.  We were on the left.
[15]  As I stepped out on the right side of the vehicle, as
[16]  they were knocking and announcing and -- glass broke shortly
[17]  after and then I heard the shots firing and the -- sounded
[18]  like plastic or vinyl or whatever, falling at the front of
[19]  the residence and maybe even up in the boxing around the top
[20]  edge of the residence -- somewhere in that area is what it
[21]  sounded like to me.  I didn't go back up to the residence and
[22]  look to see where any of that actually happened but that's
[23]  just what it sounded like.  Right there at the front corner,
[24]  maybe out over the front porch, and the corner kind of close
[25]  to where I was standing.

Page 64

[1]  Q   Could you see any of the debris as it was being
[2]  blown off the house?
[3]  A   No, sir.  I was focused on taking cover and could
[4]  hear it falling.
[5]  Q   Uh-huh, (affirmative).
[6]  A   I didn't see anything because at this time, I was
[7]  between the truck and the house.  So when I heard everything
[8]  taking place, my line was around the truck to gain cover.  So
[9]  I was actually looking away from the house at the time I
[10]  started hearing the sounds.
[11]  Q   Did you have a collar or lapel mic on your uniform
[12]  at that time?
[13]  A   Did I?
[14]  Q   Yeah.
[15]  A   No, sir.
[16]  Q   Was there a way in which you, as an officer outside
[17]  of a vehicle, was there a way in which you had any radio
[18]  communication to you where you were?
[19]  A   I don't recall if I had my radio on my side that
[20]  night or not.  Normally, I probably didn't, being right there
[21]  in close proximity with Sergeant Brewer and the rest of the
[22]  unit and with the truck because I would have -- my cover
[23]  would have been pretty much at that truck until SRT gave the
[24]  all clear.
[25]  Q   In terms of what you can recall, what I'm trying to

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

---

Page 65

[1] get a sense of is whether you could hear any of the radio
[2] communications as they occurred between officers and before
[3] the shooting occurred. And of course, the time period I'm
[4] talking about is really while folks are driving out and once
[5] they get to the house before?

[6] **A  The only thing I remember hearing over an audible**
[7] **radio, and I do not recall whose it was, is "Bring EMS."**
[8] **That's the only thing I recall hearing over a radio because**
[9] **once the shots were fired and everything quieted, of course,**
[10] **you know, I'm heightened and I'm listening to see what's**
[11] **next. And it's, you know, what has happened?**
[12] **And I remember "We need EMS." Something to that effect.**
[13] **It might not have been those exact words. They were calling**
[14] **EMS to come into the house. So as far as the radio, that's**
[15] **the only traffic I remember.**

[16] Q  In thinking about the occasions in which you've
[17] been present for the execution of a search warrant for drugs,
[18] can you think of any other case where the report of the
[19] potential presence -- if I can call it that way -- the
[20] potential presence of drugs at a particular location happens?
[21] That is to say the report of it happens, and then the a
[22] search warrant is obtained and executed within a comparable
[23] span of time as with Hooks?

[24] **A  Yeah. I believe so. I believe, I mean, it wasn't**
[25] **uncommon for us to get the information and go ahead and act**

---

Page 66

[1] **on it. That wasn't an uncommon thing.**

[2] Q  Okay. Can you think of any particular cases where
[3] it was that short?

[4] **A  I can't --**

[5] Q  And short, of course, is my term. I realize. And
[6] with Frazier, obviously, it went on for months and months.

[7] **A  Right.**

[8] Q  I just wondered if there's any way to say it's
[9] common or uncommon for the execution to happen that quickly?

[10] **A  I mean, I can't give you a specific name right,**
[11] **sitting here, right now. But I don't -- I wouldn't**
[12] **think it was, you know, uncommon for us to act on the**
[13] **information as we received it, even to the point of going**
[14] **ahead and, you know, serving a warrant.**

[15] Q  Uh-huh, (affirmative).

[16] **A  That didn't stand out as uncommon to me.**

[17] Q  As of September of 2014, in your experience insofar
[18] as search warrants for drugs, was the SRT summoned to
[19] participate in the securing of the location for all drug
[20] search warrants?

[21] **A  I believe so. We were told that once they got**
[22] **established and running about the same time I was speaking of**
[23] **the OP plan situation earlier; we were told that from that**
[24] **point forward when we OPed a search warrant that SRT would**
[25] **pretty much be the ones executing it, unless there was some**

---

Page 67

[1] **kind of extenuating circumstances. If we were -- I don't**
[2] **even remember one right off that they didn't execute,**
[3] **actually.**

[4]       MR. SPEARS: Let's take a break.

[5] (BREAK)

[6] Q  MR. SPEARS: Referring your attention to Exhibit
[7] 41. After you've had an opportunity to take a look at it,
[8] could you, please, let me know whether or not you recognize
[9] this as a photocopy of the investigator's narrative that was
[10] signed off on on page two by Sergeant Chris Brewer in
[11] connection with his participation in the investigation of and
[12] the arrest of Jeff Frazier?

[13] **A  Oh, you gave me both of them. That's probably why**
[14] **you didn't find yours. You gave me your copy, too.**

[15] Q  Okay.

[16] **A  I can tell you it looks like a report that Sergeant**
[17] **Brewer did sign off on. That's all I can think because I**
[18] **don't recall ever seeing the original so I wouldn't know what**
[19] **it said. But this does look like a report that Sergeant**
[20] **Brewer done.**

[21] Q  And it would have been common practice for other
[22] investigators participating in your investigation such as the
[23] one with Jeff Frazier to prepare narratives that would go
[24] along with your overall report that in turn would be provided
[25] to the district attorney's office?

---

Page 68

[1] **A  Yes. Uh-huh, (affirmative).**

[2] Q  While you were out at the Hooks' residence, Hooks'
[3] home, on the night that David died, was there any time at
[4] which you saw Teresa Hooks outside of the home?

[5] **A  I did briefly, I believe. I think it was her. She**
[6] **was brought out the residence and sat on the thing. There**
[7] **was something out back. I don't know. I don't know if it**
[8] **was a little brick wall or something on the other side of the**
[9] **carport, maybe, in that area. She was taken to that spot at**
[10] **that specific time I seen her.**
[11] **After that, when the all clear was given, I went out**
[12] **towards the pond and was standing around down there waiting**
[13] **on of course, you know, the GBI and everything to finish**
[14] **taking place before we could leave the scene. That's the**
[15] **only time I recall seeing who I think was her.**

[16] Q  Sure. Do you recall whether -- was she in the
[17] company of a law enforcement officer?

[18] **A  I believe so.**

[19] Q  Do you recall whether she was in the company of
[20] more than one when she was -- came out of the house or
[21] positioned outside of the house?

[22] **A  I don't remember.**

[23] Q  Okay. Let me ask now about the -- some of the
[24] operational aspects of the pre-search planning. We've been
[25] told that the role of the SRT in carrying out a search

---

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

Page 69

[1]  warrant, a lot has to do with the entry and the securing of
[2]  the premises. Does that sound accurate to you?
[3]  A  Yes.
[4]  Q  Okay. And the SRT folks are drawn from, or can be
[5]  drawn from different sections or divisions of the sheriff's
[6]  department. Correct?
[7]  A  Yes.
[8]  Q  Personnel isn't all, you know, drug or any one
[9]  area?
[10] A  No, it's different divisions.
[11] Q  The search warrant that was sought for and obtained
[12] for the Hooks' residence, once the premises were secured was
[13] the plan that the Drug Unit officers would be the ones
[14] conducting the actual search of the premises?
[15] A  That's the normal. That's the way we normally
[16] operate. The SRT will execute the initial entry, securing of
[17] the residence. Once the all clear is given, the Drug Unit
[18] will come in then and conduct the search and may, you know,
[19] if it's a big place, they may get some of the SRT guys and
[20] say, "Y'all help conduct the search" or whatever. But that's
[21] normally how it's divided up.
[22] Q  All right. And realizing with David Hooks having
[23] been shot then it's a very different kind of picture.
[24] A  Right.
[25] Q  It's always hard to know what would have happened.

Page 70

[1]  But absent some extraordinary event like what happened here
[2]  with Mr. Hooks getting shot, was it your understanding as you
[3]  went out there with Chris Brewer that once the place was
[4]  secured then our role as the Drug Unit would be to search?
[5]  A  Yes.
[6]  Q  Okay. Once David Hooks was shot, is it fair to say
[7]  that then the -- you understood that there wasn't going to be
[8]  an immediate search of the premises once the premises were
[9]  secured. You were then waiting on the GBI folks?
[10] A  Right. Once that took place, then like I said,
[11] once the all clear, everything was calmed down, I went out
[12] toward the pond and we just kind of waited to see, you know,
[13] from that point what would happen. And, you know, I assumed
[14] that the GBI would come in, they would shut down the scene,
[15] they would take over, and that's what happened.
[16] Q  Right. And there wasn't going to be -- I mean,
[17] knowing that the GBI folks were going to be the ones coming
[18] in, then there wasn't --
[19] A  We would not be going in.
[20] Q  -- wasn't a search of --
[21] A  No.
[22] Q  -- the Drug Unit folks weren't going to do it?
[23] A  No.
[24]      MR. SHOOK: Can we take a break?
[25] (BREAK)

Page 71

[1]      MR. SPEAR: Those are all my questions. Thank you.
[2]      DIRECT EXAMINATION
[3]      BY MR. BUCKLEY:
[4]  Q  Just briefly, Mr. Burris, you earlier said that you
[5]  had accrued leave and so shortly after this search was done,
[6]  you used your leave to affect a resignation effective January
[7]  of the next year. Is that right?
[8]  A  Right. Yes.
[9]  Q  What, if any role, did this search or what happened
[10] play in your decision to resign and start your own private
[11] investigation company?
[12] A  It didn't have any bearing on it. I was already in
[13] the process of leaving before any of this took place.
[14] Q  Now when Garrett was interviewed and was talking
[15] about David Hooks' drug activities -- alleged -- strike that.
[16] When Garret was interviewed and said he had secured drugs
[17] from a vehicle at David Hooks' residence, what, if any,
[18] thought came to your mind about "Well, that's the guy Frazier
[19] said was involved in drugs"?
[20]      MR. SPEARS: Objection to the form.
[21] Q  MR. BUCKLEY: You can answer it.
[22] A  I mean, that -- that thought, of course, but, I
[23] mean, as I stated earlier, the fact that if there's drugs
[24] outside, I feel like it's safe to consider there may be drugs
[25] inside as well.

