# In The Matter Of:

*TERESA POPE HOOKS, ET AL. vs.*
*CHRISTOPHER BREWER, ET AL.*

---

*FORREST JONES*
*January 26, 2017*

---

*HAWTHORNE & WEBB COURT REPORTING*
*149 RIVER HILLS LANE*
*MACON, GEORGIA  31211*

Original File FORREST JONES.prn
**Word Index included with this Min-U-Script®**

Case 3:16-cv-00023-DHB-BKE   Document 83-12   Filed 05/25/17   Page 2 of 25

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

---

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERESA POPE HOOKS,          :
Individually and ESTATE
OF DAVID HOOKS, by          :
Teresa Pope Hooks,
Administratrix,             :

     PLAINTIFFS,            :    CASE NO.
                            3:16CV00023-DHB-BKE
     VS.                    :

CHRISTOPHER BREWER, ET AL., :

     DEFENDANTS.            :

JANUARY 26, 2017      DUBLIN, GEORGIA      9:45 A.M.

    Deposition of FORREST JONES, called before Laura M.
Jackson, Certified Court Reporter, State of Georgia,
Certificate No. B-959, testimony taken in the Laurens County
Courthouse Law Library, 101 North Jefferson Street, Dublin,
Georgia, beginning at approximately 9:45 a.m., January 26,
2017.

NOW OFFERING VIDEO CONFERENCING

HAWTHORNE & WEBB COURT REPORTING
149 RIVER HILLS LANE
MACON, GEORGIA 31211
PHONE: 478.746.2295
LAURA@HAWTHORNE-WEBB.COM

---

## Page 2

APPEARANCES:

FOR THE PLAINTIFFS:        MR. MITCHELL M. SHOOK
                              Salter, Shook & Tippett
                              Post Office Drawer 300
                              Vidalia, Georgia  30475
                              MITCHSHOOK@VIDALIALAW.COM

FOR THE DEFENDANT:         MS. KELLY CHRISTOPHER
                              Buckley Christopher
                              Suite 1010
                              2970 Clairmont Road N.E.
                              Atlanta, Georgia  30329
                              KCHRISTOPHER@BCHLAWPC.COM

ALSO PRESENT:              MS. TERESA P. HOOKS

REPORTER'S NOTE:           Witness RESERVES reading and
                              signing of the document.

INDEX

CROSS EXAMINATION                                    3
BY MR. SHOOK

---

## Page 3

[1]    **STIPULATIONS:**

[2]    **MR. SHOOK:** We thought we'd use the same

[3] stipulations.  Do I need to repeat them?

[4]    **MS. CHRISTOPHER:** Are they just the normal ones?

[5]    **MR. SHOOK:** The normal stipulations.

[6]    **MS. CHRISTOPHER:** Object to the form of the

[7] question and reserve everything else?

[8]    **MR. SHOOK:** That's it.

[9]    **MS. CHRISTOPHER:** That's fine.

[10]    **MR. SHOOK:** Everything else. Yeah.

[11]    (WHEREUPON, it was agreed by counsel for the

[12] respective parties that the stipulations governing the

[13] taking of the deposition of CHRISTOPHER BREWER will

[14] likewise govern the taking of the deposition of FORREST

[15] JONES.)

[16]    FORREST JONES

[17]    Witness having been first

[18]    duly sworn, testified on

[19]    **CROSS EXAMINATION**

[20]    BY MR. SHOOK:

[21] Q  State your name for the record, please.

[22] **A**  **Forrest Edward Jones.**

[23] Q  Mr. Jones, my name is Mitch Shook.  I, along with

[24] Brian Spears, represent Teresa Hooks in a case that's been

[25] filed in United States District Court for the Southern

---

## Page 4

[1] District of Georgia, Dublin Division.  We're here today to

[2] ask you some questions about this case that's filed.  The

[3] defendants in this case as it stands right now are former

[4] Sheriff Bill Harrell, Chris Brewer, and Steve Vertin are the

[5] defendants that are involved in the case as it stands right

[6] now so you know what we're here talking about.

[7] I'm going to be asking you questions today.  I will do

[8] everything I can to make sure that my questions are

[9] understandable and make sense to you.  If I ask you a

[10] question that doesn't make sense to you or you need me to

[11] repeat, don't hesitate to ask me to do that and I'll repeat

[12] it.  I don't want you to be confused about your answer.  At

[13] the same time, if you would, when I ask you a question, if

[14] you would give me an answer to the question as directly as

[15] you possibly can I would appreciate that.

[16] And also, you've noticed we have a court reporter here

[17] who's just sworn you in to tell the truth.  She's trying to

[18] take down everything that we say here today, what I say, you

[19] say, anyone else says during the course of the deposition.

[20] So if you would, when I ask you a question, give a verbal

[21] response, like a yes or a no, or whatever the verbal response

[22] might be.  A lot of times we will start using things like uh-

[23] huh (affirmative), or uh-uh (negative), or nodding our head,

[24] and she can't take that down.  It doesn't come out very well

[25] on a transcript.  So if you would do that, and if at certain

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 5

[1] times during the deposition if you don't do that, if you
[2] forget to do that, I might prompt you to say -- I may say, is
[3] that a yes or is that a no?  By doing that I'm not trying to
[4] be a smart aleck or anything.  I'm just trying to get the
[5] record straight for her.  Okay?
[6] **A  Yes.**
[7] Q  All right.  Tell me, Mr. Jones, are you originally
[8] from Laurens County?
[9] **A  No.**
[10] Q  Where were you born and raised?
[11] **A  I was born in Palatka, Florida.**
[12] Q  Okay.  And did you live in Palatka, Florida your
[13] entire childhood?
[14] **A  No.**
[15] Q  After Palatka, Florida where did you live?
[16] **A  Hinsdale, Illinois.**
[17] Q  Hinsdale?
[18] **A  Yes.**
[19] Q  Illinois.  And how old were you when you lived in
[20] Hinsdale, Illinois?  What ages, I guess I should say?
[21] **A  Three and seven.**
[22] Q  Three to seven?
[23] **A  Yes.**
[24] Q  After Hinsdale, Illinois where did you go?
[25] **A  Stoneham, Massachusetts.**

Page 6

[1] Q  Would you say that fist word?
[2] **A  Stoneham.**
[3] Q  Stoneham?
[4] **A  S-T-O-N-E-H-A-M.**
[5] Q  Okay.  What ages were you when you lived in
[6] Stoneham, Massachusetts?
[7] **A  Second grade to sixth grade.**
[8] Q  Okay.  And where did you move after that?
[9] **A  Charleston, West Virginia.**
[10] Q  And how old were you when you lived in Charleston?
[11] **A  Sixth grade through tenth grade.**
[12] Q  After you left Charleston where did you go?
[13] **A  Jellico, Tennessee.**
[14] Q  Jellico, Tennessee?
[15] **A  Yes.**
[16] Q  How old were you when you lived there?
[17] **A  Eleventh and twelfth grade.**
[18] Q  Okay.  I'm assuming that's where you graduated high
[19] school?
[20] **A  No.**
[21] Q  Okay.  I went to a boarding school in Virginia for
[22] four years.
[23] Q  And what school was that?
[24] **A  Shenandoah Valley Academy.**
[25] Q  Was that after high school or during high school?

Page 7

[1] **A  That is high school.**
[2] Q  Okay.  So your family lived in Jellico, Tennessee,
[3] but they sent you to boarding school in Virginia?
[4] **A  Yes.**
[5] Q  Did you graduate from Shenandoah Valley?
[6] **A  Yes.**
[7] Q  Obviously, you moved around a lot as a child.  Was
[8] that as part of your family's occupation or work?
[9] **A  Yes.**
[10] Q  What caused that?  What was your family involved
[11] in?
[12] **A  My father is in radiology.**
[13] Q  Okay.  Is he a radiologist?
[14] **A  No.**
[15] Q  What actually did he do in radiology?
[16] **A  Starting as a tech, but he went from place to place**
[17] **as a manager of a department.**
[18] Q  Okay.  After you graduated high school what -- tell
[19] me about your educational background.
[20] **A  I initially went to Atlantic Union College.**
[21] Q  Where is that?
[22] **A  South Lancaster, Massachusetts.**
[23] Q  Okay.
[24] **A  Only for a year.**
[25] Q  All right.

Page 8

[1] **A  I went to Southern College, Collegedale, Tennessee.**
[2] Q  Okay.  How long did you go there?
[3] **A  Only a year.**
[4] Q  All right.  After that?
[5] **A  A community college in -- I forgot the name of the**
[6] **city -- California.**
[7] Q  All right.  How long?
[8] **A  For only a semester.**
[9] Q  Okay.
[10] **A  Then Heart of Georgia Tech in Dublin for three**
[11] **quarters.  Then Macon Tech in Macon, Georgia, for a year.**
[12] Q  All right.  With the post high school education
[13] that you've completed, what degrees or diplomas or
[14] certificates do you hold?
[15] **A  Just emergency medical technician and paramedic.**
[16] Q  Did you get -- complete those requirements at Macon
[17] Tech?
[18] **A  They're two separate programs.**
[19] Q  Okay.
[20] **A  The EMT program was at Heart of Georgia in Dublin;**
[21] **paramedic was at Macon.  I completed both.**
[22] Q  All right.  So the EMT at Heart of Georgia,
[23] paramedic at Macon Tech.  All right.  What year did you
[24] complete that and become an EMT and paramedic?
[25] **A  EMT was '95.  Paramedic was '97.**

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 9

[1] Q  Got to ask, what brought you to Heart of Georgia
[2] Tech in Dublin from California?
[3] A  I moved back in with my parents to do something
[4] constructive.
[5]     MR. SHOOK:  Let's go off.
[6] (OFF THE RECORD)
[7] MR. SHOOK:  So prior to -- after you graduated and
[8] received your qualifications to be an EMT and paramedic, did
[9] you immediately get a job in that field?
[10] A  Yes.
[11] Q  Where was that at?
[12] A  Laurens County, Georgia.
[13] Q  What company was that with?
[14] A  Laurens County Emergency Medical Services.
[15] Q  Laurens County EMS?
[16] A  Yes.
[17] Q  What year would that have been, '97 or '98?
[18] A  No.  I was hired after the EMT certification full
[19] time in '96.
[20] Q  Prior to working at Laurens County EMS did you have
[21] any other jobs as you were going through your educational
[22] process involving the health care industry?
[23] A  I worked for Med First in Dublin, Georgia --
[24] Q  Okay.
[25] A  -- delivering and set up of durable home medical

Page 10

[1] equipment.
[2] Q  When would you have done that?
[3] A  Sometime in '94 through '95.
[4] Q  Other than that job, any prior jobs involving the
[5] medical field?
[6] A  No.
[7] Q  Has -- other than the EMT and paramedic degree or
[8] qualifications, do you have any other qualifications in the
[9] health care industry?
[10] A  I took a critical care paramedic class; however,
[11] that is a renewable certification that I no longer hold.
[12] Q  Okay.
[13] A  And went to a tactical EMS school in Savannah.
[14] Q  Tactical EMS?
[15] A  Yes.
[16] Q  Where did you take the critical care class?
[17] A  Augusta, Georgia.
[18] Q  And briefly tell me what the basis of that was.
[19] A  It goes beyond the normal scope of paramedic school
[20] and just gets deeper into more physiology and more of a
[21] hospital ICU type of understanding and treatment.
[22] Q  And the tactical EMS class you took at Savannah?
[23] A  Yes.
[24] Q  What did that involve?
[25] A  That takes -- it doesn't teach you anything new

Page 11

[1] that you didn't learn in paramedic school.  It's adapting it
[2] to environments that the ordinary paramedic is not used to.
[3] Q  And what different types of environments would that
[4] include?
[5] A  That can be weather environments, dangerous
[6] environments.  It could cover school active shooter
[7] environments.
[8] Q  Natural disasters, that type of thing?
[9] A  Yes.  Yes.
[10] Q  And obviously, we're here today because of your
[11] involvement with the Laurens County SRT.  Was that tactical
[12] EMS class necessary for you to become a part of or
[13] participate with the Laurens County SRT?
[14] A  It's not required.  It's not required initially;
[15] however, my understanding anyone that gets -- any medic that
[16] gets on the team, at some point, has to get some further
[17] tactical training.
[18] Q  Okay.  All right.  And was it your understanding
[19] that was a policy of the Sheriff's Department?
[20]     MS. CHRISTOPHER:  Object to form.
[21] A  THE WITNESS:  I don't know.
[22] Q  All right.  Well, let me ask you, do you know who
[23] made that requirement or if there was an agency that made
[24] that requirement?
[25] A  I don't know.

Page 12

[1] Q  Is it fair to say that at some point in time
[2] someone said to you, you need to go get this if you're going
[3] to be on the SRT?
[4] A  No.  I and others chose to go get it.  No one told
[5] us prior to us going.
[6] Q  Okay.  No one directed that you had to do it?  You
[7] did it on your own?
[8] A  Yes.
[9] Q  All right.  Have you worked since -- you began
[10] working with Laurens County EMS in 1996?  Have you worked
[11] with any other EMSs?
[12] A  No.
[13] Q  So how long have you actually worked with Laurens
[14] County EMS now, 21 years?
[15] A  Yes.
[16] Q  And as we sit here today, what is your -- I guess,
[17] what would be your title or position?
[18] A  Captain.
[19] Q  Captain.  Where does that put you in the hierarchy
[20] of Laurens County EMS?
[21] A  The chain above me is Deputy Director and then
[22] Director.
[23] Q  So that puts you third in the chain of command
[24] based on that?  Am I correct in that?
[25] A  Yes.

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

---

Page 13

[1] Q  Are there any other captains with the Laurens
[2] County EMS?
[3] A  Yes.
[4] Q  How many captains total are there?
[5] A  Three.
[6] Q  And who are the other two?
[7] A  Kenny Andrews.
[8] Q  Okay.
[9] A  T.J. Johnson.
[10] Q  Let's back up a bit.  Are you married?
[11] A  Yes.
[12] Q  And what's your wife's name?
[13] A  Allison Jones.
[14] Q  How long have you and Allison been married?
[15] A  This year will be 16 years.
[16] Q  Do y'all have any children?
[17] A  One.
[18] Q  What's the age of the child?
[19] A  He is 24.
[20] Q  He's not a child anymore?
[21] A  No.
[22] Q  What's his name?
[23] A  Cody Griggers, G-R-I-G-G-E-R-S.
[24] Q  Is Cody your stepson?
[25] A  Yes, but I adopted him.

