FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

2018 JAN 29  PM 4: 27

CLERK _____
SO/DIST OF GA.

TERESA POPE HOOKS,                    *
individually; and ESTATE OF          *
DAVID HOOKS, by Teresa Pope          *
Hooks, Administratrix,               *
                                     *
        Plaintiffs,                  *
                                     *
           v.                        *        CV 316-023
                                     *
CHRISTOPHER BREWER; STEVE            *
VERTIN; and WILLIAM "BILL"           *
HARRELL;                             *
                                     *
        Defendants.                  *

_____

O R D E R

_____

On September 24, 2014, Sheriff's Deputies with a search warrant forcibly entered the rural home of David and Teresa Hooks at 11:00 p.m. where they shot and killed David Hooks as he ran naked, holding a shotgun by his side. This suit for damages turns upon the issue of whether the search warrant was lawfully obtained. Motions for summary judgment filed by Defendants Christopher Brewer and William "Bill" Harrell place the issue squarely before the Court. A thorough and sifting examination of the record reveals genuine disputes of material fact regarding the existence of probable cause to seek the warrant. Defendants' motions for summary judgment are therefore **DENIED**.[1]

_____

[1] This Order also addresses the motions for summary judgment filed by Defendant Harrell and Defendant Steve Vertin respecting Plaintiff's illegal detention claim.

## I. BACKGROUND

Around midnight on September 22, 2014 (into the early morning of September 23, 2014), numerous items were stolen from the curtilage of the rural residence of David and Teresa Hooks, located at 1184 Highway 319 North, East Dublin, Georgia. (See Doc. No. 83-18, at 3 (Sergeant Robbie Toney's investigative summary).)   At approximately 2:00 p.m. on September 23, 2014, David Hooks called the Laurens County Sheriff's Office to report these thefts.  (Id.)  Sergeant Robbie Toney received the call, during which David Hooks reported, *inter alia*, that: (i) both his and his wife's personal vehicles had been entered and money and guns had been taken from these vehicles and a nearby detached garage; and (ii) an additional vehicle he owned, namely a Lincoln Aviator, had been stolen.  (Id.)  David Hooks provided Sergeant Toney with the Aviator's vehicle identification number ("VIN"), which Sergeant Toney entered into GCIC as a stolen vehicle. (Id.)  Shortly thereafter, Sergeant Toney - joined by Laurens County Deputy Brian Fountain - went to the Hooks property. (Id.; see also Doc. No. 83-16 (Deputy Fountain's incident report listing all items purportedly stolen from the Hooks property, including two pistols, five long guns, and several thousand rounds of ammunition).)  David Hooks took the officers to the scene of the thefts, where the officers dusted

2

for - but were unable to obtain - usable fingerprints. (Doc. No. 83-18, at 3.)   The officers left shortly thereafter. (Id.)

At approximately 4:43 p.m. on September 24, 2014, Laurens County Sergeant Ryan Brooks received a personal phone call on his cell phone from Beverly Garrett.  (Brooks Dep., Doc. No. 85, at 30; see also Doc. No. 76-9 (Sergeant Brooks' incident report).)  During this call, Beverly Garrett requested that Sergeant Brooks come to her residence because her husband, Monty Garrett, was having issues with his blood pressure. (Brooks Dep. at 30.)   Upon his arrival at the Garretts' residence, Beverly Garrett directed Sergeant Brooks to speak with Monty Garrett on their back porch; Monty Garrett, in turn, informed Sergeant Brooks that his son, Rodney Garrett, was scared and wanted to turn himself in to someone he trusted (i.e., Sergeant Brooks).[2]  (Id. at 31.)   Monty Garrett then informed Sergeant Brooks that Rodney Garrett was "laying in the woods watching to make sure [Sergeant Brooks] was the only one coming."   (Id.)

Sergeant Brooks turned around and saw an individual walking from the woods where Rodney Garrett was said to be

---

[2] Sergeant Brooks is a family-friend to the Garretts and has known Rodney Garrett since childhood.  (Brooks Dep. at 5 ("We went to school together, went to church together.  Just family friends.  My family knows all of his family or a lot of his family.").)

hiding.[3]  (Id.)  As he started down the driveway to confront this individual, Sergeant Brooks recognized him as Rodney Garrett;[4] when they met, they shook hands and embraced in a

---

[3] Because he was concerned law enforcement officers were looking for him in connection with the theft of a green truck owned by Hipolito Mendoza, Rodney Garrett was "living in the[se] woods with Chris [Willis in a tent] for a day or two." (Garrett Interview Tr., Doc. No. 126-1, at 5; Garrett Dep., Doc. 101-1, at 47-48; see also Brooks Dep. at 19 (in the course of investigating Rodney Garrett's theft of Mr. Mendoza's truck, Rodney Garrett's wife informed Sergeant Brooks on or about September 21, 2014 that Rodney Garrett had been staying somewhere in the woods in a tent and that "he wasn't the same as he used to be and didn't act the same").) Sergeant Brooks and other Laurens County officers were aware that Chris Willis regularly supplied Rodney Garrett with methamphetamine and had previously attempted to fence stolen goods on Rodney Garrett's behalf.  (See, e.g., Garrett Interview Tr. at 4-5, 8-10; Brooks Dep. at 21-29.)

[4] Notably, Rodney Garrett's own testimony casts suspicions on the voluntary nature of his submission to Laurens County authorities.  Indeed, Rodney Garrett's family had made several prior failed attempts to convince him to turn himself in to authorities. (Garrett Dep. at 19 (Q: "And would you agree with me that it - it's not surprising that there's some text messages back and forth from you to other people regarding looking - looking out for - for the law and whether or not the law was riding around your house, things of that nature?"  A: "Well, my mother tried to get me to turn myself in several times, my sister did.  Told me, just call and let them know where I was at and they - they would take me to the sheriff's department or get the sheriff's department to pick me up, but I just quit answering all together.").  Undeterred, his family persisted in "trying to talk [him] into going to - turn [himself] in, come clean."  (Id. at 55-56.)  When Rodney Garrett failed to do so himself, however, Beverly Garrett called Sergeant Brooks and had him come to her house under false pretenses and, when he arrived, Sergeant Brooks went out into the woods, found Rodney Garrett and arrested him.  (Id. (Q: "Now, it - and it - it was more or less your mother who - is it your understanding it was your mother who called Ryan Brooks -"  A: "Em-hmm, yeah."  Q: "- to come - come to her house?"  A: "Yep."  Q: "And is it your understanding that what

hug. (Id.) Notably, Sergeant Brooks was aware at the time of their interaction that Rodney Garrett: (i) was addicted to methamphetamine;[5] (ii) was presently under the influence of methamphetamine and had not slept in 7 to 10 days;[6] (iii) had a proclivity to deceive law enforcement as well as his friends

---

she told Ryan Brooks to get him to come to her house was that your father was having blood pressure issues -" A: "Yeah." Q: "- and he needed checked on?" A: "Yeah. She was worried about him because he knew that I - that I was out of the residence and they were trying to talk me into going to - turn myself in, come clean." Q: "Yeah. And then once Mr. Brooks got there, they told Mr. Brooks, Rodney is down in the woods?" A: "Yeah. I was actually at my house, but yeah." Q: "Yeah. And at that point in time, Ryan Brooks came down there, found you and - and arrested you?" A: "Yes, sir.").) Upon subsequent cross-examination by Defendants' counsel, however, Rodney Garrett amended his story and said he "was ready to come clean" and said he knew he was going to be arrested and was "going to turn [himself] in." (Id. at 69-70.)

[5] Rodney Garrett testified that from the end of 2012 through his arrest on September 24, 2014, he used methamphetamine every day and night, typically smoking approximately one to one-and-a-half grams of meth per day (which he stated was an $80- to $100-a-day habit). (Garrett Dep. at 12-14.) When he purchased methamphetamine, he typically bought between a gram and three and a half grams (colloquially known as an "8-ball") at a time. (Id. at 19-20.) At the time of his arrest, Rodney Garrett made approximately $550 to $750 per week after taxes and sustained his drug habit by stealing from neighbors and local businesses and then selling the stolen goods. (Id. at 15-18.)

[6] Rodney Garrett testified that, at the time he was arrested, he had been awake "for almost two weeks straight." (Garrett Dep. at 33.) Rodney Garrett further testified that when he "would stay up for 7 to 10 days" in a row he would "start to see - meth users call them 'shadow people.'" (Id. at 69.) He further testified that he had bought three and a half grams of methamphetamine approximately two days prior to burglarizing the Hooks property. (Id. at 49.)

and family; and (iv) had lied to Sergeant Brooks himself less than three days before regarding his involvement in suspected criminal activity. (Brooks Dep. at 10-11, 19, 27-28; Garrett Dep., Doc. No. 101-1, at 34, 69; see also Defendants' Response to Plaintiff's Statement of Material Facts Which Plaintiff Contends Create Genuine Issues ("DRPSMF"), Doc. No. 106, ¶ 14.)

At the end of their embrace, Rodney Garrett stated that he "had messed up." (Brooks Dep. at 31.) Believing that Rodney Garrett was referring to his suspected theft of a green truck owned by Hipolito Mendoza,[7] Sergeant Brooks told Rodney Garrett that they would "go to the office and talk about it and get everything sorted out." (Id.) Rodney Garrett, however, insisted that "[t]here's another vehicle you need to know about," at which point they walked back into the woods to where a Lincoln Aviator was parked. (Id. at 32.)

Rodney Garrett then attempted to explain his possession

---

[7] At the time of their interaction, a warrant had been sworn out by Laurens County officers for Rodney Garrett's arrest in connection with the theft of Mr. Mendoza's truck. (See Garrett Dep. at 10; Frazier Dep., Doc. No. 83-7, at 6-7.) Rodney Garrett was aware that police officers were looking for him in connection with the theft of Mr. Mendoza's truck. (Garrett Dep. at 10-11, 18-19, 48.) Mr. Mendoza's truck had been recovered by Laurens County officers on September 21, 2014 without the assistance of Rodney Garrett. (Brooks Dep. at 26-29.)

of the Aviator to Sergeant Brooks. (Brooks Dep. at 32-33; <u>see</u> <u>also</u> Doc. No. 76-9; Garrett Interview Tr., Doc. No. 126-1, at 2-3.) According to Sergeant Brooks' recollection of Rodney Garrett's account, Rodney Garrett was walking along Highway 319 around midnight on the evening of September 22, 2014.[8] As he was walking, he saw a driveway with its gate open and decided to investigate.[9] (Brooks Dep. at 33.) Parked on the grass near the Hooks residence Garrett found the unlocked Lincoln Aviator with its keys inside. (<u>Id.</u>) Rodney Garrett then walked over to another vehicle located near a detached garage on the same property;[10] when he opened the door to this vehicle, he located a neoprene bag (which he believed to contain money) and some digital scales,[11] which he took. (<u>Id.</u>)

---

[8] Rodney Garrett testified that, while walking down the highway, he stopped two or three times to smoke methamphetamine before reaching the Hooks property. (Garrett Dep. at 23.)

[9] Unbeknownst to Garrett, this was the Hooks driveway, which is approximately half-a-mile long. (Garrett Dep. at 24-27; Garrett Interview Tr. at 3, 7, 11.) While the mail address indicates proximity to the highway, the Hooks residence is thousands of feet from Highway 319. The seclusion of the home is important and easily seen on publicly-available satellite views of the property.

[10] Rodney Garrett testified that he smoked more methamphetamine while inside the detached garage. (Garrett Dep. at 26-28.)

[11] Rodney Garrett testified that he used his own set of scales to ensure he was not being swindled when he purchased methamphetamine. (Garrett Dep. at 47.) It is unclear whether Laurens County officers ever recovered the scales used by

He also looked around in the detached garage and found a gun safe,[12] from which he took a shotgun and a rifle. (Id.) He then entered the Aviator with the pilfered neoprene bag, scales, and firearms and drove away from the property. (Id.) Before returning to his home, however, Rodney Garrett stopped at a gas station and decided to inspect the contents of the pilfered neoprene bag. Therein, he claims to have then discovered approximately 20 grams of methamphetamine. (Id. at 33-34.) He later parked the Aviator in the woods near his parents' residence. (Id. at 34.)

After hearing Rodney Garrett's story, Sergeant Brooks called in the Aviator's VIN, which came back stolen. (Id. at 35-36.) Sergeant Brooks then called another Laurens County officer, Sergeant Gerald Frazier, who subsequently called Defendant Sergeant Christopher Brewer at approximately 5:30 p.m. and requested that Defendant Brewer travel to Sergeant Brooks' location.[13] (Doc. No. 76-9, at 2; Brewer Dep., Doc. No. 72-1, at 7.) Shortly thereafter, Defendant Brewer and

---

Rodney Garrett when he would purchase methamphetamine.

[12] (Garrett Interview Tr. at 3 ("Went over and looked the keys were in the ignition step into his shop there and he had what looked to be a metal gun safe that the locks had been ripped out of ... I didn't do that.. [sic] they were already gone[.]").)

[13] At the time of Rodney Garrett's arrest, Defendant Brewer was the supervisor of the Laurens County Sheriff's Office Narcotics Unit. (Brewer Dep. at 7.)

