[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10628
_____

D.C. Docket No. 3:16-cv-00023-DHB-BKE

TERESA HOOKS, et al.,

Plaintiffs-Appellees,

versus

CHRISTOPHER BREWER, et al.,

Defendants-Appellants.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(June 19, 2020)

Before JORDAN, GRANT, and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

In 2014, David Hooks (hereafter "Hooks") called the Laurens County Sheriff's Department to report a robbery on his property.  Several items including a car went missing, so he asked officers to investigate, and they did.  The next day, Hooks was dead—shot and killed in his home by the same police department he had called seeking help.

The district court ruled that all claims must go to trial, so it denied qualified immunity to the officers, and they now appeal.  On some claims, we agree, and on others we do not.  We affirm in part, reverse in part, and remand.

## Background

*The Shooting*.  As Teresa Hooks (hereafter "Teresa") got ready for bed one night in late September 2014, she looked out an upstairs window and saw several men clad in dark clothing running toward the back of her home.  Her husband was asleep downstairs.

The day before, the Hooks's property had been robbed, so when dark-clothed men rushed toward the door shortly before midnight, Teresa was alarmed.  She ran downstairs, banging on the walls to wake her husband.  Hooks emerged from his slumber naked, holding a shotgun, and he asked his wife what was happening.  The Hooks feared they again were being robbed.

But the men at the door were not there to break the law—they were the law. Believing Hooks was involved in the meth trade, members of the Laurens County

Sheriff's Response Team had come to execute a search warrant. Officers breached the door, and seconds later they fired twenty-three shots. Hooks suffered fatal wounds.

*The Previous Day*. To understand what led up to the shooting, we must go back to the day before. That's when Hooks noticed things missing from his property in East Dublin, Georgia, including a Lincoln Aviator and several guns. He called police, and Sgt. Robbie Toney and Deputy Brian Fountain went to the Hooks home to investigate. Hooks showed the officers around his property while Toney tried to collect fingerprints, which was unsuccessful. Hooks thought former employees might be to blame, but he was not sure, so police left with plans to stay in touch with Hooks. Toney left Hooks a voicemail the next morning and went to the Hooks property, but no one was home.

*The Garrett Arrest*. At the same time, Laurens County Sgt. Ryan Brooks received a call from Beverly Garrett that her husband was having health issues. In truth, though, the Garretts lured Brooks over because they wanted their son, Rodney Garrett (hereafter "Garrett"), to turn himself in. Garrett had a warrant out for stealing a truck, and when police arrived, he walked out of the woods and said he messed up.

Garrett had been living in the woods to avoid police. He told Brooks about the truck theft, but also about a different car—a Lincoln Aviator. Garrett had the Aviator in his possession, so Brooks ran the VIN number, and the vehicle came back

3

stolen—it was from the Hooks's property.  Garrett explained that he had been wandering down the highway and randomly came across the Hooks's home, walked up the driveway, and noticed the Aviator was unlocked.  So was another vehicle on the property, and in that car, Garrett took digital scales, some money, and a bag.  Then, Garrett said he went into the Hooks's garage, took a shotgun and rifle, and returned to the Aviator with his loot to drive off.

Garrett stopped at a gas station, opened the bag, and noticed a large amount of methamphetamine in it.  Garrett, a known meth user who was admittedly high when he stole the Hooks's property, said the drug quantity scared him.  Only a well-connected dealer would have so much meth, Garrett said, so he thought it best to turn himself in.

Eventually, Sgt. Christopher Brewer and Corporal Timothy Burris arrived at Garrett's property, searched the inside of the Aviator, and found two guns, as well as a black metal case, which apparently contained the meth.  Deputies asked Garrett about other property in his shop, but Garrett denied anything else was stolen.

Back at the Sheriff's Office, Sgt. Lance Padgett, Brooks, Brewer, and Burris questioned Garrett, who relayed the same information about the drugs and guns.  Garrett also told police he regularly received meth from his friend Chris Willis, with whom he lived in a tent in the woods.  Garrett denied knowing Hooks, but police believed they had enough information to search Hooks's property.

***The Warrant***.  Worried that Hooks might learn about Garrett's arrest, Brewer acted quickly to obtain a search warrant.  In the warrant affidavit, Brewer included the Garrett information, as well as information from a prior investigation involving a man named Jeffrey Frazier.  In that case from five years earlier, Frazier told police he supplied Hooks with meth from Atlanta.  Both Brewer and Burris investigated at the time, but nothing ever corroborated Frazier's claim, and no file was ever opened on Hooks.  Yet, Brewer's warrant affidavit stated:

> Your affiant is familiar with the residence and the occupant of the residence, David Hooks, from a prior narcotics investigation involving Jeff Frazier.  During this investigation Frazier had been interviewed by law enforcement and stated that he had been the source of supply for multiple ounces of methamphetamine to Hooks which Hooks was redistributing.

The affidavit also stated that Garrett had "provided other information which led to the recovery of stolen property which law enforcement was unaware of prior to this confession."

A magistrate judge signed the search warrant at 9:56 p.m., just over two hours after police interviewed Garrett.  The warrant allowed police to search the Hooks residence and curtilage.  Sheriff William Harrell did not review the application, but he agreed that Brewer had probable cause based on what Brewer told him.

***Warrant Meeting and Execution***.  Officers then decided to bring in the Sheriff's Response Team to execute the warrant that evening.  Moving quickly was important, Brewer claimed, because police had concerns that Hooks could destroy

5

evidence.  During the meeting, officers discussed the fact that Hooks had just been robbed and had weapons on the property, so they were told to be on high alert.

Shortly before midnight, a line of cars approached the Hooks's property. Teresa saw the cars, but did not know they were law enforcement, so she rushed downstairs, and tried to wake up her husband.  As officers began pounding on the back door, Hooks came out of a bedroom, holding a gun.

Deputy Kasey Loyd, an officer involved in the execution of the warrant, said he saw a man and woman through the backdoor window and police knocked for about thirty seconds before entering the house.  At that point, Hooks ran toward the dining room, shotgun in hand.  That was the last time Teresa saw her husband alive. Seconds later, police fired shots, killing Hooks after, officers claim, he raised his gun.