Page 72

[1]  Q  You also mentioned in your examination by Mr.
[2]  Spears that you were asked some questions about Garrett's
[3]  criminal history and Frazier's criminal history from before
[4]  they were giving their information to the police. You
[5]  remember those questions?
[6]  A  Yes.
[7]  Q  How common is it for your sources of information
[8]  about criminal and drug activity to be criminals themselves?
[9]  A  A lot more often than not.
[10]      MR. BUCKLEY: Okay. That's all the questions I
[11] have.
[12]      RECROSS EXAMINATION
[13]      BY MR. SPEARS:
[14] Q  With respect to the persons on whom you have relied
[15] during drug investigations, who themselves have criminal
[16] histories, if that person, over and above having a criminal
[17] history, when giving you new information is also lying to you
[18] about their own drug related activity, you, as an
[19] investigator take that into account, do you not, in assessing
[20] whether or not you can trust the truthfulness of their
[21] statements about other people?
[22] A  Yeah. I think a totality of everything is taken
[23] into consideration.
[24] Q  One factors in whether or not that informant is
[25] someone who you know for a fact has also been lying to you

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

---

Page 73

[1]  about other matters?

[2]  **A  Right.  And I also feel like it does come into play**

[3]  a little bit that the fact that when they're lying trying to

[4]  get out of trouble versus when he's making statements that

[5]  are actually incriminating himself.  So I put a little weight

[6]  on that as well.  It's the fact of him saying, "I ain't got

[7]  no drugs.  I don't have no guns."  You know, they're lying

[8]  trying to get out of trouble versus the fact of him saying,

[9]  "Yes, I was picking up dope and these are the people I was

[10]  taking it to," which, I mean, that's incriminating himself.

[11]  So, you know, I look at that also.

[12]      **MR. SPEARS:** Okay.  Thank you.

[13]      (DEPOSITION CONCLUDED 2:15 P.M.)

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 74

D I S C L O S U R E

STATE OF GEORGIA,

COUNTY OF :

Deposition of:  TIM BURRIS

Pursuant to Article 8.B. of the Rules and Regulations of the
Board of Court Reporting of the Judicial Council of Georgia,
I make the following disclosure:

    I am a Georgia Certified Court Reporter.  I am here as a
representative of Hawthorne & Webb Court Reporting.

    Hawthorne & Webb Court Reporting was contacted by the
offices of Brian Spears to provide court reporting services
for this deposition.  Hawthorne & Webb Court Reporting will
not be taking this deposition under any contract that is
prohibited by O.C.G.A. 15-14-37 (a) and (b).

    Hawthorne & Webb Court Reporting has no contract to
provide reporting services with any party to the case, any
counsel in the case, or any reporter or reporting agency from
whom a referral might have been made to cover this
deposition.  Hawthorne & Webb Court Reporting will charge its
usual and customary rates to all parties in the case, and a
financial discount will not be given to any party to this
litigation.

    Dated:  October 5, 2016

_____, CCR B-959
    Certified Court Reporter

---

Page 75

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

    I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in
such capacity on October 5, 2016, I reported the testimony of
TIMOTHY BURRIS, and on the foregoing pages, numbered 5
through 73, both inclusive, have transcribed a true, accurate
and complete transcript of the same.

    I FURTHER CERTIFY that I am not counsel for nor related
to any of the parties; nor am I interested in the event or
the outcome thereof.

    WITNESS my hand and official seal this 14th day of
October, 2016.

_____

                              Certificate Number B-959

---

Page 76

CERTIFICATE OF WITNESS
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERESA POPE HOOKS, ET AL.     :
            PLAINTIFFS,        :      CASE NO.
                              :      3:16CV00023-DHB-BKE
    VS.                        :
                              :
CHRISTOPHER BREWER, ET AL.,    :
      DEFENDANTS.              :

_____

DEPOSITION OF: TIM BURRIS          OCTOBER 5, 2016
    (  )I wish to make the following correction(s):
PAGE/ LINE/     CORRECTION          /      REASON
___/____/_____/_____
___/____/_____/_____
___/____/_____/_____
___/____/_____/_____
___/____/_____/_____
___/____/_____/_____
___/____/_____/_____

    (  )I have read the foregoing pages of my testimony and
wish to make no corrections.

_____
                      Tim Burris
Sworn to and subscribed before me
This ____ day of _____, 2016.

_____
Notary Public

---

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

## #

**#1** 17:14,19,19;18:1,2,8,11,12,21;
21:6,9;50:12,12;52:2,14;53:6;57:7
**#1"** 17:1;52:10
**#206** 51:15

## $

**$1,600** 53:7

## '

**'cause** 21:8

## ,

**'05** 13:11
**'99** 13:13

## "

**"Bring** 65:7
**"call"** 61:21
**"Giving** 53:3,6
**"Harrison** 55:3
**"he"** 30:14
**"Hey** 61:16
**"I** 15:20;16:11;29:1;33:22;34:1;
73:6
**"no"** 35:20
**"On** 52:8,20;54:24
**"probably"** 45:12
**"September** 53:24
**"some** 15:5
**"Subject** 17:1
**"There's** 15:18
**"there"** 30:4
**"Tim** 43:14,15;44:5
**"tried"** 4:23
**"We** 65:12
**"Well** 71:18
**"Y'all** 69:20
**"Yes** 73:9
**"yes"** 35:20

## 1

**10** 43:20
**10:30** 43:19
**10th** 51:1
**11:36** 52:9
**11:40"** 53:25
**11th** 50:24;51:5
**14th** 51:15

## 2

**2:15** 73:13
**20** 46:21;47:9
**2000** 7:11
**2004-2005** 13:10

**2005** 7:23,23
**2009** 9:5;15:18;19:8,25;38:16;
39:13;40:7,12;41:20,23;42:6;45:22;
48:8,13;52:2,8,20;54:6;56:19;58:12;
60:8
**2009"** 54:24
**2014** 5:23;6:5;7:12,23;9:25;13:19;
14:9,15;23:21;39:13;42:15,16;44:2,
25;48:13;60:11;66:17
**2015** 5:25;6:19
**207** 51:25
**208** 52:7
**209** 52:18
**20th** 52:2
**210** 53:10,23
**211** 54:4
**212** 54:21
**21st** 54:9
**22nd** 54:24
**23rd** 54:6
**24** 39:13;41:10
**24th** 9:25;10:4;13:19;14:9;23:12,
21;41:1,11;44:24;52:8
**25th** 42:16;44:2
**28th** 52:20
**2nd** 42:15,18

## 3

**3:00** 55:7,7
**31** 26:24;27:1,7;37:9
**319** 63:9,10
**32** 26:15,17,24;27:1,13
**33** 26:17,24;27:1;28:16;29:25
**34** 44:13,14
**35** 43:20;48:1,4
**36** 43:20;50:2,4
**37** 58:14,18
**38** 58:14,18
**39** 58:6,7

## 4

**40** 57:19,21,24
**41** 67:7
**42** 57:9,11
**43** 55:13,15

## 8

**8th** 53:25

## 9

**9:00** 41:10

## A

**able** 10:13;11:5;28:8;42:19,24;
43:22,25;53:12
**above** 72:16
**absent** 70:1
**absolutely** 19:11

**abundance** 24:12;29:6
**according** 35:17;55:6,14
**account** 46:13;72:19
**accrued** 71:5
**accurate** 36:6;48:7;69:2
**across** 14:6;30:21;54:14
**act** 65:25;66:12
**activities** 71:15
**activity** 17:24;19:19;24:7,13;46:6,8;
72:8,18
**actual** 16:1;37:5;69:14
**actually** 14:14;42:17;45:9;58:17;
59:8;62:13,24;63:22;64:9;67:3;73:5
**adjacent** 36:22;37:2,23
**advance** 11:7
**advantage** 21:12
**affect** 71:6
**affidavit** 55:21;60:24
**affirmative** 6:6;9:22;13:9;27:14;
30:1;34:6,8,17;35:19;48:16;49:14;
54:5,25;55:9;56:1;58:19;64:5;66:15;
68:1
**affirmatively** 43:17
**afternoon** 9:23,25;23:21;55:7,23
**again** 15:16;22:16;29:2;50:13;
51:18;52:10;53:24;54:1,6,12;55:24;
56:22;24:11
**agent** 9:17;18:4;25:3;32:12;46:12;
48:8;50:13;62:3;12:2;44:2,9
**ago** 11:9,12
**agree** 46:5
**agreement** 4:3
**ahead** 5:3;26:17;65:25;66:14
**ain't** 73:6
**allegation** 22:20,23;24:14
**alleged** 16:4;71:15
**along** 8:19;9:9;11:24;16:12;23:10;
35:24;67:24;58:3
**Although** 31:14
**always** 8:8;47:13,14;69:25
**among** 21:12;57:16;59:14;60:1
**amount** 46:23
**announcing** 63:16
**answered** 24:20;40:20
**apparently** 53:7
**appear** 48:6
**appears** 52:1;61:25;27:12;58:2
**application** 45:9,18,20,21;46:2;
55:18;60:24
**applied** 60:21
**approximate** 7:9
**approximately** 52:9;53:25;7:22
**approximating** 44:23
**area** 63:20;68:9;69:9
**Argumentative** 38:18
**around** 26:4;26:21;49:6;63:1,2,19;
64:8;68:12
**arrange** 52:3
**arrangement** 54:1
**arrangements** 51:21;52:10
**arrest** 9:4;19:3;26:4;31:15,21;
58:17,22,24;59:2,7,14;60:7,11;
67:12