---

Page 14

[1] Q  Okay.  Do you have -- do you have any relatives
[2] living in Laurens County --
[3] A  Yes.
[4] Q  -- that are related directly to you, first?
[5] A  Yes.
[6] Q  And what would their last names be?
[7] A  Jones.
[8] Q  All of them would be Jones's?
[9] A  Yes.
[10] Q  That's a fairly common name in the south and I
[11] guess everywhere for that matter.  Can you tell me a little
[12] bit about what those relationships would be?  Like, is it
[13] father, mother, uncles, cousins?
[14] A  It's father and mother.
[15] Q  Have any siblings that live here?
[16] A  No.
[17] Q  Do you have any uncles or aunts?
[18] A  No.
[19] Q  Any cousins that you're aware of?
[20] A  No.
[21] Q  Okay.  Your wife, is she -- what was her maiden
[22] name?
[23] A  Brack.
[24]    COURT REPORTER:  B-R-A-C-K?
[25]    THE WITNESS:  Yes.

---

Page 15

[1]    COURT REPORTER:  Thank you.
[2] Q  MR. SHOOK:  Is she originally from Laurens County?
[3] A  No.
[4] Q  Does she have any relatives that live in Laurens
[5] County that you're aware of?
[6] A  Yes.
[7] Q  What would their last names be?  Obviously, Brack?
[8] A  Pope.
[9]    MS. HOOKS:  Mitch, I need to talk to you outside.
[10]    MR. SHOOK:  Okay.  Break.
[11] (MR. SHOOK AND MS. HOOKS LEAVE THE ROOM MOMENTARILY AND THEN
[12] COME BACK IN.)
[13] Q  MR. SHOOK:  Mr. Jones, we were discussing -- you
[14] said there would be some of your, I guess your wife's
[15] relatives who would have the last name Pope?
[16] A  Yes.
[17] Q  And I guess at this point in time are you aware of
[18] the fact that I guess your wife and Teresa are related in
[19] some way?
[20] A  I know -- I knew that there was a possibility -- I
[21] don't know how.
[22] Q  Okay.
[23] A  Somehow, someway.
[24] Q  Obviously, Teresa's maiden name is Pope.
[25] A  I was not aware of that.

---

Page 16

[1] Q  Okay.  So you're not aware of the relationship --
[2] A  No.
[3] Q  -- between your wife and Teresa?
[4] A  No.
[5] Q  And also, I guess, your father is the director over
[6] -- or is he now or has he been, I guess, in the past, a
[7] teacher or instructor at Heart of Georgia in the radiology
[8] department?
[9] A  Yes.
[10] Q  And are you aware that -- of what Ms. Hooks does
[11] for a living?
[12] A  No.
[13] Q  Okay.  In fact, do you know Teresa at all?
[14] A  No.
[15] Q  Okay.  Did you know David?
[16] A  No.
[17] Q  So other than Brack or Pope would there be any
[18] other names of relatives of your wife that you might be aware
[19] of?
[20] A  No.
[21] Q  At time during the course of your being a EMT and a
[22] paramedic, I think I already know the answer to this but I've
[23] got to ask it anyway, at any time has your license to do
[24] either one of those jobs ever been suspended for any reason?
[25] A  No.

---

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 17

[1]  Q   And I already know the answer to this as well, but
[2]  have you been arrested or convicted of any crimes during your
[3]  lifetime?
[4]  A   No.
[5]  Q   When did you -- when did you join the SRT?
[6]  A   2006.
[7]  Q   And when you joined the SRT who was the head of the
[8]  SRT at that point in time?
[9]  A   Bryan Stokes.
[10]  Q   And my understanding is that Bryan Stokes was the
[11]  head of the SRT in 2014 when this incident took place,
[12]  September of 2014.  At any point in time were you aware of
[13]  anyone else being head of the SRT other than Bryan Stokes?
[14]  A   Yes.
[15]  Q   Who was that?
[16]  A   Brian Scarborough.
[17]  Q   When was that?
[18]  A   I don't know the time, the year time frame.
[19]  Q   Does that mean at some point in time Bryan Stokes
[20]  left or quit being the head of the SRT and Brian Scarborough
[21]  stepped in?
[22]  A   Yes.
[23]  Q   And then at some point in time that reversed back?
[24]  Bryan Stokes became the head of the SRT again?
[25]  A   Yes.

Page 18

[1]  Q   Do you have -- have you kept any record of the
[2]  number of times that you have went out on a mission with the
[3]  SRT?
[4]  A   No.
[5]  Q   Is there any written record that you're required to
[6]  complete and turn in to anyone if you go out on a call with
[7]  SRT?
[8]  A   When directed.
[9]  Q   Who would do the direction?  Who would be involved
[10]  in directing you to do that?
[11]  A   The commander.
[12]  Q   And that would, again, be Bryan Stokes?
[13]  A   Yes.
[14]  Q   Or Brian Scarborough?
[15]  A   Yes.
[16]  Q   And what circumstances would the commander direct
[17]  you to do a documentary report or something of that nature of
[18]  a call?
[19]  A   I don't know what he -- I mean, I don't know.  We
[20]  do it when he says and don't we he doesn't.
[21]  Q   So that's not something that's consistently done
[22]  for every call?
[23]  A   No.
[24]  Q   What about -- what would have -- what was the
[25]  purpose of having an EMT present when the SRT went out for a

Page 19

[1]  call?
[2]  A   It's to have as quick medical treatment as
[3]  possible.
[4]  Q   And prior to September 24, 2014, when this incident
[5]  occurred had you in the past been in situations where you
[6]  rendered treatment during the implementation of the SRT?
[7]  A   Yes.
[8]  Q   Do you know about how many times?
[9]  A   No.
[10]  Q   Well, without giving me names, because I would not
[11]  want you to violate any HIPAA regulations or anything of that
[12]  nature, have there been times in the past when you rendered
[13]  aid to civilians who were involved in the -- or injured in
[14]  some way during the involvement of the SRT's implementation?
[15]  A   Yes.
[16]  Q   Do you recall how many times that might have been?
[17]  A   No.
[18]  Q   Do you recall whether or not you were involved in
[19]  any -- the treatment of any civilian within the year prior to
[20]  this?
[21]  A   I don't know.
[22]  Q   Okay.  Would you always do a report if you were
[23]  involved in the treatment of a person?
[24]  A   No.
[25]  Q   Would you always do a medical record if you were

Page 20

[1]  involved in the treatment of a person?
[2]  A   No.
[3]  Q   What circumstances would there be where you
[4]  wouldn't do a medical record?
[5]  A   If they did not -- if they did not choose further
[6]  evaluation or transportation to the hospital.
[7]  Q   I understand.  So I guess what you're saying is, if
[8]  you just looked somebody over to make sure they're okay and
[9]  they said, I'm fine, you wouldn't do a medical record for
[10]  that?
[11]  A   Right.
[12]  Q   If you found an injury and either you decided it
[13]  was in their best interest to go to the hospital or to be
[14]  transported, or they asked you to transport them, then you
[15]  would do a medical record?
[16]  A   I may not, personally.
[17]  Q   Okay.
[18]  A   There would be a medical record.
[19]  Q   A medical record done by someone who was involved
[20]  as an EMT or paramedic?
[21]  A   Yes.
[22]  Q   In the years prior to September 24, 2014, were
[23]  there occasions where you treated members of the SRT who were
[24]  injured?
[25]  A   Yes.

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 21

[1]  Q  Do you recall how many times that would have been?

[2]  A  No.

[3]  Q  Do you recall prior to September 24, 2014, whether

[4]  it was a civilian or a member -- well, let's start with

[5]  civilian.  Do you recall ever treating a civilian for a

[6]  gunshot wound that was part of the SRT?

[7]  A  Ask again.

[8]  Q  That didn't make any sense.

[9]     MS. CHRISTOPHER: Object to form.

[10]  MR. SHOOK: Yeah.  That doesn't make sense.  Do you

[11]  recall prior to September 24, 2014, treating any civilian for

[12]  a gunshot wound that occurred as a result of the SRT's

[13]  participation or implementation in something?

[14]  A  I have treated a gunshot wound victim that was at

[15]  the scene of an SRT operation.

[16]  Q  Okay.  Did that gunshot wound result from a law

[17]  enforcement officer discharging their weapon?

[18]  A  Yes.

[19]  Q  What year was that?

[20]  A  I don't remember.

[21]  Q  Do you recall whether or not it was within two

[22]  years of 2014?

[23]  A  I don't know.

[24]  Q  Where did it occur?

[25]  A  In Laurens County.

Page 22

[1]  Q  What location in Laurens County?

[2]  A  In Lovett.

[3]  Q  Lovett?

[4]  A  Uh-huh (affirmative).

[5]  Q  And was the person that suffered the gunshot wound

[6]  a male or a female?

[7]  A  Male.

[8]  Q  Was the gunshot wound to the person involved in

[9]  that situation fatal?

[10]  A  Yes.

[11]  Q  Other than that instance, do you recall any other

[12]  instances where civilians suffered gunshot wounds as the

[13]  result of the implementation of the SRT?

[14]  A  Other than Lovett?

[15]  Q  Other than the incident at Lovett or the incident

[16]  we're here talking about today?

[17]  A  No.

[18]  Q  Same question, a little differently.  Have you ever

[19]  treated a member of the SRT or any other law enforcement

[20]  officer -- let me back up.  Have you ever treated a member of

[21]  the SRT for a gunshot wound as a result of the implementation

[22]  of the SRT team?

[23]  A  No.

[24]  Q  Have you ever treated any other law enforcement

[25]  officer for a gunshot wound not -- or related to the

Page 23

[1]  implementation of the SRT?

[2]  A  No.

[3]  Q  Have you ever treated any law enforcement officer,

[4]  period, for the treatment of a gunshot wound?

[5]  A  No.

[6]  Q  Okay.  My understanding is -- well, let me just ask

[7]  you this, were you on duty September 24, 2014, as an EMT?

[8]  A  No.

[9]  Q  At some point in time -- do you recall what you had

[10]  been doing that day?

[11]  A  No.

[12]  Q  At some point in time did you get a call regarding

[13]  the SRT?

[14]  A  Yes.

[15]  Q  Tell me when you got that call.

[16]  A  I don't know.

[17]  Q  How would you have gotten that call?

[18]  A  Text or page.

[19]  Q  And who would the text or page have been from or

[20]  who was it from?

[21]  A  The 911 center.

[22]  Q  And when you get that -- or when you got that text,

[23]  what did the text or page say?

[24]  A  I don't recall.

[25]  Q  Typically, when you would get a text or a page

Page 24

[1]  regarding your duties with the SRT what would it say?  Come

[2]  to the station?  What's the direction?

[3]  A  Yes.  Respond to LEC.

[4]  Q  Okay.  And do you recall what time you arrived at

[5]  the Laurens County Sheriff's office?

[6]  A  No.

[7]  Q  I'm assuming that's where you went?

[8]  A  Yes.

[9]  Q  You don't recall what time you got there?

[10]  A  No.

[11]  Q  Do you recall how long you were there before you

[12]  left?

[13]  A  No.

[14]  Q  Do you know whether it was an hour?  Two hours?

[15]  Three hours?

[16]  A  I couldn't estimate.  No.  More than five minutes,

[17]  less than eight hours.  I don't know.

[18]  Q  Okay.  Did you participate in any briefing?

[19]  A  Yes.

[20]  Q  And who was involved in the briefing?

[21]  A  I don't recall everyone.

[22]  Q  Okay.  Well, was Bryan Stokes there?

[23]  A  Yes.

[24]  Q  Was Chris Brewer there?

[25]  A  Yes.

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 25

[1]   Q   Sheriff Harrell?
[2]   **A   I don't recall.**
[3]   Q   Steve Vertin?
[4]   **A   Yes.**
[5]   Q   You don't recall whether you saw Sheriff Harrell
[6]   there or not?
[7]   **A   Not in the briefing, no.**
[8]   Q   Did you see him on the premises?
[9]   **A   Yes.**
[10]  Q   And how long had you been there at that point in
[11]  time when you first encountered Sheriff Harrell?
[12]  **A   I don't know.**
[13]  Q   Do you recall when you first pulled up if he was
[14]  there?
[15]  **A   I don't recall seeing him when I pulled up in the**
[16]  **parking lot.**
[17]  Q   Do you recall seeing him when you went through the
[18]  door?
[19]  **A   I don't recall.**
[20]  Q   Well, what do you recall about the briefing itself?
[21]  **A   Typical.**
[22]  Q   Okay.  Well, what was -- what was covered in the
[23]  briefing?
[24]  **A   The location, the plan.**
[25]  Q   Was there a written operations plan?

Page 26

[1]   **A   Yes.**
[2]   Q   Did you see that plan?  I guess -- let me ask you
[3]   this, was the plan, the written operations plan, shared with
[4]   everybody in the briefing?
[5]   **A   I don't recall.**
[6]   Q   But you recall seeing it yourself?
[7]   **A   Yes.**
[8]   Q   And with regards to the written operations plan,
[9]   did it cover who was going to be where and what each of you,
[10]  your individual job duties would be?
[11]  **A   Yes, in general terms.**
[12]  Q   Okay.  Did anyone go over the search warrant with
[13]  the team?
[14]  **A   Yes.**
[15]  Q   Who would have done that?
[16]  **A   I don't recall who it was.  That, as well, is**
[17]  **typical that the warrant is passed around and gone over.**
[18]  Q   And would that mean that everyone in the briefing
[19]  would have access to the warrant to read it, look at it, see
[20]  what it was about?
[21]  **A   Yes.**
[22]  Q   And you had access to it?
[23]  **A   Yes.**
[24]  Q   And to your knowledge other people in the briefing
[25]  room had the same access you had to it?