Corporal Timothy Burris arrived at the Garretts' residence and the officers searched the Aviator's interior. (Brooks Dep. at 38.) Therein, they located scales and two firearms, but not the neoprene bag. (Doc. No. 76-9, at 2.) Instead, the officers discovered a locked metal case, approximately one foot square in size, which Rodney Garrett claimed was his own and into which he had placed the contents of the neoprene bag;[14] because it was locked, however, they were unable to examine its contents. (Brooks Dep. at 38-41; Brewer Dep. at 124-28; Doc. No. 76-9, at 2.) Defendant Brewer then asked Sergeant Brooks to take Rodney Garrett and find the key to the metal case, which Rodney Garrett claimed was at his residence (but was ultimately unable to locate it).[15] (Doc. No. 76-9,

---

[14] Rodney Garrett later testified that he stole this metal case from the Hooks property. (Garrett Dep. at 61.)

[15] The officers were never able to locate the key for the metal case. (Brewer Dep. at 124-28.) Somehow the case was opened later in Defendant Brewer's office. (See Brewer Dep. at 125 (Q: "The - the - when was the first time that you saw the contents of the bag that Garrett said he had taken from the console of the truck?" A: "When I returned to my office and began to inventory the items in the lockbox." Q: "Okay. When you received the lockbox - well, between the time you received the lockbox from Garrett and the time that you got to your office did you open it?" A: "No, sir." Q: "You obtained a key to open it, I take it?" A: "No, sir." Q: "Someone did?" A: "I don't think we ever found the key."); see also Brooks Dep. at 38-41 (Sergeant Brooks never saw the contents of the metal case); Burris Dep., Doc. No. 83-1, at 27-30 (Corporal Burris did not know what was in the metal case); Garrett Dep. at 61-65 (Rodney Garrett never saw the metal case opened (or its contents) after he turned it over to the officers).)

at 2.)

While at Rodney Garrett's residence, Sergeant Brooks read Rodney Garrett his Miranda rights and asked him to identify any property inside his shop that was stolen; in response, Rodney Garrett "looked around and said no yall [sic] got everything."[16]   (Id.)   Sergeant Brooks also asked Rodney Garrett about the location of a four-wheel ATV he had previously been seen operating. (Brooks Dep. at 42.)   Rodney Garrett denied stealing the ATV but admitted that he knew where it was located;[17] accordingly, Rodney Garrett and the officers drove out and found the ATV. (Id. at 42-43.)

The officers subsequently took Rodney Garrett to the Laurens County Sheriff's Office. (Brooks Dep. at 44; Doc. No. 76-9, at 2.)   En route, Sergeant Brooks received a call from another Laurens County officer, Sergeant Lance Padgett, who stated that the stolen Aviator was his assignment and that he needed to question Rodney Garrett in regards thereto. (Brooks Dep. at 44.)   Sergeant Padgett then called Sergeant Toney to inform him that David Hooks' Aviator had been located. (Doc.

_____

[16] Rodney Garrett was then-known to be a suspect in several other outstanding burglaries and/or thefts that occurred in the Laurens County area. (See, e.g., Brooks Dep. at 7-16, 22-29, 45-48.)

[17] Rodney Garrett told the officers that he had purchased the ATV from Jimmy White a year or two before. (Garrett Interview Tr. at 5.)

No. 83-18, at 4.)

When Rodney Garrett arrived at the Laurens County Sheriff's Office, Sergeant Padgett - along with Sergeant Brooks, Corporal Burris and Defendant Brewer - took him to an office for questioning, which began at approximately 7:45 p.m. (Brooks Dep. at 45; Garrett Interview Tr. at 2.)  During this questioning, Rodney Garrett admitted to the officers that: (i) he was temporarily "living" in a tent in the woods with his friend, Chris Willis; (ii) Mr. Willis' house was littered with enough "baggies" that it "would have blowed [sic] your mind;"[18] (iii) he regularly bought methamphetamine from Mr. Willis (and/or an associate of Mr. Willis, Jeremy Lumley, with Mr. Willis acting as an intermediary or broker); (iv) he was presently "strung out" on methamphetamine; (v) he had smoked approximately a half-gram of the methamphetamine purportedly taken from the Hooks property, up to and throughout the night before his arrest; and (vi) he had contemplated selling the methamphetamine to a few individuals, including Mr. Willis.

---

[18]  This appears to be a reference to Mr. Willis' possession of bagged quantities of methamphetamine or other controlled substances.  (See Garrett Interview Tr. at 8 (Padgett: "[W]hat about Chris [Willis]? What has he been up to?"  Garrett: "[N]othing but wrong[.]"  Padgett: "[W]ell, let's hear it[.]"  Garrett: "I know meth probably hard too. He uh."  Brooks: "[T]ell em what you was telling me about the false floors in his house[.]"  Garrett: "[N]o uh it's not false floors its carpet... what would be carpet is baggies he's got that many laying on the floor.  If you'd walked in it would have blowed [sic] your mind.").)

(Garrett Interview Tr. at 2, 4-5, 8-10; see also Padgett Dep.,
Doc. No. 83-15, at 15-17; Garrett Dep. at 60-61, 78.)  Despite
the officers' repeated attempts to get him to admit otherwise,
Rodney Garrett maintained that he had never had any prior
interaction with David Hooks or his property.   (Garrett
Interview Tr. at 4, 7, 10-11; Garrett Dep. at 57-58; see also
Brewer Dep. at 60-62 ("I don't know if this will help you, but
after the interview concluded I do not recall any steps I took
to determine if [Rodney] Garrett did, in fact, know [David]
Hooks.").)  Further, despite David Hooks having reported seven
firearms and thousands of rounds of ammunition being stolen
from his property, Rodney Garrett insisted that he only took
a shotgun and a rifle.[19]  (See Garrett Interview Tr. at 3-6,
10.)  The officers also questioned Rodney Garrett about other
thefts in which he was a suspect, for all of which he either
denied having any knowledge or gave exculpatory explanations.[20]

---

[19]  (See, e.g., Garrett Interview Tr. at 6 (Padgett:
"[W]ell something is up cause you telling me you stole his
truck and stole 2 guns and there is other guns in there that
went missing[.]"  Garrett: "[W]ell if I gonna admit to it...
I would've.").)  On October 11, 2014, Laurens County officers
located additional stolen property at "a location that is
associated with Rodney Garrett," namely his uncle Lenwood
Lord's residence.  (Doc. No. 83-18, at 5, 14-15.)  Notably,
this recovered property included a shotgun reported stolen by
David Hooks on September 23, 2014.  (Id.)

[20]  E.g., he found it broken down in the woods, bought it
from a coworker "probably a year in [sic] a half two years
ago," "was working on it for a man," "[t]hat was a different
model than what he had," "naw that's good, that's mine,"
"bought it at a yard sell [sic]," "bought 'em never used 'em,"

(Garrett Interview Tr. at 3, 5-10; see also Brooks Dep. at 45-48.)  Moreover, the officers also inquired whether he had swapped any of the items he had taken from the Hooks property for drugs or cash, which he denied.  (Garrett Interview Tr. at 4, 6, 10.)

When the questioning ended at approximately 8:10 p.m., Sergeant Padgett wrote a citation against Rodney Garrett for his burglary of the Hooks property and directed Sergeant Brooks to have him booked in the Laurens County jail.[21] (Brooks Dep. at 45; DRPSMF ¶ 32.)  Sergeant Padgett then called Sergeant Toney and informed him that Rodney Garrett had turned himself in and claimed that he did not steal any other property from the Hooks property other than the Aviator, two guns, scales, money, and methamphetamine.  (Doc. No. 83-18, at 4; see also Toney Dep., Doc. No. 83-17, at 27-29.)  At approximately 8:30 p.m., Defendant Brewer, Sergeant Padgett, and Corporal Burris called Laurens County's Deputy Chief Assistant District Attorney Brandon Faircloth and spoke with him "for a few minutes" about seeking a search warrant for the Hooks property.[22]  (See Faircloth Dep., Doc. No. 83-5, at 10-

---

etcetera.  (See Garrett Interview Tr. at 3, 5-10.)

[21] Rodney Garrett was never charged with possession of the methamphetamine he professed to have taken from the Hooks property.  (Garrett Dep. at 68.)

[22] What information was disclosed to - and what information was withheld from - Mr. Faircloth during this

13

11, 14-15, 17-43.)

---

discussion remains unclear.   Nevertheless, Mr. Faircloth
testified that he explicitly advised the officers to provide
the magistrate with each and every relevant fact they had in
their possession to ensure they did not obtain a search
warrant under false pretenses.   (See Faircloth Dep. at 28-30
(Q: "And basically, what I'm understanding is that you left
Brewer with the, I guess we would call it, advice that he
should put everything he had into the affidavit to get the
search warrant?" [objection to form]  A: "I think that's fair.
I mean, basically, we always advise officers that they want to
make sure that they tell the full truth and that they give a
full picture to the Magistrate.   You don't want a situation
where they think that something is not important - not that
they're trying anything but they're just - they are focusing
on things that they view as more important and so they leave
something out that the Magistrate may think is the most
important part either way.   And so to make sure that the
Magistrate is in the best position to rule whether to give a
warrant or not, it's best to make sure they have all of the
information.   And so that's what we always tell them is,
'Everything that you know, you need to include in the
affidavit. And if there's something that you know that's not
in the affidavit, you need to make sure that you tell them,'
because we don't want them to ever be - you know, getting a
warrant obviously under false pretenses, which is not really
an issue, but also just accidentally leaving something out
that might be a critical point."   Q: "So if Chris Brewer
didn't put everything into the affidavit, he would have done
that against your advice?" [objection to form]  A: "I mean, I
guess so.  But again, you have to bear in mind that our advice
is literally just that.   It's our legal opinion because we
have a duty to give law enforcement legal opinions on stuff
when they need help on that.   But our advice is never
guidance.   And it's never, you know, something they have to
follow. And at no point do we try to supplant the idea that
they may know better than us on whatever they're doing, not
just, you know, going out to a crime scene or interviewing a
witness but also preparing a search warrant. So, you know,
ultimately, they're professionals. They have to make the
choice that they make as far as what information they include
or not.  And whether they listen to us or not, that's entirely
up to them because we can't tell them what to do and we don't.
But, by the same token, we do always advise them and give them
- it's our opinion - make sure any relevant fact you include
in your discussion with the Magistrate, whether it's on paper
in the affidavit or in your sworn testimony.").)

Significantly, Corporal Burris was the case agent investigating one Jeff Frazier in or around 2009. (Burris Dep., Doc. No. 83-1, at 9-24, 50-60; see also Doc. No. 83-2, at 5-28 (records relating to the investigation of Jeff Frazier).) During this investigation, Jeff Frazier purportedly admitted to Corporal Burris that he was bringing methamphetamine back from Atlanta and distributing it to others, including David Hooks and other well-to-do businessmen, judges, and attorneys in the greater Dublin area. (Burris Dep. at 9, 15.) Importantly, Jeff Frazier's accusations were never corroborated, and no case file was opened regarding David Hooks in relation to the investigation of Jeff Frazier or otherwise, despite having Jeff Frazier under surveillance for over two months and conducting numerous controlled purchases via informants during that period. (Burris Dep. at 13-24, 59-60; see also Brewer Dep. at 78-79, 95-96.) Defendant Brewer was directly involved in the investigation of Jeff Frazier.[23] (See Brewer Dep. at 74,

---

[23] Defendant Brewer testified that he investigated David Hooks in connection with the investigation of Jeff Frazier by: (i) driving "up onto the [Hooks] property attempting to make contact with somebody"; (ii) "rid[ing] through and try[ing] to catch people leaving" the Hooks property; and (iii) attempting to set up controlled purchases from David Hooks. All of these attempts were unsuccessful and failed to corroborate Jeff Frazier's accusation. (See Brewer Dep. at 78-79, 94-97; see also DRPSMF ¶¶ 38-39.) Defendant Brewer testified that no records exist of any of these purported efforts and that no case file was initiated with regards to David Hooks. (Brewer Dep. at 78-79, 95-96.) Moreover, Defendant Brewer testified

78-79; Burris Dep. at 50-60; see also Doc. No. 83-2, at 29-30
(Defendant Brewer's narrative regarding October 2009
investigation of Jeff Frazier).)

Without further investigation, Defendant Brewer sought a
search warrant for the Hooks residence and its curtilage.[24]
(Doc. No. 1-2, at 3-5 (Defendant Brewer's affidavit in support
of search warrant); Brewer Dep. at 4.)  Because he was "trying

_____

that he had been informed by Sergeant Gerald Frazier that
Sergeant Frazier had interviewed a suspect by the name of
"May" who had reportedly told Sergeant Frazier that David
Hooks was distributing methamphetamine.  (Brewer Dep. at
74-76.)  In his own deposition, however, Sergeant Frazier
testified that - approximately one year before Rodney
Garrett's burglary of the Hooks property - he had "worked a
break-in or a theft from [David Hooks'] truck" which resulted
in the arrest of David Hooks' former employee, Markell May,
but that there had been no criminal investigation of David
Hooks as a result thereof (or for any other reason).  (Frazier
Dep. at 23-24.)  Defendant Brewer testified that he did not
include Mr. May's accusations in the affidavit in support of
the Hooks search warrant because he "couldn't recall anything
other than [he] remembered [Sergeant] Gerald [Frazier] telling
me about this guy . . . but neither one of [them] could come
up with enough information while [he] was writing to include
that in the affidavit."  (Brewer Dep. at 92-93.)  Finally,
Defendant Brewer testified that there was an accusation by a
"Robbie Miller" in 2002 "[t]hat David Hooks was distributing
methamphetamine," but provided no further information as to
whether he was actually aware of this accusation by Mr. Miller
at the time of applying for the search warrant on September
24, 2014 and/or the circumstances of such accusation.  (Id. at
93, 96.)