Teresa ran into the master bedroom, locked the door, called her son to report that they were being robbed, and asked him to contact 911.  After a few moments, Teresa recognized the sound of police radios, opened the bedroom door, and was handcuffed by Officer Steve Vertin.  Vertin took Teresa out the backdoor and had her sit in a chair by the pool.

At that point things had changed.  No longer would the Response Team be conducting the search it expected.  Instead, the Georgia Bureau of Investigation would take over.  Harrell knew "the search warrant was not going to go any further."

Although not under arrest, Teresa was not free to leave until, Vertin testified, "GBI investigators . . . deemed she could go."  A woman officer searched Teresa but found nothing.

After the GBI interviewed her, Teresa had zip-tie handcuffs removed and was free to leave.  She rushed to the hospital in Macon, but her husband had already died.

Police did not find any drugs.

*The Lawsuit*. Teresa sued officers on behalf of Hooks's estate, as well as in her own capacity, alleging that the search of her home, the shooting death of her husband, and her detention violated the Fourth Amendment.  She claimed that police included false information and omitted key facts in the warrant affidavit, making it and the warrant's execution invalid.  Invoking qualified immunity, officers moved for summary judgment, but the district court denied the motion.

## Jurisdiction and Standard of Review

Under the collateral order doctrine, we may review an interlocutory appeal of a district court's summary judgment order denying qualified immunity.  *Behrens v. Pelletier*, 516 U.S. 299, 306-08 (1996).  In exercising that authority, we (1) give no deference to the district court and (2) view all evidence and make all inferences in favor of the non-moving party.  *Perez v. Susczynski*, 809 F.3d 1213, 1216-17 (11th Cir. 2016).  Viewing the record that way, we determine whether qualified immunity shields officers—that is, whether the officers violated clearly established law.  *Id*.

We do not address factual disputes; we focus on purely legal questions. *Mitchell v. Forsyth*, 472 U.S. 511,530 (1985).

## Discussion

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Usually, a warrant establishes probable cause, but not when "the magistrate . . . issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984). When that occurs, the warrant is invalid if, without that information, the warrant would lack probable cause. In considering probable cause, we do not isolate events, but consider the "totality of the circumstances," to decide whether there was a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Affidavits support probable cause when they "establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

Probable cause is "not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)). The mere "probability or substantial chance of criminal activity" is all that is needed. *Id.*

(quoting *Gates*, 462 U.S. at 243-44 n.13). This "flexible and fluid concept" turns on examining all information together. *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). Nothing even approaching "conclusive proof or proof beyond a reasonable doubt" is required. *Id.* And police need not "resolve every inconsistency found in the evidence." *Id.* Officers just have to be reasonable given the totality of the circumstances. *Id.*

At the same time, affiants cannot lie or omit critical information. *Paez*, 915 F.3d at 1286. In *Franks v. Delaware*, 438 U.S. 154, 171 (1978) the Supreme Court held that a warrant fails to provide probable cause if it includes a "deliberate falsity or . . . reckless disregard" for the truth. In those situations, courts put aside all the recklessly included false information and determine whether the affidavit still supports probable cause. *Id.* This also extends "to information *omitted from* warrant affidavits." *Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997) (emphasis added). Minor or insignificant omissions, on the other hand, cannot invalidate a warrant. *Id.* at 1327.

To determine if officer conduct invalidates a warrant, then, we first ask if the affidavit included any "intentional or reckless misstatement or omission." *Paez*, 915 F.3d at 1287. Recklessness occurs when an officer "should have recognized the error, or at least harbored serious doubts" about the information. *United States v. Kirk*, 781 F.2d 1498, 1503 (11th Cir. 1986). An officer cannot ignore "easily

discoverable facts" and "choose to ignore information." *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004). If we determine that the officer acted recklessly, then, at the second step, we ask if those misstatements and omissions were material to the probable cause determination. *Paez*, 915 F.3d at 1287.

Taking all inferences in Teresa's favor, Brewer is not entitled to qualified immunity. First, Brewer made reckless misstatements and omissions. For example, Brewer's affidavit recites that Frazier told police Hooks was "redistributing" meth, but Frazier never said as much. Indeed, Corporal Burris—the person who interviewed Frazier at the time—could not remember Frazier's saying Hooks provided meth to *any* third party.

What's more, the investigation happened five years earlier, and nothing corroborated Frazier's claims. Police never interviewed Hooks, and no file was opened. Reading Brewer's affidavit gives one the impression that Frazier had the goods on Hooks. Brewer should have realized this, or at least had serious doubts about the Frazier information. *Madiwale*, 117 F.3d at 1326-27; *Kirk*, 781 F.2d at 1503. Otherwise *any* information that someone at one time told police about someone else—no matter how old, or how wrong—could be used to support probable cause.

Nor can Brewer prevail by claiming he cleared the affidavit with Burris. He tries, arguing that if Burris saw the affidavit and confirmed it, then the act cannot be

reckless—at worst, that's negligence, he claims.  But the extent of his discussion with Burris is a factual claim, not a legal one.  After all, a quick look at the record makes it far from clear what happened.  Brewer testified that he "believe[d]" he talked with Burris about Frazier but when asked if he "talk[ed] to Burris about his contact with Frazier," Brewer "hesitate[d] to swear to that under oath."  Brewer could not "recall specific questions that we talked about or information that we referenced," but it was "not . . . when was the time, what was the setting, where were y'all at."  Burris, too, was vague.  All he could say was that he "probably" looked at the warrant, but he could not "say for certain."  Nor could Burris "specifically recall looking through" the warrant application.  Yet, defendants claim that this record, *as a matter of law*, requires dismissal.  Not so.  Ultimately, Brewer's discussions with Burris *might* have provided a reason for including the Frazier information, but that's a factual question—one that lies beyond our reach at this time.