**arrested** 10:5;15:17;19:8;20:14;
25:23,24;31:4;44:25;54:20;57:2;
58:11
**arrived** 35:4
**aside** 48:23
**aspects** 68:24
**assessing** 72:19
**associated** 10:6
**assume** 13:18;36:10
**assumed** 36:14;70:13
**assuming** 36:3,4,15;41:3,7;36:21;
37:20
**Atlanta** 15:5
**attempted** 45:1
**attention** 67:6
**attorney** 4:24
**attorney's** 58:16
**attorneys** 60:2
**attorney's** 67:25
**audible** 65:6
**audio** 42:13;44:1,4,9;53:6;43:3,21;
44:7
**August** 17:4;50:24;51:1,4,15;52:1,
8,20
**authorization** 55:19
**Aviator** 12:19,20,21;25:12;27:9,16,
24;28:7;29:9;37:11
**avoiding** 28:24
**aware** 19:14;20:11,12;21:24;22:4;
24:22,23;25:21,23;26:6;31:5;44:15,
22;45:3,6;46:1;48:12
**away** 22:13;55:24;64:9

## B

**back** 15:5;16:12;17:25;19:15;20:7;
21:10;29:13,24;31:22;32:3;47:20;
48:20;49:12;63:2,21;68:7
**bag** 30:21
**based** 14:24;27:20,22;36:16;60:18;
61:24
**basically** 25:3
**batteries** 58:4
**bearing** 71:12
**bearings** 63:11
**became** 48:18
**began** 6:25
**begging** 45:2
**beginning** 6:19;17:4
**begins** 52:8;54:23
**behalf** 29:20
**behind** 45:15,17;62:25
**best** 14:10;21:20;40:23;61:3;23:13;
30:24;34:18;35:2,6
**big** 6:2;69:19
**bit** 18:7;20:6;73:3
**blocks** 40:12
**blown** 64:2
**both** 30:9;51:8;67:13
**bought** 17:16;30:11
**box** 29:4
**boxing** 63:19
**boy** 17:9

Case 3:16-cv-00023-DHB-BKE   Document 83-1   Filed 05/25/17   Page 22 of 28

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

**bracket** 32:20
**bracketed** 23:11
**Brandon** 34:5,19;42:7;61:4
**break** 67:4;70:24;67:5;70:25
**Brewer** 9:18;10:14;13:7;18:1,3;
25:2,3,8,9;27:23;30:8,10;31:22;
32:5,12,22;34:15;35:4,7,16,24;
37:21,22;40:24;41:14,15;44:16;
45:9,20;48:9;50:12,22;51:8,19;52:1,
9,13,22;53:12,25;54:7,13,17;57:6;
60:14,19,20;61:9,13,18;62:1,24,
25;64:21;67:10,17,20;70:3
**Brewer's** 34:23
**Brian** 4:10;52:23;61:11
**brick** 68:8
**briefing** 47:12,14;49:12
**briefly** 11:9,15;12:4,14;68:5;71:4
**bring** 16:11
**bringing** 15:4
**brings** 6:3
**broke** 63:16
**Brooks** 25:1,2,25;26:1;31:19
**brought** 68:6
**Buckley** 4:25;9:16;14,21;23:1,7,17,
25;24:5,8,17;26:5;28:23;29:1,11,18,
20,22;31:10;33:2;12;34:23;35:11,20;
36:7,12;37:1,9;38:1,18,22;39:8,16,
21;40:9,19;41:25;42:8;45:23;46:9,
17;56:20;62:5;71:3,21;72:10
**building** 40:11
**built** 62:13
**bullets** 62:22
**Burris** 4:10;5:18;42:12;43:4,11,14;
44:8;71:4;4:3;5:12
**Burris"** 43:15;44:5
**busy** 17:9
**buy** 17:20;51:9,15,22,24;52:6,19;
54:9,9;53:23;54:3
**buys** 16:24;17:3,13;18:4,16,21;
20:22;54:17
**bystanders** 31:16

**C**

**calendar** 45:22
**call** 8:3,6,9;11:17;20:23;21:5;25:4,
8;32:17;34:10,12,22;41:13;52:2;
61:16,17,19;65:19
**called** 7:25;8:8;25:2;43:15;61:8
**calling** 65:13
**calmed** 70:11
**came** 30:21;31:2,6;32:3;34:11;
36:5;68:20;71:18
**can** 5:7,8;15:8;18:6;19:8;20:3;
25:19;26:14,18,20;29:18;31:15;
32:20;33:22;34:1,14;38:13;43:18;
45:14;47:25;49:25;53:18,19;56:6,
15;57:13;60:12;64:25;65:18,19;
67:16,17;69:4;71:21;72:20;7:9;
26:22;29:8;30:10;33:10;49:15;
57:11;59:1;60:5;61:9;62:21;66:2;
70:24
**can't** 45:11;56:5;66:4,10

**capsulize** 15:3
**carefully** 17:21
**carport** 63:3,4;68:9
**carrying** 68:25
**case** 9:2,7,13,16,17,17,20,21;10:1;
14:13,19;19:1;32:12;38:4;41:15,16,
19,22;42:1,3;48:8;54:13;65:18
**cases** 6:20;20:4;66:2
**cause** 46:16
**caution** 24:12;29:6
**CD** 44:14
**cell** 34:23
**Center** 31:22;32:3,9
**certain** 5:8;8:12;16:25;27:25;38:24;
45:11
**certainly** 46:12
**chance** 11:18;12:15;48:5;50:4
**changed** 47:20
**check** 45:15,17
**Chris** 9:18;10:14;13:7;18:1;25:2,3;
27:23;30:8,10;31:22;32:5,22;34:23;
35:4,16;37:21;40:24;41:14;44:16;
45:9,20;48:9;50:11;53:25;54:17;
60:13;61:9;62:1;67:10;70:3
**CI** 58:3
**circumstances** 67:1
**claim** 15:4;30:19;36:5;60:6
**claimed** 14:24;22:1;30:11;31:17;
59:14,21;60:2;62:2
**claiming** 15:19;24:23;47:3
**claims** 56:24
**clear** 64:24;68:11;69:17;70:11
**close** 21:1;62:18;63:24;64:21
**closely** 17:19
**clue** 11:4;32:11
**collar** 64:11
**color** 58:8
**coming** 14:4;62:22;70:17
**commander** 49:5;61:11
**common** 66:9;67:21;72:7
**communicated** 42:7
**communication** 64:18
**communications** 65:2
**company** 5:21;6:25;7:1,3;68:17,19;
71:11
**comparable** 65:22
**complete** 63:7
**completed** 60:23
**CONCLUDED** 73:13
**concluding** 38:13
**conduct** 4:5;69:18,20
**conducting** 69:14
**conference** 41:13
**confine** 32:21
**connected** 24:7
**connection** 9:13,20;11:6;50:7;
62:3;67:11
**consider** 38:7,10,25;71:24
**consideration** 72:23
**consisted** 20:25
**contact** 13:20;17:25;18:7,11,13;
23:11,20;27:10;30:25;31:3,18;
59:13;61:4,10

**contacting** 32:14
**contained** 27:25
**contents** 27:16;28:8,21;29:9,11;
60:23
**controlled** 16:24;17:3,13,14,20,21;
18:16,21;20:11,22;51:5,9,22;52:11,
25;53:19;54:7,17;57:25
**conversation** 34:4,19;35:8;41:13;
44:21;61:5
**conversations** 30:8
**convicted** 56:5
**conviction** 58:22;59:2
**copy** 44:1;48:7;55:17;57:14;58:8;
67:14
**corner** 63:23,24
**Corporal** 52:23
**corroborate** 38:5
**corroborates** 39:2
**corroboration** 39:5,9
**costs** 58:3
**couldn't** 24:19;25:6;37:15
**counsel** 4:4
**counties** 8:13
**county** 8:19;7:6;8:23,24,25;55:19
**couple** 28:3;49:24;62:10
**course** 9:1,11;17:4,18;24;18:10,15,
20;19:2;24:11,12;30:20;38:3;49:17;
56:16;57:6;59:13;65:3,9;66:5;68:13;
71:22
**court** 4:14,22;35:21;44:13;55:19,
19;26:16,19
**cover** 64:3,8,22
**covered** 10:13,22,25
**criminal** 72:3,3,8,15,16;58:20
**criminals** 72:8
**CROSS** 5:15
**culminated** 9:4
**culminating** 6:4
**currency** 24:7
**current** 46:8
**currently** 5:20
**custody** 15:17;36:17;56:6
**cut** 24:2

**D**

**date** 9:24;10:5,9;15:14;21:23;
22:18;46:2
**dated** 42:25
**dates** 16:1,4;44:24
**David** 13:20;14:11,25;15:6,9,12,22,
25;16:5,9,12,15;18:12,22;19:4,7,9,
25;20:11;21:21,23;22:1,4,6,15,17,
24;23:5,11,14,23;24:11;30:12,14,
15,25;31:19,19;36:23,24;37:25;
38:12;39:6,10,10,15;40:2,4,7,13,17;
41:9;59:21;62:1,3;68:3;69:22;70:6;
71:15,17
**day** 41:1;50:25;51:4,5
**deal** 14:2
**dealing** 18:2;30:15;62:2
**dealings** 24:15;49:4
**death** 21:23;22:4;62:1