Page 27

[1]   **A   Yes.**
[2]   Q   Generally, in those situations would the drug unit
[3]   be the one that would go over the warrant with people or the
[4]   members of the SRT?
[5]   **A   That would not be unusual.**
[6]   Q   What was your understanding of the duties of the
[7]   SRT that night?  What was the purpose of the SRT going there
[8]   for?
[9]   **A   To secure the residence, the building.**
[10]  Q   Was it -- based on what you were told and what you
[11]  saw in the plan, was it your understanding that the SRT was
[12]  not going to be involved in the actual search of the
[13]  premises?
[14]  **A   Yes.  That's correct.**
[15]  Q   That's correct?  In other words, -- I said that in
[16]  a bad way.  I'm correct in saying your understanding is that
[17]  the SRT was not participating in the search?
[18]  **A   You're correct.**
[19]  Q   And do you recall any discussions about the fact
[20]  that the Hooks' home had been burglarized a couple of nights
[21]  before this?
[22]  **A   Yes.**
[23]  Q   What do you recall being said about that?
[24]  **A   I recall that some type of burglary incident had**
[25]  **taken place there prior to that -- the night in question.  I**

Page 28

[1]   **don't recall details of who, what was taken, damaged.  I**
[2]   **don't recall that.**
[3]   Q   Where was this briefing held at?
[4]   **A   In the -- I guess, at the break room at the**
[5]   **Sheriff's Department.**
[6]   Q   And were there -- can you give me an estimate of
[7]   how many people were present for the briefing?
[8]   **A   The rooms a little bigger than this.  Twenty.  I**
[9]   **don't know.**
[10]  Q   Was the room full?
[11]  **A   Yes.**
[12]  Q   Did you see anyone coming and going during the
[13]  briefing that you recall, entering and exiting the room?
[14]  **A   No.**
[15]  Q   Was it your understanding that everybody that was
[16]  going to participate in this was supposed to be in that
[17]  briefing?
[18]       **MS. CHRISTOPHER:** Object to form.
[19]  **A   THE WITNESS: I wouldn't know.**
[20]  Q   Okay.  What's your understanding -- as being a
[21]  person who is assigned to the SRT, what's your understanding
[22]  about -- or what was your understanding about the policy of
[23]  the SRT when it come (sic) to the briefings with regards to
[24]  participants being present?
[25]  **A   I don't know.**

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 29

[1]  Q  Well, if you were going to participate in the
[2]  execution or the securing of the building, as you've said, in
[3]  pursuant to an alleged search warrant, was -- I mean, if you
[4]  were a member of the SRT, was it optional whether or not you
[5]  attended the briefing?
[6]      MS. CHRISTOPHER: Object to form.
[7]  A  THE WITNESS:  I don't know.
[8]  Q  You don't know?
[9]  A  Uh-uh (negative).
[10]  Q  Okay.  That's fair.  I mean, you weren't a deputy,
[11]  right?
[12]  A  No, I'm not.
[13]  Q  You had no arrest powers?
[14]  A  Correct.
[15]  Q  You weren't a certified peace officer?
[16]  A  Correct.
[17]  Q  And basically, the training that you had had with
[18]  regards to this type of situation was the training you
[19]  received at the tactical school in Savannah, the tactical EMS
[20]  school, correct?
[21]  A  And subsequent training with the team.
[22]  Q  Okay.  And that would be kind of in-house training
[23]  with the team then?
[24]  A  In-house, as well as outside instructor courses and
[25]  classes.

Page 30

[1]  Q  All right.  Okay.  Do you recall during the
[2]  briefing discussions regarding the fact that David Hooks
[3]  would be on high alert as a result of the burglary at his
[4]  home a couple of nights before this?
[5]  A  No.
[6]  Q  Do you recall any conversations during the briefing
[7]  about the fact that David Hooks was a person who owned
[8]  firearms, and perhaps a lot of firearms?
[9]  A  No.
[10]  Q  Do you recall any conversations during the briefing
[11]  about alternative ways to execute the alleged search warrant,
[12]  other than the way that was being planned?
[13]  A  No.
[14]  Q  Do you recall when the briefing took place?  What
[15]  time?
[16]  A  No, I don't.
[17]  Q  Do you recall -- let me back up.  My understanding
[18]  is there were other -- were there other EMTs or paramedics
[19]  that were assigned to the SRT that night as well?
[20]  A  Yes.
[21]  Q  And who were they?
[22]  A  Dwayne Ussery.
[23]  Q  And what was Dwayne Ussery's job that night?
[24]  A  He was -- he was on the perimeter of the house.
[25]  Q  And who else?

Page 31

[1]  A  John Spires.
[2]  Q  Okay.
[3]  A  John Mabry.
[4]  Q  Okay.
[5]  A  And Jack Wood.
[6]  Q  Okay.  All of those licensed EMTs and paramedics?
[7]  A  Yes.  They're all paramedics.
[8]  Q  Of the EMTs and paramedics involved with the SRT
[9]  that night, who was the highest ranking?
[10]  A  Dwayne Ussery.
[11]  Q  What was his rank?
[12]  A  He's the deputy director of the ambulance service.
[13]  Q  Second highest ranking?
[14]  A  Me.
[15]  Q  During the briefing were people that were part of
[16]  the briefing allowed to ask questions regarding what was
[17]  going to happen?
[18]  A  Yes.
[19]  Q  And were they allowed to ask questions about the
[20]  written operations plan?
[21]  A  Yes.
[22]  Q  Did you ask any questions?
[23]  A  No.
[24]  Q  Do you recall any questions that were asked in your
[25]  presence?

Page 32

[1]  A  No.
[2]  Q  Who do you recall speaking at the briefing?
[3]  A  I don't specifically.
[4]  Q  Normally who would speak at a briefing like that?
[5]  A  Commander.
[6]  Q  That would be Bryan Stokes?
[7]  A  Yes.
[8]  Q  Okay.
[9]  A  Could be the case officer of whatever it is,
[10]  whatever the case is.
[11]  Q  Which in this case would be Chris Brewer?
[12]  A  Yes.
[13]  Q  Okay.
[14]  A  Could be the Chaplain.
[15]  Q  Chaplain?
[16]  A  I don't know if he's really a Chaplain, but Gerald
[17]  Frazier is --
[18]  Q  He's supposed to be the Chaplain?
[19]  A  Well, he at least acts as our Chaplain and he does
[20]  very well at it.
[21]  Q  Okay.  And that would be more or less a prayer type
[22]  thing?
[23]  A  Yes.
[24]  Q  And my understanding is that -- well, let me just
[25]  ask you this, have you been, in the past, prior to this, on

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 33

[1] calls with the SRT where the Sheriff was present?

[2] **A   Yes.**

[3] Q   And is it your understanding that the Sheriff would

[4] participate regularly with the SRT if they went out on a

[5] call?

[6] **A   Not unusual for him to be there.**

[7] Q   Is it fair to say he was there certainly more than

[8] he was not?

[9]     **MS. CHRISTOPHER:** Object to form.

[10] **A   THE WITNESS: I wouldn't know.**

[11] Q   You wouldn't know?  And of course, the Sheriff, to

[12] your knowledge, would be the highest ranking law enforcement

[13] officer involved in the briefing at all?  Correct?

[14] **A   Yes.**

[15] Q   No one in that briefing had more authority than he

[16] did?

[17] **A   Not that I know of.**

[18] Q   And he would regularly participate in the

[19] briefings?

[20] **A   That was not unusual.**

[21] Q   All right.  So do you recall any discussion during

[22] the briefing about the possibility that there might be Mr.

[23] and Ms. Hooks' daughter, or son, or grandchildren present at

[24] the residence?

[25] **A   No.**

Page 34

[1] Q   Do you recall seeing a diagram of the house at the

[2] briefing?

[3] **A   No.**

[4] Q   Do you recall anybody discussing the layout of the

[5] house?

[6] **A   No.**

[7] Q   Do you recall anyone discussing which door the SRT

[8] would utilize to attempt to serve the search warrant?

[9] **A   Yes.**

[10] Q   And who was the person that came up with that?

[11] **A   I don't know.**

[12] Q   It would have had to have been one of the

[13] individuals in charge?

[14] **A   That's an assumption.**

[15] Q   Obviously, you didn't come up with the idea to go

[16] to the back door?

[17] **A   No.**

[18] Q   Versus the front door?

[19] **A   Correct.**

[20] Q   And as you sit here today you really don't know who

[21] came up with that concept?

[22] **A   No.**

[23] Q   What were you directed that your job was going to

[24] be?

[25] **A   I would be at the rear of the group of personnel at**

Page 35

[1] the back door.

[2] Q   Okay.

[3] **A   And to remain there unless needed.**

[4] Q   Okay.  At some point in time the briefing was over

[5] and this group of people, including the SRT, started -- I

[6] guess, did they go to the parking lot to get in their

[7] vehicles?

[8] **A   Yes.**

[9] Q   And what vehicle did you ride in?

[10] **A   I was in one of the box vans that we use to travel.**

[11] **It's an old ambulance.**

[12] Q   Okay.  And how were you dressed?

[13] **A   In OD green pants, shirt, a ballistic vest, and a**

[14] **helmet.**

[15] Q   And did you ride with the other members of the SRT?

[16] **A   In the same vehicle, yes.**

[17] Q   Can you see -- can you easily see out of the van

[18] that you're riding in on the way to the Hooks' residence?

[19] **A   Yes.**

[20] Q   Does it have windows on the side or back or both?

[21] **A   Well, I could see from my vantage point.  I'm in**

[22] **the front seat.**

[23] Q   Okay.  You were actually in the front seat with the

[24] driver?

[25] **A   Yes.**

Page 36

[1] Q   And how many vehicles in this caravan were ahead of

[2] you or the vehicle you were in?

[3] **A   One.**

[4] Q   And would that be the car that Kasey Loyd was

[5] riding in --

[6] **A   Yes.**

[7] Q   -- or driving in?  Do you know who was in the

[8] vehicle with him?

[9] **A   No.**

[10] Q   Do you know how many cars were behind you?

[11] **A   No.**

[12] Q   Did -- on the way out to the residence, did Kasey

[13] Loyd have his blue lights on?

[14] **A   No.**

[15] Q   Did you at any time see him turn his blue lights

[16] on?

[17] **A   No.**

[18] Q   Do you recall how long it took to get from the

[19] Sheriff's Department out to the Hooks residence?

[20] **A   No.**

[21] Q   All right.  Now, it's my understanding that you had

[22] prior to -- prior to arriving at the Hooks house, at some

[23] point in time you had called the EMS and asked that they

[24] position an ambulance in close proximity to the area?

[25] **A   Yes.**

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 37

[1]  Q  Do you know who you talked to when you did that?

[2]  A  T.J. Johnson.

[3]  Q  T.J. Johnson, okay.  And was that a common practice
[4]  when the SRT would go out?

[5]  A  Yes.

[6]  Q  Was it a policy that they did that or that you guys
[7]  did that every time the SRT was implemented?

[8]  A  I don't know if that's policy.

[9]  Q  Okay.  Did anyone specifically on that evening
[10]  direct you to do that?

[11]  A  No.

[12]  Q  So you did that of your own volition?

[13]  A  Yes.  It was common practice.

[14]  Q  Okay.  Now, did you hear or was there any
[15]  conversation in the van regarding the implementation of the
[16]  SRT on the way out to the Hooks residence?

[17]  A  I don't think I understand your question.

[18]  Q  Well, did you guys, the members of the SRT, did you
[19]  overhear them or did you have any conversations with them
[20]  about what we're going to do when we get there while you're
[21]  in the van on the way out there?

[22]  A  No.

[23]  Q  And what was your understanding about how this
[24]  alleged search warrant was going to be executed?  Was it
[25]  going -- was it supposed to be a knock-and-announce warrant?

Page 38

[1]  A  Yes.

[2]  Q  And do you know what that means?

[3]  A  Yes.

[4]  Q  What's your understanding of what it means?

[5]  A  Physically knock on the door and announce your
[6]  presence.

[7]  Q  Okay.  Does that also encompass actually waiting
[8]  for someone to come to the door and open the door to execute
[9]  the warrant?

[10]  A  Yes.

[11]  Q  Do you recall there being any discussions during
[12]  the briefing about how the knock and announce warrant was
[13]  going to be executed?  Was it going to be something that
[14]  happened very quickly?  Was it going to be something that was
[15]  slow and time was taken with it?

[16]  A  No.

[17]  Q  So let me make that one question.  Was it supposed
[18]  to be something that was executed quickly?

[19]  A  Not necessarily.

[20]  Q  Was it -- was the -- do you recall anyone saying,
[21]  we're going to take our time with this when we knock and
[22]  announce?

[23]  A  Yes.  That's -- yes.

[24]  Q  Was it -- do you recall there being discussions
[25]  about the fact that this was a two-story house?

Page 39

[1]  A  Yes.

[2]  Q  And obviously, we know now that this -- that you
[3]  guys arrived right at 11:00 o'clock at night.  Do you recall
[4]  about what time you guys got there?

[5]  A  No.  I know that from hearing.  No.  I mean I
[6]  didn't look at my watch.  I didn't know what time it was.

[7]  Q  Right.  At the time you didn't?

[8]  A  No.  Correct.

[9]  Q  Obviously, at the point in time when you started
[10]  administering aid, you were looking at your watch and
[11]  charting things and making sure you --

[12]  A  No.

[13]  Q  You wouldn't have done that?

[14]  A  No.

[15]  Q  You wouldn't have charted exactly what time you
[16]  started administering aid to Mr. Hooks?

[17]  A  No.

[18]  Q  Okay.  But you know now that it was around 11:00
[19]  o'clock?

[20]  A  Yes.

[21]  Q  So do you recall there being any discussions about
[22]  the fact that at this time of night there's good likelihood
[23]  that Mr. Hooks might be asleep?

[24]  A  No.

[25]  Q  Nobody mentioned that in the briefing?

Page 40

[1]  A  Not that I heard.

[2]  Q  That would be a reasonable thing to consider,
[3]  wouldn't it, at 11:00 o'clock at night?

[4]  A  I don't have an argument for that.

[5]  Q  It's reasonable for people to be in bed at 11:00
[6]  o'clock at night, I guess, is what I'm saying?

[7]  A  Yes.

[8]  Q  Especially people that work and get up early in the
[9]  morning, right?

[10]  A  Yes.

[11]  Q  Now, my understanding is that you -- the van pulled
[12]  up into the driveway.  Do you recall whether or not the
[13]  lights were on on the van?

[14]  A  The headlights?

[15]  Q  Uh-huh (affirmative).  Yes.

[16]  A  Yes.

[17]  Q  You saw the headlights on the van on?

[18]  A  Yes.

[19]  Q  Do you recall whether or not at any point in time
[20]  the driver turned those lights off prior to driving up the
[21]  driveway to the house?

[22]  A  No.

[23]  Q  Is that a no, I don't recall?

[24]  A  I don't recall.

[25]  Q  Okay.  Is it possible that lights were turned off

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 41

[1] at some point in time as the van was approaching the house?

[2]     MS. CHRISTOPHER: Object to the form.

[3] Q  MR. SHOOK:  Is that a possibility?

[4] A  I guess.

[5] Q  Okay.

[6] A  Yes, I'm sure -- anything's possible.  I don't

[7] recall.