[24] The search warrant sought controlled substances,
particularly methamphetamine, and "[p]araphernalia necessary
for manufacturing, packaging, cutting, weighing, and/or
distributing controlled substances" as well as "[c]urrency of
the United States obtained, connected with and/or possessed to
facilitate the financing of illicit drug trafficking."  (Doc.
No. 1-2, at 1.)

16

to expedite the process" of securing a search warrant, Defendant Brewer did not "go back and pull Frazier's file" or otherwise review any records relating to the investigation of Jeff Frazier or any other individual(s) who may have claimed a connection between David Hooks and illegal activity. (Brewer Dep. at 77, 83-87, 90-94.)   No additional oral testimony was provided to the issuing magistrate in support of the warrant application, other than possibly reciting the contents of the affidavit offered in support thereof.[25] (Brewer Dep. at 28-29.)

---

[25] (Brewer Dep. at 28-29 (Q: "When you met with the magistrate, did you provide any testimony or information to the magistrate beyond what's contained within the application for the search warrant and affidavit?"  A: "Yes.  Is that a question or were you reading that from the document?"  Q: "No. I'm asking that as a question."  A: "I do not recall any oral testimony; however, in reviewing my document, there was a note in there that I provided her with a copy of the affidavit and provided her with oral testimony.  Quite commonly, and I'm assuming that that's what this meant, was that I read her the part of the affidavit that specifically applied with this search warrant application."  Q: "So you read the affidavit?"  A: "Not the whole affidavit."  Q: "Okay."  A: "Just the part that specific - that would be a specific search warrant application."  Q: "So in referencing the process of seeking the warrant to be signed by the magistrate, your testimony is that you read part of the warrant application/affidavit to the magistrate?"  A: "That is my common practice."  Q: "Okay. But beyond that, though, as you sit here today, do you recall providing information other than what you read from your application to the magistrate?"  A: "No. I do not have an independent recollection of that."  Q: "Do you have any record other than, I know you've referred to a record, some note you say that you -- other than that is there any other record that might contain a notation by you to the effect of the information that you provided to the magistrate, if any -"  A: "No, sir."  Q: "- over and above what was within the affidavit application?"  A: "No, sir.").)

Laurens County Magistrate Judge Faith Snell signed the search warrant for the Hooks property on September 24, 2014 at 9:56 p.m. (See Doc. No. 1-2, at 1-2 (the search warrant).) The Laurens County Sheriff's Response Team ("SRT"), which would ultimately serve the search warrant, however, was assembled and briefed at some point between 8:00 p.m. and 10:00 p.m. Defendant Sheriff William "Bill" Harrell was present for this briefing and questioned Defendant Brewer regarding the factual basis for the search warrant and the steps he had taken to investigate these underlying facts.[26] (Harrell Dep., Doc. No. 83-8, at 55-70; Brewer Dep. at 176-77; Forte Dep., Doc. No. 83-6, at 11-14; Loyd Dep., Doc. No. 83-13, at 32-35; Meeks Dep., Doc. No. 83-14, at 21-23; Wood Dep., Doc. 83-20, at 9.) During the briefing, it was discussed that the executing officers should not be in a hurry and they should take their time with the "knock and announce"

---

[26] Defendant Harrell further testified that he had conversations with Defendant Brewer regarding the warrant prior to the beginning of the SRT's briefing. (Harrell Dep. at 69 (Q: "You had had conversations with Brewer about the warrant prior to the briefing starting?" A: "Yes." Q: "And those would be face-to-face conversations?" A: "Yes." Q: "And in those face-to-face conversations he outlined to you what he had done and what his probable cause was?" A: "Best I recall, yes." Q: "And you agreed that his actions at that point in time were appropriate?" A: "Yes.").) Defendant Harrell admits that he had "the authority at any time to pull the plug" on the execution of the search warrant. (Id. at 70.) He testified, however, that he could not recall whether he was present prior to Judge Snell signing the search warrant. (Id. at 54-55.)

18

to allow sufficient time for any occupants to come to the door. (Loyd Dep. at 39, 43, 48-49.)

The SRT and other members of the Laurens County Sheriff's Office, including Defendants Brewer, Harrell, and Corporal Steve Vertin, drove out to Highway 319 North, down the half-mile driveway and arrived at the Hooks residence to execute the search warrant at approximately 11:00 p.m.[27] Deputy Kasey Loyd was stationed at the residence's back door in standard uniform (navy hat, navy shirt, khaki pants), while the other-executing officers - stacked behind Deputy Loyd - wore dark-green tactical gear with the word "SHERIFF" sewn in black stitching on the front of their bulletproof vests. (Loyd Dep. at 35-36, 60; Vertin Dep., Doc. No. 83-19, at 18, 31; Wood Dep. at 19.)

At the time Laurens County officers were approaching her residence, Teresa Hooks was upstairs getting ready for bed. (Hooks Aff., Doc. No. 90, ¶ 2.) As she turned off the light beside her bed, she heard the sounds of a car approaching.

---

[27] At the time the officers approached the Hooks residence, it was nighttime, cloudy, and windy, but not raining. (Loyd Dep. at 61-62.) It began raining shortly after the officers entered the Hooks residence and continued throughout Teresa Hooks' subsequent pool-side detention. (Hooks Aff., Doc. No. 90, ¶ 12.) Weather reports recorded at nearby Dublin Municipal Airport indicate that it was 61 degrees Fahrenheit and "misting" at the times in question. (Doc. No. 127-2, at 4, 9; see also Doc. No. 87-1, at 1-2 (Laurens County 911 computer-aided dispatch report indicating at 11:14 p.m. that "air evac cannot lift due to weather").)

(Id.)  While Defendants state that their vehicles' blue lights were activated before service of the warrant, Teresa Hooks states that she looked out of her upstairs window and could not see anything other than a dark vehicle and several people dressed in dark colors with head cover "rushing towards" the back of her home.  (Id. ¶¶ 2-3; Hooks Dep., Doc. No. 69, at 112; see also Frazier Dep., Doc. No. 83-7, at 16 (blue lights were not activated).)  She then heard pounding on her back door and indiscernible yelling.  (Hooks Dep. at 120-22; Hooks Aff. ¶ 11.)  Fearing that her property was being burglarized again, she ran down the stairs while banging on the wall in the hopes of waking David Hooks, who was asleep in the master bedroom on the first floor.  (Hooks Aff. ¶ 4; Hooks Dep. at 15.)  As she reached the bottom of the stairs, David Hooks opened the master bedroom door - naked and holding a shotgun - and asked what was happening.[28]  (Hooks Aff. ¶ 5.)  David Hooks stepped back into the master bedroom to put on a pair of pants; before he could do so, however, the back door was forcibly breached.[29]  (Id.; see also Hooks Dep. at 104-24.)

---

[28] These would be the last words spoken between David and Teresa Hooks.  (Hooks Dep. at 166, 169-170.)

[29] According to Deputy Loyd, he knocked on the back door two or three times and announced "sheriff's office, search warrant."  (Loyd Dep. at 50-54.)  While Defendants assert that there was a pause of approximately 20 to 30 seconds between each such announcement, Deputy Loyd himself testified that the entire "knock and announce" phase lasted less than 30 seconds. (Id.)  After his initial knocking, Deputy Loyd claims he saw

In response to the sound of the back door being forcibly opened, David Hooks rushed across the foyer and into the living room - heading towards the dining room, the kitchen and back door - with his shotgun down by his side and with Teresa Hooks following close-behind. (Hooks Aff. ¶ 6.) Before the Hooks could reach the dining room, however, the officers fired 23 shots. In the resulting hail of bullets, David Hooks was struck by three.[30] (Hooks Aff. ¶¶ 7, 13; Hooks Dep. at 124-

---

a woman in a red shirt and a man through the back door's window. (Id. at 53.) While he originally believed that these individuals were coming to answer the back door, he claims that before reaching the door the individuals "dipped off to the last room on the right." (Id. at 55-56.) Believing that these individuals were attempting to flee or destroy evidence, Deputy Loyd made the decision to breach the back door and stepped out of the way to allow the other officers to knock-down the door with a battering ram and enter the residence. (Id. at 38, 56-59.) As they crossed the threshold into the residence's kitchen, the officers yelled "Sheriff's office with a search warrant." (Id. at 59.) Notably, Teresa Hooks attests that "the layout of [her] house makes it physically impossible to see the foyer from the backdoor of [her] home." (See Hooks Aff. ¶ 14 & Exs. 1 & 2.) Moreover, she testified that she was not aware that the individuals forcibly-entering her home were law enforcement officers and further attests that "[a]t no time during the course of events, including before they forcibly entered my home, could [she] ever understand anything that was being said by the individuals." (Hooks Dep. at 127-28; Hooks Aff. ¶ 11 ("All I ever heard was yelling by multiple people but nothing was ever clear about what was being said.").)

[30] David Hooks remained conscious after being shot. (Jones Dep., Doc. No. 83-12, at 51-54; Johnson Dep., Doc. No. 83-11, at 13-14, 16-17, 19-20, 22-23.) Immediately after he was shot, the SRT's paramedics tended to David Hooks' injuries in an attempt to stabilize him for transport. (Woods Dep. at 25-30.) Emergency services were called but, due to the inclement weather, air evacuation was not possible. (Jones Dep. at 55; Johnson Dep., Doc. 83-11, at 23-24; Doc. No. 87-1,

27; Forte Dep. at 33.)  David Hooks never raised or fired his shotgun. (Hooks Aff. ¶¶ 6-7; Hooks Dep. at 127.)

During the gunfire, Teresa Hooks turned around, ran across the living room and through the foyer and ducked, unscathed, into the master bedroom, locking the door behind her. (Hooks Aff. ¶ 7; Hooks Dep. at 129-30.)  From the master bedroom, she called her son, Brandon Dean, and told him that she was being robbed, shots had been fired, and he should call 911.[31] (Hooks Dep. at 131-32; Dean Dep., Doc. No. 70, at 51-

---

at 1-2.)   An ambulance arrived on the premises at approximately 11:14 p.m. and left shortly thereafter with David Hooks headed for the nearby Fairview Park Hospital. (Johnson Dep. at 9-10, 15-16; Harrell Dep. at 112-13.)  The paramedics knew at the time that they were headed to Fairview Park that its facilities were inadequate given the severity of David Hooks' injuries, but were afraid that he would not survive a longer trip if he was not properly stabilized first. (Wood Dep. at 33 (Q: "At some point in time during your involvement with Mr. Hooks, did you realize he was going to have to go somewhere other than Fairview Park?"  A: "Yes, sir."  Q: "Okay. About when did you come to that realization?"  A: "Whenever we was (sic) on the scene. We tried to originally try to fly him out. Could not fly him out due to weather. Due to transport time it was too long to try to leave [the] scene to make it to Macon in case something did happen to him."  Q: "Right."  A: "So we elected to carry him to Fairview Park to make sure he was stabilized so other transportations [sic] could be evaluated for him.").)  David Hooks was subsequently transported via ambulance from Fairview Park Hospital's emergency room to the Coliseum Hospital in Macon.  (Johnson Dep. at 23-26; Hooks Dep. at 175.)   Notably, it is an approximately 8-mile drive from the Hooks residence to the Fairview Park Hospital, and an approximately 50-mile drive from Fairview Park Hospital to the Coliseum Hospital.

[31] Brandon Dean's residence is located across a pond from the Hooks residence; after receiving the aforementioned phone call from Teresa Hooks, he immediately called 911 to inform them of the shooting.  (Dean Dep. at 51-54; Hooks Dep. at

52.)   Aware that there was at least one other individual in the house besides David Hooks, now incapacitated and moribund, the officers began shouting for whoever was still in the house to come out.   (Vertin Dep. at 34.)   Teresa Hooks testified that she did not hear any commands prior to opening the door, but rather recognized the sounds of police radio chatter from inside the master bedroom; accordingly, she slowly opened the door, showed her empty hands, and walked out of the bedroom towards Defendant Vertin in response to his commands.   (Hooks Dep. at 162-64; Vertin Dep. at 37-38.)