The same can be said about the affidavit's Garrett paragraph.  Brewer, presumably to bolster Garrett's credibility, wrote that Garrett "provided *other* information which led to the recovery of stolen property which law enforcement was unaware of prior to this confession."  (emphasis added).  It is true that police asked Garrett about other property—a four-wheeler, a generator, a chainsaw, a miter saw, and more.  Then, only hours later, Brewer submitted his affidavit.  So what supported his claim that Garrett's information led to recovery of previously unknown stolen

11

property?  In briefing, defendants say that Garrett admitted those items were stolen, but he did not.  Garrett said he bought the four-wheeler.  He denied any involvement with alleged stolen tools and a generator.  He claimed a trailer was his, that he bought a chainsaw, as well as cutting torches and a miter saw.  Like the district court, we are "unable to locate any crimes—other than his rampant prior possession and use of [drugs] and the theft of the Hooks's property" that Garrett admitted to.  This is something Brewer should have known—indeed probably *did* know considering his involvement in the Garrett interview.   Or, put another way, including this information in the affidavit was reckless.  *Kirk*, 781 F.2d at 1503.

And clearly so.  Thus, qualified immunity does not protect Brewer's conduct. *Wesby*, 138 S. Ct. at 589.   True, Brewer was not required to "resolve every inconsistency in the evidence," *Paez*, 915 F.3d at 1286, or "explore and eliminate every theoretically plausible claim of innocence," *Kingsland*, 382 F.3d at 1229.   But nor could he turn a blind eye to easily discoverable facts and ignore critical information.  *Id.*  Indeed, an officer must make some "basic investigatory steps." *Howard v. Gee*, 538 F. App'x 884, 890 (11th Cir. 2013).  Brewer was not required to turn over every rock to confirm Frazier's story, but he should do *something* to ensure the affidavit's accuracy.  *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).  And on that point, the record does not establish, as a matter of law, that Brewer did so.

Still, the misstatements and omissions must be material to the probable cause determination. *Paez*, 915 F.3d at 1287. If an officer recklessly includes irrelevant information in an affidavit, then probable cause remains intact and defendants prevail. *Id.* To determine materiality we delete the misstatements, include the omissions, and ask whether the affidavit still establishes probable cause. *Id.*; *Kirk*, 781 F.2d at 1502. Here, that means eliminating: (1) the Garrett "other crimes" information, and (2) the fact that Frazier said Hooks distributed drugs. And it means including: the five-year-old Frazier investigation turned up no information on David Hooks, and none of Frazier's claims had been corroborated. All police would have in this "new affidavit" is Garrett's saying he stole drugs from Hooks and questionable information from Frazier. Nothing would support drugs in the Hooks's home. The question is: does this amount to probable cause to search the Hooks's home? We think not. Although probable cause requires only a minimal showing, a warrant affidavit cannot be so hollow as to be meaningless—it must include a "probability or substantial chance of criminal activity." *Wesby*, 138 S. Ct. at 586.

Remember though, this is a qualified-immunity case. And that means plaintiff must show defendants not only violated constitutional rights—they violated clearly established ones. *Wesby*, 138 S. Ct. at 589-90. We define the right at issue with a high degree of specificity before determining whether the officer exceeded constitutional bounds. *Id.* at 590. So while it is clearly established that an officer

13

may not recklessly make material misstatements and omissions in a warrant affidavit, *Madiwale*, 117 F.3d at 1226-27, we must determine it was clearly established that *Brewer's conduct* violated these principles, *Wesby*, 138 S. Ct. at 589-90. That typically means that binding precedent controls the case, but such precedent need not be identical—it must only "squarely govern" our case. *Kisela v. Hughest*, 138 S. Ct. 1148, 1153 (2018) (per curiam).

Plenty of authority does. Misstatements and omissions in affidavits pierce qualified immunity only when the "new affidavit" lacks even *arguable* probable cause. *Madiwale*, 117 F.3d at 1324. This not-quite-probable-cause standard turns on whether "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). But it also requires us to consider whether an officer "in the *same circumstances* and possessing the *same knowledge*" as Brewer could have thought there was a significant chance that Hooks had methamphetamine in his home. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (emphasis added). If factual questions remain about the information Brewer "possessed or could have possessed" we cannot conclude arguable probable cause existed because we cannot say that an officer with the *same information* as Brewer could think probable cause existed. *Kingsland*, 382 F.3d at 1232.

And those are things we do not know.  Brewer was involved in the 2009 Frazier investigation, so he may have known that Frazier's information was bunk.  Or, maybe not.  Plus, the record is vague as to whether Brewer asked Burris about the Frazier investigation before submitting the affidavit.  In other words, there is a "question[] of fact regarding the information [Brewer] *possessed or could have possessed*."  *Kingsland*, 382 F.3d at 1232.  And "when it is unclear how much of the proffered evidence tending to support a finding of arguable probable cause was . . . misrepresented," we decline to find arguable probable cause.  *Id.*  If it turns out that Brewer knew the Frazier information was a misrepresentation and that he never confirmed it with Burris (or anyone else), his conduct would "create[] factual issues as to . . . honesty and credibility," *id.*, thus meaning officers "possessing the same knowledge" as he could not have reasonably thought probable cause existed, *Grider*, 618 F.3d at 1257.  Besides, whether Frazier's information could establish arguable probable cause largely turns on the "veracity, reliability, and basis of knowledge, as well as any independent corroboration of the details of the tip."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1254 (11th Cir. 2013).  No doubt, the veracity and reliability of Frazier's information—and what Brewer knew about it—remains in play.

In short, we accept plaintiff's story and answer the pure legal question of whether that version amounts to a violation of clearly established law.  *Al-Amin v.*

*Smith*, 511 F.3d 1317, 1325 (11th Cir. 2008). In this context, a defendant does not violate clearly established law if he has arguable probable cause. But that turns on circumstances the defendant faced and knowledge the defendant had. And because those things are not clear, we cannot grant summary judgment to Brewer.

We reach the opposite result for Vertin and Harrell. As to Vertin, Teresa argues that he illegally detained her outside her house. But, at the very least, Vertin did not violate any clearly established law, so he is entitled to qualified immunity. *See Croom v. Balkwill*, 645 F.3d 1240, 1246-47 (11th Cir. 2011). Officers may temporarily detain occupants of a house while executing a search warrant. *Muehler v. Mena*, 544 U.S. 93, 98 (2005). Yes, the GBI took over the investigation and Laurens County officers never executed the warrant they intended to, but there is no authority—let alone clearly established authority—that suggests this distinction makes a difference. *Wesby*, 138 S. Ct. at 589-90.