**debris** 64:1
**December** 7:12;62:11
**decided** 48:24;49:6
**deciding** 46:16
**decision** 61:1,21;71:10
**defendants** 29:20
**define** 20:19
**definitely** 61:14
**definitive** 33:16
**delivered** 16:17
**delivery** 16:1
**Demonte** 56:24;57:2
**depart** 21:5
**department** 55:2;59:22;69:6;7:7;
8:25
**deposed** 11:1
**deposition** 4:2,5,18,19,20;10:12,
16,18;11:8;73:13
**depositions** 4:12;11:1
**deputies** 10:18;52:14
**Deputy** 34:10
**describe** 62:21
**described** 52:7;53:23;54:4
**description** 52:19;56:23
**determinative** 46:11
**determining** 46:7
**device** 53:6
**didn't** 5:5;22:18;25:6;32:11,15;
37:16;40:1;56:2,2;61:15;63:21;64:6;
66:16;67:2,14;71:12;22:20,23
**died** 68:3
**difference** 4:17
**different** 69:5,10,23
**differently** 20:4
**DIRECT** 71:2
**directly** 54:1;57:4;61:13;63:5
**disc** 43:15
**discussed** 41:23;60:13
**discussion** 32:25;56:15,17;60:17
**distribute** 15:20;24:4
**distributed** 38:16
**distributing** 22:12;47:4;53:18;60:2,
7
**distribution** 16:20;22:18;38:8
**distributor** 16:16
**district** 58:16;67:25
**divided** 69:21
**divisions** 69:5,10
**document** 33:25;48:2;57:12;48:1;
50:2;55:13;57:9,19;58:6
**documents** 9:8;57:10;26:24;58:14
**doesn't** 16:1,4,7;28:23;29:2;40:6;
44:5
**don't** 4:11;5:6;8:3;10:9,15,23,24;
11:4;12:11;14:1,2,7;15:14,15;16:6,
22,25;18:3,4;19:15;20:7,8;22:3,16;
25:10,14;27:18;28:2;29:1,3,13;30:6;
34:1,2,25;37:3,13,16,18,19;38:23;
39:23;41:5,8,12,17;42:25;44:23;
45:6;47:6,13,19;49:19,20,20;59:4,8,
11,24;61:8,17;62:10,15;64:19;
66:11;67:1,18;68:7,7,22;73:7

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

**done** 19:12;21:21;32:7,18,18;
42:15,16;47:19;56:9;67:20;71:5
**door** 27:17
**door's** 29:15
**dope** 15:25;17:16;21:15,18;56:2;
73:9
**doubt** 19:11
**down** 4:16;7:24;25:5,11;28:18;
68:12;70:11,14
**drawn** 69:4,5
**drew** 27:23
**driveway** 63:1,14
**driving** 40:25;65:4
**drug** 8:22;15:13;19:19;22:2,7;24:7;
46:6,8;52:19;66:19;69:8;71:15;72:8,
15,18;7:19,20,23,25;8:3,8;9:1,16;
13:8,11,12,16;18:2;19:10,17;21:25;
23:4,11,13,22;32:6;39:19;44:17;
48:14,23;52:15;53:7;60:20;69:13,
17;70:4,22
**drugs** 15:1;22:21,24;23:5;24:15,15,
23;30:11,16;35:9;36:1,25;37:5,14,
25;38:6,7,7,14,17;39:1,15;40:2,2,4,
5,7,13,17;53:18;59:15;60:2,7;62:2;
65:17,20;66:18;71:16,23,24;73:7
**drugs"** 71:19
**Dublin** 60:3
**Dudley** 6:12
**duly** 5:14
**duration** 17:6
**during** 12:16;14:19;18:4,19;19:2;
38:4;59:12;72:15;7:13;17:18,24;
18:10,15;41:13

**E**

**earlier** 53:15;66:23;71:4,23
**early** 42:16
**edge** 63:20
**effect** 16:17;19:18;23:4,14,22;
31:18;35:25;40:13,17,25;53:12;
56:18;65:12
**effective** 71:6
**eight** 17:7;54:10,17
**either** 5:5;6:1;14:25;21:24;25:23;
33:19;39:20
**else** 6:1;13:25;14:1;27:22
**employed** 5:19
**employee** 6:22
**employees** 6:7
**employment** 62:11
**EMS** 65:14
**EMS"** 65:7,12
**end** 7:9,11;34:19;43:5,6,18,23
**ended** 48:15
**enforcement** 68:17;31:22;32:3,9
**engaging** 22:7
**enough** 35:9;39:24
**entitled** 44:4
**entry** 69:1,16
**equipment** 23:15,23;24:2,4;58:4
**errors** 45:15
**established** 48:18;66:22

**even** 10:9;14:7;20:1;28:2;31:17;
41:4,6,9;49:11;63:19;66:13;67:2
**evening** 30:8
**event** 70:1
**events** 6:4
**eventually** 57:2
**evidence** 31:4
**exact** 10:9;44:23;65:13
**exactly** 27:18
**examination** 72:1;5:15;71:2;72:12
**example** 19:16
**exclusive** 8:23,24
**excuse** 31:19;48:5
**execute** 67:2;69:16
**executed** 47:15;55:3;65:22
**executing** 48:18;66:25
**execution** 47:16;48:10;60:11;
65:17;66:9
**exhibit** 27:21;48:3;27:1,7,13;28:16;
48:4;50:4;55:15;57:11,21,24;58:7;
67:6;44:14;48:1;50:2;55:13;57:9,19;
58:6
**EXHIBITS** 26:24;58:14
**experience** 4:12;14:24;66:17
**explain** 10:4
**expression** 20:20
**extent** 24:18
**extenuating** 67:1
**extraordinary** 70:1

**F**

**facing** 63:13,13
**fact** 11:19;41:22;42:5,7;56:9;71:23;
72:25;73:3,6,8
**factors** 72:24
**fair** 18:1;70:6;39:24
**Faircloth** 34:5,20;35:5,7,17,24;
41:14,24;42:7;44:21;56:17;59:2;
61:4
**fairness** 45:12
**falling** 63:18;64:4
**false** 47:23
**familiar** 41:19;62:4,8
**family** 31:16;45:2
**far** 10:25;20:7;25:5;32:13,18;39:14;
48:20,21;61:12,14;65:14
**feel** 13:4;38:10,25;71:24;73:2
**felon** 56:5
**few** 11:10;27:2;61:25
**figured** 26:15
**file** 19:20;20:7;43:15;44:4;57:23;
58:15
**financing** 24:7
**find** 47:25;59:22;67:14
**finding** 28:10,12;29:5
**fine** 5:2;6:1;11:25;33:24;34:1
**finish** 68:13
**firearms** 28:4
**fired** 65:9
**firing** 63:17
**first** 5:13;14:21;25:2;26:9;32:10;

35:15;53:24;61:10
**five** 52:19
**flat** 34:2
**Florida** 58:20
**focused** 24:11;64:3
**folks** 42:14;65:4;69:4;70:9,17,22
**folks"** 15:20
**following** 51:11;59:13,7
**follow-up** 60:5
**Force** 8:6,8,11
**forget** 61:10
**form** 4:7;5:1;16:14;23:1,7,17;24:18;
26:5;31:10;35:11;36:7;38:1,18;
39:16;40:9,19;41:25;42:8;45:23;
46:9,17;56:20;62:5;71:20
**formal** 4:21
**format** 4:13
**forward** 66:24
**found** 31:6;35:18;36:5,22;38:14,17;
39:1;41:4;56:10,13
**four** 47:10;52:6
**frame** 49:13
**Frank** 56:24
**Frazier** 9:2,13,17;11:6;14:13,19,
23;15:3,8,12;16:8,16,24,25;18:11,
13,16,21,23,25;19:3,5,8,16;20:14,
21,24;21:14,25;22:8,9,10,14;38:4,
16;39:10;40:1;41:15,16,19,22;42:2,
5;45:21;46:2;47:2,2,3;48:10;49:23;
50:8;52:3;53:8,13;54:20;55:3,23,24;
56:18,23,24;57:5,16;58:1,4;59:3,5,
10,13,21;60:1;66:6;67:12,23;71:18
**Frazier's** 15:4,17;16:19;19:8;
21:1;47:17;54:14;55:20,22;56:5,13;
58:17;59:7;60:6,7;72:3
**Frazier"** 52:21
**friends** 59:22
**front** 27:17;29:12;63:13,18,23,24
**full** 5:17;51:25;53:4;54:23
**funds"** 53:7

**G**

**gain** 64:8
**Garret** 71:16
**Garrett** 9:20,21;10:1,5;12:18,22;
14:12;22:5;23:6,9,12,20;24:22,23;
25:1,5,9,23;26:9;27:10,24;29:10;
30:11,15,24;31:9,18;32:2;35:18;
36:10,17,21;37:5,16,21,22,22;
40:16,22;41:7;44:22;45:4,5;46:20;
59:5;71:14
**Garrett's** 26:4;30:18;31:2,3,6,
11,15,21;36:4,4;44:17;60:11;72:2
**gather** 19:23
**gave** 57:10;62:3;64:23;67:13,14
**GBI** 8:7;12:2;42:14;44:10;62:3;
68:13;70:9,14,17
**GCIC** 58:21
**general** 5:2;7:18
**generalized** 16:11
**generally** 10:10;54:13
**gentlemen** 29:22

**Georgia** 6:12;7:2
**gets** 10:5;26:10;57:2
**Giddens** 12:2,5;42:18;44:9;46:19
**gist** 30:18
**given** 4:18;15:9;22:15,23;29:6;
42:15;68:11;69:17
**gives** 15:25
**giving** 4:13;15:5,19;56:18;72:4,17
**glass** 63:16
**goes** 18:25
**grams** 35:17;46:21;47:9
**Greg** 59:19
**guess** 22:14;25:10;27:18;28:18,20;
32:14;37:17
**guesstimate** 45:13
**guides** 48:22
**guns** 56:3,6,9,12
**guns"** 73:7
**guy** 15:18;17:20;71:18
**guy"** 15:19
**guys** 69:19