[8] Q  Based on what your recollection here today?

[9] A  Yes.

[10] Q  What about the lights on the vehicle that Kasey

[11] Loyd was driving, the headlights on it?

[12] A  I recall seeing them on.

[13] Q  Do you recall whether or not at any point in time

[14] they were turned off as the vehicle approached the driveway

[15] to the home?

[16] A  I do not recall.

[17] Q  So once again, based on your recollection is that a

[18] possibility?

[19]     MS. CHRISTOPHER: Object to form.

[20] A  THE WITNESS:  Yes, based on my recollection.

[21] Q  All right.  Who was driving the van, by the way?

[22] A  Dwayne Ussery.

[23] Q  All right.  So my understanding is you -- once the

[24] van came to a stop, you exited the van?

[25] A  Yes.

Page 42

[1] Q  At a point in time when you exited the van, had all

[2] the other members of the SRT that were in the back exited the

[3] back of the van?

[4] A  I don't know.

[5] Q  What's the first thing you recall seeing as you got

[6] out of the van?

[7] A  The house.

[8] Q  Okay.

[9] A  The house.

[10] Q  Do you recall seeing any lights on in the house?

[11] A  Yes.

[12] Q  At the point in time when you got out of the van?

[13] A  Oh, no.  Not when I got out of the van.

[14] Q  Were all the lights -- do you recall that there

[15] were no lights on at the house when you got out at the van?

[16] A  At the van the only light visible was a security

[17] light.

[18] Q  That would have been an outside light?

[19] A  An outdoor light.

[20] Q  Okay.  At some point in time did you see a light

[21] come on?

[22] A  No.

[23] Q  You're out of the van, you're standing next to the

[24] van.  Do you see the members of the SRT head to the back

[25] door?

Page 43

[1] A  Yes.

[2] Q  And how were they traveling to the back door?  Were

[3] they walking?  Jogging?  Running?

[4] A  Walking quickly.

[5] Q  Quick walk?

[6] A  Yes.

[7] Q  And where were you in line with that group?

[8] A  At the rear.

[9] Q  And how many people do you think were in front of

[10] you?

[11] A  Eight.  I don't recall exactly.

[12] Q  And based on what was said during the briefing,

[13] what was your understanding about what Kasey Loyd was

[14] supposed to do?

[15] A  He would knock on the door and announce the

[16] presence.

[17] Q  And was he supposed to do that more than once?

[18] A  A number was not given.

[19] Q  So to your knowledge there was never a discussion

[20] about how many times he would knock on the door and announce

[21] that the Sheriff's Department was there?

[22] A  I don't recall that, no.

[23] Q  Do you recall what he was supposed to announce,

[24] what he was supposed to say?

[25] A  Sheriff's Department, search warrant.

Page 44

[1] Q  Okay.  Now, my understanding is that you followed

[2] the SRT to the back door and you positioned yourself between

[3] the two vehicles that were in the carport?

[4] A  Yes.

[5] Q  And that would have been an SUV and a pick-up

[6] truck?

[7] A  I don't recall.

[8] Q  And my understanding is that at that point in time

[9] you believe that you were the last person in the group of SRT

[10] members approaching the back of the house?

[11] A  Yes.

[12] Q  And while you were at the back of the house did you

[13] hear Kasey Loyd knock on the door?

[14] A  Yes.

[15] Q  Did he knock on the door with his hand?

[16] A  Yes.

[17] Q  Do you know whether he used his hand or his fist?

[18] A  His fist.

[19] Q  Do you know whether he knocked on the wood part of

[20] the door or on the frame of the door?

[21] A  I don't know.

[22] Q  Do you know whether or not he knocked on the

[23] window?

[24] A  I don't know.

[25] Q  Could you see anything through the door from the

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 45

[1] position you were at?
[2] **A  I could see into the kitchen.  There was a small**
[3] **light on.**
[4] Q  Would that have been like a nightlight?
[5] **A  I don't know.**
[6] Q  Well, was the entire kitchen illuminated or was it
[7] --
[8] **A  Not in this sense, no.**
[9] Q  All right.  And how many times did you hear Kasey
[10] Loyd announce?
[11] **A  I don't recall exactly.  Three.**
[12] Q  And do you recall -- would he knock and then
[13] announce, "Sheriff's Department, search warrant?"
[14] **A  Yes.**
[15] Q  What kind of time period would there be in between
[16] his announcing and then the next knock?
[17] **A  That's hard to say.**
[18] Q  Matter of seconds?
[19] **A  Ten, 15 seconds.**
[20] Q  Now, my understanding, at some point in time you
[21] heard him say something else?
[22] **A  Yes.**
[23] Q  What was that?
[24] **A  "Contact."**
[25] Q  And did you hear that over the radio that you --

Page 46

[1] **A  No.**
[2] Q  -- were wearing?  You heard him say that from his
[3] voice?
[4] **A  Yes.**
[5] Q  Did the members of the SRT have radio ear piece and
[6] microphone?
[7] **A  Yes.**
[8] Q  When he said "contact" what did you take that to
[9] mean?
[10] **A  It means he sees someone.**
[11] Q  He sees someone?
[12] **A  Yes.**
[13] Q  Did he indicate who he saw or what he saw?
[14] **A  "He."**
[15] Q  He said --
[16] **A  He used the word "he."**
[17] Q  He used the word "he?"
[18] **A  (Nodding head affirmatively.)**
[19] Q  When did he use the word "he?"
[20] **A  After he said "contact."**
[21] Q  And what did you hear after that?
[22] **A  "He's coming toward me."**
[23] Q  He's coming toward me?
[24] **A  Yes.**
[25] Q  And then what did you hear?

Page 47

[1] **A  Kasey said, "He dipped off to the right."**
[2] Q  Kasey said, he dipped off to the right?
[3] **A  Yes.**
[4] Q  Do you know whether that would have meant Kasey's
[5] right or the person in the house's right?
[6] **A  I wouldn't know.  I assume Kasey's right.**
[7] Q  Okay.  How long after the initial knock and
[8] announce was it until you heard "contact?"
[9] **A  I don't know.**
[10] Q  Well, are we talking about a matter of seconds?
[11] **A  I don't know.  I couldn't accurately answer that.**
[12] Q  Okay.  What's the next thing you heard?
[13] **A  Someone say, "breach."**
[14] Q  Do you know who said the word "breach?"
[15] **A  I don't.**
[16] Q  Did you hear that through your earpiece or through
[17] normal communication?
[18] **A  Normal communication.**
[19] Q  And what did you observe next?
[20] **A  Someone breached the door with a ram.**
[21] Q  Do you know who that was?
[22] **A  I don't recall.**
[23] Q  And how many times did they have to hit the door to
[24] open it?
[25] **A  I don't recall that either.**

Page 48

[1] Q  Did it make a fairly large noise when that
[2] battering ram is used to breach a door?
[3] **A  Yes.**
[4] Q  And did you observe the actual breach?  Were you
[5] physically --
[6] **A  Yes.**
[7] Q  -- watching when the door --
[8] **A  Yes.**
[9] Q  -- was breached?  And when the door was breached,
[10] did that cause the door to fling open in a rather loud
[11] manner?
[12] **A  It certainly flung open, yes.**
[13] Q  There was nothing quiet about the breach?
[14] **A  No.**
[15] Q  What did you hear, if anything, next?
[16] **A  Shouting.**
[17] Q  And what was being shouted?
[18] **A  "Put it down."**
[19] Q  Did you hear anything other than "put it down?"
[20] **A  Yes.  But not that I could tell you what the**
[21] **specific words were.**
[22] Q  Did it appear to you that several people were
[23] yelling at the same time?
[24] **A  I'd say it sounded that way, yes.**
[25] Q  And the fact that several -- and the people that

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 49

[1] were yelling were members of the SRT?

[2] **A   That was my assumption.  I could not physically see**

[3] **them.**

[4] Q   And the fact that they were yelling all at the same

[5] time made it to the point where you couldn't understand

[6] exactly what they were saying?

[7] **A   I couldn't understand everything they were saying.**

[8] Q   And what's the next thing that you heard?

[9] **A   Gunfire.**

[10] Q   How many shots did you hear?

[11] **A   I don't know.**

[12] Q   How long between the first shot and the last shot?

[13] **A   Very little.**

[14] Q   Did it appear to you that the shots were almost all

[15] simultaneous with each other?

[16] **A   Yes.  Not literally simultaneous, but yes.**

[17] Q   I guess what I'm saying is, at the point in time

[18] when you heard the first shot, to the point in time when you

[19] heard the last shot, was there ever any break in the shots?

[20] **A   I mean, I could hear individual, but we're talking**

[21] **about half a second, a fraction of a second between them.**

[22] Q   Right.  If I told you there were 23 shots fired

[23] would you, based on what you heard that night, think that

[24] that was not accurate?

[25] **A   I would have no reason to say it's not.**

Page 50

[1] Q   My understanding is, is that from the time -- my

[2] understanding is that all the shots were fired before several

[3] members of the SRT could even get through the door.

[4]    **MS. CHRISTOPHER:** Object to form.  Is that a

[5] question?

[6] Q   MR. SHOOK:  Do you recall that?

[7]    **MS. CHRISTOPHER:** Object to form.

[8] **A   THE WITNESS: I don't recall how many were in or**

[9] **how many were out at the time.**

[10] Q   You recall giving a recorded statement to GBI Agent

[11] Kendra Fitzgerald back right after this happened, right?

[12] **A   Yes.**

[13] Q   In fact, that was on September 25th at 1:36 a.m. at

[14] the Laurens County Law Enforcement Center?

[15] **A   Yes.**

[16] Q   And do you recall in that statement your telling

[17] her that before the last man got there the shots were already

[18] fired?

[19] **A   Yes.**

[20] Q   Do you recall who you -- well, let me back up.  At

[21] some point in time did somebody request that you come into

[22] the house?

[23] **A   Yes.**

[24] Q   Do you recall who asked for your assistance?

[25] **A   No.**

Page 51

[1] Q   My understanding is, is that you went in behind

[2] Corporal Vertin?

[3] **A   Yes.**

[4] Q   And it's also my understanding that at the point in

[5] time that the shots were being fired that you couldn't

[6] actually see anything that was going on through the door?

[7] **A   Correct.**

[8] Q   When you entered the house tell me what you saw.

[9] **A   I saw a kitchen island.  I saw team members in**

[10] **front of me facing down a hallway.  I saw to the right -- to**

[11] **my right a person lying down, right lateral -- on their right**

[12] **side.**

[13] Q   Were there any lights on in the kitchen at this

[14] point in time?

[15] **A   Yes.**

[16] Q   Do you know who turned the lights on?

[17] **A   No.**

[18] Q   So you saw David lying on his right side?

[19] **A   Yes.**

[20] Q   And which way was he facing?

[21] **A   He was on his right side facing away from me.  He**

[22] **had his back to me.**

[23] Q   And you would have been standing in the kitchen at

[24] the time?

[25] **A   Yes.**

Page 52

[1] Q   And did you see or hear any interaction between any

[2] members of the SRT and David at that time?

[3] **A   No.**

[4] Q   Did you hear anyone say anything to him about -- or

[5] give him any direction?

[6] **A   No.**

[7] Q   Who was -- who was guarding him?

[8] **A   I don't know.**

[9] Q   Did you see anyone standing over him as he was

[10] laying on the floor?

[11] **A   No.**

[12] Q   And what else did you see about -- tell me what

[13] else you observed about David on the floor.

[14] **A   He was awake.**

[15] Q   He was awake?

[16] **A   Yes.**

[17] Q   Did you see -- did you see a firearm?

[18] **A   Yes.**

[19] Q   My understanding is you saw that firearm at his

[20] feet?

[21] **A   Yes.**

[22] Q   Behind him or with his back turned to it?

[23] **A   Well, no.  It was at his feet.**

[24] Q   And the barrel of the gun was pointing toward the

[25] kitchen?

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 53

[1]  **A  The kitchen door, the exterior door.  Kitchen**
[2]  **exterior door.**
[3]  Q  So the shotgun would be laying on his backside?
[4]      MS. CHRISTOPHER: Object to form.
[5]  **A  THE WITNESS:  I mean, it's at his feet.  It's not**
[6]  **in front of him or behind him.**
[7]  Q  Okay.
[8]  **A  It's below him.**
[9]  Q  It's below him.  All right.  He's facing back into
[10] the dining room --
[11] **A  Yes.**
[12] Q  -- at that point in time?  Correct?
[13] **A  I'm not real familiar with what's what in the**
[14] **house.  So I'm --**
[15] Q  Well, let me rephrase that.  He's facing away from
[16] the kitchen?
[17] **A  Yes.**
[18] Q  He was conscious?
[19] **A  Yes.**
[20] Q  Did you speak with him?
[21] **A  Yes.**
[22] Q  Tell me what you said to him and what he said to
[23] you.
[24] **A  I said can you speak to me?**
[25] Q  What did he say?