Defendant Vertin handcuffed Teresa Hooks with metal handcuffs behind her back and took her out the back door

---

153-54.)   The 911 operator told him to stay on the phone until law enforcement arrived at the Hooks residence.   (Dean Dep. at 51-54.)   Shortly thereafter he saw blue lights from across the pond and was disconnected from the 911 operator, so he got in his truck and drove over to the Hooks residence.   (Dean Dep. at 51-54; Hooks Dep. at 153-54.)   Upon arriving at the Hooks residence, he exited his vehicle unsure of what was transpiring; he was quickly tackled by Laurens County officers and handcuffed behind his back.   (Dean Dep. at 55-61; Brooks Dep. at 54-55; Hooks Dep. at 154; Frazier Dep. at 18.)   He was placed in the back of a police vehicle and detained for interview by the GBI.   (Dean Dep. at 61-63.)   Defendant Harrell and the other Laurens County officers were aware that Teresa Hooks had called Brandon Dean and that he was on his way to the Hooks residence before he arrived.   (Brooks Dep. at 54 ("The Sheriff come (sic) over the radio and said that Ms. Hooks had called her son and he was supposed to be on the way to the location and he told us to just watch out for him to get there."); Vertin Dep. at 39 ("I asked her if anybody else was in the house.   She told me, no, but she had called her son and he was on the way over.   I yelled out to the perimeter guys that her son was on the way over."); see also Doc. No. 87-1, at 3-4 (Laurens County 911 dispatch report of call received from Brandon Dean at 11:02 p.m.).)

because he "knew that area was secure and there was nobody there possibly going to shoot at us or shoot us."[32] (Vertin Dep. at 37-39; Hooks Dep. at 137.) Defendant Harrell "told somebody, 'Y'all get her separated and go from there and provide somebody with a seat if they needed a seat to sit down.'" (Harrell Dep. at 116.) Defendant Vertin then took Teresa Hooks to the side of the house and had her sit in a patio chair by the pool. (Vertin Dep. at 38-39; Hooks Dep. at 141-42.)

Defendant Vertin testified that "as soon as the shooting happened," he knew that Laurens County officers would not be involved in the search of the Hooks property; rather, any search would be handled by the Georgia Bureau of Investigation ("GBI").[33] (Vertin Dep. at 47; see also Harrell Dep. at 113;

---

[32] To reach the back door, Defendant Vertin required Teresa Hooks, who was barefoot, to walk through broken glass and her husband's blood. (Hooks Dep. at 137-38 ("He walks me to the living room, put the handcuffs on me, behind me. He tells me to follow him and to keep looking at him, and he walks me through the living room and the dining room. Then when we get to the kitchen I see blood. He walks me through the glass and the blood because I was barefooted. He takes me outside, puts me in a chair by the pool."); see also Vertin Dep. at 38-40, 45; Forte Dep. at 37; Jones Dep. at 57-58.) When she reached the back door of the house, she could see her husband lying on a stretcher. (Hooks Dep. at 139.) Teresa Hooks was wearing a shirt and sweat pants that had no pockets. (Hooks Dep. at 160-61; Vertin Dep. at 39.)

[33] Defendant Harrell similarly testified that he knew that "the search warrant was not going to go any further." (Harrell Dep. at 113.) Indeed, at approximately 11:15 p.m. on September 24, 2014, Laurens County's Captain Stan Wright contacted GBI Special Agent Jerry Jones requesting "GBI

Burris Dep. at 69-70; Doc. No. 87-1, at 5.)   Further, while Defendant Vertin testified that Teresa Hooks was not under arrest and that he had no probable cause to arrest her, he admits that she was not free to leave and that he posted a guard with her to ensure that she would be unable to leave. (Vertin Dep. at 40-42; see also Jones Dep., Doc. No. 83-12, at 58-65.)   Indeed, Defendant Vertin testified that he detained Teresa Hooks "for the [GBI] investigators . . . until they deemed she could go," and asserts that it was standard operating procedure to detain anybody "in the house . . . until the investigators decide whether they need them or not." (Vertin Dep. at 46.)   Defendant Harrell testified that, once Teresa Hooks was taken outside of the house, Laurens County officers had complete control of the inside and outside of the residence and deemed the property "cleared"; nevertheless, Defendant Harrell maintains that Teresa Hooks' continued detention was for her own safety (and the safety of the Laurens County officers) and to ensure she remained on the premises to be interviewed by GBI.   (Harrell Dep. at 118-21.)

During her pool-side detention, Defendant Vertin directed

---

assistance . . . regarding an officer involved use of force incident."   (Doc. No. 87-1, at 5.)   During this phone call, Captain Wright informed Special Agent Jones that "[t]he scene had been secured and [Laurens County] sheriff's office members involved in the incident were waiting to be interviewed" and that the request for assistance was made "on behalf of [Defendant] Harrell."   (Id.)

a female Laurens County officer, Deidre Byrd, to search Teresa Hooks' person. She found nothing of note. (Vertin Dep. at 41-43.) Defendant Vertin later removed the metal handcuffs from Teresa Hooks but immediately replaced them with plastic zip-tie handcuffs. (Id. at 41.) During her detention, Teresa Hooks was "terrified" and pleaded with the officers to find out about her husband's status and whether she could visit with him, all of which were ignored or denied. Indeed, she was told she could not move until GBI interviewed her.[34] (Hooks Dep. at 140-41, 145-47, 194; Jones Dep. at 59; Loyd Dep. at 73-75.) Her detention continued up to and through her eventual interview by GBI officers approximately two hours after her initial escort from the interior of the house. (Hooks Aff. ¶ 12; Doc. 94-1, at 10 (GBI interview summary indicating that Teresa Hooks' interview began at approximately 12:43 a.m. on September 25, 2014).)

After being interviewed by GBI agents, Defendant Harrell removed the zip-tie handcuffs from Teresa Hooks and allowed her to leave the premises at approximately 1:30 a.m. on September 25, 2014. (Hooks Dep. at 140-42, 150-51; Hooks Aff. ¶ 12.) No search of the Hooks residence or other property

---

[34] Notably, no questions were asked of Teresa Hooks during her detention prior to her questioning by GBI agents. (Hooks Dep. at 142.) Only after her questioning by GBI agents, she learned that her husband had been taken to the hospital. (Id. at 157, 164.)

occurred while she was on the premises.  (Hooks Aff. ¶¶ 7-8;
see also Doc. No. 87-1, at 8-10.)  She and Brandon Dean then
got in his truck and drove approximately 55 miles to the
Coliseum Hospital in Macon where David Hooks had been
transported.  (Hooks Dep. at 157, 175.)  David Hooks died of
his injuries shortly after Teresa Hooks arrived at the
hospital in Macon, but before she and her children were able
to see him.[35]  (Hooks Dep. at 160, 175-76; Dean Dep. at 75-76.)

     At approximately 1:52 a.m. on September 25, 2014, GBI
Special Agent Lindsey Giddens acquired a separate search
warrant for the Hooks residence on the grounds that "there
[was] probable cause to believe evidence of violations of

---

     [35]  Hooks Dep. at 175-77 (Q: "Okay. All right. So you got
to Macon, got to the hospital. Tell me what happened next."
A: "We - They called - When we got there, they - on the phone
they had told me to let them know at the front desk that I was
there and they would meet me. And they did. And we went to the
waiting room. He was in surgery, and they told me they had
lost him one time and got him back. And the nurse came out and
told me that. And probably - probably between five and ten
minutes, her - the nurse and the doctor came out and said that
he - he didn't make it." Q: "And you understood that to mean
he passed away, correct?" A: "Yes." [. . .] Q: "So your
husband was still in - Where - When you saw your husband,
where was he in the hospital? Was he still in the surgery
room, or had he been taken to a different place?" A: "He was
kind of in a corridor." Q: "On a stretcher -- On a gurney?"
A: "Yes." Q: "Okay. And you did in fact identify him as your
husband to them, correct?" A: "Yes." Q: "And filled out
paperwork indicating -" A: "Yes." Q: "- the same? Did you
have time to interact with him and look at him in any way
where you could see his injuries or see anything that had
happened to him?" A: "I did." Q: "Okay. What is it that you
saw?" A: "His head was swollen, big; the side of his face was
gone; his chest was open.").)

Aggravated Assault on a Police Officer O.C.G.A. [§] 16-5-21(c) [was] located within the [Hooks] residence." (Doc. No. 87-1, at 6-9.)  On September 26, 2014, GBI agents sought a "search warrant addendum," noting in their application that: (i) "Laurens County Sheriff's Office personnel ha[d] not executed a search of the residence, vehicles and outside buildings located within the curtilage for methamphetamine as authorized by the September 24, 2014 drug search warrant;" and (ii) GBI agents "began executing the search warrant issued to [Special Agent] Giddens on September 25, 2014" but "ha[d] not conducted a search for methamphetamine and paraphernalia." (Id. at 10.) The addendum application requested authorization for "GBI agents to search the residence, vehicles, and outside buildings located within the curtilage for controlled substances, specifically methamphetamine . . . because this was the reason Laurens County SRT and deputies were at this location." (Id.)  The addendum was signed by Judge Snell on September 26, 2014.  (Id.)  No contraband or related items were located on the premises during GBI's search thereof. (Hooks Aff. ¶ 10.)  Teresa Hooks was not allowed back into her home until approximately 8:00 p.m., September 26, 2014.  (Id. ¶ 9.)

On April 19, 2016, Plaintiff Teresa Hooks - in both her individual capacity and as the administratix of the Estate of David Hooks - initiated this action against Defendants Brewer,

Harrell, Vertin, and Randall Deloach in their individual capacities. (Doc. No. 1.) On August 29, 2016, Plaintiff requested leave to file an amended complaint, which the Court granted on September 6, 2016. (Doc. Nos. 32, 34; see also Doc. No. 35 (the Amended Complaint).) On January 24, 2017, the parties filed a stipulation of dismissal with prejudice with regards to Defendant Deloach, which the Court granted on February 2, 2017. (Doc. Nos. 61, 62.) Defendants Brewer, Harrell, and Vertin filed their respective motions for summary judgment on May 18, 2017. (Doc. Nos. 75, 77, 78.) On November 29, 2017, the Court entertained oral argument by the parties on the aforementioned motions. At the summary judgment hearing, the Court allowed the parties to submit additional materials relevant to the matters in dispute for the Court's consideration, including information regarding the weather conditions on the date of the incident, investigative photographs, and search warrants obtained by Defendant Brewer in other matters.[36] The Court also allowed the parties to submit supplemental briefing on Defendants' motions for summary judgment, which the parties filed on December 15, 2017. (See Doc. Nos. 126, 127.)

---

[36] While the majority of these additional materials have not been filed with the Clerk because of their voluminous nature, the Court has nevertheless expanded the record to include these materials to the extent they are referenced in this Order.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." FED. R. CIV. P.
56(a). The purpose of the summary judgment rule is to dispose
of unsupported claims or defenses which, as a matter of law,
raise no genuine issues of material fact suitable for trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In considering a motion for summary judgment, all facts
and reasonable inferences are to be construed in favor of the
nonmoving party. Hogan v. Allstate Ins. Co., 361 F.3d 621,
625 (11th Cir. 2004). Moreover,

> [t]he mere existence of some factual dispute will
> not defeat summary judgment unless the factual
> dispute is *material* to an issue affecting the
> outcome of the case. The relevant rules of
> substantive law dictate the materiality of a
> disputed fact. A genuine issue of material fact
> does not exist unless there is sufficient evidence
> favoring the nonmoving party for a reasonable jury
> to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)
(*en banc*) (quoted source omitted) (emphasis supplied). The
party opposing the summary judgment motion, however, "may not
rest upon the mere allegations or denials in its pleadings.
Rather, its responses . . . must set forth specific facts
showing that there is a genuine issue to be tried." Walker v.
Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Clerk has given the nonmoving party notice of the

summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.   (Doc. No. 81.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.   The time for filing materials in opposition has expired, and the motions are ripe for consideration.

### III. DISCUSSION

In the amended complaint, Plaintiff asserts two primary causes of action, namely: (A) a claim - in both her individual and administratrix capacities - against Defendants Brewer and Harrell for illegally obtaining and executing the search warrant in violation of the Fourth Amendment; and (B) a claim - in her individual capacity -against Defendants Harrell and Vertin for detaining her in violation of the Fourth Amendment.[37]   (Doc. No. 36, at 19-23.)   Plaintiff seeks, *inter alia*, damages for the wrongful death of David Hooks, damages

---

[37] Out of an apparent abundance of caution, Defendants Harrell and Vertin have also analyzed Plaintiff's detention claim under state law (*i.e.*, Georgia's false imprisonment statute, O.C.G.A. § 51-7-20), arguing that they are entitled to official immunity from such a claim. (<u>See</u> Doc. No. 77-1, at 18-20; Doc. No. 78-1, at 16-20.)   In her responses, however, Plaintiff has only analyzed her detention claim under 42 U.S.C. § 1983. (<u>See</u> Docs. 87, 94.)   Accordingly, the Court provisionally deems any such state-law claim abandoned. <u>See</u>, *e.g.*, <u>Clark v. City of Atlanta</u>, 544 F. App'x 848, 855 (11th Cir. 2013).

31

to the Hooks residence and related property, punitive damages and an award of her litigation expenses. (<u>Id.</u> at 24-26.) Defendants contend that they are entitled to qualified immunity on Plaintiff's claims.