As to Harrell, the unlawful detention claim fails because Vertin is entitled to qualified immunity. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013). And on the illegal search claim, plaintiff cannot meet the "extremely rigorous" supervisor-liability standard. *Piazza v. Jefferson Cty.*, 923 F.3d 947, 957 (11th Cir. 2019). Harrell must have "either directly participated in the unconstitutional conduct" or there must be "a casual connection . . . between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1047

(11th Cir. 2014).  Neither exists here.  Harrell was at the warrant execution meeting, but nothing suggests he was personally involved in unconstitutional conduct.  *See Smith v. LePage*, 834 F.3d 1285, 1298 (11th Cir. 2016).  He also had no role in securing the warrant.  He did not "direct[] subordinates to act unlawfully or kn[o]w that the subordinates would act unlawfully and fail[] to stop them from doing so."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  And nothing shows that Harrell "had subjective knowledge of a risk of serious harm" to the Hooks that he recklessly disregarded."  *Keith*, 749 F.3d at 1048.  So he keeps his qualified immunity shield.

Two final notes: First, Teresa can pursue punitive damages against Brewer.  Such damages are available in a § 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 55 (1983).  Hooks may attempt to prove this at trial.

Second, we do not address defendants' proximate-cause argument because it is outside our grasp.  In reviewing the denial of qualified immunity, we have jurisdiction over only the legal issue of whether the defendant violated clearly established law, which does not include whether a genuine factual dispute exists as to an element of a claim (such as causation).  *See Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1344 (11th Cir. 2013).  The causation issue is not "inextricably

intertwined" with immunity, so we could not exercise pendent jurisdiction over it, either. *See Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016).

We **AFFIRM** the district court's order as to Brewer, **REVERSE** as to Harrell and Vertin, and **REMAND** for further proceedings consistent with this decision.

JORDAN, Circuit Judge, concurring in part and dissenting in part.

For the reasons stated in the majority opinion and in the district court's order, I agree that Officer Brewer is not entitled to qualified immunity on the unreasonable search claim.  I also agree that Sheriff Harrell should not be held liable in his supervisory capacity on any claim, and that Ms. Hooks is entitled to pursue punitive damages.

I part ways, however, with the majority's holding that the two-hour detention of Ms. Hooks in cuffs following the shooting of her husband did not violate clearly established law.  This detention of an innocent person—without probable cause, without a contemporaneous execution of a valid search warrant, and without exigent circumstances—is a clear Fourth Amendment violation far outside any narrow exception permitted by Supreme Court precedent.  With respect, I dissent from the grant of qualified immunity to Officer Vertin and Sheriff Harrell on Ms. Hooks' detention claim.

* * * * *

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  A person is "seized" within the meaning of the Fourth Amendment when "there is a governmental termination of freedom of movement through means intentionally applied."  *Brower v. Cty. of Inyo*, 489 U.S. 593, 597

(1989) (emphasis omitted).  *See also Terry v. Ohio*, 392 U.S. 1, 16 (1981) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

As a "general principle . . . Fourth Amendment seizures must be supported by the 'long prevailing standards' of probable cause[.]"  *Dunaway v. New* York, 442 U.S. 200, 212–13 (1979) ("The requirement of probable cause has roots that are deep in our history.") (citation and internal quotation marks omitted).  *See also Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[E]very arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."); *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) (same).

The Constitution permits certain types of limited exceptions to this general rule, including some detentions not supported by probable cause.  *See, e.g., Terry*, 392 U.S. at 20.  The guiding principle is reasonableness—"balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *United States v. Place*, 462 U.S. 696, 703 (1983).  But unless one of these exceptions applies, all prolonged detentions must be supported by probable cause.  *See Dunaway*, 442 U.S. at 210–13.

The majority bases its resolution of Ms. Hooks' detention claim on a narrow rule articulated in *Summers*, 452 U.S. at 704–05. *Summers* permits "temporary detentions by law enforcement of a premises' occupants while those premises are being searched pursuant to a search warrant." *Croom v. Balkwill*, 645 F.3d 1240, 1247 (11th Cir. 2011) (citing *Summers*, 452 U.S. at 705). *See also Muehler v. Mena*, 544 U.S. 93, 100–02 (2005) (officers acted reasonably by detaining an occupant in handcuffs for two to three hours while a search of the premises was in progress given the fact that the warrant sought weapons and evidence of gang membership).

The problem with relying on *Summers*, of course, is that no search was ever conducted during the detention of Ms. Hooks. After the shooting, Officer Vertin handcuffed Ms. Hooks with metal handcuffs behind her back, took her out the back door to the side of the house, and had her sit on a patio chair by the pool. Another officer searched Ms. Hooks' person and found nothing of note. Officer Vertin removed the metal handcuffs and replaced them with plastic zip-tie handcuffs. Ms. Hooks' detention continued up to and through her eventual interview by GBI officers approximately two hours after her initial escort from the interior of the house. She was not permitted to leave the premises until approximately 1:30 a.m.

Both Officer Vertin and Sheriff Harrell testified that as soon as the shooting occurred, they knew Laurens County officers could not execute the search pursuant to the search warrant. This was because the established policy for officer-involved

shootings was to secure the premises, cease any further investigation, and await the arrival of GBI to conduct an independent investigation.  Significantly, even GBI did not conduct a search during the time Ms. Hooks was detained.  In fact, GBI agents did not acquire a search warrant for the Hooks residence until approximately 1:52 a.m.—after Ms. Hooks was released.  Thus, Ms. Hooks' detention was not incidental to *any* search whatsoever, as neither the GBI nor Laurens County officers conducted a search during the two-hour detention.

The majority does not address this fundamental contradiction with the precedent it cites.  It says only that it finds irrelevant the fact that Laurens County officers did not execute their original search warrant because GBI took over the investigation.  *See* Maj. Op. at 16.  In just a few sentences, and without directly saying so, the majority endorses a dramatic broadening of what the Supreme Court intended to be an *exception* to the general rule that a seizure of this nature and duration must be supported by probable cause.  *See Bailey v. United States*, 568 U.S. 186, 200 (2013) ("Because [the *Summers*] exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment, it must be circumscribed.").  The majority's extension is so broad, in fact, that it essentially eliminates one of the exception's core elements: the requirement of a contemporaneous search pursuant to a valid warrant.