**H**

**half** 44:22,24
**handing** 26:25
**handled** 48:22
**handling** 48:25
**happen** 11:17;66:9;70:13
**happened** 25:21;59:23;62:15;
63:22;65:11;69:25;70:1,15;71:9
**happens** 65:20,21
**hard** 28:10,12;29:4;69:25
**haven't** 10:23,23;11:18;12:23,23;
33:8
**he'd** 44:25,25;61:16
**he's** 15:17,19;17:15,16;28:23;
36:9,15,17,18;73:4;15:19;17:15;
18:24;29:1;50:24
**head** 43:17;61:12
**headed** 21:8
**headquarters** 28:19
**hear** 5:6;16:18;42:19;43:18,22;
64:4;65:1
**heard** 35:23;39:23;46:22;63:17;
64:7
**hearing** 64:10;65:6,8
**heck** 47:9
**heightened** 65:10
**help** 28:4;69:20
**hesitancy** 29:11
**himself** 15:9;22:9;41:9;45:3;73:5,
10
**histories** 72:16
**history** 59:3;72:3,3,17;58:21
**home** 10:6;21:2;22:1;23:5,15,23;
36:24;37:3,25;38:14;40:3,5,7,13,15,
18,23;47:11,17;48:10;49:17;55:11,
23;56:3,8,9;57:16;60:12;62:16,17;
68:3,4
**Hooks** 13:20;14:11,17,22,25;15:6,
9,12,23;16:1,5,9,15,18,19;18:12,22;
19:4,7,10,25;20:12;21:21;22:6,12,

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

15,18,18,20,24;23:11;24:11,14,24;
30:12,14,15,25;31:19;36:23;38:12,
16;39:6,10,11,15;40:2,4,7,13,17;
41:9;44:19;59:21;60:2,6;62:3;65:23;
68:4;69:22;70:2,6
**Hooks'** 10:6;20:16;21:23;22:1,4;
23:5,15,23;30:19;31:7;36:24;37:23,
25;40:23;47:11;49:17;60:12;62:1,
16;68:2,2;69:12;71:15,17
**Hooks"** 16:12
**hope** 21:17
**hoping** 55:16
**hours** 41:10;42:16
**house** 13:22,23;36:1;38:21,24;
39:1,3;53:20,20;62:22;63:2,4,5,7;
64:2,7,9;65:5,14;68:20,21
**hundreds** 33:7

## I

**I'd** 38:2,4,10
**I'll** 4:10;9:8,23;13:3;18:6;27:2;
28:6;36:20;42:21,24;43:18,19;44:5,
13;48:4;62:5
**I'm** 4:10;5:25;8:10;9:4;10:24;13:7,
24;20:24;22:12;23:2;25:19;26:25;
28:25;29:16;30:5;33:3;37:17;42:4,
12;43:6,7;44:23;48:2;49:11;50:15;
52:5;53:3;54:20;55:16,24;58:17;
59:11;64:25;65:3,10,10
**I've** 5:5,6;8:8;11:18;24:10;33:8;
55:14
**idea** 24:25
**identified** 42:22;58:20
**illegal** 40:7;56:8
**immediacy** 49:16
**immediate** 70:8
**implication** 39:5
**important** 12:12;25:17
**imprint** 43:19
**incident** 6:4;12:13
**include** 22:5,18,20,23;34:15
**included** 27:23;56:19
**incriminating** 73:5,10
**indicate** 37:24
**indicated** 19:3;31:25
**indication** 39:10
**informant** 51:1;72:24
**information** 14:10,17,22;16:17;
19:23;22:15,17;23:4,14,22;24:21;
31:5,12;35:24,25;36:16;37:24;38:3,
3;39:14,20;40:1,3,12,17,25;46:6,7;
48:19;49:15,22,23;51:1;56:18;
65:25;66:13;72:4,7,17
**informed** 15:9,12;59:2
**initial** 50:25;69:16
**initially** 61:8
**initiate** 19:20:11
**initiated** 19:25;20:4;32:13;61:3,10
**inquiry** 19:21
**inside** 26:10;27:19;29:16;35:9;
36:24;37:25;38:7,10;71:25;40:21
**insofar** 20:10;36:15;66:17;18:25

**interest** 19:22
**interior** 27:16;28:7
**interpose** 24:17
**interview** 42:20;44:1,5,9;46:19
**Interview"** 43:14
**interviewed** 12:3;59:9;71:14,16
**interviews** 13:1;42:14
**intimate** 11:16
**intimately** 57:4
**into** 23:9;34:11;36:5;41:6;46:13;
50:8;57:5;61:5;65:14;72:19,23;73:2
**investigate** 19:9;44:17
**investigating** 19:16
**investigation** 11:7;18:10,15,25;
19:2,20;20:21;42:6;45:21;46:3;47:2;
50:8,23,25;57:5;67:11,22;71:11
**investigations** 72:15;7:2,5,17,18
**investigative** 6:13;7:19;24:13;47:3;
50:7;60:6,13,14;7:21
**investigator** 5:20;6:21;9:12;19:17;
20:25;72:19
**investigator's** 50:6;67:9
**investigators** 17:16;32:6;67:22
**involved** 10:1;14:25;16:19;19:19;
24:13;45:1;50:23,24;51:9;52:1,13;
54:1,6,7,12,13,18;55:2;57:5,6;
60:16,20;71:19
**involving** 9:2
**isn't** 25:16;33:13;47:23;69:8;47:9
**it's** 4:3,14,19,23;29:12;38:6,10,
25;43:5,19;46:12;55:7,17;56:8;
65:11;66:8;69:10,19,21,23;71:24;
16:11;46:11,11;48:3;57:21;73:6
**items** 27:25;30:20;38:8,9

## J

**Jackson** 52:16
**jail** 59:9
**January** 5:23,25;6:20;71:6
**Jeff** 9:2;11:6;15:8;16:8;18:11,13,22,
25;19:2,5,7;41:16;47:2;48:10;52:21;
55:20;58:9,23;59:7,13;67:12,23
**Jeffrey** 38:15;50:8
**Jerry** 12:7,9;44:2
**joined** 13:8
**Jones** 12:6,10;44:2
**judge** 32:22;33:2;45:10;55:18
**judicial** 46:15
**jurisdictional** 8:16

## K

**keep** 11:24;12:18
**keeping** 55:16
**kept** 11:3;56:24
**key** 28:10,12;29:5
**kind** 5:3,9;6:14;19:21,21;21:12,20;
23:10;31:24;32:21;33:3;38:5;53:15;
63:3,24;67:1;69:23;70:12
**knew** 14:25;31:17;39:23;56:12
**knocking** 63:16
**know"** 29:1;33:22;34:1

**knowing** 37:17;38:12;70:17
**knowledge** 10:2;14:10,21;21:21;
23:13;30:24;31:13;34:18;39:18;
40:24;61:3
**known** 36:1

## L

**lapel** 64:11
**last** 11:20;12:10;41:1;44:22;61:25
**late** 23:21
**later** 30:22
**Laurens** 7:6;8:23,24,24;55:19
**law** 68:17;31:22;32:3,9
**leads** 19:21
**learned** 30:21
**learning** 56:23
**least** 21:13;30:5;49:13
**leave** 44:13;68:14;71:5,6
**leaves** 55:23
**leaving** 53:13,20;55:3;71:13
**left** 21:6;37:7;49:5;62:13;63:2,3,4,5,
13,14
**less** 4:21;46:23
**let's** 6:7;9:24;49:22;50:22,23;
51:24;49:12
**license** 6:16,18,22,24
**lies** 56:19
**Lincoln** 12:21;26:10;27:9,16,24;
28:18;29:9
**line** 64:8
**lines** 16:12;35:25
**link** 40:1
**linked** 40:4
**list** 19:21;62:1,3,4,8
**listed** 50:23
**Listen** 12:25
**listening** 65:10
**listing** 48:8
**literally** 33:7
**little** 11:16;17:10;20:6;68:8;73:3,5
**located** 23:14,23
**location** 16:7,8;44:19;60:10;65:20;
66:19
**lockbox** 27:25;28:9,13,17,22;29:25
**logistics** 51:9
**long** 4:14;5:22;13:12;26:21;31:15;
62:13
**longer** 42:17
**look** 4:18;11:5;12:1,15;19:24;27:2,
13;28:6;33:10;45:8;48:4,5;49:24;
50:3;52:7;55:15;57:11,20;58:7;
63:22;67:7,19;73:11
**looked** 11:15;12:23;27:19;49:11;
63:6
**looking** 13:25;14:5;28:6;45:18;
53:3;54:20;56:22;57:13;58:18;64:9
**looks** 49:9;67:16
**lot** 11:20;30:4;45:14;47:9;62:14;
69:1;72:9
**lying** 56:13;72:17,25;73:3,7