Page 54

[1]  **A  He didn't say any word.  He looked at me, what I**
[2]  **took to perceive as a nod of the head.**
[3]  Q  Did you have any other conversations with him while
[4]  you were there with him in the house?
[5]  **A  Yes.**
[6]  Q  What -- tell me about those.
[7]  **A  I asked him not to move and that he would be**
[8]  **getting out soon.**
[9]  Q  Did you observe where he had been struck by the
[10] projectiles?
[11] **A  From my vantage point, yes.**
[12] Q  And what's your understanding of where, based on
[13] when you first saw him, where his wounds were?
[14] **A  In his cheek or jaw and his chest.  And I believe**
[15] **in his back, left -- I don't remember exactly where,**
[16] **trapezoid area or shoulder blade area.**
[17] Q  Of his back?
[18] **A  Yes.**
[19] Q  What's the next thing you did?
[20] **A  I determined that his breathing is stable.**
[21] Q  Okay.
[22] **A  And that there's not -- I'm looking for**
[23] **uncontrolled bleeding that I can control --**
[24] Q  Okay.
[25] **A  -- at that moment.**

Page 55

[1]  Q  Tell me about your search for uncontrolled
[2]  bleeding.
[3]  **A  Okay.  There was bleeding.  I could not identify**
[4]  **any arterial bleeding so --**
[5]  Q  How would you identify that?  By the color of the
[6]  blood?
[7]  **A  The volume --**
[8]  Q  The volume of the blood?
[9]  **A  -- at which it's exiting.**
[10] Q  So at the scene based on your initial assessment
[11] you didn't believe that there was arterial bleeding at that
[12] point in time?
[13] **A  Not that I could identify.**
[14] Q  Okay.  What did you do?
[15] **A  I called the ambulance that I knew would be**
[16] **standing by close.**
[17] Q  Okay.
[18] **A  To tell them that we did have an individual that**
[19] **needed the ambulance to come on in.**
[20] Q  Okay.  What's the next thing you did?
[21] **A  I stayed there and other medics came in and removed**
[22] **him.**
[23] Q  Do you recall who that was?
[24] **A  No.**
[25] Q  It's my understanding that at some point in time

Page 56

[1]  you called for a drag mat?  Is that correct?
[2]  **A  Yes.  I think my statement in there is -- I don't**
[3]  **recall the specific words.  That would be the norm.**
[4]  Q  Okay.  And again, who were the EMTs that came in?
[5]  **A  I don't know.**
[6]  Q  All right.  Now, my understanding is at the point
[7]  in time when the other EMTs came in and -- did they actually
[8]  put David on the drag mat and take him out?
[9]  **A  I don't know because when they moved him, I wasn't**
[10] **watching them.**
[11] Q  Okay.
[12] **A  Or I don't --**
[13] Q  So you don't know if they used a drag mat or if
[14] they just actually physically drug him out?
[15] **A  Yeah.  I don't.**
[16] Q  All right.  Now, my understanding is you stayed in
[17] the house at that point in time?
[18] **A  Yes.**
[19] Q  And tell me what you observed next.
[20] **A  A lot of calling out to someone.**
[21] Q  Okay.  Tell me what you heard and who you heard it
[22] from.
[23] **A  The only voice that I know I heard specifically**
[24] **with a name is Steve Vertin saying to show me your hands,**
[25] **come out with your hands up.  Multiple times.**

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 57

[1] Q   Do you know about how long it was from the time you
[2] first heard Corporal Vertin asking the person to come out, to
[3] the point in time when they came out?
[4] A   I don't know.
[5] Q   Are we talking about a matter of seconds or
[6] minutes?
[7] A   Minutes.
[8] Q   Do you recall hearing Corporal Vertin say to what
[9] we now know is Ms. Hooks to put her hands behind her back?
[10] A   Yes.
[11] Q   And do you recall seeing him place her in handcuffs
[12] behind her back?
[13] A   No.
[14] Q   Do you recall seeing her (sic) physically take her
[15] from the residence?
[16] A   Do I recall her --
[17] Q   Do you recall seeing Corporal Vertin physically
[18] take her out of the residence?
[19] A   Yes.
[20] Q   And would he have -- well, do you recall how he
[21] took her out of the residence, what direction he came?
[22] A   From the front room through, I guess, what we've
[23] established is the dining room, --
[24] Q   Correct.
[25] A   -- into the kitchen, and out the exterior door.

Page 58

[1] Q   Okay.  The place where -- so she was led through
[2] the area where Mr. Hooks had been laying after he was shot?
[3] A   Yes.
[4] Q   Was there quite a bit of blood in that area on the
[5] floor?
[6] A   There was blood in that area on the floor.
[7] Q   Did you observe anything about the condition of the
[8] residence as a result of all the gunfire that had taken place
[9] inside there?
[10] A   No.
[11] Q   Did you see any damage to the walls, furniture --
[12] A   No.
[13] Q   -- things of that nature?  I'm assuming you're not
[14] saying it wasn't there; you're just saying you didn't see it?
[15] A   I didn't see it.
[16] Q   And my understanding is, is you observed Corporal
[17] Vertin bring Teresa Hooks outside the residence and sit her
[18] down in a chair next to the pool?
[19] A   Yes.
[20] Q   You were there and observed that yourself?
[21] A   Yes.
[22] Q   Did you have any conversation with Corporal Vertin
[23] about why are we doing this?
[24] A   No.
[25] Q   You're not a law enforcement officer?  That's

Page 59

[1] really not your job, right?
[2] A   Correct.
[3] Q   Did anything you observed about Teresa Hooks as she
[4] was being brought out of the house make you think she was a
[5] threat to you in any way?
[6] A   No.
[7] Q   You observed what she was saying during that period
[8] of time, correct?
[9] A   Yes.
[10] Q   Tell me what you observed Teresa Hooks saying as
[11] she was being led out of the house and sat in the chair.
[12] A   Repetitive, "what's going on?"
[13] Q   Did you hear her asking about her husband?
[14] A   I don't recall.
[15] Q   When Teresa was brought out and sat in the chair,
[16] where was David?
[17] A   He was -- I don't recall how the vehicles were
[18] parked.  I don't know if they were face in or face out, but
[19] on the opposite end of the vehicle as the vehicles -- as the
[20] kitchen door.
[21] Q   Okay.  So the vehicles would have been between
[22] where she was positioned in a chair by the pool and where he
[23] was at?
[24] A   Yes.
[25] Q   Such that she would not be able to see him?  Well,

Page 60

[1] maybe --
[2] A   I can't answer that.
[3] Q   Let me rephrase that.  Well, the vehicles were in
[4] between where she was and where he was?
[5] A   Yes.
[6] Q   Did you observe anything going on with any EMTs or
[7] any other person with regards to David at the scene after you
[8] came out and Teresa was brought out and put in the chair?
[9] A   Yes.
[10] Q   Did you render any aid to David after that?
[11] A   No.
[12] Q   I'm assuming you don't know what was going on with
[13] David while you were still in the house with Corporal Vertin?
[14] A   That's correct.
[15] Q   You don't know what aid was rendered to him by the
[16] other EMTs or -- other than what they may have told you?
[17] A   I didn't witness them do it.  I saw result of it
[18] after.
[19] Q   Okay.  And is it your understanding that they
[20] attempted to use quick clot gauze and things of that nature
[21] to stop bleeding?
[22] A   Yes.
[23] Q   Did they start an IV?
[24] A   Yes.
[25] Q   And did you make any calls with regards to trying

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 61

[1] to get any other type of ambulance or emergency service
[2] there?
[3] **A   A call was made; I didn't make that call.**
[4] Q   To try to get --
[5] **A   I don't think I did.**
[6] Q   To try to get a helicopter there?
[7] **A   Yes.**
[8] Q   Did you have any other contact with Mr. Hooks after
[9] that?
[10] **A   No.**
[11] Q   How long did you stay at the scene?
[12] **A   I don't know.**
[13] Q   Obviously, we know that you gave your interview to
[14] Agent Fitzgerald at 1:36 --
[15] **A   Yes.**
[16] Q   -- in the morning.  So at some point in time you
[17] left the scene and went back to the law enforcement center,
[18] correct?
[19] **A   Yes.**
[20] Q   Did you wait for the GBI to get there before you
[21] went back or were you instructed to go back before the GBI
[22] got there?
[23] **A   Got to the residence?**
[24] Q   Correct.  Before the GBI got to the residence.
[25] **A   We were instructed.**

Page 62

[1] Q   To go back?
[2] **A   Yes.**
[3] Q   Who instructed you to do that?
[4] **A   I don't recall.**
[5] Q   Would that have been the Sheriff?
[6]    **MS. CHRISTOPHER:** Object to form.
[7] **A   THE WITNESS:  I don't know.**
[8] Q   The Sheriff was there on the scene, correct?
[9] **A   I don't know.  At the time of our departure, I**
[10] **don't know.**
[11] Q   Well, let me back up.  The Sheriff was there on the
[12] scene at the point in time when the search warrant was
[13] attempted to be served?
[14] **A   Yes.**
[15] Q   And the Sheriff was there when David Hooks was
[16] shot?
[17] **A   I don't know.**
[18] Q   Well, do you have any reason to believe he wasn't?
[19] **A   I didn't witness him.  I did not witness him there,**
[20] **but as far as I know he was there.**
[21] Q   Did you witness him there after David was shot,
[22] while Teresa was being held next to the pool in the chair?
[23] **A   No.**
[24] Q   You did not participate in his -- David's
[25] transportation to Fairview Park?

Page 63

[1] **A   No.**
[2] Q   You didn't participate in his transportation to
[3] Macon?
[4] **A   No.**
[5] Q   You -- during the period of time that you observed
[6] -- how long do you think you were there and observed Teresa
[7] in the chair handcuffed?
[8] **A   A minute.  I don't know.**
[9] Q   Okay.
[10] **A   Short time.**
[11] Q   Did you ever observe anyone give her any answers to
[12] her questions?
[13] **A   Yes.**
[14] Q   And who would that have been?
[15] **A   Chris Brewer.**
[16] Q   What did Chris Brewer say to Teresa Hooks?
[17] **A   He said we're here for a search warrant.**
[18] Q   Was that when she was in the chair?
[19] **A   Yes.**
[20] Q   You saw him approach her and say, we're here for a
[21] search warrant?
[22] **A   No.  It was response to her question of what's**
[23] **going on.**
[24] Q   Okay.  So where was he at in relation to her when
[25] they had this conversation?

Page 64

[1] **A   Standing beside her.**
[2] Q   He was standing beside her?
[3] **A   Yes.**
[4] Q   And she was in a chair?
[5] **A   Yes.**
[6] Q   She had handcuffs on to your knowledge?
[7] **A   I don't -- handcuffs, zip tie, something.**
[8] Q   Something?
[9] **A   Yes.**
[10] Q   She was restrained?
[11] **A   Yes.**
[12] Q   Now, I understand you're not a law enforcement
[13] officer.  You're an EMT.
[14] **A   Correct.**
[15] Q   Just based on your observation, did it appear to
[16] you she was free to leave at any time she wanted to?
[17]    **MS. CHRISTOPHER:** Object to form.
[18] **A   THE WITNESS:  I wouldn't know.**
[19] Q   Well, did the fact that she had been placed in a
[20] chair by Corporal Vertin, restrained as just an ordinary
[21] citizen, did that make you -- does that make you believe at
[22] that point in time she was free to go?
[23]    **MS. CHRISTOPHER:** Object to form.
[24] **A   THE WITNESS:  I couldn't answer that.  At the time,**
[25] **I don't -- I don't know who's the ordinary citizen or who's**

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 65

[1] not.

[2] Q   Oh, okay.  I understand.  And I know you're not a

[3] law enforcement officer so I'm -- I was just -- other than

[4] Chris Brewer telling her, we're here for a search warrant,

[5] did you hear anyone else or see anyone else have any

[6] conversation with her, to answer any questions that she was

[7] asking about what was going on, or about her husband, or

[8] anything?

[9] A   Not that I recall.

[10] Q   I think you described her demeanor when you spoke

[11] with Agent Fitzgerald that she was "quite hysterical?"

[12] A   Yes.  Yes.

[13] Q   Did you observe her crying?

[14] A   Yes.

[15] Q   Screaming?

[16] A   Yes.  The questions, what's going on?  why? you

[17] could characterize as a yell.

[18] Q   Okay.  You have, in your experience as an EMT,

[19] observed individuals in the past that have -- that are

[20] exhibiting symptoms of psychological trauma, haven't you?

[21] A   Yes.

[22] Q   Would you say that what you observed from Teresa

[23] Hooks that night as she was sitting in that chair was

[24] consistent with that?

[25]       MS. CHRISTOPHER:  Object to form.

Page 66

[1] A   THE WITNESS:  Yes.

[2] Q   All right.  Let me just look at a couple of things

[3] and I think I'm about done here.  Did you overhear any of the

[4] -- any members of the SRT make any statements about the

[5] shooting, why they fired their weapon?

[6] A   No.

[7] Q   Were -- did you go back to the Law Enforcement

[8] Center with the rest of the members of the SRT?

[9] A   I don't know if it was everyone or partial.  I

[10] don't know.

[11] Q   Did you go in the van?

[12] A   A van -- a transport van was sent --

[13] Q   Okay.  So the van that you went in --

[14] A   -- to get us.

[15] Q   -- stayed on the scene?

[16] A   Yes.

[17] Q   Do you recall whether more than one van came to get

[18] you?

[19] A   I don't know.

[20]       MR. SHOOK:  That's it.

[21]       (DEPOSITION CONCLUDED 11:38 A.M.)

[22]

[23]

[24]

[25]

Page 67

D I S C L O S U R E

STATE OF GEORGIA,

COUNTY OF BIBB:

Deposition of:  FORREST JONES

Pursuant to Article 8.B. of the Rules and Regulations of the
Board of Court Reporting of the Judicial Council of Georgia,
I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a
representative of Hawthorne & Webb Court Reporting.

Hawthorne & Webb Court Reporting was contacted by the
offices of Mr. Mitch Shook to provide court reporting
services for this deposition.  Hawthorne & Webb Court
Reporting will not be taking this deposition under any
contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

Hawthorne & Webb Court Reporting has no contract to
provide reporting services with any party to the case, any
counsel in the case, or any reporter or reporting agency from
whom a referral might have been made to cover this
deposition.  Hawthorne & Webb Court Reporting will charge its
usual and customary rates to all parties in the case, and a
financial discount will not be given to any party to this
litigation.

Dated:  January 26, 2017

_____, CCR B-959
Certified Court Reporter

Page 68

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in
such capacity on January 26, 2017, I reported the testimony
of FORREST JONES, and on the foregoing pages, numbered 3
through 66, both inclusive, have transcribed a true, accurate
and complete transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related
to any of the parties; nor am I interested in the event or
the outcome thereof.

WITNESS my hand and official seal this 6th day of
February, 2017.

_____
Certificate Number B-959

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

Page 69

CERTIFICATE OF WITNESS
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

```
TERESA POPE HOOKS,              :
ET AL.,                         :
          PLAINTIFFS,           :    CASE NO.
                                :    3:16CV00023-DHB-BKE
      VS.                       :
                                :
CHRISTOPHER BREWER, ET AL.,     :
          DEFENDANTS.           :
```

DEPOSITION OF: Forrest Jones          January 26, 2017
     (  )I wish to make the following correction(s):
PAGE/ LINE/      CORRECTION            /      REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

     (  )I have read the foregoing pages of my testimony and
wish to make no corrections.

                    _____
                         Forrest Jones

Sworn to and subscribed before me
This ____ day of _____, 20___.