Qualified immunity is a judicially-created affirmative defense under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." <u>Lumley v. City of Dade City</u>, 327 F.3d 1186, 94 (11th Cir. 2003) (citations omitted). Here, it is clear that Defendants were acting in their discretionary capacities when they engaged in the conduct presently challenged by Plaintiff, a point which Plaintiff does not contest. Accordingly, the burden shifts to Plaintiff to demonstrate that qualified immunity is not appropriate. <u>See</u> <u>id.</u>

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1865 (2014). "The first [prong] asks whether the facts, taken in the light most favorable to the

party asserting the injury, show the officer's conduct violated a federal right." <u>Id.</u> (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) (alterations omitted)).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."[38]  <u>Id.</u> at 1866 (citing <u>Hope v. Pelzer</u>, 536 U.S.

---

[38] <u>Tolan</u>, 134 S. Ct. at 1866 ("Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." (internal quotations, citations, and alterations omitted)); <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." (internal quotations, citations, and alterations omitted)); <u>Hope</u>, 536 U.S. at 741 ("Our opinion in <u>Lanier</u> thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances.  Indeed, in <u>Lanier</u>, we expressly rejected a requirement that previous cases be 'fundamentally similar.'  Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.  The same is true of cases with 'materially similar' facts." (citing <u>United States v. Lanier</u>, 520 U.S. 259 (1997))); <u>Hill v. Cundiff</u>, 797 F.3d 948, 979 (11th Cir. 2015) ("A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." (internal quotations and citations omitted)); <u>see also</u> <u>Ziegler v. Martin Cty. Sch.</u>

730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs . . . . [b]ut under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[39] Id. (citations omitted).

## A. The Search Warrant

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "Generally, a search is reasonable under the Fourth Amendment when supported by a warrant or when the search fits

---

Dist., 831 F.3d 1309, 1326 n.12 (11th Cir. 2016) ("In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." (citations omitted)).

[39] Tolan, 134 S. Ct. at 1866 ("This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . In making that determination, a court must view the evidence in the light most favorable to the opposing party." (internal quotations and citations omitted)); see also Johnson v. Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002) ("[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial."); Simmons v. Bradshaw, 2018 WL 345324, at *5 (11th Cir. Jan. 10, 2018) ("In other words, the question of what circumstances existed at the time of the encounter is a question of fact for the jury — but the question of whether the officer's perceptions and attendant actions were objectively reasonable under those circumstances is a question of law for the court." (citations omitted)).

within an established exception to the warrant requirement."
United States v. Prevo, 435 F.3d 1343, 1345 (11th Cir. 2006).
The Fourth Amendment further provides that "no Warrants shall
issue, but upon probable cause, supported by Oath or
affirmation." U.S. CONST. AMEND. IV.

"[P]robable cause is a fluid concept — turning on the
assessment of probabilities in particular factual contexts —
not readily, or even usefully, reduced to a neat set of legal
rules." Illinois v. Gates, 462 U.S. 213, 232 (1983); see also
Arrington v. Kinsey, 512 F. App'x 956, 959 (11th Cir. 2013)
("In determining whether probable cause exists, we deal with
probabilities which are the factual and practical
considerations of everyday life on which reasonable and
prudent men, not legal technicians, act." (internal quotations
and alterations omitted) (citing Rankin v. Evans, 133 F.3d
1425, 1435 (11th Cir. 1998))). Accordingly, "[p]robable cause
to support a search warrant exists when the totality of the
circumstances allow a conclusion that there is a fair
probability of finding contraband or evidence at a particular
location." United States v. Brundidge, 170 F.3d 1350, 1352
(11th Cir. 1999) (citing United States v. Gonzalez, 940 F.2d
1413, 1419 (11th Cir. 1991)); see also United States v.
Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) ("[T]he affidavit
must contain sufficient information to conclude that a fair
probability existed that seizable evidence would be found in

the place sought to be searched." (citations omitted)). Under this "totality of the circumstances" analysis, an affidavit in support of a search warrant "should establish a connection between the defendant and the [area] to be searched and a link between the [area to be searched] and any criminal activity" and must be based on "fresh" information. Martin, 297 F.3d at 1314 (citations omitted).

An informant's veracity and basis of knowledge are relevant considerations - as opposed to independent essential elements - in assessing whether probable cause exists to support a search warrant. Gates, 462 U.S. at 233 ("[T]hey are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."). Similarly, independent police corroboration of an informant's tip is a relevant consideration - as opposed to an essential requirement - in the Court's analysis. Brundidge, 170 F.3d at 1353 ("[I]ndependent police corroboration has never been treated as a requirement in each and every case."); see also Martin, 297 F.3d at 1314 ("[W]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." (citations

36

omitted)).   Further, "making a statement against one's penal
interests without more will not raise an informant's tip to
the  level  of  probable  cause  required  under  the  Fourth
Amendment."   Ortega v. Christian, 85 F.3d 1521, 1525 (11th
Cir. 1996) (citations omitted)).

Of direct pertinence to the instant claim, the Fourth
Amendment  prohibits  officers  from  making  deliberately-or
recklessly-false  statements  to  secure  a  search  warrant.
Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997)
(citing Franks v. Delaware, 438 U.S. 154, 171 (1978)); see
also  Smith v. Sheriff, Clay Cty., 506 F. App'x 894, 898 (11th
Cir. 2013) ("[T]he existence of a warrant will not shield an
officer from liability where the warrant was secured based
upon an affidavit that contained misstatements made either
intentionally or with reckless disregard for the truth."
(citing  W. Point-Pepperell, Inc. v. Donovan, 689 F.2d 950,
959 (11th Cir. 1982))); Daniels v. Bango, 487 F. App'x 532,
537 (11th Cir. 2012) ("A law enforcement officer recklessly
disregards the truth when he should have recognized the error
in the warrant application, or at least harbored serious
doubts as to the facts contained therein.  This is especially
true  when  the  inconsistency  gives  the  agent  cause  to
investigate further." (internal quotations and alterations
omitted) (citing United States v. Kirk, 781 F.2d 1498, 1503
(11th Cir. 1986)); cf. Madiwale, 117 F.3d at 1326 ("Negligent

37

or innocent mistakes do not violate the Fourth Amendment.").

This prohibition similarly "applies to information omitted from warrant affidavits," such that "a warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit." Madiwale, 117 F.3d at 1326-27 (citations omitted); see also Kingsland v. City of Miami, 382 F.3d 1220, 1228-29 (11th Cir. 2004) ("[O]fficers should not be permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon. . . . While the constitutional reasonableness of a police investigation does not depend on an officer's subjective intent or ulterior motive in conducting the investigation, it does not follow that the officer may then investigate selectively. . . . [A]n officer may not choose to ignore information that has been offered to him or her . . . . [n]or may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts . . . ." (internal citations omitted)); cf. Madiwale, 117 F.3d at 1327 ("Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." (internal citations omitted)).

Nevertheless, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, and

38

there remains sufficient content in the warrant affidavit to support a finding of probable cause, then the warrant is valid." Madiwale, 117 F.3d at 1326. Similarly, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. at 1327. Moreover, even where a falsity or omission would otherwise invalidate a warrant, the relevant officers may still enjoy qualified immunity so long as they would have had "arguable probable cause" to seek the warrant (i.e., a reasonable officer in the same circumstance and possessing the same knowledge as the defendants could have believed that probable cause supported the search). See id. ("[T]his circuit has previously reasoned that an officer would not be entitled to qualified immunity when the facts omitted were so clearly material that every reasonable law officer would have known that their omission would lead to a search in violation of federal law." (citing Haygood v. Johnson, 70 F.3d 92, 95 (11th Cir. 1995))); Smith, 506 F. App'x at 899 ("[T]o overcome summary judgment on qualified immunity grounds, Smith must identify certain facts omitted from the affidavit that were so clearly material that every reasonable law officer would have known that their omission would lead to a search or seizure in violation of federal law." (internal quotations and citations omitted)); Daniels, 487 F. App'x at 537 ("[A]n officer will not receive

qualified immunity if a reasonable officer should have known that the statements in the affidavit were included with a reckless disregard for the truth or that facts were recklessly omitted from the affidavit supporting probable cause." (citing Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994))).

With these standards in mind, the Court now turns to an analysis of whether the warrant issued for the search of the Hooks residence was supported by probable cause. The affidavit provided by Defendant Brewer in support of the search warrant contains an approximately twenty-two paragraph narrative. (See Doc. No. 1-2, at 3-5.) Of these twenty-two paragraphs, the first eighteen are generalized statements and boilerplate language regarding Defendant Brewer's law-enforcement experience and general familiarity with drug-trafficking practices.[40] (Id.) The remaining four paragraphs

---

[40] Defendants provided the Court with six "search warrants, sworn to by [Defendant] Brewer, in other unrelated matters." (See Doc. 127, at 22; see also id. at 22 n.10 ("Defendants contend that these search warrants are irrelevant to the matter presently before the Court and do not wish to place these warrants into the record. As such, Defendants have supplied the Court and opposing counsel with copies separate from the court record." (citations omitted)).) Defendants admit that "[t]hese search warrants are very similar to the search warrant in the instant matter, in that all of the search warrants give [Defendant] Brewer's extensive experience and training as an investigator with Laurens County Sheriff's Office Drug Unit. . . . Many of the search warrants set out [Defendant] Brewer's background and experience, then give a brief description, of 1 - 4 paragraphs, of the basis for [Defendant] Brewer's probable cause for the issuance of the search warrant." (Id. at 22-23.) Notably, the affidavits provided by Defendant Brewer in support of three of these other search warrants contain the exact same generalized statements and boilerplate language regarding Defendant

are substantive and are repeated below:

> Within the past 6 hours your Affiant spoke with Rodney Garrett after Garrett had waived his Miranda Rights in writing. Garrett was in custody for burglary and theft of a motor vehicle as well as other offenses. Garrett had been taken into custody after turning himself into Sgt. Ryan Brooks of the Laurens County Sheriff [sic] Office and reporting some of his crimes to Sgt. Brooks. Your affiant responded to the location where Brooks had met with Garrett where your affiant recovered approximately 20 grams of suspected methamphetamine, a digital scale, two firearms, and a Lincoln Aviator which Garrett stated he had taken from 1184 Highway 319 North, which is within the confines of Laurens County, Georgia.
>
> During the interview Garrett stated that during the previous night he had traveled to the residence at 1184 Highway 319 North with the intentions of committing a theft. Garrett stated that he entered the interior of a pickup truck which was parked under the carport of the residence and removed a "neoprene" bag and a digital scale from the center console of the vehicle. Garrett stated that he believed the bag contain [sic] currency at the time he removed it from the vehicle. Garrett stated that after taking a Lincoln Aviator which was also parked at the residence and traveling into the city of Dublin he discovered the bag contained a large amount of suspected methamphetamine. Garrett stated that he then became scared for his safety and placed the bag and scale into a locked box which they had been recovered from by your affiant.
>
> Your affiant is familiar with the residence and the occupant of the residence, David Hooks, from a

---

Brewer's law-enforcement experience and general familiarity with drug-trafficking practices contained in the affidavit in support of the Hooks search warrant. (See Warrants Nos. 2011-0995 (search warrant dated June 9, 2011 for residence of mother of convicted felon believed to be in possession of firearm), 2012-1518 (search warrant dated September 12, 2012 for residence where fugitive was believed to be located), and 2013-1989 (search warrant dated August 27, 2013 for data stored on cellular phone obtained during execution of earlier search warrant).)

prior narcotics investigation involving Jeff
Frazier. During this investigation Frazier had
been interviewed by law enforcement and stated that
he had been the source of supply for multiple
ounces of methamphetamine to Hooks which Hooks was
redistributing.

Garrett also admitted to committing other criminal
offenses for which he was a suspect and provided
other information which led to the recovery of
stolen property which law enforcement was unaware
of prior to this confession.

(Id. at 5.)

Plaintiff asserts that the foregoing paragraphs contain
numerous falsities and/or material omissions. Upon
consideration of the record, as set forth in the factual
background, *supra,* and detailed in the subsequent explanatory
footnotes, the Court finds that there are genuine disputes of
fact with respect to these falsities and omissions, and
further, the disputes are material to the determination of
probable cause. The falsities and material omissions include:
(i) the falsity that Defendant Brewer was "familiar with"
David Hooks and the Hooks residence from a prior narcotics
investigation involving Jeff Frazier;[41] (ii) the falsity that

---

[41] Defendant Brewer testified that at some undefined point
in time he and/or other Laurens County law enforcement
officers "drove out to the Hooks residence to verify that what
[Jeff] Frazier had told us as far as where Hooks was living
was actually true . . . [and that they] actually drove up onto
the property attempting to make contact with somebody at that
time," but that no such contact was ever made. (Brewer Dep.
at 78.) Yet, Defendant Brewer further testified that his
understanding of David Hooks' relation to the investigation of
Jeff Frazier came primarily - if not entirely - from Corporal
Burris's post-arrest interview of Jeff Frazier in 2009. (Id.