The majority's expansion of *Summers* (and *Mena*) would permit officers to detain innocent people virtually indefinitely, absent probable cause, as long as some warrant for the premises exists and some search is expected to happen eventually (whether or not the search is contemporaneous with the detention, or even imminent).  The Supreme Court intended *Summers* to be a "categorical" exception not subject to ad hoc determination.  *See Mena*, 544 U.S. at 97–98.  *See also Bailey*, 568 U.S. at 193 ("The rule announced in *Summers* allows detention incident to the execution of a search warrant[.]").  By extension, the inverse of *Summers* must be similarly categorical: when no search is contemporaneously executed, its exception does not apply.  We are simply not at liberty as a court of appeals to fashion Fourth Amendment exceptions beyond what the Supreme Court has specifically authorized.

\* \* \* \* \*

That is not my only concern.  Assuming that the initial brief detention of Ms. Hooks was reasonable—and I believe it was, given the dangerous series of events that preceded it and the officers' need to secure the premises for safety—there was no justification for her continued lengthy detention in cuffs once the interests justifying that detention disappeared.  As explained in *Croom*, "a seizure that is reasonable at its inception may quickly become *unreasonable* if it extends beyond its unique justification."  645 F.3d at 1250 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

In the related *Terry* stop context, for example, the Supreme Court has held that the police may not extend an otherwise lawful traffic stop—without reasonable suspicion—to conduct an unrelated investigation. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) ("A seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation.") (citation and internal quotation marks omitted). Indeed, as we recently recognized, when it comes to unlawfully prolonged detentions, even a relatively short prolongation violates the Constitution. *See United States v. Campbell*, 912 F.3d 1340, 1355 (11th Cir. 2019) (officer's 25-second-long questioning of a driver about "crime in general" impermissibly prolonged an otherwise lawful traffic stop and violated the Fourth Amendment because it was unrelated to the initial purpose of the stop and unsupported by reasonable suspicion) (quoting *Rodriguez*, 135 S. Ct. at 1616).

As set forth above, Ms. Hooks was held in cuffs for two hours while her husband was dying in the hospital, even though no search was being conducted. The Supreme Court—and we—have permitted detentions as long or longer than the one endured by Ms. Hooks, but in all of those cases the detentions were incident to and during the execution of a valid search warrant. *See Mena*, 544 U.S. at 97–98; *Croom*, 645 F.3d at 1249; *Daniel v. Taylor*, 808 F.2d 1401, 1402 (11th Cir. 1986). That critical fact is missing here.

Not only was Ms. Hooks' detention not incidental to any search, but the justifications for the *Summer* exception did not exist.  *See Bailey*, 568 U.S. at 194 (cautioning that the *Summers* "exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale"). The Supreme Court has identified "three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight."  *Id.* (quoting *Summers*, 452 U.S. at 702–03) (internal quotation marks omitted).  Not one of these interests justified the detention of Ms. Hooks.

First, Sherriff Harrell and Officer Vertin did not detain Ms. Hooks to facilitate the completion of the search (e.g., "to open locked doors or locked containers").  *See Summers*, 452 U.S. at 703.  As they both acknowledged in their depositions, they knew they would not be searching the premises as soon as they heard Mr. Hooks had been shot, because GBI would take over.  Thus, they knew they would not be needing Ms. Hooks' assistance to aid in a search.

Second, although Sheriff Harrell claimed that he detained Ms. Hooks to ensure officer safety, there was no reason to believe Ms. Hooks posed a safety risk. Unlike in *Mena*, 544 U.S. at 100, where the officers executed a search warrant of premises where "a wanted gang member reside[d]"—an "inherently dangerous

situation[ ]"—here, there was no evidence Ms. Hooks was dangerous, there was no reason to suspect her of any wrongdoing, and no charges against her were contemplated.  An officer had already searched her person, and Sheriff Harrell and his deputies had control of the premises.

Third, flight was not a concern.  As the Supreme Court explained in *Summers*, flight becomes a risk "in the event that incriminating evidence is found."  452 U.S. at 702.  But neither the Lauren County officers nor GBI were searching for evidence implicating Ms. Hooks, and there was no indication or fear that she would flee. Sheriff Harrell stated in his deposition that Ms. Hooks "need[ed] to be there until the GBI talked to her *as a witness*." D.E. 83-8 at 121:11–12 (emphasis added).  Yet there was no reason to believe she would not freely and willingly make herself available to GBI later as a witness.

Holding Ms. Hooks in cuffs for two hours for questioning (when no search was being conducted) was not a valid reason to prolong a detention under *Summers*. *Cf. Mena*, 544 U.S. at 101 (holding that questioning Mena about her immigration status during the detention did not violate the Fourth Amendment because "the Court of Appeals did not find that the questioning extended the time Mena was detained"). Not surprisingly, our sister circuits have rejected the application of *Summers* to witness-detention scenarios divorced from the execution of a search warrant.  *See Cruz v. Barr*, 926 F.3d 1128, 1144 (9th Cir. 2019) (explaining that although officers

26

may ask questions of *Summers* detainees, that "does not allow officers to conduct a *Summers* detention *for the purpose* of obtaining answers from detainees" or to "hold[ ] them long beyond the length of the search so they can be further interrogated"); *United States v. Watson*, 703 F.3d 684, 695 (4th Cir. 2013) (holding that *Summers* did not apply to officers' three-hour detention of a building occupant, while the officers sought to obtain a search warrant for the building, because "the presence of a search warrant was central to the Court's decision" in *Summers*).

As explained earlier, absent an exception to the probable cause requirement, Ms. Hooks' detention is governed by the "general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway*, 442 U.S. at 213. The majority says the prolonged detention of Ms. Hooks did not violate any clearly established law, *see* Maj. Op. at 16, but the Fifth Circuit holds otherwise.