## M

**magistrate** 32:15,22;33:1,5;34:4;
45:10;55:18
**main** 9:15;18:1,7
**majority** 8:9;18:4
**making** 17:15;73:4
**manner** 9:15;11:3
**manufacturing** 23:15;30:16
**many** 7:20;59:8
**March** 6:20,20,24
**mark** 44:12;59:17
**marked** 52:18;55:14;26:24;44:14;
48:1;50:2;55:13;57:9,19;58:6,14
**materials** 11:6;27:23;47:3;57:23;
58:16;61:24
**matter** 11:10,19
**matters** 73:1
**may** 13:3;14:8;16:21;20:4,5;23:18;
32:18;34:10;35:12;38:7,19;39:3;
45:6,24;47:20;62:6;69:18,19;71:24;
7:11
**maybe** 14:6;32:20;46:11;63:19,24;
68:9
**mean** 10:23;17:9;19:12;20:4;27:18,
19;29:3;30:3,5;32:15,16;33:10;
36:13;38:20,23,23;40:6,11;47:6;
49:17;61:15,21;65:24;66:10;70:16;
71:22,23;73:10
**meaning** 16:8
**means** 20:20
**meet** 17:20
**meeting** 26:9;50:12,24;51:19;52:2,
13
**member** 9:15;19:10;23:13
**members** 21:25;31:17;44:17;52:15
**mention** 18:22
**mentioned** 19:7;72:1
**mentions** 15:22;39:10
**met** 33:2,5;52:9
**meth** 15:4,10,20;16:9,16,17;23:24;
24:2,4;30:22;31:3,6;35:17;36:3,6,
22;37:23;41:6;48:16;46:20;47:4,8;
56:24
**methamphetamines** 23:16;50:9
**mic** 64:11
**Middle** 7:2
**might** 19:24;20:2;27:21;51:12;
61:17;65:13
**Mike** 7:5
**Milledgeville** 6:21
**mind** 36:23;38:25;71:18
**mine** 61:15
**minute** 26:22;42:10
**minutes** 11:10;43:20;49:24
**mischaracterize** 22:17
**miscommunication** 5:10
**mistaken** 13:7;9:5
**moment** 17:25;55:16;57:13
**moments** 11:10;27:2
**Monday** 52:8
**money** 17:14

Case 3:16-cv-00023-DHB-BKE   Document 83-1   Filed 05/25/17   Page 25 of 28

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

**monitor** 53:19
**monitored** 17:19;18:16
**month** 7:11,11;11:9,12;44:22,24
**months** 17:4;62:12;66:6,6
**more** 11:16;16:18;17:10;20:6;
38:12;47:9;68:20;72:9
**morning** 11:16,22;42:16
**most** 25:16
**motion** 10:8;32:13
**move** 24:19
**moved** 28:18
**moving** 11:24
**much** 32:12,16;47:10;64:23;66:25
**multi** 8:14
**municipality** 8:19
**myself** 63:12

**N**

**name** 5:17;7:1,3;12:6,10;14:5;17:1;
19:7,22;39:6,10;50:15;59:17;61:10;
66:10
**names** 15:19,22
**narrative** 50:6;67:9
**narratives** 67:23
**Navigator** 12:19
**nearly** 17:4
**necessarily** 38:23
**necessary** 24:18
**need** 13:3;16:18;65:12
**needed** 23:23;32:17;49:7
**needs** 5:2
**negative** 20:15
**new** 19:22;72:17
**next** 18:19;44:4;50:25;51:14;53:3;
54:3,9;65:11;71:7
**night** 11:20;14:4;31:5;41:10;62:15;
64:20;68:3
**nine** 7:22;17:7
**Nodding** 43:17
**nomenclature** 7:24
**nonetheless** 34:11
**normal** 17:10;69:15
**normally** 69:15,21;64:20
**notice** 4:3;57:14
**number** 4:11;7:16;9:8;44:25;51:15,
21,24;52:6,19;53:23;54:3,9;26:15;
29:25
**numbers** 51:12;27:1

**O**

**o'clock** 41:10
**object** 24:19;62:5;16:14;23:1,7,17;
26:5;31:10;35:11;38:1,18;39:8,16;
40:9,19;41:25;42:8;45:23;46:9,17;
56:20
**objection** 5:1;16:21;23:25;24:5,8,
17;36:12;37:1;38:22;39:21;36:7;
71:20
**observation** 21:13,20
**observations** 42:5;62:21
**obtained** 30:10;65:22;69:11

**obviously** 4:21;6:3;66:6;4:25
**occasions** 59:8;65:16
**occurred** 6:4;17:3;62:13;65:2,3
**October** 9:5;15:17;17:5;19:8,25;
39:13;40:12;42:15,18;48:8,13;54:9,
24;58:11;60:7
**off** 20:3;26:22;30:8;42:10;49:25;
64:2;67:2,10,17;26:23;42:11;50:1;
61:23
**office** 6:10;13:15;25:4;34:10,11;
58:16;61:5,15;62:11,14;67:15
**officer** 34:16;35:4;46:15;54:18;
57:15;60:21;61:13;64:16;68:17
**officers** 35:2,3;47:11;60:20;65:2;
69:13
**official** 6:19,24
**officially** 6:25
**often** 72:9
**once** 4:19;5:8;15:16,17;18:24;19:8;
20:14;25:22;26:8;27:16;28:7;29:9,
15;35:4;54:1,20;55:22,22;56:9;65:4,
9;66:21;69:12;70:3,8,11;19:7;48:5;
69:17;70:6,10
**one** 13:23;15:22;20:23;21:17;25:4,
6;29:25;33:4,6;34:24;35:14;38:15;
41:20,23;42:17,17,18,24;43:14;
45:15;47:19,20,21;49:9;50:19,20;
51:14,18,21;54:12;55:23;56:16;
67:2,23;68:20;69:8;4:17;42:15;
57:10;72:24
**ones** 4:6;49:9;66:25;69:13;70:17
**ongoing** 61:6
**only** 22:15;29:12;31:11;34:18;35:4;
39:5;42:1;52:13;54:13;58:8;65:6,8,
15;68:15
**OP** 66:23
**OPed** 66:24
**open** 11:18;19:20,21
**opened** 20:8;27:17;29:15;30:2,6
**operate** 69:16
**operated** 8:13
**operational** 9:12;68:24
**operations** 47:17;48:7,9,15,21
**opportunity** 4:18,20;67:7
**OPs** 47:21;48:25;49:3,7
**option** 60:14
**options** 60:13
**oriented** 10:12
**original** 67:18
**originally** 37:14
**others** 52:23
**otherwise** 22:1
**ounce** 46:23;52:21
**ounces** 16:12
**ounces"** 15:6
**out** 6:9,21;11:20;13:23;24:11;25:9,
10,22;26:3,8,15;27:9;28:17;29:6,10,
10;30:19;31:14,25;37:15;59:22;
60:10;62:14,17,23;63:6,15,24;65:4;
66:16;68:2,6,7,11,20,25;70:3,11;
73:4,8
**outright** 56:19
**outside** 38:7,9;39:1;64:16;68:4,21;

71:24
**over** 7:22;9:11;11:5;13:16;17:4;
18:21;34:4;47:10;51:25;63:24;65:6,
8;70:15;72:16;9:1
**overall** 67:24
**own** 5:20;14:24;49:8;71:10;72:18
**owns** 14:6,7

**P**

**packaging** 23:24;38:9
**Padgett** 34:15
**Padgett's** 34:10
**page** 48:20;51:11,11,25,25;52:7,
18;53:23;54:3,4,21;67:10;53:10
**pages** 26:25;48:6
**paid** 58:3
**paper** 8:4,10
**paperwork** 11:14
**paragraph** 50:11;51:25;52:7,19;
53:4,11,24;54:23
**parallel** 63:8,10
**paraphrasing** 55:25
**part** 15:15;23:2;43:7;48:14,24;55:4;
57:23;58:15;62:23
**participate** 66:19
**participating** 54:18;67:22
**participation** 67:11
**particular** 37:3,13,18;59:24;65:20;
66:2
**parts** 55:2
**party** 15:10
**passenger** 27:17;29:12
**Payne** 52:16
**people** 8:6;11:1;15:19;16:5;20:5;
72:21;73:9
**per** 42:5
**period** 7:13,16;17:18;65:3
**person** 4:23;7:3;16:25;17:19;18:7;
19:22;22:15;34:18;43:10;50:13;
72:16
**person's** 17:1
**personally** 13:20;39:18,22;60:23
**Personnel** 69:8
**persons** 12:3;18:2;24:15;34:14;
59:15;62:2;72:14
**pertained** 11:7;18:11
**pertaining** 48:9;52:10
**phone** 11:23;20:23;21:5;32:17;
34:5,23,25;35:1;61:17;52:2
**photocopies** 58:22
**photocopy** 27:8;50:5;67:9
**photograph** 27:8,15;28:2,17;58:9
**photographs** 12:16,23,24;28:5,6;
29:8,15
**phrase** 8:11;15:5;36:20;52:8;54:24
**PI** 6:18
**PI's** 6:16
**picking** 47:4;73:9
**picture** 69:23
**pictures** 53:13
**piece** 46:7
**place** 20:12,23;22:2;34:12;42:6;

46:8;64:8;68:14;69:19;70:3,10;
71:13
**placed** 34:22;41:3,6
**PLAINTIFF'S** 26:24;44:14;48:1;
50:2;55:13;57:9,19;58:6,14
**plan** 9:12;47:17;48:7,9,15,25;49:3,
7;66:23;69:13
**planning** 68:24
**plans** 32:13;47:21
**plastic** 63:18
**play** 13:4;42:13;71:10;73:2
**PLAYED** 43:3,21;44:7
**please** 5:7;6:3;9:7;27:7;50:3;57:20;
67:8;5:17;33:13;48:17;58:7
**plowing** 5:3
**pm** 55:8;73:13
**point** 5:4;21:1;24:10;25:32;22:34:3;
35:8,23;36:13;37:13,15,19;48:12;
49:12;55:6,10;56:12;57:1;59:1;
60:18;66:13,24;70:13
**pointing** 37:9
**police** 72:4
**pond** 14:7;63:13;68:12;70:12
**porch** 63:24
**PORTION** 43:3,21;44:7
**portions** 42:13
**positioned** 20:25;37:15;54:14;
62:18;68:21
**possession** 31:4,6;36:5;44:18
**possibly** 13:4;20:11;45:1;58:17
**potential** 65:19,20
**pound** 47:4,8
**practice** 48:14;67:21
**preliminaries** 4:8
**premises** 69:2,12,14;70:8,8
**prepare** 48:14,25;52:25;67:23
**prepared** 9:12;11:6;12:2;47:17,20,
21,21;48:7;49:9;50:6;62:1,8
**pre-search** 68:24
**presence** 36:3;65:19,20
**present** 5:19;32:25;33:4;34:14;
35:3,3;65:17
**presented** 55:18
**pretty** 17:9;64:23;66:25
**previous** 39:2
**previously** 4:6;38:4;7:6
**prior** 9:23;14:9;19:3;23:11;9:25;
14:13;22:4;23:20
**private** 5:20;6:14,15,21;71:10
**probable** 46:16
**probably** 11:9;45:17;64:20;67:13;
30:3;45:11
**proceeds** 38:8
**process** 17:21;19:24;71:13
**property** 14:6;20:17;21:14,18;23:5;
25:9,10,15,22;26:8;67:12;10:2;29:10;
30:20,21;31:7;36:23;38:6
**prosecution** 58:24
**provided** 16:8;45:10;48:3;57:24;
61:25;67:24
**proximity** 64:21
**pulled** 58:23;62:23,25;63:3
**purchase** 51:5;52:4,11,20;53:1,7,