_____

Notary Public

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

**,**

**'94** 10:3
**'95** 8:25;10:3
**'96** 9:19
**'97** 8:25;9:17
**'98** 9:17

**"**

**"breach"** 47:13,14
**"contact"** 46:8,20;47:8;45:24
**"He** 47:1
**"He's** 46:22
**"he"** 46:16,17,19,14
**"put** 48:19,18
**"quite** 65:11
**"Sheriff's** 45:13
**"what's** 59:12

**1**

**1:36** 50:13;61:14
**11:00** 39:3,18;40:3,5
**11:38** 66:21
**15** 45:19
**16** 13:15
**1996** 12:10

**2**

**2006** 17:6
**2014** 17:11,12;19:4;20:22;21:3,11,
22;23:7
**21** 12:14
**23** 49:22
**24** 13:19;19:4;20:22;21:3,11;23:7
**25th** 50:13

**9**

**911** 23:21

**A**

**able** 59:25
**above** 12:21
**Academy** 6:24
**access** 26:19,22,25
**accurate** 49:24
**accurately** 47:11
**active** 11:6
**acts** 32:19
**actual** 27:12;48:4
**actually** 7:15;12:13;35:23;38:7;
51:6;56:7,14
**adapting** 11:1
**administering** 39:10,16
**adopted** 13:25
**affirmative** 4:23;22:4;40:15
**affirmatively** 46:18
**again** 17:24;18:12;21:7;41:17;56:4

**age** 13:18
**agency** 11:23
**Agent** 50:10;61:14;65:11
**ages** 5:20;6:5
**agreed** 3:11
**ahead** 36:1
**aid** 19:13;39:10,16;60:10,15
**aleck** 5:4
**alert** 30:3
**alleged** 29:3;30:11;37:24
**Allison** 13:13,14
**allowed** 31:16,19
**almost** 49:14
**along** 3:23
**alternative** 30:11
**always** 19:22,25
**ambulance** 31:12;35:11;36:24;
55:15,19;61:1
**Andrews** 13:7
**announce** 38:5,12,22;43:15,20,23;
45:10,13;47:8
**announcing** 45:16
**anymore** 13:20
**anything's** 41:6
**appear** 48:22;49:14;64:15
**appreciate** 4:15
**approach** 63:20
**approached** 41:14
**approaching** 41:1;44:10
**area** 36:24;54:16,16;58:2,4,6
**argument** 40:4
**around** 7:7;26:17;39:18
**arrest** 29:13
**arrested** 17:2
**arrived** 24:4;39:3
**arriving** 36:22
**arterial** 55:4,11
**asleep** 39:23
**assessment** 55:10
**assigned** 28:21;30:19
**assistance** 50:24
**assume** 47:6
**assuming** 6:18;24:7;58:13;60:12
**assumption** 34:14;49:2
**Atlantic** 7:20
**attempt** 34:8
**attempted** 60:20;62:13
**attended** 29:5
**Augusta** 10:17
**aunts** 14:17
**authority** 33:15
**awake** 52:14,15
**aware** 14:19;15:5,17,25;16:1,10,
18;17:12
**away** 51:21;53:15

**B**

**back** 9:3;13:10;17:23;22:20;30:17;
34:16;35:1,20;42:2,3,24;43:2;44:2,
10,12;50:11,20;51:22;52:22;53:9;
54:15,17;57:9,12;61:17,21,21;62:1,
11;66:7;15:12

**background** 7:19
**backside** 53:3
**bad** 27:16
**ballistic** 35:13
**barrel** 52:24
**based** 12:24;27:10;41:17,20;43:12;
49:23;54:12;55:10;64:15;41:8
**basically** 29:17
**basis** 10:18
**battering** 48:2
**became** 17:24
**become** 8:24;11:12
**bed** 40:5
**began** 12:9
**behind** 36:10;51:1;53:6;57:9,12;
52:22
**below** 53:8,9
**beside** 64:1,2
**best** 20:13
**beyond** 10:19
**bigger** 28:8
**Bill** 4:4
**bit** 13:10;14:12;58:4
**blade** 54:16
**bleeding** 54:23;55:2,3,4,11;60:21
**blood** 55:6,8;58:4,6
**blue** 36:13,15
**boarding** 6:21;7:3
**born** 5:10,11
**both** 8:21;35:20
**box** 35:10
**Brack** 14:23;15:7;16:17
**B-R-A-C-K** 14:24
**breach** 48:2,4,13
**breached** 47:20;48:9,9
**break** 28:4;49:19;15:10
**breathing** 54:20
**Brewer** 4:4;24:24;32:11;63:15,16;
65:4;3:13
**Brian** 3:24;17:16,20;18:14
**briefing** 24:18,20;25:7,20,23;26:4,
18,24;28:3,7,13,17;29:5;30:2,6,10,
14;31:15,16;32:2,3;33:13,15,22;
34:2;35:4;38:12;39:25;43:12
**briefings** 28:23;33:19
**briefly** 10:18
**bring** 58:17
**brought** 9:1;59:4,15;60:8
**Bryan** 17:9,10,13,19,24;18:12;
24:22;32:6
**building** 27:9;29:2
**burglarized** 27:20
**burglary** 27:24;30:3

**C**

**California** 8:6;9:2
**call** 18:6,18,22;19:1;23:12,15,17;
33:5;61:3,3
**called** 36:23;55:15;56:1
**calling** 56:20
**calls** 33:1;60:25
**came** 34:10,21;41:24;55:21;56:4,7;

57:3,21;60:8;66:17
**can** 4:8,15;11:5;28:6;35:17;53:24;
54:23;14:11;35:17
**Captain** 12:18,19
**captains** 13:1,4
**car** 36:4
**caravan** 36:1
**care** 9:22;10:9,10,16
**carport** 44:3
**cars** 36:10
**case** 3:24;4:2,3,5;32:9,10,11
**cause** 48:10
**caused** 7:10
**center** 23:21;61:17;50:14;66:8
**certain** 4:25
**certainly** 33:7;48:12
**certificates** 8:14
**certification** 9:18;10:11
**certified** 29:15
**chain** 12:21,23
**chair** 58:18;59:11,15,22;60:8;
62:22;63:7,18;64:4,20;65:23
**Chaplain** 32:14,15,16,18,19
**characterize** 65:17
**charge** 34:13
**Charleston** 6:9,10,12
**charted** 39:15
**charting** 39:11
**cheek** 54:14
**chest** 54:14
**child** 7:7;13:18,20
**childhood** 5:13
**children** 13:16
**choose** 20:5
**chose** 12:4
**Chris** 4:4;24:24;32:11;63:15,16;
65:4
**CHRISTOPHER** 3:4,6,9,13;
11:20;21:9;28:18;29:6;33:9;41:2,19;
50:4,7;53:4;62:6;64:17,23;65:25
**circumstances** 18:16;20:3
**citizen** 64:21,25
**city** 8:6
**civilian** 19:19;21:4,5,5,11
**civilians** 19:13;22:12
**class** 10:10,16,22;11:12
**classes** 29:25
**close** 36:24;55:16
**clot** 60:20
**Cody** 13:23,24
**college** 8:5;7:20;8:1
**Collegedale** 8:1
**color** 55:5
**coming** 28:12;46:22,23
**command** 12:23
**commander** 18:11,16;32:5
**common** 14:10;37:3,13
**communication** 47:17,18
**community** 8:5
**company** 9:13
**complete** 8:16,24;18:6
**completed** 8:13,21
**concept** 34:21

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

**CONCLUDED** 66:21
**condition** 58:7
**confused** 4:12
**conscious** 53:18
**consider** 40:2
**consistent** 65:24
**consistently** 18:21
**constructive** 9:4
**contact** 61:8
**control** 54:23
**conversation** 37:15;58:22;63:25;
65:6
**conversations** 30:6,10;37:19;54:3
**convicted** 17:2
**Corporal** 51:2;57:2,8,17;58:16,22;
60:13;64:20
**couldn't** 24:16;47:11;49:5,7;51:5;
64:24
**counsel** 3:11
**County** 5:8;9:12,14,15,20;11:11,
13;12:10,14,20;13:2;14:2;15:2,5;
21:25;22:1;24:5;50:14
**couple** 27:20;30:4;66:2
**course** 4:19;16:21;33:11
**courses** 29:24
**court** 4:16;3:25;14:24;15:1
**cousins** 14:13,19
**cover** 11:6;26:9
**covered** 25:22
**crimes** 17:2
**critical** 10:10,16
**CROSS** 3:19
**crying** 65:13

## D

**damage** 58:11
**damaged** 28:1
**dangerous** 11:5
**daughter** 33:23
**David** 16:15;30:2,7;51:18;52:2,13;
56:8;59:16;60:7,10,13;62:15,21
**David's** 62:24
**day** 23:10
**decided** 20:12
**deeper** 10:20
**defendants** 4:3,5
**degree** 10:7
**degrees** 8:13
**delivering** 9:25
**demeanor** 65:10
**department** 7:17;16:8;11:19;28:5;
36:19;43:21,25;45:13
**departure** 62:9
**deposition** 3:13,14;4:19;5:1;66:21
**deputy** 29:10;31:12;12:21
**described** 65:10
**details** 28:1
**determined** 54:20
**diagram** 34:1
**didn't** 11:1;21:8;34:15;39:6,7;
54:1;55:11;58:14,15;60:17;61:3;
62:19;63:2

**different** 11:3
**differently** 22:18
**dining** 53:10;57:23
**diplomas** 8:13
**dipped** 47:1,2
**direct** 18:16;37:10
**directed** 12:6;18:8;34:23
**directing** 18:10
**direction** 18:9;24:2;52:5;57:21
**directly** 4:14;14:4
**director** 16:5;31:12;12:21,22
**disasters** 11:8
**discharging** 21:17
**discussing** 15:13;34:4,7
**discussion** 33:21;43:19
**discussions** 27:19;30:2;38:11,24;
39:21
**District** 3:25;4:1
**Division** 4:1
**documentary** 18:17
**doesn't** 4:10,24;10:25;18:20;
21:10
**don't** 4:11,12;5:1;11:21,25;15:21;
17:18;18:19,19,20;19:21;21:20,23;
23:16,24;24:9,17,21;25:2,5,12,15,
19;26:5,16;28:1,2,9,25;29:7,8;32:3,
16;34:11,20;37:8,17;40:4,23,24;
41:6;42:4;43:11,22;44:7,21,24;45:5,
11;47:9,11,15,22,25;49:11;50:8;
52:8;54:15;56:2,5,9,12,13,15;57:4;
59:14,17,18;60:12,15;61:5,12;62:4,
9,10,17;63:8;64:7,25,25;66:9,10,19
**done** 10:2;18:21;20:19;26:15;
39:13;66:3
**door** 25:18;34:7,16,18;35:1;38:5,8,
8;42:25;43:2,15,20;44:2,13,15,20,
20,25;47:20,23;48:2,7,9,10;50:3;
51:6;53:1,1,2;57:25;59:20
**down** 4:18,24;51:10,11;58:18
**down"** 48:18,19
**drag** 56:1,8,13
**dressed** 35:12
**driver** 35:24;40:20
**driveway** 40:12,21;41:14
**driving** 36:7;40:20;41:11,21
**drug** 27:2;56:14
**Dublin** 4:1;8:10,20;9:2,23
**duly** 3:18
**durable** 9:25
**during** 4:19;5:1;6:25;16:21;17:2;
19:6,14;28:12;30:1,6,10;33:21;
38:11;43:12;59:7;63:5;31:15
**duties** 24:1;26:10;27:6
**duty** 23:7
**Dwayne** 30:22,23;31:10;41:22

## E

**ear** 46:5
**early** 40:8
**earpiece** 47:16
**easily** 35:17
**education** 8:12

**educational** 7:19;9:21
**Edward** 3:22
**eight** 24:17;43:11
**either** 16:24;20:12;47:25
**Eleventh** 6:17
**else** 3:7,10;4:19;17:13;30:25;45:21;
52:12,13;65:5,5
**emergency** 8:15;61:1;9:14
**EMS** 9:15,20;10:13,14,22;11:12;
12:10,14,20;13:2;29:19;36:23
**EMSs** 12:11
**EMT** 8:20,22,24,25;9:8,18;10:7;
16:21;18:25;20:20;23:7;64:13;65:18
**EMTs** 30:18;31:6,8;56:4,7;60:6,16
**encompass** 38:7
**encountered** 25:11
**end** 59:19
**enforcement** 21:17;22:19,24;23:3;
33:12;58:25;61:17;64:12;65:3;
50:14;66:7
**entered** 51:8
**entering** 28:13
**entire** 5:13;45:6
**environments** 11:2,3,5,6,7
**equipment** 10:1
**Especially** 40:8
**established** 57:23
**estimate** 24:16;28:6
**evaluation** 20:6
**even** 50:3
**evening** 37:9
**everybody** 26:4;28:15
**everyone** 24:21;26:18;66:9
**everywhere** 14:11
**exactly** 39:15;43:11;45:11;49:6;
54:15
**EXAMINATION** 3:19
**execute** 30:11;38:8
**executed** 37:24;38:13,18
**execution** 29:2
**exhibiting** 65:20
**exited** 41:24;42:1,2
**exiting** 28:13;55:9
**experience** 65:18
**exterior** 53:1,2;57:25

## F

**face** 59:18,18
**facing** 51:10,20,21;53:9,15
**fact** 15:18;16:13;27:19;30:2,7;
38:25;39:22;48:25;49:4;50:13;64:19
**fair** 12:1;29:10;33:7
**fairly** 14:10;48:1
**Fairview** 62:25
**familiar** 53:13
**family** 7:2,10
**family's** 7:8
**far** 62:20
**fatal** 22:9
**father** 7:12;14:13,14;16:5
**feet** 52:20,23;53:5
**female** 22:6

**field** 9:9;10:5
**filed** 3:25;4:2
**fine** 3:9;20:9
**firearm** 52:17,19
**firearms** 30:8,8
**fired** 49:22;50:2,18;51:5;66:5
**first** 3:17;14:4;25:11,13;42:5;49:12,
18;54:13;57:2;9:23
**fist** 6:1;44:17,18
**Fitzgerald** 50:11;61:14;65:11
**five** 24:16
**fling** 48:10
**floor** 52:10,13;58:5,6
**Florida** 5:11,12,15
**flung** 48:12
**followed** 44:1
**forget** 5:2
**forgot** 8:5
**form** 3:6;11:20;21:9;28:18;29:6;
33:9;41:2,19;50:4,7;53:4;42:6;
64:17,23;65:25
**former** 4:3
**Forrest** 3:22,14,16
**found** 20:12
**four** 6:22
**fraction** 49:21
**frame** 17:18;44:20
**Frazier** 32:17
**free** 64:16,22
**front** 34:18;35:22,23;43:9;51:10;
53:6;57:22
**full** 9:18;28:10
**furniture** 58:11
**further** 11:16;20:5