Jeff Frazier had stated during an interview that Hooks was

"redistributing" methamphetamine that had been supplied by

Jeff Frazier;[42] (iii) the falsity that Rodney Garrett had

admitted to committing other criminal offenses for which he

was a suspect;[43] (iv) the falsity that Rodney Garrett had

---

at 71-85.)   Corporal Burris testified, however, that Jeff
Frazier: (i) never told Corporal Burris that David Hooks had
ever distributed drugs to anyone; and (ii) never told Corporal
Burris when and/or where he had provided methamphetamine to
David Hooks (i.e., whether it was at the Hooks residence or
another location).  (Burris Dep. at 14-24.)  Corporal Burris
further testified that: (a) Jeff Frazier's accusations
regarding David Hooks were nothing more than a "generalized
statement [along the lines of] 'I bring ounces back to David
Hooks;'" (b) Jeff Frazier was the only person who had
previously accused David Hooks of drug-related activity; (c)
there was never any kind of observation (e.g., a stakeout,
controlled purchase, etc.) of David Hooks and/or the Hooks
residence for any reason at any time; (d) no information
resulted from the investigation that would indicate that the
Hooks residence contained equipment related to the
manufacture, packaging, cutting, and/or distribution of
methamphetamine and/or currency connected to drug activity;
(e) "there was nothing uncovered during the course of the
investigation of Jeff Frazier . . . that signaled or indicated
or in any way suggested that David Hooks had anything to with
Jeff Frazier;" and (f) there was never "any information to the
[Laurens County Sheriff's Office's] Drug Unit to the effect
that there were any drugs at David Hooks' home or on his
property other than what [Rodney] Garrett had to say."  (Id.)

    [42] See n.41, supra.

    [43] During his deposition, Defendant Brewer was unable to
specifically identify any - let alone catalog all - of the
other crimes to which Rodney Garrett had purportedly
confessed.  (See Brewer Dep. at 34-42.)  Indeed, while
Defendant Brewer testified that Rodney Garrett had admitted to
committing "other thefts, possible burglaries," Defendant
Brewer was unable to say what items were stolen or from whom
they were stolen.  (Id. at 40-41.)  Having reviewed the record
in this matter in great detail, the Court is unable to locate
any crimes - other than his rampant prior possession and use

of methamphetamine (and marijuana) and the theft of the Hooks'
property - for which Rodney Garrett had admitted culpability;
rather, Rodney Garrett either outrightly denied any
involvement in any other criminal activity or provided
exculpatory explanations for possessing stolen goods (the
great majority of which he denied were in fact stolen).  For
example, when questioned by Sergeant Brooks regarding a four-
wheel ATV that Rodney Garrett had previously been seen
operating, Rodney Garrett denied having stolen the ATV but
admitted that he knew where the ATV was located; indeed, when
questioned about it at the station, Rodney Garrett claimed
that he had bought the ATV from a Mr. Jimmy White
approximately one and a half to two years prior.  (Garrett
Interview Tr. at 5; Brooks Dep. at 42-43.)  When Sergeant
Brooks asked Rodney Garrett to point out any items located
inside his residence that were stolen (other than the Hooks'
property) before taking Rodney Garrett to the Sheriff's
Office, Rodney Garrett "looked around and said no yall [sic]
got everything."  (Doc. No. 76-9, at 2; see also Garrett
Interview Tr. at 7 (Brooks: "[W]hat about the stuff I took
from your house. The red trailer and black trailer[?]"
Garrett: "[T]hat's mine[.]"  Padgett: "[W]hat else is out
there that you know is stolen that you can help us get our
hands on[?]"  Garrett: "[T]hat's it. We went out and look
while ago. That was everything[.]"  Padgett: "[A]nd what did
y'all go out and look for?"  Garrett: "[T]hey just wanted me
to go out and look and make sure there wasn't anything else
there that wasn't mine that I didn't buy and pay for[.]"
Brooks: "[Y]eah and I took him out there and told him to show
me anything else that we didn't get the other night that may
have been stolen[.]").)  When questioned whether he had stolen
a Stihl chainsaw that was reported missing from a local
business, Rodney Garrett denied having stolen the chainsaw and
claimed that he bought it from a Mr. John Chinholster for $200
(although Rodney Garrett later conceded - after repeated
questioning on the subject - that he had reason to question
whether the chainsaw was "hot" because of the low price he
paid for it).  (Garrett Interview Tr. at 7-8; see also Brooks
Dep. at 45-48.)  When asked about tools that had been stolen
from Mr. James Dixon, Rodney Garrett denied all knowledge and
claimed that Mr. Dixon had a personal vendetta against him
because of past business dealings.  (See Garrett Interview Tr.
at 5.)  Indeed, the interview transcript is peppered with
well-worn, self-serving explanations often uttered by those
caught in possession of stolen property, ranging from his
having bought the relevant property "at a yard sell [sic]," to
having been "working on it for a man," to having found it

provided other information which led to the recovery of stolen property which law enforcement was unaware of prior to his confession;[44] (v) the omission that David Hooks had reported

---

broken down in the woods. (See id., generally; see also n.20, supra.)

[44] Notably, none of the "other information" provided by Rodney Garrett that purportedly led to the recovery of stolen property was provided spontaneously (i.e., without prompting); rather, it was only after he was accused of having stolen the specific property in question that he provided information as to its location (along with an exculpatory explanation for his possession of said property and/or knowledge of its location). See n.10, n.43, supra. Moreover, it is unclear from the ambiguous wording of Defendant Brewer's affidavit whether he was attesting that, prior to Rodney Garrett's statements to the officers, law enforcement was unaware that the property in question had in fact been stolen or whether they were simply unaware of its then-present location. If it is the former, this would be a false and/or misleading statement given that most if not all of the property about which Rodney Garrett was questioned was already known - or at least believed - to be stolen. (See Brooks Dep. at 7-11 (suspected theft by Rodney Garrett on or about August 19, 2014 of property owned by Mr. Faulk); id. at 11-16, 22-27 (suspected theft by Rodney Garrett on or about September 21, 2014 of tools and other property owned by Mr. Dixon); id. at 17-29 (suspected theft by Rodney Garrett on or about September 21, 2014 of a green truck owned by Mr. Mendoza).) If it is the latter, this still would be a false and/or misleading statement given that the locations of the vast majority of the stolen property about which Rodney Garrett was questioned on September 24, 2014 were previously known to Sergeant Brooks and other Laurens County law enforcement. (See Brooks Dep. at 24-26 (on September 21, 2014 - at Sergeant Brooks' instruction and in his presence - Monty Garrett identified tools on Rodney Garrett's property that did not belong to Rodney Garrett); id. at 26-29 (on September 21, 2014, Chris Willis informed Sergeant Brooks regarding the location of the green truck stolen from Mr. Mendoza); id. at 45-48 (stolen Stihl chainsaw recovered by Sergeant Brooks prior to interview of Rodney Garrett at Sheriff's Office); see also Doc. No. 76-9 (Sergeant Brooks' incident report dated September 25, 2014).) Indeed, other than the property stolen from the Hooks, the only property that was located by officers as a result of Rodney Garrett's statements was a four-wheel

the midnight burglary of his property on the following afternoon of September 23, 2014;[45] (vi) the omission that Laurens County law enforcement officers met with David Hooks at the Hooks residence on September 23, 2014 to investigate the aforementioned burglary, including dusting for fingerprints in the detached garage and vehicles on the premises;[46] (vii) the omission that the "prior narcotics investigation involving Jeff Frazier" occurred in 2009;[47] (viii) the omission that the lengthy 2009 investigation of Jeff Frazier resulted in no corroboration of Jeff Frazier's

---

ATV - that itself may not have even been stolen. (See Brooks Dep. at 21, 42-44; Garrett Interview Transcript at 5 (Rodney Garrett claimed that he bought ATV from Jimmy White).) Further, Rodney Garrett had never previously provided any accurate information to law enforcement officers that led to the recovery of stolen goods or evidence of other crimes. (Brewer Dep. at 102-03.)

[45] (See Toney Dep. at 17; Doc. No. 83-18, at 3-6.)

[46] (See Toney Dep. at 17-23; Doc. No. 83-18, at 3-4; see also Brewer Dep. at 100-02.)

[47] (See Brewer Dep. at 71-96; Burris Dep. at 9, 39.) Defendants argue that any information gleaned from the 2009 investigation of Jeff Frazier would not be "stale" with regards to David Hooks' suspected distribution of methamphetamine in September 2014 because David Hooks' purported distribution of drugs was a "continuous crime"; Defendants, however, have failed to put forth sufficient evidence to demonstrate that they had a reasonable basis to believe David Hooks was distributing drugs, let alone on a protracted, repeated, or continuous basis. (See Burris Dep. at 14-24; Brewer Dep. at 112-13, 175-76; see also n.41 (regarding Burris' testimony that Frazier gave no information about the distribution of drugs), supra; n.56 (discussing the lack of evidence of manufacturing, processing, and/or packaging on the Hooks property), infra.)

assertion that he was supplying methamphetamine to David Hooks;[48] (ix) the omission of Rodney Garrett's criminal history, including that he was a suspect in multiple thefts that had recently occurred in Laurens County, that he was suspected of dealing in stolen property, that there was a warrant out for his arrest for a theft unrelated to the Hooks (i.e., the theft of a Mr. Mendoza's truck) of which he was aware, and that he denied culpability for any of these pending crimes;[49] (x) the omission of Rodney Garrett's extensive history of methamphetamine purchase and use, including that he had a regular supplier of methamphetamine with whom he was presently living, from whom he had purchased approximately 3.5 grams of methamphetamine less than three days before the Hooks burglary, and who had previously fenced stolen goods on his behalf;[50] (xi) the omission of Rodney Garrett's admission that

---

[48] (See Brewer Dep. at 71-97; Burris Dep. at 9-24, 50-60; DRPSMF ¶¶ 38-39.)

[49] (See, e.g., Brewer Dep. at 70-99; Brooks Dep. at 7-16; 22-29, 45-48; Garrett Dep. at 15-19, 48, 59; see also n.10, n.43, n.44, supra.)

[50] (Garrett Dep. at 11-14 (Q: "Okay.  So you had been doing meth on a regular basis from the end of 2012 up until you were arrested for - for this -"  A: "Em-hmm, yes, sir."  Q: "- case in November - I'm sorry, September 24, 2014?"  A: "Yes."  Q: "How regular would you do it?"  A: "Every day."  Q: "Daily?"  A: "Yes, sir."  Q: "And how much meth do you think you would - you would do in a normal day?"  A: "A gram to gram and a half, probably."  Q: "Okay. And would that more or less be seven days a week?"  A: "Yes, sir."  Q: "Take me through when you would - when you were doing meth, what is the schedule like for something like that? Is that something you

he had smoked methamphetamine before, during, and after the
burglary of the Hooks property, including having smoked some
of the methamphetamine that he professed to have taken from

---

do throughout the day or is it something you do -" A: "Day
and night." Q: "- day and night?" A: "It's almost impossible
to sleep on it, they say, unless- unless you're on it for a
long time and then you get to where you could sleep again, but
I could never sleep." Q: "Okay. So, as far as actually doing
it, would you do some early in the morning?" A: "Early in the
morning and then maybe again after lunch, and then maybe again
around 10 or 11:00 at night." Q: "Okay. So it was throughout
the day?"   A: "Yeah."   Q: "Okay. Now, what was the - I'm
assuming, since you were doing that much meth, that you had to
be purchasing it?" A: "Yeah." Q: "And what was the going
rate for a gram of meth back then?" A: "80 to $100 a gram."
Q: "Okay." A: "Usually." Q: "So your daily habit was an 80-
to $100-a-day habit?" A: "Yeah."); id. at 19-20 (Q: "Okay.
Okay. When you would - when you would purchase meth for your
own use, what quantities would you purchase it in?" A:
"Usually - usually anywhere from a gram to three and a half
grams, what they call an 8-ball, a street 8-ball." Q: "Okay.
So that would require you, based on your habit, to have to
make purchases several times a week?" A: "Yes, sir."); id. at
49 (Q: "You've talked about doing a lot of methamphetamine
that day and that evening, that night. When did you buy the
methamphetamine that you were - you were doing that night?"
A: "Either Saturday or Sunday.  I think it was Saturday
evening." Q: "Okay. And do you remember how much you bought
at that point in time?" A: "Three and a half grams." Q:
"Three and a half grams? That would be an 8-ball?" A: "Yes,
sir." Q: "And I think you told - in your statement, you told
Chris Brewer and Lance Padgett that you were buying your meth
from Chris Willis?" A: "Yeah." Q: "And is that who you
bought that from?" A: "That or either somebody he knew would
come by -" Q: "Okay." A: "- and bring the drugs."); id. at
55, 60, 70-71; Garrett Interview Tr. at 4-5, 8-10).) Of note,
Rodney Garrett testified that he used his own set of scales to
ensure he was not being swindled when he purchased
methamphetamine. (Garrett Dep. at 47.)  Sergeant Brooks was
previously informed by Chris Willis's father, Bobby Willis,
that Chris Willis had attempted to sell stolen goods to Bobby
Willis on behalf of Rodney Garrett.  (Brooks Dep. at 21-27.)

the Hooks property;[51] (xii) the omission that Sergeant Brooks "knew Rodney Garrett was a meth[amphetamine] addict . . . and knew at the time of his arrest he [i.e., Garrett] was under the influence of methamphetamine and had not slept in 7 to 10 days;"[52] (xiii) the omission that Defendant Brewer and the other officers who were present for Rodney Garrett's interview were aware that Rodney Garrett was under the influence of methamphetamine at the time of the interview;[53] (xiv) the omission that Sergeant Brooks and other officers "knew [Rodney Garrett's] propensity to lie to law enforcement and his own family;"[54] and (xv) the omission that Rodney Garrett had never previously provided any accurate information to law enforcement officers.[55] Further, while Defendant Brewer states in the search warrant affidavit that the location to be searched was "the residence of David Nelson Hooks" where he

---

[51] (Garrett Interview Tr. at 10; Padgett Dep. at 15-17; see also Garrett Dep. at 21-34, 60-61, 77-79 (Q: "We're sitting here talking about all the methamphetamine you had smoked within the -" A: "Yes." Q: "- the house leading up to when you were there, and then you actually smoked some in the -" A: "In the room, in the shop, yeah." Q: "- shop. Would it be fair to say that at that point in time -" A: "You could have." Q: "- you were pretty high?" A: "Yes, sir. Emhmm.").)