In *Heitschmidt v. City of Houston*, 161 F.3d 834 (5th Cir. 1998), the plaintiff, who was not a target of the police's investigation and was not suspected of any wrongdoing, was detained for four hours in handcuffs while the police searched his house during an investigation of illegal activity by another occupant. *See id*. at 835–36. The Fifth Circuit reversed the district court's grant of qualified immunity to the officers, holding that the plaintiff sufficiently alleged a violation of his clearly established right to be free from an unreasonable seizure. *See id*. at 839. In reaching this conclusion, the Fifth Circuit explained that the justifications supporting the

plaintiff's detention were "far less persuasive than was the case in *Summers*"—the plaintiff was not trying to flee, the officers had no reason to believe he was involved in any crime, and there was no reason to believe he would endanger the officers. *See id*. at 838–39 ("While the existence of a search warrant may, in some circumstances, support a reasonable belief that anyone present at the premises to be searched is engaged in criminal activity . . . that justification is significantly weakened when, as here, police know the occupant's identity and yet have no articulable reason for suspecting that person of criminal activity.").

Here, as in *Heitschmidt*, there was no justification for the prolonged detention of Ms. Hooks, who was a witness to the police shooting her husband but not a suspect of any crime. As the district court aptly noted: "[A]llowing [Ms. Hooks] to leave the premises to go to the hospital to attend to her dying husband would in no way have impeded any search or investigation under the totality of the circumstances; in fact, her continued detention most likely hampered the investigation by unnecessarily diverting manpower." D.E. 131 at 65 n.60. The majority does not explain why the result here should not be the same as in *Heitschmidt*.

\* \* \* \* \*

Even if we were to assume that the general requirement of probable cause does not control, we would have to review the detention of Ms. Hooks under the longstanding Fourth Amendment principle of reasonableness, which requires

"balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703. "[W]e look to the 'objective reasonableness' of the law enforcement officer's actions, asking: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Croom*, 645 F.3d at 1249 (citations and internal quotation marks omitted).

After the shooting of her husband, Ms. Hooks was cuffed with zip-ties, searched, and placed in a chair by the pool on the side of her house. There she stayed for approximately two hours in the rain, at all times bound with zip-ties. She was held even though Officer Vertin and Sheriff Harrell testified there was no probable cause to arrest her. They also understood that, after the shooting of Mr. Hooks, no search of the premises would be conducted by Laurens County officers.

The two-hour involuntary detention of Ms. Hooks, while she was restrained by zip-tie cuffs and confined to a chair, hardly strikes me as a "slight" intrusion into her Fourth Amendment protected interests. Not only was the detention lengthy, but handcuffs as a use of force made the detention "more intrusive" than what was authorized in *Summers*. *See Mena*, 544 U.S. at 99.

Even if we accept that the intrusion here was "slight," the government interests on the other side of the Fourth Amendment ledger cannot be characterized

as "substantial" as to justify the prolonged seizure.  As discussed, the officers' articulated purposes for Ms. Hooks' detention were safety and awaiting the arrival of GBI to interview her.  But once the premises were secured, and Ms. Hooks was searched and deemed not to be a threat, those safety concerns were substantially diminished.  There was no evidence to indicate that Ms. Hooks was a suspect or flight risk, that she would interfere with the search, or that she would be unavailable for interview by GBI at some later date.  The justifications for detaining her absent any probable cause were simply non-existent.

* * * * *

I would hold that the two-hour detention of Ms. Hooks in cuffs, without probable cause to arrest her, with no ongoing search of the premises, and with no exigent circumstances, violated clearly established Fourth Amendment law. Accordingly, I would affirm the district court's denial of qualified immunity to Officer Vertin and Sheriff Harrell on Ms. Hooks' detention claim.

GRANT, Circuit Judge, concurring in part and dissenting in part:

I agree that Sergeant Vertin has qualified immunity for his detention of Teresa Hooks.  I also agree that the plaintiff has not met the "extremely rigorous" standard for holding Sheriff Harrell liable for the actions of his subordinates on any of the claims.  *Piazza v. Jefferson Cty.*, 923 F.3d 947, 957 (11th Cir. 2019) (citation omitted).  But I disagree with the majority's ruling denying qualified immunity to Sergeant Brewer for his search warrant application.  According to the majority, the search warrant here was not valid—indeed, was not even arguably valid—even though the warrant (1) was based on the testimony of a witness who voluntarily admitted to serious crimes in order to talk to police; (2) explained that the witness rifled through the cab of a pickup truck parked next to a house; (3) relayed that the witness found a large amount of methamphetamine and digital scales; (4) stated that the witness grabbed those items and stole another car along with two guns from the same property; (5) reported that the house belonged to a man who had previously been named as a drug dealer by an informant; (6) was prepared by an officer who checked with an assistant district attorney to confirm that his affidavit would establish probable cause for a search of the car owner's house; and (7) was approved by a magistrate judge.  That cannot be the rule.  Because of that disagreement, I respectfully concur in part and dissent in part.

\*     \*     \*

By the time he heard Rodney Garrett's unsolicited car-theft confession, Laurens County Sheriff's Office narcotics unit supervisor Christopher Brewer had heard from several sources over the years that David Hooks was trafficking in

methamphetamine. One of those sources was a meth dealer named Jeff Frazier. In an interview with narcotics officers in 2009, Frazier described Hooks as a smart, careful drug dealer who was jealous of his territory and a dangerous guy to cross. According to Frazier, Hooks dealt mostly in cocaine but also did some business in methamphetamine. Frazier said that he personally delivered over 100 grams of meth to Hooks about once a month.

Sgt. Brewer hoped that Frazier's information might be the lead he needed to get something solid on Hooks. He drove out to Hooks's house in an unsuccessful effort to make contact with him, and he and other narcotics officers lingered in the area from time to time hoping to see something suspicious or make an informative traffic stop. But they were never able to corroborate Frazier's information—until Garrett came along.

In the late summer of 2014, Sergeant Brewer learned that Garrett had turned himself in to Sergeant Brian Brooks, who was a family friend of the Garretts and who had known Rodney Garrett since he was a child. Garrett was addicted to methamphetamine and had turned to stealing to support his habit. He confessed to Sgt. Brooks that he had stolen a luxury SUV, two guns, and a "large amount of meth" from David Hooks's property.