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

19;54:7
**purchases** 17:7,15;54:18;57:25
**purchasing** 15:1
**purposes** 10:3;25:16
**pursuant** 4:3
**put** 51:12;73:5

## Q

**quarter** 47:4,8
**quickly** 66:9
**quieted** 65:9
**quiz** 43:6
**quote/unquote** 4:23

## R

**radio** 64:17,19;65:1,7,8,14
**ran** 62:11,14
**rather** 37:6
**read** 11:18;12:4,14;45:14;53:24
**realize** 31:14,24;66:5
**realizing** 36:20;69:22
**really** 5:6;32:11;43:7;65:4
**rear** 27:9
**reason** 39:3
**recall** 15:8;17:3;19:13;22:3;29:22,23;30:6,10;32:5,10;33:5;34:7,14,23;35:7,16;41:22;45:13,18;47:2,5,13;49:19,20;59:1,7,11,12,21,24;60:1,5;64:19,25;65:7,8;67:18;68:15,16,19
**receipt** 27:22
**received** 14:22;24:22;25:8;38:4;40:22;66:13
**recency** 46:6
**recite** 45:20
**recognize** 27:8,15;42:20;43:10,25;44:6,8;50:5;57:14;58:8,22;67:8
**recollection** 28:5;35:2
**record** 26:22;37:9;42:10;43:8;49:25;55:16;58:23;26:23;42:11;50:1;61:23
**recorded** 18:16
**recording** 44:1,9;53:6;56:17;43:3,21;44:7
**recordings** 12:25;18:20;42:14;43:2
**records** 20:1
**RECROSS** 72:12
**refer** 10:4,5;13:3;51:12
**reference** 41:15
**referencing** 14:14
**referred** 46:20
**referring** 52:20;67:6
**refers** 50:11
**reflect** 19:22;46:2
**reflected** 36:24;57:15
**refresh** 28:4;33:25
**relate** 38:3
**related** 18:19;72:18
**relationship** 14:11;39:15
**relative** 46:6;47:8
**relatively** 21:1;62:18
**reliable** 51:1

**relied** 72:14
**remained** 13:17
**remember** 9:25;10:9;13:23,24;14:1;15:2,11,14,15;16:3,10,22;18:5,14;19:12;20:18;22:22;23:8,19;24:1,3,6,9;25:19;27:18;28:9,13,24;29:4;30:13,17;31:15;32:11,16,19;33:15,20;34:2,25;35:1,6;36:2;37:3,4,13,16,18;41:17;42:9;45:7;56:15;59:4,6,17;60:16;65:6,12,15;67:2;68:22;72:5
**remembered** 14:4
**report** 18:12;19:18;28:3;33:10;38:15,17;40:16,22;53:11;55:7,25;56:22;65:18,21;67:16,19,24
**reported** 22:6,10;30:24;37:21;45:1
**reporter** 35:21;44:13;26:16,19
**reporting** 16:19;21:24;30:10
**reports** 11:14;17:1
**represent** 35:24
**representing** 4:24
**requesting** 57:15
**reserved** 4:4
**residence** 35:10,18;37:23;38:10,11;53:13,14;54:15;55:3,20;62:19;63:19,20,21;68:2,6;69:12,17;71:17
**resign** 71:10
**resignation** 71:6
**respect** 20:21;21:21;24:21;47:1;49:22;58:1;72:14
**respond** 5:8;38:19;45:24
**response** 6:2;21:5;25:8;55:1
**responses** 4:16
**responsible** 61:13
**responsiveness** 4:7;5:1
**rest** 64:21
**restitution** 58:4
**result** 44:18
**return** 17:20;32:9
**returning** 17:15;53:14,20
**right** 7:24;9:6,18;11:11;12:11;14:20;17:14;20:3;23:10;25:6,17;26:1;28:11;33:13,16;34:13;39:1;43:1;45:16;47:6;52:22;55:24;56:7;63:7,11,15;64:20;66:10,11,11;67:2;69:22;71:7;8:15,18,21;9:10;10:7,17,20;12:8,14;15:22,24;16:9,13;17:2,8,11,12;21:7,11,16,16,19;22:11,16,16;25:13,18;26:2,12;32:1,1,24;37:6;39:6,11,12;40:6,6;46:16;47:24;49:19;50:14,16;51:23;52:24;55:11;56:4,14;57:2;58:5;60:22;61:22;63:23;66:7;69:24;70:10,16;71:8;73:2
**ringing** 11:23
**robbing** 30:20
**rode** 25:5;62:24
**Rodney** 9:20;10:1;14:12;23:12;24:22;25:23;27:24
**Rogers** 59:17
**role** 62:25;70:4;71:9
**room** 34:16;35:4
**running** 66:22

**Ryan** 25:1,2;28:23

## S

**safe** 38:6,10,13,25;71:24
**sake** 37:20
**sales** 16:4;20:11
**same** 4:5;50:19;51:4;53:23;66:22;16:21;23:25;24:5,8;36:12;37:1;38:22;39:21;50:20
**sat** 68:6
**saw** 68:4
**saying** 11:17;14:15;15:25;28:23;29:14,16;33:16;37:17;73:6,8
**scales** 35:17;36:3,6,22;37:22;41:3;44:18
**Scarborough** 52:23
**scene** 28:8;68:14;70:14
**scheduled** 11:11
**search** 12:18;30:9;32:14;33:7;47:14,16;48:10,19;49:18;55:10,17,20;56:9;60:12,15,21,24;61:1;65:17,22;66:18,20,24;68:25;69:11,14,18;70:4,8,20;71:5,9
**search"** 69:20
**second** 19:15;25:3;43:15;50:11;52:19;54:23
**seconds** 43:20
**sections** 69:5
**sector** 6:14,15
**secured** 69:12;70:4,9;71:16
**securing** 66:19;69:1,16
**seeing** 45:13;55:3;67:18;68:15
**seek** 61:1
**seeking** 55:19
**seems** 28:9
**seized** 26:12;57:16
**seizing** 28:3
**seizure** 57:12,14
**self-employed** 5:22
**self-identified** 43:11
**sell** 21:15
**selling** 15:1;22:20;30:15;50:8
**sense** 4:14;10:13,21,22;15:16;21:18;23:3;51:14;65:1
**September** 6:5;9:25;10:4;13:19;14:9,15;23:12,21;39:13;42:16;44:2,24;48:13;54:6;60:11;66:17
**Sergeant** 5:1,25;50:11;51:8,18;52:1,9,13,22;53:12;54:7,12;62:24,25;64:21;67:10,16,19
**series** 6:4
**serve** 7:13
**serving** 66:14
**set** 10:8;20:25;32:13;51:5;53:18
**seven** 54:3
**several** 17:8;53:13
**sheet** 57:21
**sheriff's** 13:15;55:2;59:22;62:11,14;69:5;7:7;8:25
**SHOOK** 12:20;70:24
**shooting** 65:3
**short** 4:14;66:3,5

**shortly** 63:16;71:5
**shot** 69:23;70:2,6
**shots** 63:17;65:9
**show** 9:9;33:25;35:9
**showing** 29:12;48:2
**shut** 70:14
**side** 27:17;29:12;63:2,5,7,8,15;64:19;68:8
**sign** 67:17
**signaled** 19:3
**signature** 4:4
**signed** 33:2,8,12;45:9;57:15;67:10
**signing** 34:3
**simply** 43:13;44:4
**single** 57:21
**sit** 49:2
**site** 31:14,21
**sitting** 66:11;46:1
**situation** 53:18;66:23
**six** 53:23
**sleep** 11:22
**small** 6:2
**Snell** 55:18
**sold** 15:13;24:23
**somebody** 14:1,6
**someone** 19:18;53:17;72:25;21:8
**someplace** 25:11
**sometime** 11:12;17:5;23:21;49:8
**sometimes** 51:11
**somewhere** 27:21;46:21;62:18;63:20
**sorry** 5:25;35:22
**sort** 8:19;15:3;53:20
**sought** 30:9;69:11
**sound** 12:11;69:2
**sounded** 63:17,21,23
**sounds** 9:6;43:5;45:16;47:6;64:10
**source** 21:25;31:11;50:20;51:19;50:12,12;52:2,9,14;53:6
**source"** 53:3
**sources** 72:7
**span** 18:21;32:21;65:23
**SPARS** 58:7
**speak** 14:24;20:5
**speaker** 34:5,25
**speaking** 9:15;11:3;35:5;66:22
**speaks** 28:3
**SPEAR** 71:1
**Spears** 4:10;72:2;4:2,10;5:16;12:21;16:15;23:2;24:21;26:6,17,22,25;28:25;29:8,14,19,24;31:11;36:9;37:10;38:20;39:9,17;42:10,12;43:4,22;44:8,12,15;48:2;49:25;50:3;55:14;57:10,20;58:15;61:24;67:4,6;71:20;72:13;73:12
**Special** 12:2
**specific** 4:24;9:24;14:11;35:25;41:15;42:6;49:19;66:10;68:10
**specifically** 14:2;15:15;24:25;30:6;32:18;43:6;45:13,18;47:13;59:11,18,20,24;60:4,9;41:17
**specifics** 15:14;16:22;47:7
**specify** 28:16