## G

**gauze** 60:20
**gave** 61:13
**GBI** 50:10;61:20,21,24
**general** 26:11
**Generally** 27:2
**Georgia** 4:1;8:10,11,20,22;9:1,12,
23;10:17;16:7
**Gerald** 32:16
**gets** 10:20;11:15,16
**given** 43:18
**giving** 19:10;50:10
**goes** 10:19
**good** 39:22
**govern** 3:14
**governing** 3:12
**grade** 6:7,7,11,11,17
**graduate** 7:5
**graduated** 6:18;7:18;9:7
**grandchildren** 33:23
**green** 35:13
**Griggers** 13:23
**G-R-I-G-G-E-R-S** 13:23
**group** 34:25;35:5;43:7;44:9
**guarding** 52:7
**guess** 5:20;12:16;14:11;15:14,17,
18;16:5,6;20:7;26:2;28:4;35:6;40:6;

Case 3:16-cv-00023-DHB-BKE    Document 83-12    Filed 05/25/17    Page 22 of 25

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

41:4;49:17;57:22
**gun** 52:24
**gunfire** 58:8;49:9
**gunshot** 21:6,12,14,16;22:5,8,12,
21,25;23:4
**guys** 37:6,18;39:3,4

## H

**half** 49:21
**hallway** 51:10
**hand** 44:15,17
**handcuffed** 63:7
**handcuffs** 57:11;64:6,7
**hands** 56:24,25;57:9
**happen** 31:17
**happened** 38:14;50:11
**hard** 45:17
**Harrell** 4:4;25:1,5,11
**haven't** 65:20
**he's** 32:16;13:20;31:12;32:18;
46:23;53:9,15
**head** 4:23;17:7,11,13,20,24;42:24;
46:18;54:2
**headlights** 40:14,17;41:11
**health** 9:22;10:9
**hear** 37:14;44:13;45:9,25;46:21,25;
47:16;48:15,19;49:10,20;52:1,4;
59:13;65:5
**heard** 40:1;45:21;46:2;47:8,12;
49:8,18,19,23;56:21,21,23;57:2
**hearing** 39:5;57:8
**Heart** 8:10,20,22;9:1;16:7
**held** 28:3;62:22
**helicopter** 61:6
**helmet** 35:14
**hesitate** 4:11
**hierarchy** 12:19
**high** 6:18,25,25;7:1,18;8:12;30:3
**highest** 31:9,13;33:12
**Hinsdale** 5:16,17,20,24
**HIPAA** 19:11
**hired** 9:18
**hit** 47:23
**hold** 8:14;10:11
**home** 9:25;27:20;30:4;41:15
**Hooks** 3:24;16:10;30:2,7;36:19,22;
37:16;39:16,23;57:9;58:2,17;59:3,
10;61:8;62:15;63:16;65:23;15:9,11
**Hooks'** 27:20;33:23;35:18
**hospital** 10:21;20:6,13
**hour** 24:14
**hours** 24:14,15,17
**house** 30:24;34:1,5;36:22;38:25;
40:21;41:1;42:7,9,10,15;44:10,12;
50:22;51:8;53:14;54:4;56:17;59:4,
11;60:13
**house's** 47:5
**huh** 4:23
**husband** 59:13;65:7
**hysterical"** 65:11

## I

**I'd** 48:24
**I'll** 4:11
**I'm** 4:7;5:3,4;6:18;20:9;24:7;
27:16;29:12;35:21;40:6;41:6;49:17;
53:13,14;54:22;58:13;60:12;65:3;
66:3
**I've** 16:22
**ICU** 10:21
**idea** 34:15
**identify** 55:3,5,13
**Illinois** 5:16,19,20,24
**illuminated** 45:6
**immediately** 9:9
**implementation** 19:6,14;21:13;
22:13,21;23:1;37:15
**implemented** 37:7
**incident** 17:11;19:4;22:15,15;27:24
**include** 11:4
**including** 35:5
**indicate** 46:13
**individual** 26:10;49:20;55:18
**individuals** 34:13;65:19
**industry** 9:22;10:9
**in-house** 29:22,24
**initial** 47:7;55:10
**initially** 7:20;11:14
**injured** 19:13;20:24
**injury** 20:12
**inside** 58:9
**instance** 22:11
**instances** 22:12
**instructed** 61:21,25;62:3
**instructor** 16:7;29:24
**interaction** 52:1
**interest** 20:13
**interview** 61:13
**into** 10:20;40:12;45:2;50:21;53:9;
57:25
**involve** 10:24
**involved** 4:5;7:10;18:9;19:13,18,
23;20:1,19;22:8;24:20;27:12;31:8;
33:13
**involvement** 11:11;19:14
**involving** 9:22;10:4
**island** 51:9
**it's** 36:21;49:25;51:4;53:5;55:9;
11:1,14,14;14:14;19:2;35:11;40:5;
53:5,8,9;55:25
**IV** 60:23

## J

**Jack** 31:5
**jaw** 54:14
**Jellico** 6:13,14;7:2
**job** 9:9;10:4;26:10;30:23;34:23;59:1
**jobs** 9:21;10:4;16:24
**Jogging** 43:3
**John** 31:1,3
**Johnson** 13:9;37:2,3

**join** 17:5
**joined** 17:7
**Jones** 3:22,23;5:7;13:13;14:7;
15:13;3:15,16
**Jones's** 14:8

## K

**Kasey** 36:4,12;41:10;43:13;44:13;
45:9;47:1,2
**Kasey's** 47:4,6
**Kendra** 50:11
**Kenny** 13:7
**kept** 18:1
**kind** 29:22;45:15
**kitchen** 45:2,6;51:9,13,23;52:25;
53:1,16;57:25;59:20;53:1
**knew** 15:20;55:15
**knock** 38:5,12,21;43:15,20;44:13,
15;45:12,16;47:7
**knock-and-announce** 37:25
**knocked** 44:19,22
**knowledge** 26:24;33:12;43:19;
64:6

## L

**Lancaster** 7:22
**large** 48:1
**last** 14:6;15:7,15;44:9;49:12,19;
50:17
**lateral** 51:11
**Laurens** 5:8;9:12,14,15,20;11:11,
13;12:10,13,20;13:1;14:2;15:2,4;
21:25;22:1;24:5;50:14
**law** 21:16;22:19,24;23:3;33:12;
58:25;61:17;64:12;65:3;50:14;66:7
**laying** 52:10;53:3;58:2
**layout** 34:4
**learn** 11:1
**least** 32:19
**leave** 64:16;15:11
**LEC** 24:3
**led** 58:1;59:11
**left** 6:12;17:20;24:12;54:15;61:17
**less** 24:17;32:21
**let's** 21:4;9:5;13:10
**license** 16:23
**licensed** 31:6
**lifetime** 17:3
**light** 42:16,17,18,19,20;45:3
**lights** 36:13,15;40:13,20,25;41:10;
42:10,14,15;51:13,16
**likelihood** 39:22
**likewise** 3:14
**line** 43:7
**literally** 49:16
**little** 14:11;22:18;28:8;49:13
**live** 5:12,15;14:15;15:4
**lived** 5:19;6:5,10,16;7:2
**living** 14:2;16:11
**location** 22:1;25:24
**long** 8:2,7;12:13;13:14;24:11;

25:10;36:18;47:7;49:12;57:1;61:11;
63:6
**longer** 10:11
**look** 26:19;39:6;66:2
**looked** 20:8;54:1
**looking** 39:10;54:22
**lot** 4:22;7:7;25:16;30:8;35:6;56:20
**loud** 48:10
**Lovett** 22:2,3,14,15
**Loyd** 36:4,13;41:11;43:13;44:13;
45:10
**lying** 51:11,18

## M

**Mabry** 31:3
**Macon** 8:11,11,16,21,23;63:3
**maiden** 14:21;15:24
**making** 39:11
**male** 22:6,7
**man** 50:17
**manager** 7:17
**manner** 48:11
**many** 13:4;19:8,16;21:1;28:7;36:1,
10;43:9,20;45:9;47:23;49:10;50:8,9
**married** 13:10,14
**Massachusetts** 5:25;6:6;7:22
**mat** 56:1,8,13
**matter** 14:11;47:10;57:5;45:18
**may** 5:2;20:16;60:16
**maybe** 60:1
**me"** 46:22
**mean** 17:19;18:19;26:18;29:3,10;
39:5;46:9;49:20;53:5
**means** 38:2,4;46:10
**meant** 47:4
**Med** 9:23
**medic** 11:15
**medical** 8:15;9:25;10:5;19:2,25;
20:4,9,15,18,19;9:14
**medics** 55:21
**member** 21:4;22:19,20;29:4
**members** 20:23;27:4;35:15;37:18;
42:2,24;44:10;46:5;49:1;50:3;51:9;
52:2;66:4,8
**mentioned** 39:25
**microphone** 46:6
**might** 4:22;5:2;16:18;19:16;33:22;
39:23
**minute** 63:8
**minutes** 24:16;57:6,7
**mission** 18:2
**Mitch** 3:23;15:9
**moment** 54:25
**MOMENTARILY** 15:11
**more** 10:20,20;32:21;33:7,15;
43:17;66:17;24:16
**morning** 40:9;61:16
**mother** 14:13,14
**move** 6:8;54:7
**moved** 7:7;9:3;56:9
**Multiple** 56:25

## N

**name** 3:21,23;8:5;13:12,22;14:10, 22;15:15,24;56:24
**names** 14:6;15:7;16:18;19:10
**Natural** 11:8
**nature** 18:17;19:12;58:13;60:20
**necessarily** 38:19
**necessary** 11:12
**need** 3:3;4:10;12:2;15:9
**needed** 35:3;55:19
**negative** 4:23;29:9
**new** 10:25
**next** 42:23;45:16;47:12,19;48:15; 49:8;54:19;55:20;56:19;58:18;62:22
**night** 27:7,25;30:19,23;31:9;39:3, 22;40:3,6;49:23;65:23
**nightlight** 45:4
**nights** 27:20;30:4
**Nobody** 39:25
**nod** 54:2
**nodding** 4:23;46:18
**noise** 48:1
**norm** 56:3
**normal** 3:4,5;10:19;47:17,18
**Normally** 32:4
**noticed** 4:16
**number** 18:2;43:18

## O

**Object** 3:6;11:20;21:9;28:18;29:6; 33:9;41:2,19;50:4,7;53:4;62:6; 64:17,23;65:25
**observation** 64:15
**observe** 47:19;48:4;54:9;58:7;60:6; 63:11;65:13
**observed** 52:13;56:19;58:16,20; 59:3,7,10;63:5,6;65:19,22
**obviously** 11:10;39:2;7:7;15:7,24; 34:15;39:9;61:13
**occasions** 20:23
**occupation** 7:8
**occur** 21:24
**occurred** 19:5;21:12
**o'clock** 39:3,19;40:3,6
**OD** 35:13
**off** 9:5;40:20,25;41:14;47:1,2;9:6
**office** 24:5
**officer** 21:17;22:20,25;23:3;29:15; 32:9;33:13;58:25;64:13;65:3
**old** 5:19;6:10,16;35:11
**on"** 59:12
**once** 41:17,23;43:17
**one** 12:4,6;16:24;27:3;33:15;34:12; 35:10;38:17;66:17;13:17;36:3
**ones** 3:4
**only** 8:8;42:16;56:23;7:24;8:3
**open** 38:8;47:24;48:10,12
**operation** 21:15
**operations** 25:25;26:3,8;31:20
**opposite** 59:19

**optional** 29:4
**ordinary** 11:2;64:20,25
**originally** 5:7;15:2
**others** 12:4
**out** 4:24;18:2,6,25;33:4;35:17; 36:12,19;37:4,16,21;42:6,12,13,15, 23;50:9;54:8;56:8,14,20,25;57:2,3, 18,21,25;59:4,11,15,18;60:8,8
**outdoor** 42:19
**outside** 15:9;29:24;42:18;58:17
**over** 16:5;20:8;26:12,17;27:3;35:4; 45:25;52:9
**overhear** 37:19;66:3
**own** 12:7;37:12
**owned** 30:7

## P

**page** 23:18,19,23,25
**Palatka** 5:11,12,15
**pants** 35:13
**paramedic** 8:15,21,23,24;9:8;10:7, 10,19;11:1,2;16:22;20:20;8:25
**paramedics** 30:18;31:6,7,8
**parents** 9:3
**Park** 62:25
**parked** 59:18
**parking** 25:16;35:6
**part** 7:8;11:12;21:6;31:15;44:19
**partial** 66:9
**participants** 28:24
**participate** 11:13;24:18;28:16; 29:1;33:4,18;62:24;63:2
**participating** 27:17
**participation** 21:13
**parties** 3:12
**passed** 26:17
**past** 16:6;19:5,12;32:25;65:19
**peace** 29:15
**people** 26:24;27:3;28:7;31:15;35:5; 40:5,8;43:9;48:22,25
**perceive** 54:2
**perhaps** 30:8
**perimeter** 30:24
**period** 23:4;45:15;59:7;63:5
**person** 19:23;20:1;22:5,8;28:21; 30:7;34:10;44:9;47:5;51:11;57:2; 60:7
**personally** 20:16
**personnel** 34:25
**physically** 48:5;49:2;56:14;57:14, 17;38:5
**physiology** 10:20
**pick-up** 44:5
**piece** 46:5
**place** 7:16,16;17:11;27:25;30:14; 57:11;58:1,8
**placed** 64:19
**plan** 25:24,25;26:2,3,3,8;27:11; 31:20
**planned** 30:12
**please** 3:21
**point** 11:16;12:1;15:17;17:8,12,19,

23;23:9,12;25:10;35:4,21;36:23; 39:9;40:19;41:1,13;42:1,12,20;44:8; 45:20;49:5,17,18;50:21;51:4,14, 53:12;54:11;55:12,25;56:6,17;57:3; 61:16;62:12;64:22
**pointing** 52:24
**policy** 11:19;28:22;37:6,8
**pool** 58:18;59:22;62:22
**Pope** 15:8,15,24;16:17
**position** 12:17;36:24;45:1
**positioned** 44:2;59:2
**possibility** 15:20;33:22;41:3,18
**possible** 19:3;40:25;41:6
**possibly** 4:15
**post** 8:12
**powers** 29:13
**practice** 37:3,13
**prayer** 32:21
**premises** 25:8;27:13
**presence** 31:25;38:6;43:16
**present** 15:25;28:7,24;33:1,23
**prior** 9:7;10:4;12:5;19:4,19;20:22; 21:3,11;27:25;32:25;36:22,22; 40:20;9:20
**process** 9:22
**program** 8:20
**programs** 8:18
**projectiles** 54:10
**prompt** 5:2
**proximity** 36:24
**psychological** 65:20
**pulled** 25:13,15;40:11
**purpose** 18:25;27:7
**pursuant** 29:3
**put** 12:19;56:8;57:9;60:8
**puts** 12:23