[52] (DRPSMF ¶ 14; see also Garrett Dep. at 77-79.)

[53] (DRPSMF ¶ 17.)

[54] (DRPSMF ¶ 14; see, e.g., Brooks Dep. at 8-18.)

[55] (Brewer Dep. at 102-03.)

assumed there would be located "[p]araphernalia necessary for manufacturing, packaging, cutting, weighing, and/or distributing controlled substances" as well as "[c]urrency of the United States obtained, connected with and/or possessed to facilitate the financing of illicit drug trafficking" (doc. no. 1-2, at 3), this conclusion was based solely on Rodney Garrett's statement that he had stolen approximately twenty grams of methamphetamine and a set of scales from a vehicle located within the curtilage of the Hooks property, which Defendant Brewer himself testified "really ain't that much dope."[56]

---

[56] (See Brewer Dep. at 112-13 (Q: "In all of what you understood Garrett had said, did Garrett ever say that he saw any illegal substance inside of David Hooks' home?" A: "No, sir." Q: "Did he ever say that he saw any illegal substance in any location, other than in the truck from which he took the bag?" A: "No, sir." Q: "Did he ever identify -- excuse me. Did he ever relay to you or to your knowledge to any other law enforcement officer on the day of the search warrant that he, Garrett, had observed any drug paraphernalia over and above a bag and after he opened the bag, a plastic bag?" A: "No. Other than the scale I don't recall anything else." Q: "Okay. Did he ever relay to you or to any other law enforcement officer on the day of the search warrant application any observation that reflected the presence on David Hooks' property of the equipment needed to process or produce illegal drugs?" A: "Not that I recall." Q: "Did he ever relay to you any information or to any other officer to the best of your knowledge on the day of the search warrant application that he, Garrett, saw items that consisted of packaging of drugs? Again, other than the bag and the plastic bag?" A: "No. Not that I recall."); id. at 175-76 (Q: "Okay. So in a manner of speaking, you weren't aware of any shipment about to be made?" A: "No, sir." Q: "Or sale about to take place?" A: "No, sir." Q: "Or manufacturing that was taking place at the Hooks' property?" A: "No, sir." Q: "Or evidence that reflected that chemicals needed for the manufacture of

Taking the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the facts support a conclusion that Defendants Brewer and Harrell violated the Fourth Amendment in obtaining and/or executing the search warrant.  Indeed, a reasonable factfinder could easily conclude that, in his presentation to Judge Snell, Defendant Brewer: (a) embellished, distorted, or otherwise supplied false inculpatory facts; and (b) disregarded, ignored, or otherwise omitted material exculpatory facts.  Further, the aforementioned falsities and omissions are clearly integral to the "totality of the circumstances" of the probable cause analysis.  Moreover, given that the material falsities and omissions in the affidavit were known or

---

meth were going to be delivered?" A: "No, sir." Q: "Or were even present on the property?" A: "No, sir." Q: "And there was no specific information that you had to the effect that if there were illegal drugs there at the property that they were about to be moved." A: "Nothing specific."); see also id. at 115 (Q: "So as of the day of the search warrant was there any source of information, law enforcement or informant or citizen, any source of information that you had that provided you with information about any drug activity taking place inside the Hooks' home?" A: "If you specifically narrow it down to inside the home then I'd have to answer no.").) Notably, during Rodney Garrett's interview, Sergeant Padgett estimated that the street value of 20 grams of methamphetamine was between three and four thousand dollars, which Defendant Brewer testified "really ain't that much dope." (Brewer Dep. at 112; see also Garrett Interview Tr. at 11 (Padgett: "3 or 4 thousand dollars ain't that big of a deal with a regular dope dealer. Chris [Willis] could be making that everyday.").)

reasonably knowable by Defendant Brewer,[57] a reasonable factfinder could conclude that these falsities (and omissions) were included (and omitted) intentionally or with reckless disregard for the truth. See Madiwale, 117 F.3d at 1327 ("A party need not show by direct evidence that the affiant makes an omission recklessly. Rather, it is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." (internal quotations and citations omitted)). Similarly, Plaintiff has provided sufficient evidence from which a reasonable factfinder could conclude that the above-referenced falsities and material omissions were known or reasonably knowable by Defendant Harrell and that Defendant Harrell was personally involved in obtaining the search warrant or otherwise knew Defendant Brewer was acting unlawfully and failed to stop him from doing so. See Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) ("[S]upervisors are liable under § 1983 either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the

---

[57] Kingsland, 382 F.3d at 1228 ("A qualified immunity analysis must charge the officer with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances." (alterations omitted) (quoting Sevigny v. Dicksey, 846 F.2d 953, 957 n.5 (4th Cir. 1988))).

alleged constitutional violation. A causal connection can be established by, *inter alia*, facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." (internal quotations and citations omitted)); <u>Baskin v. Parker</u>, 602 F.2d 1205 (5th Cir. 1979) (sheriff may be personally liable under § 1983 for search carried out under illegally obtained warrant if he participated in obtaining the warrant and organizing search party).

While the Court concludes that a reasonable jury could determine that the affidavit contained falsities and material omissions, Defendants Brewer and Harrell may still enjoy qualified immunity if they nevertheless had "arguable probable cause" to seek the search warrant. When the aforementioned falsities are removed from - and omitted material facts are included in - the affidavit attested to by Defendant Brewer in support of the search warrant, however, arguable probable cause would not exist for the search of the Hooks residence. That is, viewing the facts in the light most favorable to Plaintiff, a reasonable officer in the same circumstances and possessing the same knowledge as Defendants Brewer and Harrell could not have believed probable cause existed under the totality of the circumstances given they: (a) elected not to

obtain easily discoverable facts, turned a blind eye to exculpatory information that was available to them, or otherwise conducted their investigation in a biased fashion; and (b) relied on an uncorroborated tip from a criminal suspect who was known to lie to law enforcement, even though the information supplied was against the suspect's penal interests. See Gates, 462 U.S. at 233; Kingsland, 382 F.3d at 1233; Madiwale, 117 F.3d at 1326-27; Brundidge, 170 F.3d at 1353; Martin, 297 F.3d at 1314. More particularly, in the absence of the alleged falsities and in consideration of the material omissions, Defendants Brewer and Harrell had only the uncorroborated word of a known liar and car thief to put methamphetamine and other evidence of drug activity in the home of David Hooks. No reasonable officer in the same circumstances and possessing the same knowledge could have believed probable cause existed to support the search warrant. See Garmon v. Lumpkin Cty., 878 F.2d 1406, 1410-11 (11th Cir. 1989) ("[A] magistrate's decision to issue an arrest warrant does not absolve the officer who applied for the warrant from liability: The question is whether a reasonably well-trained officer applying for a warrant would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not

objectively reasonable.").

In conclusion, the disputed issues of fact are material because, if Plaintiff's version of the facts is accepted, the search warrant is unsupported by arguable probable cause. Accordingly, qualified immunity from suit on this issue is effectively unavailable at summary judgment, even though after a full trial Defendants Brewer or Harrell may yet prevail. See Simmons, 2018 WL 345324, at *4 ("If the official's motion [for summary judgment] does not succeed, however, then his qualified immunity defense remains intact and proceeds to trial."); Herren v. Bowyer, 850 F.2d 1543, 1546 (11th Cir. 1988) ("[I]f the legal norms allegedly violated were as a matter of law clearly established at the appropriate time, a genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity." (citations omitted)).

Before turning to Plaintiff's claim of unlawful detention, the Court must address Defendants Brewer and Harrell's argument that they are entitled to summary judgment on Plaintiff's claims for property damages, wrongful death, and punitive damages arising out of the alleged unlawful search.

Plaintiff may recover punitive damages against Defendants in their individual capacities if she can show that their

conduct was "motivated by an evil motive or intent" or it involved "reckless or callous indifference to federally protected rights." Anderson v. City of Atlanta, 778 F.2d 678, 688 (11th Cir. 1985); see also Christiansen v. McRay, 380 F. App'x 862, 864 (11th Cir. 2010) ("[I]n order to receive punitive damages in § 1983 actions, a plaintiff must show that the defendant's conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of others.") Here, Defendants conclusorily contend that Plaintiff cannot make this showing. Yet, if the jury credits Plaintiff's version of events, it could reasonably find that Defendants were callously indifferent towards David and Teresa Hooks' federally protected rights. That is, Plaintiff's entitlement to punitive damages turns upon the same genuine disputes of material fact related to her claim of an unconstitutional search, and from those facts, a jury must determine whether Defendants' conduct manifested malevolent intent or reckless indifference to the Hooks' Fourth Amendment rights. Accordingly, the Court will not grant summary judgment in favor of Defendants on Plaintiff's claim for punitive damages. With respect to Plaintiff's claim for property and wrongful death damages, common law tort principles of damages and causation apply in the § 1983 context. Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir.

2000). That is, § 1983 defendants are responsible for the natural and foreseeable consequences of their actions. Id. A plaintiff therefore must show that, except for the constitutional tort, the alleged "injuries and damages would not have occurred" and that "such injuries and damages were reasonably foreseeable consequences of the tortious acts or omissions in issue." Id. In this case, Plaintiff's entitlement to damages for property damage and wrongful death hinge upon the resolution of genuine disputes of material fact, especially with respect to proximate cause.

In response, Defendants Brewer and Harrell contend that Plaintiff's wrongful death claim is foreclosed by the recent decision of the United States Supreme Court, County of Los Angeles, Calif. v. Mendez, 137 S. Ct. 1539 (2017). The Mendez Court abrogated the Ninth Circuit's "provocation rule," which comes into play *only after* a determination has been made that a law enforcement officer's use of force was otherwise reasonable. Id. at 1546. The "provocation rule" "instructs the court to ask whether the law enforcement officer violated the Fourth Amendment in some other way in the course of events leading up to the seizure." Id. If a separate Fourth Amendment violation was committed, the "provocation rule" would provide a second path to liability for an officer's use of force and "render the officer's otherwise *reasonable*

defensive use of force *unreasonable* as a matter of law." Id. (quoted source omitted) (emphasis in original).  In rejecting the "provocation rule," the Court held that this approach "manufacture[d] an excessive force claim where one would not otherwise exist."  Id.

The Mendez Court, however, did not foreclose the possibility of recovery for injuries proximately caused by an unconstitutional entry occurring prior to the use of force. Indeed, the Court recognized that the harm proximately caused by two torts (warrantless entry and excessive force) may overlap.  Id. at 1548.  Yet, the two claims should not be conflated.  Rather, each claim must be analyzed separately to include damages and proximate cause.  Id. at 1548-49.  In fact, the Court remanded the case to the Ninth Circuit for an analysis of whether proximate cause allows the plaintiffs to "recover damages for their shooting injuries based on the deputies' failure to secure a warrant at the outset."  Id. at 1549.  Stated another way, the Supreme Court left open the possibility that a jury may "take into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it."  Id. at 1547 n.*.

In this case, genuine disputes of fact remain regarding whether the risks associated with the execution of an invalid search warrant were reasonably foreseeable.  The Court notes,

for instance, in viewing the evidence in the light most favorable to Plaintiff, that Defendants sought a warrant and chose to execute it at night upon a rural, secluded home of a man who the officers knew owned firearms and had been burglarized the day before.  Include therewith the fact that the officers did not knock and announce their presence, and a reasonable jury could conclude that the death of David Hooks was a reasonably foreseeable risk to their invalid entry.  Of course, the issue of whether David Hooks' conduct - the material details of which are hotly disputed by the parties - was a superseding cause of his own death should also be left to the jury in its consideration of causation.  Accordingly, genuine issues of material fact preclude the grant of summary judgment on these categories of damages.