Garrett said that he had been kicked out of the house where he had been staying and wandered onto the Hooks property looking for something to steal, stopping now and then to smoke meth along his way. At the end of a half-mile driveway, he saw two vehicles parked under the carport next to the house, a shed

32

about 50 yards from the house, and a Lincoln Aviator, conveniently parked in the dark near the shed.  The keys were in all three vehicles.

Garrett took two long guns from the shed and got into the Aviator.  He saw that the Aviator was low on gas, so he rifled through the cab of Hooks's pickup truck, looking for gas money.  He found some loose bills in the center console, as well as a neoprene bag shaped like a beer bottle.  The bag felt like it might contain paper money, so Garrett grabbed it, along with a set of digital scales that he found in the console under the bag, and took off in the Aviator.

When Garrett got to a gas station and opened the bag, he was startled to find that it was full of meth—about three or four thousand dollars' worth, he thought.  The rest of that night, and the next, Garrett hid out in the woods smoking some of the meth and trying to decide what to do.  His mind raced—he was certain that only a big-time drug dealer would have that much meth lying around in his car.  He considered selling the rest of it and getting out of town, but the only person he could think of who might buy it was his own drug source, and he couldn't trust that person to keep quiet.  He saw no easy way out.

Finally, Garrett decided that his best course was to turn himself in and hand the drugs over to the police.  He knew that between another vehicle theft a few days earlier and the theft of the Aviator and guns from the Hooks property he would get a stiff prison sentence.  But he feared the big-time drug dealer whose property he had stumbled upon, and he hoped that the police could protect him.  So he went home, and his mother called Sgt. Brooks, who was a family friend.  His confession followed.

When Sgt. Brewer heard Garrett's story, it added up.  Sgt. Brewer was familiar with David Hooks's house from the Frazier investigation, so he recognized the Hooks property from Garrett's description of the location and layout of the house, carport, and shed.  What's more, he knew that the guns and the Aviator had been stolen from Hooks just as Garrett claimed, because Hooks had reported the theft and provided a description of the guns and the VIN for the Aviator.  Sgt. Brewer had reason to believe Garrett when he said that the methamphetamine came from Hooks's other car, based on past reports of Hooks's drug trafficking from Frazier and others.  And to top it off, he had a meth addict who had been stealing to feed his habit but was willing to give up nearly a month's supply of the drug and go to jail out of fear for his safety.

Sgt. Brewer thought that he had enough to get a warrant to search Hooks's house.  But just to be sure, he called an assistant district attorney and asked his opinion.  The attorney thought that if Sgt. Brewer put Garrett's tip and all the corroborating information that he had in a search warrant application, it would be enough to find probable cause for the search.  So Sgt. Brewer prepared an affidavit relating Garrett's story and added some of the reasons that he found Garrett's story believable.

Given these facts, I have no doubt that "reasonable officers in the same circumstances and possessing the same knowledge" as Sgt. Brewer "could have believed that probable cause existed." *Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) (citation omitted).  And surely it was *at least arguably* enough for the magistrate to make the "practical, common-sense judgment" that there was a "fair

probability" of finding contraband or other evidence of criminal activity in David Hooks's house.  *Illinois v. Gates*, 462 U.S. 213, 238, 244 (1983).  That being so, the majority ought to have concluded that Sgt. Brewer is entitled to immunity from suit on any claim arising from his warrant application.  *Lowe*, 958 F.2d at 1570.  Instead, while paying lip service to the correct analytical framework, the majority begins its analysis with a clear factual error, continues by making too much of an irrelevant statement, and concludes by measuring its improperly truncated "new affidavit" against an artificially high legal standard.

The majority's first mistake is one of fact—Frazier *did* say that David Hooks was distributing methamphetamine, though not in so many words.  The majority wrongly declares that "Frazier never said as much," based on the deposition testimony of Corporal Tim Burris, who interviewed Frazier in 2009 and contemporaneously reported the content of the interviews to Sgt. Brewer.  It's true that Cpl. Burris testified in 2016 that he did not recall Frazier saying that David Hooks sold meth to "any third party."

The good news is that we are not forced to rely on Cpl. Burris's memory of the Frazier interviews—the record contains an audio recording that we can rely on instead.  And in that recorded interview, Frazier referred to both Hooks's "meth business" and his "coke business."  He also said that Hooks was angry because a nearby drug dealer was "moving a lot of dope" and "taking some of his business obviously."  And if that is not enough to show that Frazier revealed Hooks to be a drug dealer, Frazier also told Cpl. Burris that he was delivering about a quarter pound

of methamphetamine (roughly 113 grams) to Hooks every month. That's a lot of meth—so much that no one would seriously suggest that it could be for personal use.

Moreover, the inference that Hooks was redistributing the methamphetamine that he got from Frazier was not just a matter of common sense. In Georgia, as Sgt. Brewer was no doubt aware, anyone who possesses 28 grams or more of methamphetamine is guilty of trafficking—a more serious offense even than possession with intent to distribute. *See* O.C.G.A. § 16-13-31(e); *United States v. Madera-Madera*, 333 F.3d 1228, 1231–32 (11th Cir. 2003). So while Sgt. Brewer's statement in the warrant affidavit that Frazier said "that he had been the source of supply for multiple ounces of methamphetamine to Hooks which Hooks was redistributing" was a rough summary of Sgt. Brewer's take-away from the interviews rather than a direct quote, it was certainly "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). The majority's decision to discard Frazier's information in its probable cause analysis was wrong.

The majority also finds fault with Sgt. Brewer's affidavit statement that Garrett had confessed to "other criminal offenses" not related to the Hooks theft and "provided other information which led to the recovery of stolen property which law enforcement was unaware of prior to this confession." Yes, that statement was partially false—though Garrett had confessed to stealing another car and buying a stolen chainsaw, police learned of both of those thefts before talking to Garrett. But even if this partial misstatement was intentional or reckless (and it's not at all clear that it was either), it was not material to the analysis because probable cause would

not "be negated if the offending statement was removed." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).  Considering all the other information in Sgt. Brewer's affidavit, whether Garrett also confessed to previous petty crimes just didn't matter. *See O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001).