TERESA HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

TIM BURRIS
October 5, 2016

**spoke** 22:6;32:22
**spoken** 10:23
**spot** 68:9
**square** 10:9
**squares** 9:24
**SRT** 7:14,15;32:14;47:11;48:18;
49:3,4,5,7;55:1;61:11,12;62:17;
63:3;64:23;66:18,24;68:25;69:4,16,
19
**SRT's** 48:22;62:25
**stakeout** 20:16,20,24
**stand** 66:16
**standing** 63:25;68:12
**stands** 62:23
**start** 7:9,11;19:23;42:24;44:6;71:10
**started** 13:15;14:3;34:11;48:18;
64:10
**starts** 15:18
**state** 5:17;35:24
**stated** 71:23
**statement** 16:11;59:25
**statements** 72:21;73:4
**step** 60:6
**stepped** 63:6,15
**steps** 19:9;20:10;44:16;50:7
**sticker** 27:21;44:12;48:3
**still** 29:2,10
**stipulate** 29:8,18
**stipulations** 4:6,1
**Stokes** 61:10,11,16
**stole** 12:22;25:14
**stop** 11:18;55:22
**stop"** 55:4
**stopped** 63:5
**story** 4:14;39:2
**straight** 63:3,6
**strength** 38:14
**strictly** 48:22
**strike** 24:19;71:15
**stuff** 11:19;26:10;32:15;48:21
**subject** 16:24,25;20:23;17:13,18,
19;18:1,2,7,11,12,21;21:6,9;57:7
**suggested** 19:4
**summarization** 57:25
**summarizing** 50:6
**summary** 9:12;12:1
**summoned** 66:18
**supervisor** 9:18;13:17,17;48:8;
61:19
**supplying** 59:15
**sure** 8:10;29:21;30:5;33:11;45:16;
47:19;49:11;50:17;59:11;6:23;
29:21;68:16
**surveillance** 53:15
**suspect** 50:20;53:18
**sworn** 5:14
**system** 20:6

### T

**tactical** 48:21,24
**talk** 20:5
**talked** 25:1;50:20
**talking** 15:18;36:18;50:19;53:15;
65:4;71:14
**Task** 8:6,8,11
**Team** 55:1
**technically** 4:22;8:7
**telling** 12:13;36:9,10,15,21
**Teresa** 24:14;68:4
**term** 17:15;66:5
**terms** 16:15;17:25;22:13;28:3;47:8;
64:25
**test** 33:13
**testified** 5:14
**testimony** 24:19
**Thanks** 4:9
**that'll** 42:21
**that's** 5:7;6:24;8:9;11:25;17:14,
21;33:24;34:17;35:13,14;37:10;
41:7;46:23,23;51:5;52:6;53:14;56:7;
63:2,22;65:14;69:20;70:15;71:18;
73:10;6:1;33:3;34:13;45:17;53:14;
61:14,63:10;65:8;67:13,17;68:14;
69:15,15;72:10
**theft** 10:6;40:23;45:1
**theirs** 49:11
**theory** 21:13
**there'd** 53:19
**there'll** 8:13
**there's** 15:18;16:18;17:13;26:9,
10;28:17;38:5,7;20:39:1,3,14;40:12,
16;46:8,16;47:14;52:18;56:16,24;
62:10;66:8;71:23;32:21;33:7;52:6
**thereof** 38:8
**they'd** 21:9
**they're** 20:6;38:10;73:3,7
**thinking** 13:25;37:18;65:16
**third** 15:10;34:16;51:25
**Thirty-eight** 58:21
**Thirty-one** 26:16
**Thirty-seven** 58:20
**though** 28:2;49:8
**thought** 12:10;71:18,22
**three** 26:25;35:3;51:24;62:12
**Tim** 4:8;43:11;4:2;5:12
**times** 20:22;30:4;44:25;45:14;
47:10;59:9
**Timothy** 5:18
**title** 43:13
**to"** 73:10
**today** 4:11;12:13;46:1
**today's** 11:8
**together** 8:16;30:5;31:25
**told** 35:7,16;37:21;42:13;55:24;
56:23;60:18;66:21,23;68:25
**took** 37:5,14,22;70:10;71:13
**top** 53:10;63:19
**totality** 72:22
**touch** 18:6
**toward** 70:12
**towards** 10:12;43:5;68:12
**town** 6:11
**traffic** 55:4,22;65:15
**transaction** 22:2,7
**transcribed** 4:19

**transferred** 7:23
**travel** 31:21
**traveled** 62:16
**trouble** 73:4,8
**truck** 35:18;36:22;37:2;41:1,3,6,10;
64:7,8,22,23
**true** 47:23;48:6;55:17
**trust** 72:20
**truth** 36:10,11,16,22
**truthfulness** 72:20
**try** 11:24;18:6;20:9
**trying** 11:22;22:12;23:2;25:19;42:4;
43:7;52:5;64:25;73:3,8
**turn** 45:2;67:24
**two** 17:4;30:5;42:15,25;51:15;
52:15;67:10
**type** 5:1;8:16;9:13;13:1;47:25

### U

**Uh-uh** 20:15
**unaware** 39:19
**uncommon** 65:25;66:1,9,12,16
**uncorroborated** 38:15
**uncovered** 19:2
**under** 6:21;8:24;48:22
**undercover** 50:13
**understood** 70:7
**undertaken** 19:9;41:23;45:22;58:1
**uniform** 64:11
**unit** 7:19;8:12,16,22;64:22;7:19,21,
23,25;8:3,8;9:1,16;13:8,12,12,16;
18:2;19:10,18;21:25;23:4,13,22;
32:6;39:19;44:17;48:14,23;52:15;
53:7;60:20;69:13,17;70:4,22
**unit's** 23:20,11
**units** 55:1
**unless** 13:7;16:18;66:25
**up** 6:2;14:4;17:25;19:15,20,21;
20:25;24:10;27:23;47:4;49:1,5;51:6;
53:10,18;60:18;62:13,23,25;63:1,3,
19,21;69:21;73:9
**upwards** 17:7
**use** 8:7;19:16;20:20
**used** 8:11;23:15;24:2,4;71:6
**useful** 46:12
**using** 17:20;20:6,7;34:23

### V

**valuable** 46:7,11
**vehicle** 27:11;28:8;29:17;32:2;
37:4,6,6,7,14,23;38:17;45:2;62:25;
63:4,6,15;64:17;71:17
**vehicles** 57:17
**version** 31:2
**versus** 73:4,8
**Vertin** 52:23
**vinyl** 63:18
**vis-à-vis** 60:6
**voice** 43:10,22
**voices** 42:19
**volume** 46:20

### W

**Wagner** 7:5
**waited** 70:12
**waiting** 68:12;70:9
**wake** 4:20;61:25
**walked** 35:14;61:5
**wall** 68:8
**wants** 33:23
**warrant** 26:3;30:9;32:14,23;33:2;
34:4;45:8,20;46:1;47:14,16;48:10;
55:10,17,21;60:12,15,21,24;61:1;
65:17,22;66:14,24;69:1,11
**warranted** 49:7
**warrants** 33:7;48:19;66:18,20
**Warren** 59:19
**wasn't** 11:17;14:2;20:9,16;32:2;
49:2;65:24;66:1;70:7,16,18,20
**way** 10:4;19:4,15,17,19;32:20;33:4,
6;34:24;36:21;37:4,17;42:22;64:16,
17;65:19;66:8;69:15
**way"** 61:16
**we'll** 5:3;42:24;4:5;11:24;45:14,
16;54:3
**we're** 4:21;26:20;28:6;40:11;
50:19
**we've** 9:8;10:13,16,22;48:2;
61:24;68:24
**weapons** 57:17
**weeks** 61:25
**weight** 46:20;73:5
**welcome** 14:15
**weren't** 31:14;70:22
**what's** 10:21;12:12;29:12,16;
65:10
**whatsoever** 18:13;24:15;30:25
**whole** 30:3
**who's** 17:14
**whose** 25:11,14;65:7
**wide** 11:18
**within** 41:1;65:22
**Without** 38:12
**witness** 4:4,17,22;26:25;5:13;
16:22;23:8,19;24:1,6,9;26:20;29:3;
33:24;34:2;35:13,22;36:13;37:2;
38:2,23;39:22;40:10,21;42:1,9;
45:25;46:10,18;56:21;62:7
**wondered** 66:8
**woods** 25:12;54:14
**word** 8:8;44:5
**words** 49:2;65:13
**work** 6:9,13;7:20;9:1
**worked** 7:4,6,17;8:12,22;9:2,11,16;
10:1;11:19;42:2
**working** 6:20;10:24
**workup** 58:15
**world** 23:3
**wouldn't** 20:1;66:11;67:18
**write** 49:2
**writing** 32:14
**wrong** 20:24;33:14,17

## Y

**y'all** 10:25;11:1
**year** 42:6;45:22;62:12;71:7
**years** 7:17,20
**Yep** 15:21;58:10
**you'll** 4:19;48:20
**you're** 4:17,18,22;10:15;12:12;
14:15;17:20;18:1,7;19:23;20:10,12;
26:9;28:7;36:4;37:21;39:19;41:19;
56:23;10:25;28:11
**you've** 4:12;31:24;50:4;60:18;
65:16;67:7