## Q

**qualifications** 9:8;10:8,8
**quarters** 8:11
**quick** 19:2;60:20;43:5
**quickly** 38:14,18;43:4
**quiet** 48:13
**quit** 17:20
**quite** 58:4

## R

**radio** 45:25;46:5
**radiologist** 7:13
**radiology** 7:12,15;16:7
**raised** 5:10
**ram** 47:20;48:2
**rank** 31:11
**ranking** 31:9,13;33:12
**rather** 48:10
**read** 26:19
**real** 53:13
**really** 32:16;34:20;59:1
**rear** 34:25;43:8
**reason** 16:24;49:25;62:18
**reasonable** 40:2,5

**recall** 19:16,18;21:1,3,5,11,21; 22:11;23:9,24;24:4,9,11,21;25:2,5, 13,15,17,19,20;26:5,6,16;27:19,23, 24;28:1,2,13;30:1,6,10,14,17;31:24; 32:2;33:21;34:1,4,7;36:18;38:11,20, 24;39:3,21;40:12,19,23,24;41:7,12, 13,16;42:5,10,14;43:11,22,23;44:7; 45:11,12;47:22,25;50:6,8,10,16,20, 24;55:23;56:3;57:8,11,14,16,17,20; 59:14,17;62:4;65:9;66:17
**received** 9:8;29:19
**recollection** 41:8,17,20
**record** 3:21;5:5;18:1,5;19:25;20:4, 9,15,18,19;9:6
**recorded** 50:10
**regarding** 23:12;24:1;30:2;31:16; 37:15
**regards** 26:8;28:23;29:18;60:7,25
**regularly** 33:4,18
**regulations** 19:11
**related** 14:4;15:18;22:25
**relation** 63:24
**relationship** 16:1
**relationships** 14:12
**relatives** 14:1;15:4,15;16:18
**remain** 35:3
**remember** 21:20;54:15
**removed** 55:21
**render** 60:10
**rendered** 19:6,12;60:15
**renewable** 10:11
**repeat** 3:3;4:11,11
**Repetitive** 59:12
**rephrase** 53:15;60:3
**report** 18:17;19:22
**reporter** 4:16;14:24;15:1
**represent** 3:24
**request** 50:21
**required** 11:14,14;18:5
**requirement** 11:23,24
**requirements** 8:16
**reserve** 3:7
**residence** 27:9;33:24;35:18;36:12, 19;37:16;57:15,18,21;58:8,17; 61:23,24
**respective** 3:12
**Respond** 24:3
**response** 4:21,21;63:22
**rest** 66:8
**restrained** 64:10,20
**result** 21:12,16;22:13,21;30:3;58:8; 60:17
**reversed** 17:23
**ride** 35:9,15
**riding** 35:18;36:5
**right** 4:3,5,5;7:7;25:8;4,7,12,22,23; 11:18,22;12:9;29:11;30:1;33:21; 36:21;39:3;40:9;41:21,23;45:9;47:2, 5,5,6;50:11,11;51:10,11,11,11,18, 21;53:9;56:6,16;59:1;66:2;20:11; 39:7;49:22
**right"** 47:1
**room** 26:25;28:4,10,13;53:10;

Case 3:16-cv-00023-DHB-BKE   Document 83-12   Filed 05/25/17   Page 24 of 25

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

57:22,23;15:11
**rooms** 28:8
**Running** 43:3

## S

**same** 3:2;4:13;26:25;35:16;48:23;
49:4;22:18
**sat** 59:11,15
**Savannah** 10:13,22;29:19
**saw** 25:5;27:11;40:17;46:13,13;
51:8,9,9,10,18;52:19;54:13;60:17;
63:20
**saying** 20:7;27:16;38:20;40:6;49:6,
7,17;56:24;58:14,14;59:7,10
**Scarborough** 17:16,20;18:14
**scene** 21:15;55:10;60:7;61:11,17;
62:8,12;66:15
**school** 6:19,21,23,25,25;7:1,3,18;
8:12;10:13,19;11:1,6;29:19,20
**scope** 10:19
**Screaming** 65:15
**search** 26:12;27:12,17;29:3;30:11;
34:8;37:24;43:25;45:13;55:1;62:12;
63:17,21;65:4
**seat** 35:22,23
**second** 49:21,21;6:7;31:13
**seconds** 45:18,19;47:10;57:5
**secure** 27:9
**securing** 29:2
**security** 42:16
**seeing** 25:15,17;26:6;34:1;41:12;
42:5,10;57:11,14,17
**sees** 46:10,11
**semester** 8:8
**sense** 4:9,10;21:8,10;45:8
**sent** 7:3;66:12
**separate** 8:18
**September** 17:12;19:4;20:22;21:3,
11;23:7;50:13
**serve** 34:8
**served** 62:13
**service** 31:12;61:1
**Services** 9:14
**set** 9:25
**seven** 5:21,22
**several** 48:22,25;50:2
**shared** 26:3
**She's** 4:17
**Shenandoah** 6:24;7:5
**Sheriff** 4:4;25:1,5,11;33:1,3,11;
62:5,8,11,15
**Sheriff's** 11:19;24:5;28:5;36:19;
43:21,25
**shirt** 35:13
**Shook** 3:23,2,5,8,10,20;9:5,7;15:2,
10,11,13;21:10;41:3;50:6;66:20
**shooter** 11:6
**shooting** 66:5
**Short** 63:10
**shot** 49:12,12,18,19;58:2;62:16,21
**shotgun** 53:3
**shots** 49:10,14,19,22;50:2,17;51:5

**shoulder** 54:16
**shouted** 48:17
**Shouting** 48:16
**show** 56:24
**siblings** 14:15
**sic** 28:23;57:14
**side** 35:20;51:12,18,21
**simultaneous** 49:15,16
**sit** 12:16;34:20;58:17
**sitting** 65:23
**situation** 22:9;29:18
**situations** 19:5;27:2
**sixth** 6:7,11
**slow** 38:15
**small** 45:2
**smart** 5:4
**somebody** 20:8;50:21
**Somehow** 15:23
**someone** 12:2;20:19;38:8;46:10,
11;56:20;47:13,20
**Sometime** 10:3
**someway** 15:23
**son** 33:23
**soon** 54:8
**sounded** 48:24
**south** 14:10;7:22
**Southern** 3:25;8:1
**speak** 32:4;53:20,24
**speaking** 32:2
**Spears** 3:24
**specific** 48:21;56:3
**specifically** 32:3;37:9;56:23
**Spires** 31:1
**spoke** 65:10
**SRT** 11:11,13;12:3;17:5,7,8,11,13,
20,24;18:3,7,25;19:6;20:23;21:6,15;
22:13,19,21,22;23:1,13;24:1;27:4,7,
7,11,17;28:21,23;29:4;30:19;31:8;
33:1,4;34:7;35:5,15;37:4,7,16,18;
42:2,24;44:2,9;46:5;49:1;50:3;52:2;
66:4,8
**SRT's** 19:14;21:12
**stable** 54:20
**standing** 42:23;51:23;52:9;55:16;
64:2,1
**stands** 4:3,5
**start** 4:22;21:4;60:23
**started** 35:5;39:9,16
**Starting** 7:16
**State** 3:21
**statement** 50:10,16;56:2
**statements** 66:4
**States** 3:25
**station** 24:2
**stay** 61:11
**stayed** 55:21;56:16;66:15
**stepped** 17:21
**stepson** 13:24
**Steve** 4:4;25:3;56:24
**still** 60:13
**stipulations** 3:3,5,12,1
**Stokes** 17:9,10,13,19,24;18:12;
24:22;32:6

**Stoneham** 5:25;6:2,3,6
**S-T-O-N-E-H-A-M** 6:4
**stop** 41:24;60:21
**straight** 5:5
**struck** 54:9
**subsequent** 29:21
**suffered** 22:5,12
**supposed** 28:16;32:18;37:25;
38:17;43:14,17,23,24
**sure** 4:8;20:8;39:11;41:6
**suspended** 16:24
**SUV** 44:5
**sworn** 3:18;4:17
**symptoms** 65:20

## T

**tactical** 10:13,22;11:11,17;29:19,
19;10:14
**talk** 15:9
**talked** 37:1
**talking** 4:6;22:16;47:10;49:20;57:5
**teach** 10:25
**teacher** 16:7
**team** 11:16;22:22;26:13;29:21,23;
51:9
**tech** 7:16;8:10,11,17,23;9:2
**technician** 8:15
**telling** 50:16;65:4
**Ten** 45:19
**Tennessee** 6:13,14;7:2;8:1
**tenth** 6:11
**Teresa** 3:24;15:18;16:3,13;58:17;
59:3,10,15;60:8;62:22;63:6,16;
65:22
**Teresa's** 15:24
**terms** 26:11
**testified** 5:8
**that's** 3:24;4:2;6:18;18:21,21;
24:7;37:8;14:10;27:15;29:10;34:14;
38:23;45:17;58:25;66:20
**there's** 39:22;54:22
**they're** 20:8;8:18;31:7
**third** 12:23
**thought** 3:2
**threat** 59:5
**three** 8:10;5:21,22;13:5;24:15;
45:11
**tie** 64:7
**times** 4:22;5:1;18:2;19:8,12,16;
21:1;43:20;45:9;47:23;56:25
**title** 12:17
**TJ** 13:9;37:2,3
**today** 4:1,7,18;11:10;12:16;22:16;
34:20;41:8
**told** 12:4;27:10;49:22;60:16
**took** 10:10,22;17:11;30:14;36:18;
54:2;57:21
**total** 13:4
**toward** 46:22,23;52:24
**training** 11:17;29:17,18,21,22
**transcript** 4:25
**transport** 20:14;66:12

**transportation** 20:6;62:25;63:2
**transported** 20:14
**trapezoid** 54:16
**trauma** 65:20
**travel** 35:10
**traveling** 43:2
**treated** 20:23;21:14;22:19,20,24;
23:3
**treating** 21:5,11
**treatment** 10:21;19:2,6,19,23;20:1;
23:4
**truck** 44:6
**truth** 4:17
**try** 61:4,6
**trying** 4:17;5:3,4;60:25
**turn** 6:16;36:15
**turned** 40:20,25;41:14;51:16;52:22
**twelfth** 6:17
**Twenty** 28:8
**two** 8:18;13:6;21:21;44:3;24:14
**two-story** 38:25
**type** 10:21;11:8;27:24;29:18;32:21;
61:1
**types** 11:3
**typical** 26:17;25:21
**Typically** 23:25

## U

**uh-** 4:22
**uh-uh** 4:3;23:9
**uncles** 14:13,17
**uncontrolled** 54:23;55:1
**understandable** 4:9
**Union** 7:20
**unit** 27:2
**United** 3:25
**unless** 35:3
**unusual** 27:5;33:6,20
**up** 9:25;13:10;22:20;25:13,15;
30:17;34:10,15,21;40:8,12,20;
50:20;56:25;62:11
**use** 3:2;35:10;46:19;60:20
**used** 11:2;44:17;46:16,17;48:2;
56:13
**using** 4:22
**Ussery** 30:22;31:10;41:22
**Ussery's** 30:23
**utilize** 34:8

## V

**Valley** 6:24;7:5
**van** 35:17;37:15,21;40:11,13,17;
41:1,21,24,24;42:1,3,6,12,13,15,16,
23,24;46:11,12,12,13,17
**vans** 35:10
**vantage** 35:21;54:11
**vehicle** 35:9,16;36:2,8;41:10,14;
59:19
**vehicles** 35:7;36:1;44:3;59:17,19,
21;60:3
**verbal** 4:20,21

TERESA POPE HOOKS, ET AL. vs.
CHRISTOPHER BREWER, ET AL.

FORREST JONES
January 26, 2017

**Versus** 34:18
**Vertin** 4:4;25:3;51:2;56:24;57:2,8,
17;58:17,22;60:13;64:20
**vest** 35:13
**victim** 21:14
**violate** 19:11
**Virginia** 6:9,21;7:3
**visible** 42:16
**voice** 46:3;56:23
**volition** 37:12
**volume** 55:7,8

## W

**wait** 61:20
**waiting** 38:7
**walk** 43:5
**walking** 43:3,4
**walls** 58:11
**warrant** 26:12,17,19;27:3;29:3;
30:11;34:8;37:24,25;38:9,12;43:25;
62:12;63:17,21;65:4
**warrant"** 45:13
**wasn't** 56:9;58:14;62:18
**watch** 39:6,10
**watching** 48:7;56:10
**way** 15:19;19:14;27:16;30:12;
35:18;36:12;37:16,21;41:21;48:24;
51:20;59:5
**ways** 30:11
**we're** 4:6;11:10;22:16;37:20;
38:21;49:20;63:17,20;65:4;4:1
**we've** 57:22
**weapon** 21:17;66:5
**wearing** 46:2
**weather** 11:5
**weren't** 29:10,15
**West** 6:9
**what's** 13:12;28:21;49:8;53:13;
54:12;63:22;65:16;13:18,22;24:2;
28:20;38:4;42:5;47:12;54:19;55:20
**WHEREUPON** 3:11
**who's** 4:17;64:25,25
**wife** 14:21;15:18;16:3,18
**wife's** 13:12;15:14
**window** 44:23
**windows** 35:20
**within** 19:19;21:21
**without** 19:10
**witness** 60:17;62:19,19,21;3:17;
11:21;14:25;28:19;29:7;33:10;
41:20;50:8;53:5;62:7;64:18,24;66:1
**wood** 44:19;31:5
**word** 6:1;46:16,17,19;47:14;54:1
**words** 27:15;48:21;56:3
**work** 7:8;40:8
**worked** 9:23;12:9,10,13
**working** 9:20;12:10
**wouldn't** 20:4,9;28:19;33:10,11;
39:13,15;40:3;47:6;64:18
**wound** 21:6,12,14,16;22:5,8,21,25;
23:4
**wounds** 22:12;54:13

**written** 18:5;25:25;26:3,8;31:20

## Y

**y'all** 13:16
**year** 7:24;8:3,11,23;9:17;13:15;
17:18;19:19;21:19
**years** 6:22;12:14;13:15;20:22;
21:22
**yell** 65:17
**yelling** 48:23;49:1,4
**you've** 4:16;8:13;29:2

## Z

**zip** 64:7