### B. Plaintiff's Detention

As previously noted, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.  A "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied." Brower v. Cty. of Inyo, 489 U.S. 593, 596-97 (1989); see also Terry v. Ohio, 392 U.S. 1, 16 (1981) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a

trip to the station house and prosecution for crime - 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

Generally, a seizure is reasonable if it is supported by probable cause. Croom v. Balkwill, 645 F.3d 1240, 1246 (11th Cir. 2011) ("Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime."); Ortega, 85 F.3d at 1525 ("A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim. An arrest made with probable cause, however, constitutes an absolute bar to a section 1983 action for false arrest." (citing Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990))); Daniel v. Taylor, 808 F.2d 1401, 1403 (11th Cir. 1986) ("As a general rule, an official seizure of a person must be supported by probable cause, even if no formal arrest is made." (citing Dunaway v. New York, 442 U.S. 200 (1979)). "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is

committing an offense." Ortega, 85 F.3d at 1525 (citations omitted).

Notwithstanding the foregoing, "certain types of limited detentions — *i.e.* seizures lacking the essential attributes of full, custodial arrests — may be constitutional even in the absence of probable cause." Croom, 645 F.3d at 1246 (citing Terry, 392 U.S. at 20; and United States v. Place, 462 U.S. 696, 703 (1983)). One such category of permissible "limited detentions" are "temporary detentions by law enforcement of a premises' occupants while those premises are being searched pursuant to a search warrant." Id. at 1247 (citing Michigan v. Summers, 452 U.S. 692, 705, 101 (1981); and Muehler v. Mena, 544 U.S. 93, 100-02 (2005)). Nevertheless, even under this "categorical" exception to the probable cause requirement, an officer's actions in detaining an individual must be objectively reasonable in light of the facts available to the officer. See Croom, 645 F.3d at 1249 ("When evaluating a limited seizure under an exception to the probable-cause requirement, we look to the 'objective reasonableness' of the law enforcement officer's actions, asking: 'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'" (quoting Terry, 392 U.S. at 21-22)); see also Messerschmidt v. Millender, 565 U.S. 535,

61

547 (2012) ("[U]nder our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness.").

In the case establishing the "temporary detention during search pursuant to search warrant" exception to the general requirement that probable cause exist for a seizure, the Supreme Court stated that it was "[o]f prime importance . . . that the police had obtained a warrant to search [the detainee's] house for contraband" because "[a] neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who reside there" and therefore "detention of one of the residents while the premises [are] searched, although admittedly a significant restraint on [her] liberty, was surely less intrusive than the search itself." Summers, 452 U.S. at 701. Accordingly, the Supreme Court held that "for Fourth Amendment purposes, . . . a warrant to search for contraband *founded on probable cause* implicitly carries with it the limited authority to detain the occupants of the premises *while a proper search is conducted*." Id. at 705 (emphasis added) (footnotes omitted); see also id. at 705 n.21 ("Although special circumstances, or possibly a prolonged detention, might lead to a different conclusion in

an unusual case, we are persuaded that this routine detention of residents of a house *while it was being searched for contraband pursuant to a valid warrant* is not such a case." (emphasis added)).

Here, viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor, a reasonable factfinder could conclude that Defendant Harrell was the impetus for Plaintiff Teresa Hooks' detention or otherwise had knowledge of her detention by subordinate officers and failed to stop them from doing so. (See Harrell Dep. at 116-21.) Further, at least with respect to Defendant Harrell, Plaintiff has provided sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendant Harrell had arguable probable cause to believe that the search warrant was valid. See Section III.A, *supra*. That is, a reasonable factfinder could conclude that Defendant Harrell himself was aware - at the time he instructed Defendant Vertin to detain Plaintiff - that the search warrant was invalid. Were the factfinder to reach such a conclusion, no reasonable officer possessing the knowledge of Defendant Harrell could reasonably conclude that the detention of Plaintiff was lawful because he himself admits

63

that he lacked probable cause to detain her.[58]   Because
Plaintiff's right to be free from seizure absent probable
cause (or an exception thereto) was clearly-defined at the
time of her detention and Defendant Harrell has provided no
other lawful justification for Plaintiff's detention,[59]
Defendant Harrell is not entitled to summary judgment on this
issue.

But there is an even more fundamental reason why
Defendants Harrell and Vertin are not entitled to rely on the
"temporary detention during search pursuant to search warrant"
exception to the requirement that they have probable cause to
detain Plaintiff; no search occurred during - at least a
significant portion of - Teresa Hooks' detention.   Indeed, as
admitted by both Defendants Harrell and Vertin, they were
aware at the moment the officers fired their weapons that
neither they nor any other Laurens County officer would be
conducting a search pursuant to the search warrant.   (Harrell

---

[58] (See Harrell Dep. at 116-21 (only reasons for Teresa
Hooks' detention was safety of herself and officers and to
hold her until she could be interviewed *as a witness* by GBI
agents); see also Vertin Dep. at 42-47 (no probable cause to
arrest Teresa Hooks; rather, she was detained because it was
"standard" to "detain [anybody in the house] until the [GBI]
investigators decide whether they need them or not").)

[59] Defendants Harrell and Vertin themselves both argue
that "the case at bar is not a Terry stop case."   (Doc. No.
105, at 3; Doc. No. 104, at 9 n.4 ("Sheriff Harrell adopts by
reference as if restated verbatim herein . . . Section I of
[Defendant] Vertin's Reply Brief . . . .").)

64

Dep. at 113; Vertin Dep. at 47; see also Burris Dep. at 69-70;
Doc. No. 87-1, at 5.)   Further, they knew their only role
after the shooting was to secure the site until GBI agents
arrived and further admit they were aware that the premises
were secured by 11:15 p.m. - shortly after Plaintiff was taken
outside the residence.[60]  (See Harrell Dep. at 113; Vertin Dep.
at 47; see also Burris Dep. at 69-70; Doc. No. 87-1, at 5.)
Additionally, a Laurens County officer searched Plaintiff's
person during her detention and found nothing of note, yet
Defendants Harrell and Vertin continued to hold Plaintiff
without probable cause.[61]  (See Vertin Dep. at 41; Harrell Dep.

---

[60] While not argued by Defendants in their briefing,
Defendant Harrell testified that the only reasons he could
conceive of for Teresa Hooks' detention was for her own
safety, the safety of officers on the premises, and to ensure
she could be interviewed as a witness by GBI.  (See Harrell
Dep. at 116-21.)   While such rationale may in exigent
circumstances justify warrantless action, see, e.g., Riley v.
California, 134 S. Ct. 2473, 2494 (2014), United States v.
Place, 462 U.S. 696, 701-02 (1983), there is no indication
that such exigent circumstances existed at the time of Teresa
Hooks' detention given the premises had been secured by 11:15
p.m.  Indeed, allowing Plaintiff to leave the premises to go
to the hospital to attend to her dying husband would in no way
have impeded any search or investigation under the totality of
the circumstances; in fact, her continued detention most
likely hampered the investigation by unnecessarily diverting
manpower.  See Missouri v. McNeely, 569 U.S. 141, 149 (2013)
("To determine whether a law enforcement officer faced an
emergency that justified acting without a warrant, this Court
looks to the totality of circumstances.") (citations omitted).

[61] Again, the Court notes that Defendants Harrell and
Vertin themselves assert that this "is not a Terry stop case."
(See n.59, supra).  And while Defendants Harrell and Vertin
now attempt to argue that they would have had probable cause
to arrest Teresa Hooks for obstruction (i.e., O.C.G.A. § 16-

at 117-21.)

Belying any argument that the GBI agents' search of the Hooks residence was somehow an extension or continuation of the Laurens County officers' search is the undisputed fact that the GBI agents did not rely on the search warrant obtained by Laurens County officers; rather, the GBI agents sought - and were granted on September 25, 2014 at 1:52 a.m. - their own search warrant for the premises based on their belief that probable cause existed to believe the residence contained "evidence of violations of Aggravated Assault on a Police Officer O.C.G.A. [§] 16-5-21(c)" (i.e., the officer-involved shooting of David Hooks). (See Doc. No. 87-1, at 6-9.)  Indeed, in identifying the scope of evidence or contraband sought to be located on the Hooks premises, the search warrant obtained by GBI originally made no mention of controlled substances; rather, it was not until GBI agents sought the addendum to their own search warrant on September 26, 2014 that they began to search for methamphetamine or other controlled substances. (Compare id. at 6-9; with id. at 10 ("The GBI CSS began executing the search warrant issued to [Special Agent] Giddens on September 25, 2014.  The residence

---

10-24) because she purportedly "failed to comply with Defendant Vertin's orders/requests" (doc. no. 78-1, at 15), reaching such a conclusion would require the Court to weigh the evidence and resolve a genuine dispute of material fact - which is wholly inappropriate at summary judgment.  See Tolan, 134 S. Ct. at 1866.

has been secured by law enforcement agencies since that time; however, GBI agents have not conducted a search for methamphetamine and paraphernalia.").) Moreover, in this addendum, the attesting agent specifically states that "Laurens County Sheriff's Office personnel have **not** executed a search of the residence, vehicles and outside buildings located within the curtilage for methamphetamine and paraphernalia as authorized by the September 24, 2014 drug search warrant." (Id. at 10 (emphasis added).)

In sum, viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a reasonable factfinder could conclude that Defendants Harrell and Vertin improperly took it upon themselves to treat the original search warrant for the Hooks premises and its occupants as an arrest warrant for Plaintiff or otherwise chose to detain her without probable cause or valid exception thereto (or at the very least expanded her detention past the clearly-established boundaries of such exception). See Muehler v. Mena, 544 U.S. 93, 101 (2005) ("[A] lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." (internal quotations and citations omitted)). Indeed, no reasonable officer could have concluded that there was a justifiable benefit to detaining Plaintiff because the premises were

secured, she was not a suspect, and she was readily available for interview at any subsequent point. See Mincey v. Arizona, 437 U.S. 385, 393 (1978) ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."). Moreover, the law was clearly-established at the time of this detention that: (i) the general rule is that - absent an established exception thereto - probable cause is required to seize an individual "even if no formal arrest is made;" and (ii) the "temporary detention during search pursuant to search warrant" exception only applies "while a proper search is conducted." See Summers, 452 U.S. at 696, 705 (citations omitted); see also Mena, 544 U.S. at 101; Croom, 645 F.3d at 1247; Prevo, 435 F.3d at 1345.

Accordingly, viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor, Defendants Harrell and Vertin's detention of Plaintiff was not objectively reasonable because no reasonable officer could believe their actions were appropriate in the absence of probable cause or an established exception thereto. See Croom, 645 F.3d at 1249. Therefore, summary judgment is not appropriate on this issue.

## IV. CONCLUSION

Even under the rigorous standards imposed by qualified immunity, the Court concludes that Defendants are not now entitled to judgment as a matter of law.  The record, viewed in the light most favorable to Plaintiff, establishes genuine disputes of material fact that preclude the protection of qualified immunity.  These disputed facts include, but are not necessarily limited to the knowledge, actions, and intent of Defendants at the time they sought and executed the search warrant for the Hooks residence and the facts and circumstances attendant to Teresa Hooks' detention.  These issues of fact and inference turn on credibility: obviously, the credibility of Rodney Garrett is important, but the credibility of Defendants Brewer, Harrell and Vertin are also under scrutiny here.  Credibility determinations are particularly within the province of the jury.  If there ever was a case before me involving an assertion of qualified immunity that demanded a trial by jury, this is it.

Moreover, at this pivotal summary judgment phase of the case, it is appropriate to emphasize that the Court makes no factual findings but accepts the facts plead by Plaintiff, **all reasonable inferences** therefrom being drawn in favor of Plaintiff, who opposes the defense motions.  The Court will not attempt to chronicle or catalogue the reasonable

69

inferences which may flow from facts plead. Suffice it to say that a jury may find many more than those which presently occur to the presiding judge. For example, while the Court has confined its examination of the conduct of Sheriff Harrell and Sergeant Brewer to the moment of their submission of the search warrant application to the Magistrate, reasonable jurors may attach critical importance to the animus of Sheriff Harrell in gratuitously publishing false statements of DNA evidence purporting to link David Hooks to the methamphetamine found in possession of Rodney Garrett. (See Harrell Dep. at 149-52.) This single example may manifest itself inferentially in manifold ways. Suffice it to say that reasonable inferences from Plaintiff's factual allegations abound, belying the protestations of simplicity proffered by the defense under the rubric of qualified immunity. Facially, this case is one where, on the defense side perhaps a dozen eye witnesses are available and may testify. On Plaintiff's side, there were but two, one dead and one survivor, who was sequestered shortly after the shooting of her husband. Reasonable inferences drawn from all the facts established by the evidence in the case have at least the potential to overcome the apparent disparity in eye witness testimony. Inferences therefore are also of critical importance. Under the circumstances, it is all the more appropriate that this

case, the facts which may be developed by the evidence adduced at trial, and all reasonable inferences flowing therefrom, should be subjected to scrutiny under the bright and revealing light of a jury trial.

Upon the foregoing and due consideration, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's claims. Accordingly, Defendants' respective motions for summary judgment (doc. nos. 75, 77, 78) are **DENIED**.[62]

**ORDER ENTERED** at Augusta, Georgia, this ___29th___ day of January, 2018.

UNITED STATES DISTRICT JUDGE

---

[62] Plaintiff and Defendants have also filed motions to exclude the proposed testimony of the parties' respective expert witnesses. (See Doc. Nos. 73, 74.) These motions remain pending before the Court and will be addressed in subsequent separate orders.