To put an even finer point on it, even if we were to make all the changes to the warrant that the majority suggests, the "new" search warrant affidavit would still establish (at least) arguable probable cause to search Hooks's home.  *See Paez*, 915 F.3d at 1288.  To begin, the majority seriously undervalues the information provided by Garrett, which formed the heart of Sgt. Brewer's probable cause showing.  If believed, Garrett's claim that he had discovered digital scales and a significant amount of methamphetamine in David Hooks's car—while the car was parked a few feet from Hooks's back door, in the middle of the night in rural Laurens County—was enough to "supply the authorizing magistrate with a reasonable basis for concluding that [he] might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'"  *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (citation omitted).

The majority complains that Sgt. Brewer lacked direct evidence that Hooks kept methamphetamine in his home.  But as we have said before, there "need not be an allegation that the illegal activity occurred at the location to be searched, for example the home," as long as the affidavit establishes "a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  *Id.* (citation omitted).  Sgt. Brewer made both connections here.

The affidavit explained that Sgt. Brewer was "familiar with" Hooks and his home from a prior investigation, meaning that he had personally driven to the Hooks home and was able to confirm that the house Garrett described belonged to David Hooks—thus establishing "a connection between the defendant and the residence to be searched." *Id.* And evidence that Hooks had 20 grams of methamphetamine— not an amount suitable for personal use—stashed right outside his house was enough to provide the required link to the house. *See United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence that a suspect possesses contraband of a type that he would normally be expected to hide in his home supports a finding of probable cause to search the home). "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained." *Kapordelis*, 569 F.3d at 1310 (citation omitted). The fact that Hooks had scales and a bag full of methamphetamine in his car raised a "fair probability" that he had drugs and related paraphernalia in his house too. *Gates*, 462 U.S. at 238.

The affidavit also contained enough information supporting Sgt. Brewer's belief in the truth of Garrett's statement about where he found the methamphetamine. Because the affidavit relied on hearsay from an informant, Sgt. Brewer was required to provide information from which the magistrate could evaluate the informant's credibility, including his "veracity" and "basis of knowledge." *Gates*, 462 U.S. at 230. This does not mean that Sgt. Brewer was required to vouch for Garrett's good character; Garrett, like many police informants,

was hardly a model citizen, and Sgt. Brewer did not try to cast him in that light in his affidavit.  Where an informant's background and character are questionable or unknown, his "veracity" can be established by showing that "corroboration through other sources of information reduced the chances of a reckless or prevaricating tale," and provided "a substantial basis for crediting the hearsay."  *Id.* at 244–45 (citation omitted).  And the informant's veracity and basis of knowledge are "closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."  *Id.* at 230.

Sgt. Brewer's affidavit described three circumstances supporting the reliability of Garrett's information.  *First*, in explaining how he got the methamphetamine, Garrett voluntarily confessed to stealing the Aviator and two guns, as well as the drugs and digital scales, from David Hooks's property.  The fact that Garrett was willing to risk significant criminal exposure (he was later sentenced to 10 years with 5 to serve in prison) tended to make his account of where he found the methamphetamine more believable.  Although the fact that an informant's statement is against his penal interests is not enough to establish probable cause standing alone, admissions "of crime, like admissions against proprietary interests, carry their own indicia of credibility" and provide at least some support for a finding of probable cause.  *United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion); *see United States v. Burston*, 159 F.3d 1328, 1334 (11th Cir. 1998).

Garrett also confessed that he often smoked a gram of meth a day, that he had been smoking meth on the night of the thefts, and that he was looking for something

39

to steal in order to support his habit when he entered Hooks's property. This confession, besides being yet another statement against Garrett's penal interests, gave Sgt. Brewer an additional reason to believe that Garrett had stumbled on the drug stash as he said. After all, where would Garrett have gotten the money to buy 20 grams of methamphetamine? And if he had traded stolen goods for the drugs after leaving the Hooks property, as the district court suggested, why would he have turned it over to law enforcement, rather than keeping it for his own use? In this context, Garrett's explanation—that he was alarmed by the amount of meth that he found and afraid for his safety once the owner discovered its theft—made sense. *See Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) ("internal coherence" of informant's story supported finding of probable cause).

*Second*, the fact that Garrett's knowledge was based on his personal observation supported the reliability of his information. *See United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999). Garrett claimed to have found the methamphetamine in David Hooks's car himself—and he had proof of his firsthand experience, because he still had the drugs, along with the Aviator and guns that he admitted to stealing at the same time. It would have been a different matter if Garrett claimed that he had stolen a car and some drugs from Hooks but could not produce either one.

*Third*, Sgt. Brewer provided information from a previous informant (Frazier) who had also claimed that David Hooks was involved with methamphetamine. To be sure, Frazier's information was stale and had not been corroborated before. But otherwise-uncorroborated allegations made by two informants in separate

statements can corroborate each other. *See United States v. Martin*, 615 F.2d 318, 326 (5th Cir. 1980).[1]  And stale information connecting a suspect with drug trafficking in the past can provide support for allegations of more recent drug activity. *See United States v. Magluta*, 198 F.3d 1265, 1272 (11th Cir. 1999), *vacated in part on other grounds on reh'g* 203 F.3d 1304, 1305 (11th Cir. 2000); *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994).

With all of this information corroborating Garrett's claim that he found 20 grams of methamphetamine in Hooks's car, Sgt. Brewer had plenty of facts to support the magistrate's finding of probable cause—more than he needed to preserve his qualified immunity from the plaintiff's civil claims.  To deny qualified immunity, we must conclude not only that the revised affidavit does not support a finding of probable cause, but also that "a reasonably well-trained officer" in the appellant's "position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986).  And "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341.  Sgt. Brewer had at least arguable probable cause to obtain the search warrant, and he should not be held personally liable for any damages arising from the execution of the warrant.

*      *      *

If this search warrant application doesn't satisfy the "arguable probable cause" standard, I almost don't know what would.  I therefore respectfully dissent

---

[1] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981).

to the majority's decision on the warrant, and join the remainder of the majority opinion.